Michael B. Solow
Fredric W. Yerman
Paul C. Llewellyn
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000

*Attorneys for Plaintiff*
*4Kids Entertainment, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : |
| | : |
| 4KIDS ENTERTAINMENT, INC., *et al.,*[1] | : |
| | : |
| Debtors | : |
| | : |
| TV TOKYO CORPORATION and NIHON | : |
| AD SYSTEMS, INC., | : |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : |
| 4KIDS ENTERTAINMENT, INC. | : |
| | : |
| Defendant and Counterclaim-Plaintiff | : |
| | : |
| v. | : |
| | : |
| ASATSU-DK INC., NIHON AD SYSTEMS, | : |
| INC., TELEVISION TOKYO CHANNEL 12, | : |
| LTD and TV TOKYO CORPORATION, | : |
| | : |
| Counterclaim-Defendants | : |

Chapter 11

Case No. 11-11607 (SCC)

(Jointly Administered)

Case No. 11-02225 (SCC)

**ANSWER AND COUNTERCLAIMS**
**OF 4KIDS ENTERTAINMENT, INC.**

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: 4Kids Entertainment, Inc. (1380); 4Kids Ad Sales, Inc. (6309); 4Kids Digital Games, Inc. (7645); 4Kids Entertainment Home Video, Inc. (0094); 4Kids Entertainment Licensing, Inc. (3342); 4Kids Entertainment Music, Inc. (6311); 4Kids Productions, Inc. (3593); 4Kids Technology, Inc. (8181); 4Kids Websites, Inc. (7563); 4Sight Licensing Solutions, Inc. (8897); The Summit Media Group, Inc. (2061); and World Martial Arts Productions, Inc. (8492).

1

## ANSWER

Plaintiff 4Kids Entertainment, Inc ("4Kids"), by and through its attorneys, for its answer to the Complaint, alleges as follows:

1.    Admits, on information and belief, the allegations of paragraph 1 of the Complaint.

2.    Admits, on information and belief, the allegations of paragraph 2 of the Complaint.

3.    Admits the allegations of paragraph 3 of the Complaint.

4.    Admits the allegations in the first sentence of paragraph 4 of the Complaint, and, with respect to the remaining allegations of paragraph 4, refers to its answers to the allegations of paragraphs 1, 2 and 3 of the Complaint.

5.    Admits the allegations of paragraph 5 of the Complaint.

6.    Admits on information and belief the allegations of paragraph 6 of the Complaint.

7.    Admits that effective April 18, 2001, 4Kids and plaintiffs[2] entered into an agreement (the "2001 Agreement") pursuant to which plaintiffs granted 4Kids certain rights with respect to the Yu-Gi-Oh! series, and refers to the 2001 Agreement for the contents thereof.

---

[2]    Although 4Kids' counterparties in the 2001 Agreement were plaintiff Nihon Ad Systems, Inc. ("NAS") and Television Tokyo Channel 12, Ltd., the Complaint asserts that the counterparties were NAS and TV Tokyo Corporation.  4Kids states on information and belief that TV Tokyo Corporation is the successor-in-interest to or the same entity as Television Tokyo Channel 12, Ltd., and responds to the remaining allegations in the Complaint based on the assumption that that TV Tokyo Corporation is the successor-in-interest to or the same entity as Television Tokyo Channel 12, Ltd.

60121921_3.DOCX

8.     Admits that pursuant to the 2001 Agreement, plaintiffs granted 4Kids certain exclusive rights with respect to the Yu-Gi-Oh! series, and refers to the 2001 Agreement for the contents thereof.

9.     Admits that in a written agreement effective July 1, 2008 (the "2008 Agreement"), the parties amended and restated the 2001 Agreement in an Amended and Restated Yu-Gi-Oh! Agreement for the reasons and purposes set forth in the 2008 Agreement, and refers to the 2008 Agreement for the contents thereof.

10.     Admits that the 2001 Agreement and 2008 Agreement granted plaintiffs certain rights to audit 4Kids' records, and refers to the agreements for the contents thereof.

11.     Denies knowledge or information sufficient to form a belief as to the allegations of paragraph 11 of the Complaint, except admits upon information and belief the allegations of the first sentence of paragraph 11.

12.     Denies the allegations of the last sentence of paragraph 12 of the Complaint, and admits upon information and belief the allegations of the first, second and third sentences of paragraph 12 of the Complaint.

13.     Denies the allegations of paragraph 13 of the Complaint except admits that plaintiffs sent a letter to Alfred Kahn, then the Chief Executive Officer of 4Kids, on June 17, 2010 concerning plaintiffs' audit of 4Kids, admits that 4Kids responded to this letter on June 28, 2010, and refers to the parties' written correspondence for the contents thereof.

14.     Denies the allegations of paragraph 14 of the Complaint except admits that plaintiffs' counsel sent a letter to 4Kids' general counsel, Samuel Newborn, on June 25, 2010 concerning plaintiffs' audit of 4Kids, admits that 4Kids responded in a letter dated June 29, 2010 in which 4Kids explained in detail why plaintiffs were incorrect with respect to many of

the audit issues they had raised and confirmed that 4Kids was eager to discuss and resolve plaintiffs' concerns; and further refers to the parties' written correspondence for the contents thereof.

15.     Admits the allegations of paragraph 15 of the Complaint except denies knowledge or information concerning the allegations that Mr. Elliott completed the first phase of the audit.

16.     Denies knowledge or information concerning the allegations of the first sentence of paragraph 16 of the Complaint, and further states that plaintiffs have never provided 4Kids with a copy of any audit report by Mr. Elliott.  Denies the allegations of the second sentence of paragraph 16 of the Complaint.  Admits that plaintiffs sent a letter to Mr. Kahn on December 20, 2010, and refers to that letter for the contents thereof.

17.     Admits on information and belief the allegations of paragraph 17 of the Complaint.

18.     Denies the allegations of paragraph 18 of the Complaint except admits that the parties' Agreements provided that plaintiffs would receive certain payments relating to the Yu-Gi-Oh! rights, and refers to the Agreements for the terms thereof.

19.     Denies the allegations of paragraph 19 of the Complaint except refers to the 2001 Agreement for the terms thereof.

20.     Denies the allegations of paragraph 20 of the Complaint except refers to the 2001 Agreement for the terms thereof.

21.     Denies the allegations of paragraph 21 of the Complaint except admits that the Agreements provide for certain rights with respect to home videos, and refers to the parties' Agreements for the terms thereof.

22.     Denies the allegations of paragraph 22 of the Complaint except refers to parties' Agreements for the terms thereof.

23.     Denies the allegations of paragraph 23 of the Complaint except refers to parties' Agreements for the terms thereof.

24.     Admits on information and belief the allegations of paragraph 24 of the Complaint.

25.     Admits the allegations of paragraph 25 of the Complaint.

26.     Denies the allegations of paragraph 26 of the Complaint, except admits that 4Kids entered into an agreement with Funimation dated as of March 1, 2002 and amended and restated that agreement as of July 1, 2003, and refers to those agreements for the terms thereof.

27.     Denies the allegations of paragraph 27 of the Complaint, except refers to the Funimation Distribution Agreement for the terms thereof.

28.     Denies the allegations of paragraph 28 of the Complaint, except refers to the Funimation Distribution Agreement for the terms thereof.

29.     Denies the allegations of paragraph 29 of the Complaint, except refers to the parties' correspondence for the contents thereof, and further states that 4Kids included 20% of the wholesale selling price charged for Yu-Gi-Oh! home video products in Gross Income as provided for in paragraph 1 of the 2001 Agreement.

30.     Denies the allegations of paragraph 30 of the Complaint.

31.     Denies the allegations of paragraph 31 of the Complaint, except admits that 4Kids entered into certain agreements with Funimation dated as of March 1, 2002 and amended and restated as of July 1, 2003, and refers to those agreements for the terms thereof.

32.     Denies the allegations of paragraph 32 of the Complaint, except refers to the Funimation Distribution Agreement and the Funimation Video Services Agreement for the terms thereof.

33.     Denies the allegations of paragraph 33 of the Complaint, except refers to the Funimation Distribution Agreement and the Funimation Video Services Agreement for the terms thereof.

34.     Denies the allegations of paragraph 34 of the Complaint, and refers to the Funimation Video Services Agreement for the terms thereof.

35.     Denies the allegations of paragraph 35 of the Complaint, except admits that 4Kids received approximately $3,934,000 in services fees from Funimation which 4Kids earned as a result of 4Kids being the YU-HI-OH! home video licensee itself pursuant to the 2001 Agreement and the 2008 Agreement.

36.     Denies the allegations of paragraph 36 of the Complaint.

37.     Denies the allegations of paragraph 37 of the Complaint, and refers to the Funimation Video Services Agreement for the terms thereof.

38.     Denies the allegations of paragraph 38 of the Complaint, and refers to the Funimation Distribution Agreement for the terms thereof.

39.     Denies the allegations of paragraph 39 of the Complaint, and refers to the 2001 Agreement and the 2008 Agreement for the terms thereof and to 4Kids' quarterly reports for the contents thereof.

40.     Denies the allegations of paragraph 40 of the Complaint, except denies knowledge or information sufficient to form a belief as to the understanding or thought processes of

plaintiffs' auditor, and further states that 4Kids provided plaintiffs' auditor with all documents and information to which the auditor was entitled.

41.     Denies the allegations of paragraph 41 of the Complaint, except admits that 4Kids entered into a distribution agreement with Majesco Sales Inc. dated as of April 1, 2004 (the "Majesco Distribution Agreement"), and refers to that agreement for the terms thereof.

42.     Denies the allegations of the first sentence of paragraph 42 of the Complaint, except refers to the Majesco Distribution Agreement for the terms thereof.  Denies the allegations of the second and third sentences of paragraph 42 of the Complaint, except admits that Majesco did not pay 4Kids more than $366,667 pursuant to the Majesco Distribution Agreement, and admits that 4Kids included this payment in Gross Income as provided for in the 2001 Agreement and paid one-half of that amount to plaintiffs pursuant to the 2001 Agreement.

43.     Denies the allegations of paragraph 43 of the Complaint, except admits that 4Kids entered into a services agreement with Majesco Sales Inc. dated as of April 1, 2004 (the "Majesco Services Agreement"), and refers to that agreement and the Majesco Distribution Agreement for the terms thereof.

44.     Denies the allegations of paragraph 44 of the Complaint, and refers to the Majesco Services Agreement for the terms thereof.

45.     Denies the allegations of paragraph 45 of the Complaint, and specifically denies that the Majesco Services Agreement generated any "Gross Income" within the meaning of the 2001 Agreement, and refers to the 2001 Agreement for the terms thereof.

46.     Denies the allegations of paragraph 46 of the Complaint.

47.     Denies the allegations of paragraph 47 of the Complaint, and refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

48.     Denies the allegations of paragraph 48 of the Complaint, and refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

49.     Denies the allegations of paragraph 49 of the Complaint, and refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

50.     Denies the allegations of paragraph 50 of the Complaint, except admits that between 2001 and 2009, 4Kids properly made deductions from plaintiffs' share of Gross Income to account for foreign withholding taxes paid by licensees as expressly permitted by the 2001 Agreement and the 2008 Agreement, and properly detailed such deductions on royalty statements to plaintiffs as required by the parties' agreements.

51.     Denies the allegations of paragraph 51 of the Complaint, except admits that 4Kids has diligently worked with plaintiffs to provide information requested by plaintiffs concerning foreign withholding taxes paid by international licensees, and further states that plaintiffs received certain foreign tax withholding certificates relating to deductions from plaintiff's share of Gross Income directly from various international licensees.

52.     Denies the allegations of paragraph 52 of the Complaint, except admits that 4Kids has diligently worked with plaintiffs to provide information requested by plaintiffs concerning foreign withholding taxes paid by licensees and has provided such information to plaintiffs and has provided sufficient evidence of foreign withholding taxes, and further states on information and belief that plaintiffs received, directly from various international licensees, many foreign tax withholding certificates relating to deductions from plaintiff's share of Gross Income.

60121921_3.DOCX

53.     Denies as immaterial the allegations of the first sentence of paragraph 53 of the Complaint, and states that to the extent that plaintiffs have requested additional information concerning foreign withholding taxes paid by licensees, 4Kids has diligently worked with plaintiffs to provide such information and has provided sufficient evidence of foreign withholding taxes.  Denies upon information and belief the allegations of the second sentence of paragraph 53 of the Complaint.  Further states on information and belief that plaintiffs received, directly from various international licensees, foreign tax withholding certificates relating to deductions of foreign withholding taxes from plaintiff's share of Gross Income.

54.     Denies the allegations of paragraph 54 of the Complaint.

55.     Admits the allegations of paragraph 55 of the Complaint and further states that 4Kids conducted the audits of its licensees with the knowledge and approval of plaintiffs and for the mutual benefit of plaintiffs and 4Kids, and that these audits generated approximately $750,000 in additional revenue for plaintiffs.

56.     Denies the allegations of paragraph 56 of the Complaint, and refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

57.     Admits on information and belief the allegations of paragraph 57 of the Complaint, and further states on information and belief that the $4,270.58 in bank charges at issue were the result of ordinary accounting oversights, that 4Kids has repeatedly agreed to repay the $4,270.58 in question to plaintiffs, that 4Kids has paid $1,000,000 to Licensor in good faith and without admitting liability to address this issue and any other audit claims asserted by Licensor, and, therefore, has adequately cured this minor accounting error.

58.     Admits the allegations of the first sentence of paragraph 58 of the Complaint. Denies the allegations of the second sentence of paragraph 58 of the Complaint, and refers to

9

the 2001 Agreement for the terms thereof. Denies the allegations of the third sentence of paragraph 58 of the Complaint, except admits that the parties have discussed the payment or sharing of expenses relating to YGO Style Guide Art.

59. Denies the allegations of paragraph 59 of the Complaint, except admits on information and belief that the $78,302.79 in YGO Style Guide Art were charged to plaintiffs as the result of ordinary accounting oversights. Further states that 4Kids paid plaintiff Nihon Ad Systems, Inc. the sum of $78,302.79 with respect to the YGO Style Guide Art and then inadvertently charged plaintiff Nihon Ad Systems, Inc. the full $78,302.79 rather than 50% of the $78, 302.79 or $39,151.40 as had been agreed to by the parties, that 4Kids has repeatedly agreed to divide those charges with plaintiffs as requested by plaintiffs, that 4Kids has paid $1,000,000 to Licensor in good faith and without admitting liability to address this issue and any other audit claims asserted by Licensor, and, therefore, has adequately cured this minor accounting error.

60. Admits the allegations of the first sentence of paragraph 60 of the Complaint. Denies the remaining allegations of paragraph 60 of the Complaint, except admits that plaintiffs have refused to cover 4Kids' costs to dub the Yu-Gi-Oh! GX-Ares series, and refers to the 2008 Agreement for the terms thereof.

61. Denies the allegations of paragraph 61 of the Complaint, except admits on information and belief that $3,443.69 in GX-Ares series dubbing costs were charged to plaintiffs as the result of an e-mail communication from plaintiffs. Further states that 4Kids has paid $1,000,000 to Licensor in good faith and without admitting liability to address this issue and any other audit claims asserted by Licensor, and, therefore, has adequately cured this minor accounting error.

62.    Denies the allegations of paragraph 62 of the Complaint, except refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

63.    Denies the allegations of paragraph 63 of the Complaint, except refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.

64.    Denies the allegations of paragraph 64 of the Complaint, except admits that between 2001 and 2009, 4Kids deducted from payments to plaintiffs $15,000 annually to cover costs of insurance as permitted by the parties' agreements, and admits that the percentage of insurance premiums charged to plaintiffs was well below the  percentage of 4Kids' total revenues attributable to Yu-Gi-Oh!.

65.    Denies the allegations of paragraph 65 of the Complaint, except admits that 4Kids' insurance policy covers a large number of inactive properties that have remained on the policy at the recommendation of 4Kids' insurance broker but that present little actual risk as compared to the active and widely disseminated Yu-Gi-Oh! series.

66.    Denies the allegations of paragraph 66 of the Complaint, insofar as the following Yu-Gi-Oh! Intellectual property were listed on the schedule of additional insureds as Productions covered by the errors and omissions insurance policy: Yu-Gi-Oh!, Yu-Gi-Oh! GX, Yu-Gi-Oh! The Movie, Yu-Gi-Oh! Capsule Monsters, Yu-Gi-Oh! The Movie Soundtrack, Yu-Gi-Oh! Music to Duel By, Yu-Gi-Oh! 5D's, and several Yu-Gi -Oh! websites.

67.    Denies the allegations of paragraph 67 of the Complaint.

68.    Admits the allegations of the first sentence of paragraph 68 of the Complaint. Denies the allegations of the second sentence of paragraph 68 of the Complaint, except refers to the 2001 Agreement and the 2008 Agreement for the terms thereof.  Denies the allegations of the third and fourth sentences of paragraph 68 of the Complaint, except admits that on or

about October 15, 2010, plaintiffs sent to 4Kids a so-called "assessment" of alleged material and courier costs incurred for the entire period of 2001 to September 2010 – in effect, a bill for these costs over the prior nine years – purportedly totaling $247,771.88, and based on a single currency exchange rate reflecting the single most favorable (to plaintiffs) exchange rate ever in effect during the previous nine years. Denies the allegations of the fourth sentence of paragraph 68 of the Complaint, except states that 4Kids agreed (despite the belated nature of plaintiffs' request with respect to most of these expenses) to reimburse plaintiffs for actual, documented expenses incurred by plaintiffs, at reasonable exchange rates in effect in each respective year when the materials were delivered; that 4Kids requested backup documentation for certain expenses claimed in the assessment; and that plaintiffs have failed to provide the requested documentation or to discuss reasonable exchange rates for these expenses; that 4Kids has paid $1,000,000 to Licensor in good faith and without admitting liability to address this issue and any other audit claims asserted by Licensor, and, therefore, has adequately cured any potential breach with respect to these expenses.

69. Denies the allegations of the first sentence of paragraph 69 of the Complaint, except refers to the 2001 Agreement and the 2008 Agreement for the terms thereof. Denies the allegations of the second and third sentences of paragraph 69 of the Complaint, except admits that the parties' letters dated June 25, 2010 and June 29, 2010 discussed, *inter alia*, the cost of plaintiffs' audit of 4Kids, and refers to those letter for the contents thereof. Denies the remaining allegations of paragraph 69 of the Complaint, except admits that plaintiffs' audit purported to find an underpayment by 4Kids in the amount set forth in the Complaint, denies that the audit's conclusions are correct, and states that any potential underpayment by 4Kids

related to modest accounting errors and minor disputes which total well under 5% of 4Kids' total payments to plaintiffs.

70.    Denies the allegations of paragraph 70 of the Complaint.

71.    Denies the allegations of paragraph 71 of the Complaint, except refers to the 2008 Agreement for the terms thereof, states that the 2008 Agreement provides that the $500,000 advance on royalties scheduled to be paid on July 1, 2009 shall be reduced by royalty payments to plaintiffs on or after July 1, 2008, and states that as a result of such royalty payments, no $500,000 payment was due to plaintiffs on July 1, 2009.

72.    Denies the allegations of paragraph 72 of the Complaint, except refers to the 2008 Agreement for the terms thereof, and further states that the fourth-quarter 2010 quarterly royalty report was delivered to plaintiffs on February 14, 2011.

73.    Denies the allegations of paragraph 73 of the Complaint, except refers to the August 18, 2009 letter agreement between NAS, The Cartoon Network, Inc. and 4Kids for the terms thereof.

74.    Denies the allegations of paragraph 74 of the Complaint, except states that 4Kids received the $200,000 payment from Playmates during the first quarter of 2011 and as provided in the 2008 Agreement, has applied plaintiff's share of such $200,000 payment against the credit balance in favor of 4Kids.

75.    Denies the allegations of paragraph 75 of the Complaint, except refers to the 2008 Agreement for the terms thereof.

76.    Denies the allegations of paragraph 76 of the Complaint, except refers to the plaintiffs' December 20, 2010 letter and the parties' subsequent correspondence for the contents thereof, admits that the parties engaged in discussions in February, 2011 (and March,

13

2011) in an effort to resolve their disagreements regarding the issues raised by plaintiffs' audit, states that 4Kids has cured any potential breaches of the parties agreements and remains willing to discuss with plaintiffs' any remaining concerns, and expressly denies that plaintiffs have provided 4Kids with any formal notice of the commencement of any cure period within the terms of the 2008 Agreement.

77. Denies the allegations of paragraph 77 of the Complaint, refers to plaintiffs' counsel's March 4, 2011 letter for the contents thereof, and specifically denies that receipt of that letter commenced any cure period within the terms of the 2008 Agreement.

78. Admits that allegations of paragraph 78 of the Complaint and further states that, in an effort to demonstrate its good faith in this matter and in order to rectify any legitimate underpayments identified by plaintiffs' audit, 4Kids, without waiving any defenses or other rights, paid $1,000,000 to plaintiffs.

79. Denies the allegations of paragraph 79 of the Complaint, except admits that the parties met on March 18, 2011 to discuss the disputed audit issues and admits that after meeting for approximately 6 hours, the parties' meeting did not resolve all outstanding issues.

80. Denies the allegations of paragraph 80 of the Complaint, and states that 4Kids has remained willing to discuss the audit issues with plaintiff and to address any legitimate underpayments identified by plaintiffs' audit.

81. Denies the allegations of paragraph 81 of the Complaint.

82. Denies the allegations of paragraph 82 of the Complaint.

83. Denies the allegations of paragraph 83 of the Complaint except admit that plaintiffs have purported to terminate the 2008 Agreement, and further states that such purported termination is improper and wrongful.

14

## FIRST CLAIM FOR RELIEF

84.     4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

85.     Admits the allegations of paragraph 85 of the Complaint.

86.     Denies the allegations of paragraph 86 of the Complaint.

87.     Denies the allegations of paragraph 87 of the Complaint.

88.     Denies the allegations of paragraph 88 of the Complaint.

## SECOND CLAIM FOR RELIEF

89.     4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

90.     States that paragraph 90 of the Complaint constitutes assertions of law to which no responsive pleading is required.

91.     Denies the allegations of paragraph 91 of the Complaint.

92.     Denies the allegations of paragraph 92 of the Complaint.

93.     Denies the allegations of paragraph 93 of the Complaint.

## THIRD CLAIM FOR RELIEF

94.     4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

95.     Admits the allegations of paragraph 95 of the Complaint.

96.     Denies the allegations of paragraph 96 of the Complaint.

97.     Denies the allegations of paragraph 97 of the Complaint.

98.     Denies the allegations of paragraph 98 of the Complaint.

## FOURTH CLAIM FOR RELIEF

99.  4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

100.  Denies the allegations of paragraph 100 of the Complaint.

101.  Denies the allegations of paragraph 101 of the Complaint.

102.  Denies the allegations of paragraph 102 of the Complaint.

103.  Denies the allegations of paragraph 103 of the Complaint.

104.  Denies the allegations of paragraph 104 of the Complaint.

105.  Denies the allegations of paragraph 105 of the Complaint.

<u>FIFTH CLAIM FOR RELIEF</u>

106.  4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

107.  Denies the allegations of paragraph 107 of the Complaint.

108.  Denies  the allegations of paragraph 108 of the Complaint, except admit that plaintiffs request the relief set forth therein.

<u>SIXTH CLAIM FOR RELIEF</u>

109.  4Kids repeats the allegations of paragraphs 1 to 83 of its Answer as if fully set forth herein.

110.  Denies the allegations of paragraph 110 of the Complaint, except refers to the 2008 Agreement for the contents thereof.

111.  Denies the allegations of paragraph 111 of the Complaint.

<u>**DEFENSES**</u>

By alleging the defenses set forth below, 4Kids does not assert or admit that it has the burden of proof and/or persuasion with respect to any of these defenses.

<u>FIRST DEFENSE</u>

The Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

<u>SECOND DEFENSE</u>

Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, waiver, and/or estoppel.

<u>THIRD DEFENSE</u>

Plaintiffs' claims are barred, in whole or in part, by unclean hands and by plaintiffs' own acts and omissions.

<u>FOURTH DEFENSE</u>

Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.

<u>FIFTH DEFENSE</u>

Plaintiffs' claims are barred, in whole or in part, by their failure to take appropriate steps to mitigate damages.

<u>SIXTH DEFENSE</u>

Plaintiffs' claims are barred, in whole or in part, to the extent that any damages purportedly suffered by plaintiffs were caused, in whole or in part, by their own unreasonable or culpable conduct.

<u>SEVENTH DEFENSE</u>

Any losses which may have been sustained by plaintiffs with respect to foreign tax withholding were caused, in whole or in part, by the fault, negligence, want of care and culpable conduct of plaintiffs and/or their agents and/or representatives and plaintiffs are, therefore, barred from any recovery against 4Kids.

EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of payment, accord and satisfaction.

NINTH DEFENSE

Plaintiffs have failed to plead fraud with the particularity required by Fed. R. Civ. P. 9(b).

TENTH DEFENSE

At all relevant times herein, 4Kids acted in good faith and in a commercially reasonable manner, and did not engage in any fraudulent or other culpable conduct.

4Kids reserves the right to assert additional defenses in the future and hereby gives notice that it intends to rely upon any additional defenses that become available during discovery or otherwise in this action.

**COUNTERCLAIMS**

Plaintiff 4Kids Entertainment, Inc ("4Kids"), by and through its attorneys, for its counterclaims against counterclaim-defendants (together, "ADK"), alleges as follows:

**NATURE AND BASIS OF THE ACTION**

112. These Counterclaims arise from ADK's attempted wrongful termination of an agreement between 4Kids and ADK concerning the licensing and distribution of the Yu-Gi-

18

Oh! television series and related merchandising and publishing rights in the United States, Europe and other countries.

113. Counterclaim-defendants created the Yu-Gi-Oh! series and, effective April 18, 2001, entered into a short form agreement with 4Kids (the "2001 Short Form Agreement") granting to 4Kids the exclusive merchandise licensing, television broadcast and home video right to the Yu-Gi-Oh! series throughout the world outside of Asia (the "4Kids Territory"). 4Kids and the counterclaim-defendants entered into a long form agreement which was negotiated by the parties in 2002 and signed by the parties in 2003. The long form agreement was dated as of April 18, 2001 (the "2001 Agreement") and contained the business terms set forth in the 2001 Short Form Agreement, certain additional terms negotiated and agreed upon by the parties during the course of the negotiation of the 2001 Agreement (including the compensation of the parties if 4Kids were to be the home video licensee) as well as such other provisions customarily contained in agreements of this type.

114. Since the 2001 Agreement was scheduled to expire on August 31, 2010, 4Kids approached the counterclaim-defendants in mid-2007 to negotiate an extension of the 2001 Agreement. Effective July 1, 2008, the parties entered into the Amended Restated Yu-Gi-Oh! Agreement (the "2008 Agreement" and, together with the 2001 Agreement, the "Agreements"), which continued and extended 4Kids' rights to distribute the Yu-Gi-Oh! series and related products throughout most of the world.

115. The 2008 Agreement is instructive with regard to the two largest audit claims, described in detail below, that have been asserted by the counterclaim-defendants. First, Paragraph 4(g) of the 2001 Agreement, relating to the obligation of 4Kids to provide "evidence of payment of such withholding tax on behalf of Licensor so that Licensor may claim an

19

appropriate tax credit or tax deduction," is repeated verbatim in the 2008 Agreement. During the negotiation of the 2008 Agreement, counterclaim-defendants sought no change in that wording and never indicated that they were having any difficulty claiming tax credits or tax deductions with respect to foreign withholding taxes.

116.  Second, Paragraph 1(b)(iii) of the 2001 Agreement, which provided that if 4Kids exercised the home video rights to the Yu-Gi-Oh! series and acted as the home video licensee, there would be a 20% royalty payable which would be split by 4Kids and the counterclaim-defendants 50/50, was renegotiated in connection with the 2008 Agreement. Thus, Paragraph 1(b)(iii) of the 2008 Agreement was revised to provide that if 4Kids exercised the home video rights to the Yu-Gi-Oh! series and acted as the home video licensee, the royalty would not be split 50-50 by the parties, but rather would be paid 100% to the counterclaim-defendants. ADK requested that it receive 100% of the royalty because ADK knew that 4Kids' home video subsidiary, 4Kids Entertainment Home Video, Inc. ("4Kids Home Video") was receiving revenue in its capacity as home video licensee. 4Kids could, therefore, relinquish its share of the royalty on home video sales where 4Kids Home Video was the home video licensee.

117.  The term of the 2008 Agreement is scheduled to run until 2018.  Because, in 2010, the Yu-Gi-Oh! property accounted for approximately 55% of 4Kids' annual licensing revenue, the 2008 Agreement is one of the most important assets of 4Kids. The term of the 2008 Agreement is extended automatically by one year for each new season of Yu-Gi-Oh! television episodes licensed by 4Kids from counterclaim-defendants pursuant to the option provision of the 2008 Agreement. The 2008 Agreement may, therefore, be extended after 2018 should the counterclaim-defendants produce more episodes and 4Kids exercise its option to license the rights to such episodes.

20

118.  In early 2010, counterclaim-defendants commenced an audit of 4Kids covering the 2001-2009 period. Since counterclaim-defendants are among the most important clients of 4Kids, 4Kids retrieved numerous boxes of books and records from storage in order to supply the auditor with information requested.

119.  According to paragraph 16 of the Complaint filed by counterclaim-defendants, the auditor for counterclaim-defendants rendered his "final confidential audit report" on November 17, 2010.  Although it is customary in the entertainment and licensing business for the party conducting the audit to deliver a copy of the audit report to the party being audited, to date, despite numerous requests by 4Kids, counterclaim-defendants have refused to provide 4Kids with a copy of the audit report.

120.  Commencing in June 2010, ADK began asserting audit claims which were not supported by the facts or by the 2001 or 2008 Agreements.  In addition, ADK has improperly characterized as "audit claims" (i) its failure to bill 4Kids for materials costs associated with the duplication and shipment of Yu-Gi-Oh! episodes to 4Kids , and (ii) its apparent failure to claim tax credits or tax deductions for some portion of the foreign withholding taxes deducted from ADK's share of the Yu-Gi-Oh! revenues. These claims are not "audit claims" since neither of these claims involves revenues received by 4Kids on behalf of ADK which 4Kids allegedly failed to properly disburse to ADK.

121.  Over the course of the audit, 4Kids provided the counterclaim-defendants with extensive information and documentation refuting substantially all of the audit claims. Despite such showing by 4Kids, ADK has refused to withdraw or even reduce the amount of any of its audit claims. Rather, the counterclaim-defendants, with full knowledge of the importance of the 2008 Yu-Gi-Oh! Agreement to 4Kids, have used the "audit claims," no matter how

tenuous, as a pretext to pressure 4Kids to renegotiate the business terms of the 2008 Agreement to the substantial detriment of 4Kids.

122. When 4Kids failed to bow to the pressure and cede its contractual rights to the new Yu-Gi-Oh! television series entitled "Zeal," ADK, in blatant disregard of the ten business day cure period in the 2008 Agreement, sent a notice of termination dated March 25, 2011 to 4Kids purporting to terminate the 2008 Agreement.

123. ADK's decision to send 4Kids a notice of termination rather than a notice of breach was all the more shocking in light of the conversations during the week of March 7 and the week of March 21 between counsel for 4Kids and counsel for ADK. During these conversations, counsel for 4Kids advised counsel for ADK that if counterclaim-defendants were to send 4Kids a notice of breach pursuant to Paragraph 12 of the 2008 Agreement, 4Kids would be forced to file a petition in bankruptcy under Chapter 11 within the ten business day cure period. In such event, counterclaim-defendants notice of breach would be stayed by the 4Kids bankruptcy filing. Counsel for counterclaim-defendants never advised counsel for 4Kids that in the view of counterclaim-defendants, a notice of breach had already been delivered to 4Kids and the ten business day cure period had elapsed. Rather, counsel for counterclaim-defendants agreed with the analysis put forward by counsel for 4Kids and requested that neither party take any precipitous action (in the case of 4Kids, filing for bankruptcy; in the case of counterclaim-defendants, sending a notice of breach) without further discussion.

124. ADK then elected to attempt to circumvent the ten business day cure period and the protections afforded by the Bankruptcy Code by sending on March 25, 2011 not a notice of breach but rather a notice of termination to purportedly terminate the 2008 Agreement based on the unsubstantiated audit claims.

22

125.  ADK's tactics have culminated in the wrongful termination of the 2008 Agreement premised on pretextual and baseless claims.  ADK's notice of termination intentionally and wrongfully ignored both (i) the notice requirements of Paragraph 12 of the 2008 Agreement and (ii) the fact that any amounts that 4Kids may owe to ADK on account of the "audit claims" are less than $2.1 million (the sum of the $1 million "good faith" payment made by 4Kids to ADK on March 17, 2011, and the $1.1 million credit balance in favor of 4Kids under the 2008 Agreement as of the March 25, 2011 date of the purported notice of termination.

126.  As a direct result of ADK's wrongful conduct, 4Kids filed a petition for bankruptcy in this Court on April 6, 2011 (the "Petition Date").

127.  ADK's reckless breach of contract has wrongfully driven 4Kids into bankruptcy and tortiously interfered with millions of dollars' worth of prospective deals for television broadcast rights, merchandise licensing rights and home video rights negotiated by 4Kids on behalf of the Yu-Gi-Oh! property as of the March 25, 2011 date of the purported notice of termination.  ADK's breach of contract has also tortiously interfered with the prospective merger of 4Kids with another company, Classic Media.  ADK's actions have destroyed 4Kids' hard-earned business reputation in the U.S. and Japan and damaged 4Kids' standing among its current and potential clients.  4Kids' efforts to sign new clients have ground to halt since licensors are reluctant to entrust rights to new properties to a company in bankruptcy accused of committing "fraud" against a longstanding client.

128.  These wrongful acts by ADK have threatened 4Kids with the loss of future Yu-Gi-Oh! revenue that over the next seven years of the term of the 2008 Agreement is expected to  exceed $30,000,000.  In addition, the wrongful acts of ADK have also caused severe

damage to the business reputation of 4Kids, resulted in lost revenue for 4Kids, interfered with 4Kids' prospective business opportunities and caused substantial additional damages, as set forth in greater detail below.

## THE PARTIES

129. 4Kids is a corporation organized under the laws of the State of New York, with its principal place of business in New York County.

130. On information and belief, counterclaim-defendant Asatsu-DK Inc. is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan.

131. On information and belief, counterclaim-defendant Nihon Ad Systems, Inc. is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan.

132. On information and belief, counterclaim-defendant Television Tokyo Channel 12, Ltd. is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan. On information and belief, counterclaim-defendant TV Tokyo Corporation is a corporation organized under the laws of Japan, with its principal place of business in Tokyo, Japan, and is the same entity as or the successor-in-interest to Television Tokyo Channel 12, Ltd.

## JURISDICTION AND VENUE

133. The Complaint was referred to the Bankruptcy Court pursuant to the Stipulated Order Referring Case to the Bankruptcy Court in Accordance with the Court's Standing Referral Order and 28 U.S.C. §§ 157 and 1334 [Doc. No. 1]. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28

24

U.S.C. § 157(b)(2). The Court also has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332.

134. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

135. By commencing the instant action, counterclaim-defendants have subjected themselves to personal jurisdiction and venue in this District.

136. Counterclaim-defendants regularly transact business in the State of New York. The causes of action set forth herein arise from such acts.

137. The Agreements involve the supply of goods and services in New York.

138. Counterclaim-defendants have engaged in continuous communications with 4Kids in New York to negotiate and carry out the Agreements, and have sent its executives, employees and agents to New York to attend frequent meetings with 4Kids in New York to discuss and carry out the Agreements.

139. Counterclaim-defendants entered into the Agreements to establish their presence in the United States, including New York.

140. At numerous times since 2001, counterclaim-defendants' agents and employees have visited 4Kids' New York offices.

141. Venue is properly placed in this Court pursuant 28 U.S.C. §1409 as well as 28 U.S.C. §§ 1391(a) and (c), and because the counterclaims asserted herein are compulsory counterclaims under Fed. R. Civ. P. 13.

142. Venue is properly placed in this District because 4Kids' counterclaims are compulsory counterclaims to the claims asserted in the Complaint.

143.  An actual and justiciable controversy exists between the parties with respect to the rights of the parties under the 2001 Agreement and the 2008 Agreement.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**4Kids and its Yu-Gi-Oh! Agreements and Business**

144.  4Kids is a children's entertainment company that produces children's television programming and licenses merchandise that relates to such programming, including, for example, home videos, toys, and trading cards.

145.  Plaintiffs are Japanese companies that together own the rights to several series of animated television programs entitled Yu-Gi-Oh!, Yu-Gi-Oh! GX, Yu-Gi-Oh! 5D's and Yu-Gi-Oh! Zeal (together, "Yu-Gi-Oh!"), which are children's television series originally broadcast in Japan.

146.  Since 2001, 4Kids has been the exclusive licensee in the United States, Europe and elsewhere outside of Asia of the Yu-Gi-Oh! television series and related rights, including television broadcast rights, home video rights, certain merchandising rights, publishing rights and promotion rights, as well as options for additional episodes.

147.  Prior to 4Kids' licensing of Yu-Gi-Oh!, the series was virtually unknown in the U.S. and Europe.  Beginning in 2001, however, 4Kids began licensing the television broadcast rights to Yu-Gi-Oh! in the U.S. and Europe pursuant to a license from ADK.  4Kids was an attractive partner for ADK because 4Kids had previously been responsible for the hugely successful introduction in the U.S. and Europe of the immensely popular Pokémon Japanese television series resulting in billions of dollars of revenue for the Pokémon licensors.

148.  On April 18, 2001, the counterclaim-defendants entered into a short form agreement with 4Kids (the "2001 Short Form Agreement") granting to 4Kids the exclusive

26

merchandise licensing, television broadcast and home video right to the Yu-Gi-Oh! series throughout the world outside of Asia (the "4Kids Territory"). 4Kids and the counterclaim-defendants entered into a long form agreement which was negotiated by the parties in 2002 and signed by the parties in 2003. The long form agreement was dated as of April 18, 2001 (the "2001 Agreement") and contained the business terms set forth in the 2001 Short Form Agreement, certain additional terms negotiated and agreed upon by the parties during the course of the negotiation of the 2001 Agreement (including the compensation of the parties if 4Kids were to be the home video licensee) as well as such other provisions customarily contained in agreements of this type.

149.  The 2001 Agreement granted 4Kids, among other rights, the exclusive television broadcast rights, home video rights and merchandising rights to Yu-Gi-Oh! in the 4Kids Territory, with the exception of videogame and trading card rights that were granted to ADK's licensee Konami Corporation ("Konami").  The 2001 Agreement also gave 4Kids the option to license additional episodes of Yu-Gi-Oh! as well as other rights set forth therein.  Pursuant to a separate agreement between 4Kids and Konami Corporation dated as of August 1, 2001, Konami is obligated to pay 4Kids a marketing fee equal to a portion of Konami's wholesale selling price for Yu-Gi-Oh! videogames and trading cards in the 4Kids Territory.

150.  Among other things, the 2001 Agreement required 4Kids to secure a television broadcast commitment for Yu-Gi-Oh! in the United States, to pay to ADK half of 4Kids' Gross Income as defined in the agreement from exploitation of the Yu-Gi-Oh! rights in the 4Kids Territory, and to guarantee ADK certain minimum royalties on merchandising rights.

151.  Since launching the Yu-Gi-Oh! series in the U.S. in 2001 and in Europe in 2002, 4Kids' considerable efforts and expenditures in the U.S. and internationally have transformed

the Yu-Gi-Oh! property into one of the most popular children's entertainment brands and properties in the 4Kids Territory.

152.  4Kids produces the English language adaptation of each episode of the Yu-Gi-Oh! series. It is the 4Kids-produced English language version which is broadcast in the United States and is ultimately licensed to television broadcasters throughout the 4Kids Territory. The 4Kids English language adaptation transforms the Japanese version of the Yu-Gi-Oh! series into programs that comply with the more restrictive broadcast standards and practices applicable to children's programming in the U.S. and the rest of the 4Kids Territory.  4Kids has adapted and translated over 500 Yu-Gi-Oh! episodes for broadcast in the United States and elsewhere.

153.  Beginning in 2001, 4Kids licensed the U.S. television broadcast rights to the Yu-Gi-Oh! series to the Warner Bros. Television Network ("KidsWB!") and the Cartoon Network. In addition, upon expiration of the agreement with KidsWB!, 4Kids broadcast the Yu-Gi-Oh! series on the 4Kids-controlled Saturday morning television blocks first on the Fox Broadcast Network ("Fox") which 4Kids programmed until the expiration of the agreement with Fox on December 31, 2009, and currently on The CW Network.  During the current 2010-2011 broadcast season, 4Kids is broadcasting 1.5 hours of Yu-Gi-Oh! television programming per week on The CW Network.  4Kids has also licensed television broadcast rights to the Yu-Gi-Oh! series to broadcasters throughout the rest of the 4Kids Territory, which has resulted in the Yu-Gi-Oh! series becoming extremely popular. 4Kids has also licensed home video rights to the Yu-Gi-Oh! series to home video licensees outside the United States.

154.  4Kids has licensed major toy manufacturers such as Mattel to use Yu-Gi-Oh! properties on toy products, has engaged in extensive and costly marketing of Yu-Gi-Oh!, and

through 4Kids Entertainment Home Video, Inc. ("4Kids Home Video"), produced, marketed and secured distribution in the United States for over sixty Yu-Gi-Oh! home video products.

155. During the 2001-2011 period, licensees of Yu-Gi-Oh! merchandising rights in the U.S. and Europe have sold hundreds of millions of dollars of Yu-Gi-Oh-related merchandise. The Yu-Gi-Oh! trading cards sold by Konami in the 4Kids Territory, sales of which are closely related to the success of the Yu-Gi-Oh! television series, are the best-selling children's trading cards ever.

156. These stellar results have involved significant staffing and investment commitments by 4Kids over the years. 4Kids has invested millions of dollars in Yu-Gi-Oh! related promotional materials and marketing expenses. In addition, in order to incentivize KidsWB! to telecast the Yu-Gi-Oh! series, the agreement between 4Kids and The WB Television Network entered into in June, 2001 provided for 4Kids to pay KidsWB! varying percentages (10% – 20%) of 4Kids' share of Yu-Gi-Oh! related merchandise licensing revenue and television broadcast revenue derived from the US and the rest of the 4Kids Territory. Over the course of the television broadcast agreement with KidsWB! and its affiliated company, The Cartoon Network, 4Kids has paid over $12 million to Warner Bros. owned entities to secure the continued television broadcast of the Yu-Gi-Oh! series in the U.S. during the critical early years of the series in the U.S.

157. These successful efforts by 4Kids have generated substantial revenues for ADK, in the range of $150 million over the course of last ten years in the 4Kids Territory.

158. The Yu-Gi-Oh! license and resulting revenue form a critical and central part of 4Kids' business, and many of 4Kids' employees are primarily involved in the ongoing adaptation and distribution of the Yu-Gi-Oh! series and related licensing and marketing efforts.

During 2009 and 2010, Yu-Gi-Oh! represented a substantial share of 4Kids' annual revenue, in the range of 40%.

159. In mid-2007, the parties began discussing an extension of the 2001 Agreement, which was scheduled to expire on August 31, 2010.

160. The discussions that began in 2007 culminated in the Amended and Restated Yu-Gi-Oh! Agreement dated as of July 1, 2008 (the "2008 Agreement"). Among other things, the 2008 Agreement confirmed 4Kids' existing licensed rights, added the Yu-Gi-Oh! 5Ds series to the agreement, clarified that the 4Kids option to license new episodes applied to any new "spinoff" series, and modified various other terms of the license, including the royalty to be paid to ADK on home videos released by 4Kids Home Video. In addition, the 2008 Agreement extended the term of the Yu-Gi-Oh! license to 2015 and provided for additional extensions in the event that 4Kids exercised certain options under the agreement to license the rights to additional seasons of Yu-Gi-Oh! television episodes. As a result of options that 4Kids has exercised, the term of the 2008 Agreement is currently due to end in 2018.

161. As noted earlier, the 2008 Agreement did not change the provision of the 2001 Agreement relating to the obligation of 4Kids to provide counterclaim-defendants with evidence of foreign withholding taxes so that counterclaim-defendants could apply for tax credits or tax deductions. Indeed, during the one-year period when the 2008 Agreement was being negotiated, ADK never once discussed any alleged problems ADK had or was then having claiming tax credits or tax deductions with respect to foreign withholding taxes.

162. Paragraph 1(b)(iii) of the 2001 Agreement was renegotiated so that the 2008 Agreement provided for counterclaim-defendants and 4Kids to negotiate in good faith the precise amount of the home-video royalty (between 15% and 20%) in the event that 4Kids

acted as the home video licensee, in contrast to the 2001 Agreement which provided for a 20% royalty. More importantly, Paragraph 1(b)(iii) was modified in the 2008 Agreement to provide that 100% of the home-video royalty would be paid to counterclaim-defendants on sales of home videos released by 4Kids Home Video as the home video licensee rather than the 50% – 50% split of the home-video royalty provided for in the 2001 Agreement. Counterclaim-defendants asked for 100% of the home-video royalty when 4Kids acted as the home video licensee because counterclaim-defendants knew that the 4Kids home video subsidiary, 4Kids Home Video, received additional revenue in its capacity as the licensee of the home video rights to the first two Yu-Gi-Oh! series.

163. During the 2002-2008 time period, 4Kids Home Video submitted to ADK for review and approval dozens of pieces of artwork and copy to be used on the covers, inner panels, labels and point-of-sale materials for the 4Kids Home Video releases of Yu-Gi-Oh! home videos in various formats, including VHS and DVD. ADK reviewed each piece of artwork, submitted comments where necessary and rendered final approval on any home video artwork which had been modified to reflect ADK's comments.

164. During the 2002-2008 time period, 4Kids Home Video submitted to ADK for review and approval various TV commercials, print advertisements, web advertisements, press releases and promotional and marketing materials to be used by 4Kids Home Video to advertise and promote the 4Kids Home Video releases of Yu-Gi-Oh! home videos.

165. During the 2002-2008 time period, 4Kids Home Video submitted to ADK for review and approval various DVD extras (i.e., additional scenes, Yu-Gi-Oh! trading card tips, music videos and other content) produced by 4Kids and included in the 4Kids Home Video

DVD releases of Yu-Gi-Oh! home videos to provide consumers with additional materials to encourage the purchase of the Yu-Gi-Oh! home videos.

166.  Each of the dozens of approval forms submitted to ADK in connection with the US Yu-Gi-Oh! home-video releases clearly and conspicuously noted that the 4Kids Home Video was the licensee. Each of the covers and packaging for the US Yu-Gi-Oh! home-video releases indicated that 4Kids Home Video was the home video company.

**ADK's Pretextual Audit Claims and Efforts to
Deprive 4Kids of its Valuable Licensed Rights**

167.  In early 2010 ADK began an audit of 4Kids' Yu-Gi-Oh! records.  Even though the ADK royalty audit started during the hectic period when the 4Kids outside auditor, EisnerAmper, was conducting its annual audit and the 4Kids Accounting Department was engaged in helping prepare the 4Kids Annual Report on Form 10-K, 4Kids provided the ADK auditor with substantially all of the documents that he requested.

168.  On April 30, 2010, ADK sent a letter to 4Kids Chairman and Chief Executive Officer, Alfred R Kahn, complaining that the ADK auditor was not provided with certain information that had been requested.  In fact, the April 30, 2010 letter was completely inaccurate in that the information that had been requested had been e-mailed to the ADK auditor.  However, the attachments to the e-mail had not been opened by the ADK auditor so he did not realize that he actually had the information in his possession that he had requested.

169.  During May, 2010, ADK had relayed to 4Kids a number of complaints made by the ADK auditor regarding the information he was receiving.  Again, 4Kids advised ADK that the ADK auditor was asking for backup documentation on minor expenses that had been incurred by 4Kids many years ago.  4Kids explained to ADK that most audit protocols involve

reviewing the Cash Receipts Journal, the royalty statements from major licensees and testing of expenses – audit protocols that the ADK auditor was for the most part ignoring.

170.  In early June 2010, the ADK auditor requested copies of agreements and royalty reports which contained financial information relating to 4Kids clients other than ADK.  It was explained to the auditor that 4Kids had a duty of confidentiality to its clients and would not be able to provide the ADK auditor with financial information relating to other 4Kids clients. However, 4Kids offered to provide the ADK auditor with a redacted copy of the financial information which should have sufficed to provide the auditor with the information he was seeking.

171.  During the first week of June, 2010, the ADK auditor requested copies of various agreements with Funimation, Inc., the company that served as the distributor for 4Kids Home Video, and Mattel with regard to the "Juice Box," a handheld video player jointly developed by 4Kids, Belvedere Productions and Mattel during 2004.

172.  In view of the communications problems previously experienced with the ADK auditor, 4Kids advised the ADK auditor that since 4Kids and ADK were planning to meet at the Licensing Show in Las Vegas the following Monday and Tuesday, June 7 and June 8, 2010, 4Kids would provide copies of the agreements which the ADK auditor had requested directly to ADK.  In addition, 4Kids would provide the background information directly to ADK rather than provide the information to the ADK auditor and run the risk of such information not being properly transmitted to ADK.

173.  4Kids and ADK met on June 8, 2010 at the Licensing Show.  During the meeting ADK was provided with copies of the various agreements that the ADK auditor had requested,

including agreements between 4Kids and Funimation. In addition, these agreements were e-mailed to the ADK auditor during the following week.

174. On June 17, 2010, Mr. Hosaka of ADK sent a letter to Mr. Kahn raising various issues regarding the Funimation agreements and requesting that 4Kids sign a "tolling agreement." Mr. Hosaka concluded his letter with the following:

> "Finally, in order to give us time to discuss these issues, I ask that you sign the enclosed tolling agreement. This agreement will be in existence for only a few months and I'm advised by Mr. Elliott and counsel that will give Mr. Elliott time to complete his audit and allow us time to informally discuss and explore the issues raised by the audit. Given the short nature of the tolling agreement, please sign and return it promptly."

175. On June 25, 2010, counsel for ADK sent a letter to Samuel R. Newborn, the General Counsel of 4Kids, raising some of the issues raised in the June 17, 2010 letter from Mr. Hosaka as well as certain additional issues allegedly uncovered by the initial phase of the ADK audit. The June 25, 2010 letter stated that "ADK hereby demands that 4Kids either promptly repay it for these underpayments or explain why repayment is not required." The letter closes with the following paragraph:

> "I understand that my client previously raised some of these issues with you in a letter date [sic] June 17, 2010 which 4Kids has not yet responded to. I would ask that you reply to this letter by the close of business on June 29, 2010. In the interest of resolving this matter amicably, I also ask that you agree to the attached tolling agreement in order to give the parties time to discuss the issues. I look forward to your prompt response and to working with you to resolve this matter. This letter is without waiver to any and all of ADK's rights, arguments and claims, including but not limited to its audit rights for the rest of the world (non-U.S.) royalties, all of which are expressly reserved."

176. On June 28, 2010, Mr. Kahn replied to Mr. Hosaka's letter of June 17, 2010, addressing the issues raised therein and correcting the inaccuracies contained in the June 17 letter. On June 28, 2010, Mr. Newborn replied to the June 25 letter from counsel for

counterclaim-defendants addressing the issues and correcting the inaccuracies contained in the June 25 letter. On June 30, 2010, the parties also executed a tolling agreement.

177. Throughout this period, ADK assured 4Kids that it was seeking to resolve the audit claims issues amicably. Both the June 17, 2010 letter from Mr. Hosaka and the June 25, 2010 letter from counsel for ADK also created the impression that the parties would seek to resolve the issues in a businesslike manner.

178. On July 24, 2010, the parties met at the San Diego comic book convention known as Comicon to discuss the various ADK audit claims. On August 18, 2010, Mr. Newborn met with counsel for ADK to discuss the various ADK audit claims. Prior to these two meetings, 4Kids provided ADK and its counsel with various additional documents supporting 4Kids' contentions that the overwhelming majority of the audit claims were without foundation. After the August 18, 2010 meeting, ADK's counsel stated that the ADK auditor would be returning to the 4Kids offices in the next few weeks to complete the audit and that the parties would discuss the audit claims further after the audit was completed.

179. During the fall of 2010, there were no further discussions between ADK and 4Kids with respect to the audit. Rather, ADK and 4Kids were focused predominantly on marketing and promotional initiatives for the upcoming 10th anniversary of Yu-Gi-Oh! to be celebrated in 2011, the negotiation of a separate agreement between 4Kids and ADK with respect to the production of the English language adaptation and distribution of the Yu-Gi-Oh! 3-D movie which had been produced by ADK, and the efforts made by 4Kids to obtain a theatrical distributor in the US and Europe for the Yu-Gi-Oh! 3-D movie.

180. On December 20, 2010, ADK sent a letter notifying 4Kids that the audit was complete and setting out nine audit "findings" relating to alleged withheld payments owed to

ADK.  The letter raised many of the same issues as the June letters. However, many of the claim amounts set forth in the June 25, 2010 letter were changed in the December 20, 2010 letter.  For example: the $366,000 of materials costs set forth in the June 25, 2010 letter were reduced to $247,771.88 in the December 20, 2010 letter; the claim for $2,431,788.10 in additional US home video royalties contained in the June 25, 2010 letter was dropped from the December 20, 2010 letter.  The $12,000 claim for improper bank charges in the June 25, 2010 letter was reduced $4,270.58 in the December 20, 2010 letter.

181.  In the December 20, 2010 letter, ADK alleged it was owed $4,819,354.63 on the basis of its nine audit findings.  Significantly, however, the vast majority (89.7%) of this amount allegedly due and owing to ADK - the sum of $4,324,433.66 - consisted of amounts allegedly due and owing under Findings 1 and 2, relating to home video revenue in the claimed amount of $2,058,666.50, and Finding 3 relating to international withholding taxes in a claimed amount of  $2,265,767.16.  The balance of the claims totaled $494,920.97.  The total of each purported audit claim "finding" is as follows:

- Finding 1 (home video revenue) - $1,967,000

- Finding 2 (home video revenue) - $91,666.50

- Finding 3 (international withholding taxes) - $2,265,767.16

- Finding 4 – (home video royalties under 2008 Agreement) - $26,894.27

- Finding 5 - $105,111.20

- Finding 6 - $67,328.45

- Finding 7 - (bank charges) - $4,270.58

- Finding 8 - (style guide art and dubbing fees) - $43,544.59

36

- Finding 9 - (material and courier costs) - $247,771.88

182. The December 20, 2010 letter concluded with the following paragraphs:

**The November 30, 2010 Payment**

On October 15, 2010, ADK and 4Kids agreed to amend the 2008 YGO Licensing Agreement ("2010 Amendment") to include 4Kids' purchase of the remaining season one, two and three episodes for the YGO 5D's series. Under that amendment, 4Kids was obligated to pay ADK $287,500 by November 30, 2010. ADK has not received this payment. As a result, we now insist that you make this payment or you are in breach of the YGO Licensing Agreement.

Because the total underpayment found by Mr. Eliot of $4,819.354.63 exceeds the 5% threshold established in paragraph 4(f) of the YGO Licensing Agreements, 4Kids is now obligated to reimburse ADK for the cost of Mr. Elliot's services in conducting the audit.

 Given that phase one of the audit is now complete, in accordance with paragraph 4(f) of the YGO Licensing Agreement, I insist that within 10 business days 4Kids pay ADK $4,819.354.63 to cover the full underpayment found by Mr. Elliot plus $287,500 to cover the missing payment under the 2010 Amendment. If we do not receive this payment by December 14, 2010, we will refer this matter to outside counsel to enforce our rights. If you have any questions, or would like to discuss payment terms, please feel free to contact me.

183. The concluding paragraphs of the December 20, 2010 were confusing to say the least. 4Kids had timely made the November 30, 2010 payment alluded to and in response to an e-mail from ADK on the evening of November 30, 2010 asking about the November 30, 2010 payment, 4Kids had sent ADK an e-mail response on December 1, 2010 attached to which was the bank wire transfer receipt evidencing a timely payment of the $287,500.  In addition, the final paragraph of the December 20, 2010 letter states that 4Kids must make payment of the audit findings, the auditors fee and the $287,500 by December 14, 2010, which was six days prior to the date of the December 20, 2010 letter.

184. ADK has asserted that a second letter dated December 20, 2010 was sent to 4Kids by ADK at some unspecified time, which supposedly corrected some of the inaccuracies in the

December 20, 2010 letter. However, to date, 4Kids has been unable to locate a copy of or confirm receipt of the alleged corrected version of the December 20, 2010. In addition, to date, 4Kids has not been able to locate any record of a communication from ADK explaining that the alleged "first version" of the December 20, 2010 letter was sent in error and was to be replaced by a corrected version of the December 20, 2010 letter.

185. In any event, the alleged "second version" of the December 20, 2010 letter also does not state that 4Kids is in breach of the 2008 Agreement.

186. Despite asserting that 4Kids owed it nearly $5 million pursuant to its audit of 4Kids, and despite 4Kids' repeated requests to see the auditor's report, at no time during the parties' discussions or prior to ADK's wrongful termination of the 2008 Agreement on March 25, 2011 did ADK provide 4Kids with a copy of ADK's auditor's report. To date, 4Kids has not been given access to the audit report that allegedly sets forth the nine so-called "findings."

187. ADK is flatly wrong in asserting that 4Kids owes it any money relating to home video revenues (Findings 1 and 2) or international withholding taxes (Finding 3). As for the balance of the findings, there is simply no merit to such claims, they involve small amounts due to inadvertent accounting errors incurred in the course of 4Kids remitting to Licensor over $75 million in revenue, or they concern items for which 4Kids has repeatedly sought backup information in order to evaluate the merit of ADK's claims.

188. In particular, on December 29, 2010, 4Kids sent three letters to ADK disputing the findings in ADK's December 20 letter. The first letter addressed Finding 3 related to international withholding taxes. The second letter addressed Findings 1, 2, and 4 related to home video revenues. The third letter addressed the other findings. These letters set out in detail why the vast majority of ADK's audit claims are without merit.

38

189.  As set forth more fully below, each of the nine audit "findings" asserted by ADK is either without merit, or, in the case of some smaller amounts, has been addressed by 4Kids. In addition, a substantial portion of the disputed amounts arose over six years ago and, accordingly, are barred by the statute of limitations.

### *ADK's Home Video Revenue Audit Claims are Without Merit*

190.  ADK's audit Finding 1 claimed that 4Kids failed to split $3,934,000 of revenue with ADK from a 4Kids home video service agreement with Funimation Productions, Ltd. ("Funimation").  ADK claimed an underpayment of one half of $3,934,000, or approximately $1,967,000.  This ADK audit claim ignores the express language negotiated by the parties and included in the 2001 Agreement to address the compensation due to ADK if 4Kids exploited the Yu-Gi-Oh! home video rights as the home video licensee.

191.  On April 18, 2001, 4Kids and ADK entered into a five page 2001 Short Form Agreement which granted 4Kids "the right to exploit or license (i) the television broadcast rights on all forms of television, cable and satellite and (ii) all forms of home video rights, including pay-per-view, DVD, video on demand, to the Episodes of the Series set forth above and to any Additional Episodes of the Series as to which Licensee has exercised its option. The 2001 Short Form Agreement, however, did not address the compensation of the parties in the event that 4Kids chose to exploit itself rather than license the home video rights to the Yu-Gi-Oh! Series. Paragraph 12 of the 2001 Short Form Agreement stated that 4Kids shall pay Licensor 50% of the Series Net Income which is defined as the Gross Receipts received from the license (emphasis supplied) of the Broadcast Rights, Home Video Rights and Merchandising Rights to the Series. The definition of Series Net Income contained in the 2001 Short Form Agreement did not cover the compensation of the parties if 4Kids does not license

39

certain Broadcast Rights, Home Video Rights or Merchandising Rights but rather elects to exploit such rights as the licensee.

192. ADK and 4Kids met on June 10, 2002 at the offices of 4Kids to discuss various issues relating to the 2001 Agreement, including the compensation of the parties if 4Kids acted as the U.S. home video licensee. At that meeting, ADK agreed that 4Kids Home Video could act as the home video licensee in the U.S. should it wish to do so, and thereby receive additional revenue that a licensee would otherwise collect, as long as ADK received the same share of the royalty that it would have received had 4Kids licensed US home video rights to the Yu-Gi-Oh! television episodes to a third party licensee. The market home video royalty rate at that time was 20% of the wholesale price of home video units.

193. The draft of the 2001 Agreement sent to ADK on June 3, 2002 for review prior to the June 10, 2002 meeting provided that consistent with the 2001 Short Form Agreement, 4Kids had the right to *exploit itself* the home video rights, or to license such rights to a third party:

> (b) Home Video Rights.     (i) Licensor also grants to 4Kids during the Term and in the Territory the exclusive Home Video Rights to the Episodes and to any Additional Episodes. 4Kids shall have the right during the Term and in the Territory to <u>exploit or license to third parties the right to exploit</u> Home Video Rights to the Episodes and to any additional Episodes. (2001 Agreement, at ¶ 1(b)(i)) (emphasis added).

194. The draft of the 2001 Agreement sent to ADK on June 19, 2002 after the June 10, 2002 meeting contained the following additional provision reflecting the agreement by the parties at the June 10, 2002 meeting:

> (iii) If 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty of twenty percent (20%) of the wholesale selling price charged for the Home Video Devices. Such

royalty payment shall be part of Gross Income and shall be divided among the parties as provided below in Paragraph 4. (2001 Agreement, at ¶ 1(b)(iii)).[3]

195. Thus, if 4Kids exploits the home video rights to the Yu-Gi-Oh! television episodes itself, 20% of the wholesale selling price of the home videos is counted as Gross Income which is split between the parties. This new paragraph 1(b)(iii) was inserted into the draft 2001 Agreement for the first time in the June 19, 2002 draft that was prepared as a result of the negotiations between the parties at the June 10, 2002 meeting. This new paragraph 1(b)(iii) was underlined in bold in the redlined version of the draft 2001 Agreement sent to ADK on June 19, 2002 and again on July 17, 2002. This paragraph 1(b)(iii) was never commented on, objected to, disputed or revised by ADK or its counsel and is contained in the executed copy of the 2001 Agreement which was signed by the parties in 2003.

196. Simply put, if 4Kids acts as the home video licensee and exploits the home video rights itself, the 2001 Agreement expressly provides that only the 20% of the wholesale selling price of the home videos is counted as Gross Income which is split between the parties. The 2001 Agreement further provides that if 4Kids were to license the home video rights to a third party and not exploit them itself, then the royalties received from the licensee would be treated as Gross Income and split between the parties. *See* 2001 Agreement, ¶ 4.

197. 4Kids chose to exploit the home video rights itself as permitted by Paragraph 1(b)(i) of the 2001 Agreement, and established 4Kids Home Video, a new subsidiary, to produce and sell home videos relating to the Yu-Gi-Oh! property, as well as other licensors' properties. As is customary in the home video business, 4Kids hired a third party to handle the actual duplication and distribution of the home video products, *i,e.* the video cassettes and

---

[3]        Paragraph 4 in turn states that "4Kids shall pay Licensor fifty percent (50%) of the Gross Income (as defined below) received by 4Kids from the exploitation or license of the Rights . . . ." *Id.* at ¶ 4(c).

DVDs of the Yu-Gi-Oh! television episodes.  4Kids Home Video entered into a distribution agreement with Funimation to cover these duties of Funimation.

198.  At the same time, and in order to maintain maximum control over the home videos and the packaging, advertising and marketing, 4Kids Home Video entered into a separate services agreement with Funimation which provided that 4Kids Home Video would provide extensive video production, advertising and promotion services with respect to the Yu-Gi-Oh! home video products and have the right to control the number of Yu-Gi-Oh! home video releases per year, the number of episodes per release, price points for the Yu-Gi-Oh! home videos, and the ability of the Yu-Gi-Oh! home video to be disposed of as "closeouts."

199.  Under the distribution agreement with Funimation, there was a royalty of 20% of the wholesale price paid on Yu-Gi-Oh! home videos that Funimation distributed for 4Kids, for a total of $4,863,576.21 over the seven-year term of the agreement.  As required by the 2001 Agreement at ¶ 1(b)(iii), 4Kids counted this money as Gross Income, and split it 50-50 with ADK.  ADK received nearly $2.45 million from 4Kids relating to these home video sales.

200.  Pursuant to the services agreement with Funimation, and consistent with 4Kids' role as licensee and exploiter of the home video rights, over the course of the seven year agreement with Funimation, 4Kids and 4Kids Home Video spent millions of dollars operating 4Kids Home Video, advertising and promoting Yu-Gi-Oh! home videos, "authoring" the VHS and DVD versions of the Yu-Gi-Oh! episodes; producing DVD "extras;" designing the packaging and point of purchase materials, organizing various retail promotions with other Yu-Gi-Oh! licensees to support home video sales and otherwise operating a home-video business.

201.  Because, under the terms of the Funimation Services Agreement, 4Kids Home Video had rights of approval, and therefore, control over the number of Yu-Gi-Oh! home video

42

releases per year, the number of episodes per release, price points for the Yu-Gi-Oh! home videos, and the ability of the Yu-Gi-Oh! home video to be disposed of as "closeouts," the Yu-Gi-Oh! home videos substantially benefited the overall Yu-Gi-Oh! merchandise licensing program.  4Kids Home Video's control of the US Yu-Gi-Oh! home video rights also provided numerous synergistic benefits which contributed to the successful promotion of the Yu-Gi-Oh! brand and sale of other Yu-Gi-Oh! merchandise.

202.  In return for these extensive services, over a period of seven years beginning in 2002, Funimation paid 4Kids Home Video $3,934,000 in service fees.  During that seven-year period, the 4Kids Home Video subsidiary incurred over $6.9 million in expenses, a significant portion of which related to the more than sixty Yu-Gi-Oh! home video releases.  These 4Kids Home Video expenses were reported as part of the 4Kids segment information appearing in the financial statements filed by 4Kids as a public company during the applicable periods. These expenses were reviewed and audited by the public accounting firms Deloitte & Touche and EisnerAmper, which audited the books and records of 4Kids during the applicable periods. Further, the $6.9 million of 4Kids Home Video expenses does not include the cost and value of advertising time provided by 4Kids on Saturday mornings on Fox, on the 4Kids VOD platform with Comcast and advertising space provided by 4Kids on various 4Kids-controlled websites, since these internal charges are eliminated in the preparation of consolidated financial statements.

203.  ADK has claimed in audit Finding 1 that it is entitled to one-half of 4Kids' income from the services agreement with Funimation, because, according to ADK, that income should be counted as Gross Income under the 2001 Agreement.

43

204. ADK's argument simply ignores that the 2001 Agreement permits 4Kids to exploit the home video rights itself, and provides that in such an instance, Gross Income relating to home video rights is limited to "20% of the wholesale selling price" of the home video products.

205. Moreover, approximately $2.4 million of the $3,934,000 paid to 4Kids by Funimation in service fees was paid more than six years ago and, accordingly, ADK's claims with respect to those fees are barred by the statute of limitations. Indeed, ADK was aware for many years that 4Kids Home Video received fees for its services, but waited until 2010 to claim that there was anything improper with that arrangement.

206. Audit Finding 2, like Finding 1, relates to the alleged underpayment of revenue by 4Kids Home Video under the 2004 services agreement entered into with Majesco Sales Inc. ("Majesco") for distribution of Yu-Gi-Oh! Television episodes stored on cartridges compatible with the Game Boy Advance handheld game system ("GBA"). Licensor is claiming that it is entitled to receive 50% of the $183,333.00 received by 4Kids from Majesco for performing advertising, marketing, promotion, packaging and technological services for Majesco.

207. During the 2002-2004 time period, 4Kids developed a video compression technology enabling animated television episodes to be condensed, digitized and programmed on to cartridges compatible with GBA. Majesco developed a similar video compression technology. In 2004, 4Kids Home Video and Majesco agreed to work together to release cartridges compatible with GBA containing television episodes of various series, including Yu-Gi-Oh!, with respect to which 4Kids Home Video was the licensee of home video rights. 4Kids Home Video and Majesco agreed to use the compressed version of the television

44

episodes that looked the best whether it was compressed using the 4Kids or Majesco video compression technology.

208.  4Kids did extensive work compressing the Yu-Gi-Oh! episodes which ultimately were released by Majesco. As provided in the Majesco Services Agreement, 4Kids was obliged to provide Majesco with 4 television commercials per year and 4 promotions per year for the three-year term which would be broadcast on the Saturday morning block programmed by 4Kids on the Fox Network. The fair market value of the television commercials and promotions is significantly in excess of $100,000.  4Kids also provided marketing services for Majesco and produced television commercials for the GBA Videos.

209.  In addition, 4Kids provided technical assistance to Majesco with regard to the user interface (converting the buttons on the GBA video game system into controls for a video player – play, rewind, fast-forward, pause).

210.  For all the same reasons explained with respect to Finding 1, Licensor is not entitled to any share of the income under the Majesco Services Agreement.

### *ADK's Foreign Tax Withholding Audit Claims are Without Merit*

211.  ADK's Finding 3 claimed that 4Kids failed to provide appropriate documentation of foreign (non-US) withholding taxes.  The 2001 and 2008 agreements require that 4Kids provide NAS with "evidence of payment of . . . withholding tax."  As set forth below, 4Kids and its international licensees has regularly provided such evidence to ADK on a quarterly basis throughout the course of the parties' nine-year relationship.

212.  4Kids' sublicensees in certain foreign countries are required to withhold taxes on foreign license fees and royalty payments related to the intellectual property owned by ADK. The statements of account provided by 4Kids to ADK for each calendar quarter during the term

45

of the Agreements ("participation statements") note conspicuously on their face all foreign tax withholdings deducted the applicable period. For nine years, from 2001 to 2009, 4Kids submitted participation statements to Licensor showing that foreign sub-licensees paid to foreign tax authorities a total of approximately $2.4 million in foreign tax withholdings related to the Yu-Gi-Oh! property. In addition to reporting foreign tax withholding on the quarterly participation statements, 4Kids also provided to ADK, or counterclaim-defendants have received directly from Yu-Gi-Oh! foreign licensees, tax certificates reflecting over $1.8 million of the total of approximately $2.4 million in 2001-2009 foreign tax withholding.

213. For nine years, from 2001 to 2010, ADK never complained about the participation statements 4Kids regularly provided showing the foreign tax withholding information and never claimed that it had not received adequate evidence of foreign tax withholding. On the few occasions when Licensor requested certain additional tax related documentation, 4Kids provided such documentation to ADK.

214. 4Kids merely acts as a conduit by providing the foreign tax withholding information to ADK; 4Kids does not claim any tax credits for itself relating to such foreign tax withholding. Only the copyright holder (in this case, ADK) can claim foreign withholding taxes as tax credits on their tax returns.

215. In addition, 4Kids never has received any of the tax amounts withheld by foreign sublicensees of the Yu-Gi-Oh! property. Rather, such foreign sublicensees remit the required withholding tax directly to the applicable foreign tax authorities where the sublicensees operate.

216. In the course of the audit discussions, however, ADK claimed that for the past nine years, it has had insufficient documentation to file for some $2,265,767.16 in foreign tax

credits on its Japanese corporate tax returns. Because counterclaim-defendants are very large

Japanese companies whose corporate tax returns are presumably prepared by qualified people,

4Kids has asked for confirmation from ADK as to whether ADK has, in fact, not filed for the

foreign tax credits on its Japanese corporate tax returns. Although this question has been asked

several times, including at the February 2, 2011 meeting with ADK's counsel and at the

February 23, 2011 meeting with ADK's Mr. Shinoda, 4Kids has still not received confirmation

from ADK or its counsel that ADK has not been able to either deduct or claim as a tax credit

the foreign tax withholdings reported to ADK over the past nine years. Rather, in its letter of

December 20, 2010, ADK elected to claim that 4Kids owes ADK $2,265,767.16 on account of

foreign tax withholdings without even having done the necessary due diligence to confirm and

be able to represent to 4Kids that none of the counterclaim-defendants filed for tax deductions

or tax credits during the tax years in question on account of the Yu-Gi-Oh! foreign withholding

taxes.

217. 4Kids has provided all necessary evidence of payments of withholding tax as

required by the 2001 and 2008 Agreements. The participation statements are evidence of

payment of foreign withholding tax. Indeed, 4Kids provides these same participation

statements to its other Japanese licensors without issue. Moreover, it is the responsibility of

the counterclaim-defendants and not 4Kids to make appropriate tax filings to claim whatever

tax deductions or tax credits are available under the Japanese tax law with regard to the foreign

withholding taxes. Finally, ADK's $2.3 million claim with regard to foreign withholding taxes

is not an audit claim as it does not relate to monies collected by 4Kids on behalf of ADK which

4Kids has failed to properly remit to ADK.

47

*__ADK's Claims with Respect to Third Party Audit Claims are Without Merit__*

218.    ADK's audit Finding 5 claims that 4Kids has charged ADK $105,111 reflecting one half of the cost of audits of third party licensees of Yu-Gi-Oh! properties.  ADK claims that it is not responsible for splitting the cost of audits conducted on third parties.

219.  There is no merit to ADK's claim that it should not bear half the cost of third party audits.  In claiming that it is not responsible for splitting the cost of audits conducted on third parties, ADK cites paragraph 4(f) of the 2001 and 2008 agreements, which relates to ADK's audits of 4Kids and not to audits conducted by 4Kids of licensees. In fact, both the 2001 and 2008 Agreements are silent with regard to how the costs of audits of third party licensees are to be paid.

220.  It is customary in the licensing business for the merchandise licensing agent and licensor to conduct audits of third-party licensees and to share the cost of such audits in proportion to their respective percentages of the gross receipts. Over the years, 4Kids has followed this custom with all of its clients without any issue.  In order to avoid any misunderstandings, prior to commencing its Yu-Gi-Oh! audit program, 4Kids sent ADK an e-mail dated January 5, 2005 (the "Audit E-Mail") outlining for ADK how the 4Kids audit program would operate.  The Audit E-mail stated that 4Kids would pay for the cost of the audit and then charge ADK for 50% of such costs on the participation statement. ADK approved or did not object or otherwise respond to the Audit E-mail.

221.  4Kids conducted over 22 separate audits of Yu-Gi-Oh! licensees in the US and in Europe at a cost of approximately $210,000 in audit fees paid to third-party auditors. These 22 separate audits recovered an additional $761,000 in royalties.

222.     As provided in the Audit E-Mail, 4Kids paid the third party audit fees upfront and charged ADK on various participation statements for 50% of the costs of the audits. Although the auditing process commenced in 2005, there was no objection to the audit fees charged to ADK before the 2010 audit.

223.     ADK has received approximately $450,000 as a result of audits performed on third-party licensees. This amounts to more than 50% of the approximately $761,000 in additional revenues generated from the audits.  Based on the Audit E-mail, custom and usage in the licensing business and simple considerations of equity, ADK is responsible for 50% of the audit costs and the deduction of $105,111 in third party audit costs on participation statements rendered by 4Kids to ADK was proper.

### ADK's Claims with Respect to Errors and Omissions Insurance Premiums are Without Merit

224.     ADK's audit Finding 6 claims that ADK was overcharged for its share of insurance purchased to cover 4Kids' properties.

225.     Paragraph 4(c) of the 2001 and 2008 agreements states that 4Kids may charge ADK for insurance "with [ADK's] share of the 4Kids Errors and Omissions Insurance premiums computed on a pro-rata basis . . . but in no event shall the cost to [ADK] exceed $15,000 per year."

226.     4Kids has included the Yu-Gi-Oh! property on its Errors and Omissions insurance policy for each year since 2001.  The total price of the insurance policy during that time period was approximately $150,000 per year.

227.     4Kids charged ADK $15,000 per year for this insurance pursuant to Paragraph 4(c).  ADK's share of the total insurance cost, approximately 10% of the total cost, is

readily justified in terms of the share of 4Kids' revenue relating to ADK properties, or the number of 4Kids' active properties covered by its insurance policy.

228.    Thus, the Yu-Gi-Oh! property has accounted for more than 10% of 4Kids' total revenue in each year since 2001. Pro-rating the insurance premium on the basis of total revenue results in an amount greater than the contractual maximum of $15,000 per year.

229.    Moreover, during the relevant time period, 4Kids has never had more than ten active properties. Thus, Yu-Gi-Oh! has always made up more at least 10% of the active properties covered by the insurance policy. Although ADK asserts that its share of the insurance premiums should be less than 10% because there are many other properties listed on 4Kids' insurance contract, the fact is that the majority of those properties are inactive properties or properties for which 4Kids never offered any products or collected any revenue, and that have been left on the policy at the recommendation of 4Kids' insurance broker in case an inactive property becomes the subject of a lawsuit.

### ADK's Claims with Respect to Materials and Courier Costs

230.    ADK's audit Finding 9 relates to costs for creating and couriering materials related to Yu-Gi-Oh! television episodes. Paragraph 5(a) of the 2001 and 2008 Agreements provides that 4Kids is to pay these costs.

231.    ADK failed to bill 4Kids for any of these material or courier costs from the start of the parties' relationship in 2001 until October 15, 2010. Then, on October 15, 2010, ADK sent an "assessment" including invoices in the amount of $247,771.88, which purportedly was a bill for these various costs over the previous *nine years*. This assessment was conclusory and unsubstantiated, and, moreover, was calculated at the single most optimal currency exchange rate (from ADK's perspective) over the past nine years. The October 15, 2010 assessment

50

contained no backup documentation relating to the materials costs associated with the delivery to 4Kids during 2001-2008 of the first roughly 400 Yu-Gi-Oh! television episodes.

232.    Despite the belated nature of ADK's demand, in December 2010, 4Kids indicated that it would pay for material and courier costs related to the Yu-Gi-Oh! 5D series.  On January 14, 2011, 4Kids sent an e-mail to ADK's counsel requesting that ADK provide backup documentation related to certain charges in the assessment.   4Kids also requested that an appropriate exchange rate be used for these costs based on the exchange rate in effect when the materials were delivered by ADK to 4Kids and when ADK should have billed 4Kids for the materials costs.   Neither ADK nor its counsel has responded to 4Kids with respect to these proposals and to the follow-up e-mail sent on February 28, 2011.   To date, ADK has been unwilling or unable to provide the backup documentation necessary to support the charges in the ADK assessment.

233.    In addition, a substantial portion of the material and courier costs at issue in Finding 9 date from more than six years ago, and, accordingly, any claims with respect to such costs are barred by the statute of limitations.

### *ADK's Claims That 4Kids Does Not Dispute and Has Addressed*

234.    ADK's remaining audit claims involved minor accounting errors or other minor issues that 4Kids has agreed  to address and has more than covered by virtue of a good-faith payment of $1,000,000 made by 4Kids to ADK on March 17, 2011, and by the $1.1 million credit balance (consisting of amounts previously advanced by 4Kids to ADK or paid by 4Kids on behalf of ADK) (the "Credit Balance") in favor of 4Kids as of the March 25, 2011 date of the purported letter of termination, as set forth more fully below.

235.    ADK's audit Finding 4 relates to the calculation of U.S. home video royalties due to ADK from 4Kids Home Video for the third and fourth quarters of 2008.  ADK claims that 4Kids underpaid ADK by $26,894.27 relating to such U.S. home video royalties. 4Kids has acknowledged that this ADK audit claim is correct and has explained to ADK that this underpayment was the result of an accounting oversight. As previously noted, ADK negotiated a change in the 2008 Agreement relating to U.S. home video royalties paid when 4Kids Home Video was the licensee.  Under the 2001 Agreement, 4Kids and ADK shared the U.S. home video royalties from 4Kids Home Video releases 50/50. Under the 2008 Agreement, ADK was to receive 100% of the US home video royalties payable by 4Kids Home Video with respect to Yu-Gi-Oh! Home video releases. The 4Kids accounting department erroneously accounted for the U.S. home video royalties for the third and fourth quarters of 2008 based on the 50/50 split that had been in effect under the 2001 Agreement rather than allocating 100% of the 4Kids Home Video royalties to ADK.  4Kids has agreed to pay ADK the $26,894.27 related to this claim, and the amount is covered by the $1,000,000 good-faith payment made by 4Kids to ADK on March 17, 2011 and by the $1.1 million Credit Balance in favor of 4Kids as of the March 25, 2011 date of the purported letter of termination.

236.    ADK's audit Finding 7 claims that 4Kids improperly deducted $4,721 in unspecified bank charges (e.g., wire transfer fees) from NAS's share of gross income.  These deductions for bank charges were listed clearly and conspicuously on the quarterly participation statements rendered by 4Kids to ADK for the past nine years and were customarily deducted by 4Kids from monies wired to its clients. In view of the small balance at issue, 4Kids has agreed to pay ADK this minor amount.  The amount is covered by the $1,000,000 good-faith payment

made by 4Kids to ADK on March 17, 2011 and by the $1.1 million Credit Balance in favor of 4Kids as of the March 25, 2011 date of the purported letter of termination.

237.     ADK's audit Finding 8 relates to alleged improper deductions from ADK's share of gross income for the "YGO Style Guide Art" and "YGO GX-Ares dubbing fee." With regard to the "YGO Style Guide Art," 4Kids reimbursed ADK for 100% of the "YGO Style Guide Art" and was supposed to recoup 50% of the cost from ADK.  4Kids inadvertently billed ADK for 100% of the $78,302.79 cost of the YGO Style Guide Art rather than 50% of the cost, resulting in a $39,151.40 error.  ADK also claims that it refused 4Kids' request to split the cost for "YGO GX-Ares dubbing fee," which was $3,443.69.  Although the e-mail regarding the splitting of the "YGO GX-Ares dubbing fee" is ambiguous, in view of the small amount at issue, 4Kids has agreed to reimburse ADK for the $3,443.69 "YGO GX-Ares dubbing fee."  In any event, both the cost of the"YGO Style Guide Art" and the"YGO GX-Ares dubbing fee," are covered by the $1,000,000 good-faith payment made by 4Kids to ADK on March 17, 2011 and by the $1.1 million credit balance in favor of 4Kids as of the March 25, 2011 date of the purported letter of termination.

## ADK'S WRONGFUL TERMINATION
## AND BREACH OF THE 2008 AGREEMENT

238.     In the time since the parties' exchange of correspondence in late December, 2010, 4Kids tried in vain to resolve the unjustified audit findings, unsuccessfully sought additional information from ADK regarding certain of their audit claims, and also stated its willingness to remedy those audit findings that were correct or involve *de minimis* amounts.

239.     ADK refused to respond constructively to 4Kids' responses on the disputed findings.  Rather, ADK or its counsel asserted that millions of dollars were due ADK

without addressing any of the specific information provided by 4Kids to refute the audit claims and without providing any additional information, such as on the materials costs, which the parties might have used to resolve the various open issues. Instead, on February 23, 2011 and again by letter on February 24, 2011, ADK stated that the audit issues had not been resolved, even though the parties had not yet discussed all the audit findings and ADK had not provided 4Kids with the auditor's report or other information previously requested by 4Kids. ADK demanded that 4Kids sign an "Adaptation Agreement" that would relegate 4Kids to the position of a "work for hire" production studio, responsible only for producing the English language adaptations of the new Yu-Gi-Oh! series ZeXal, or "Zeal." The Adaptation Agreement specifically provided that 4Kids would have no television broadcast rights, merchandising rights or any other rights to the new Yu-Gi-Oh! series. Since the Yu-Gi-Oh! Zeal series will be the focal point of future Yu-Gi-Oh! trading card sales and merchandise licensing, ADK was proposing that 4Kids be cut off from the majority of future Yu-Gi-Oh! revenues.

240. On March 3, 2011, 4Kids wrote a letter protesting ADK's attempt to take away 4Kids' rights to Yu-Gi-Oh! through the Adaptation Agreement, and pressed for meaningful negotiations over the audit findings.

241. By letter from its counsel dated Friday, March 4, 2011 and sent by e-mail at 6:42 PM, ADK rejected 4Kids' request for a substantive discussion of the merits of the audit findings, and refused to resume discussions unless 4Kids agreed to pay at least $2-3 million to resolve the audit findings. ADK's March 4 letter also issued an ultimatum, stating that if 4Kids did not agree to the $2-3 million settlement range or sign the Adaptation Agreement by Monday, March 7 at noon, ADK would view 4Kids as "not genuinely interested in resolving our differences."

242.    On the morning of March 7, counsel for 4Kids advised that the noon deadline did not provide 4Kids' board of directors with sufficient time to consider the ADK proposal.  On March 8, 2011, bankruptcy counsel for 4Kids spoke with counsel for ADK and advised that if ADK were to serve a notice of breach under the 2008 Agreement, 4Kids would file for bankruptcy under Chapter 11 within the ten business day cure period provided for in the 2008 Agreement.  Counsel for the parties concurred that the 4Kids bankruptcy filing within the ten business day cure period would "stay" the attempted termination of the 2008 Agreement by ADK.  Counsel for ADK never advised that he considered any prior communication from ADK to 4Kids to be a notice of breach.

243.    The discussions between 4Kids and ADK were suspended due to the catastrophic earthquake in Japan on March 11, 2011. On March 16, 2011, counsel for ADK indicated that his client would view a payment of $1 million toward ultimate resolution of the audit claims as a gesture of good faith and means of rebuilding trust between the parties.  On March 17, 2011, 4Kids wired $1 million to ADK as a gesture of good faith, all the while reserving its position that that it did not owe ADK other than non-material amounts under the 2008 Agreement.

244.    On March 18, 2011, the parties met in New York to continue negotiations to resolve the audit claims.  At the meeting, 4Kids provided ADK and its counsel with business and financial information regarding Classic Media, a company in the merchandise licensing business interested in acquiring 4Kids and with whom 4Kids was about to sign a letter of intent. The proposed sale of the business of 4Kids to Classic Media was intended to address concerns previously expressed to 4Kids by ADK and its counsel regarding the financial condition of 4Kids.  At that meeting, ADK also discussed with 4Kids potentially buying out 4Kids' rights

55

under the 2008 Agreement. Neither ADK nor its counsel stated during the lengthy March 18 meeting that they considered any prior communication by ADK to 4Kids to be a notice of breach.

245.    At the end of the six-hour meeting on March 18, 2011, ADK demanded that 4Kids pay $3 million to resolve the audit claims, well above what 4Kids reasonably owed. Because ADK continued to insist on a payment that was so far in excess of the possible value of the largely meritless claims, the parties were unable to agree on a figure that would settle the audit claims.

246.    There were further communications on March 23, 2011 between bankruptcy counsel for the respective parties regarding future negotiations and the adverse affect on all concerned if a notice of breach were sent by ADK and 4Kids was forced to file for bankruptcy during the ten business day cure period. Bankruptcy counsel for ADK requested and it was agreed that neither party take any action without first advising the other party. Again, there was no statement or intimation by counsel for ADK that he considered any prior communication by ADK or its counsel to 4Kids to be a notice of breach or that he considered the cure period to have elapsed.

247.    On March 25, 2011, ADK sent 4Kids a letter purporting to terminate the 2008 Agreement based on its meritless audit claims. The letter did not provide 4Kids with the ten business day cure period provided for in Paragraph 12 of the 2008 Agreement, and did not even purport to identify any prior notification of the commencement of that cure period.

248.    At no time prior to receipt of ADK's March 25, 2011 letter purporting to terminate the 2008 Agreement did 4Kids receive a notice of breach commencing the ten business

60121921_3.DOCX

day cure period provided for in the Agreement. In fact, ADK and its counsel, through both acts and omissions, intentionally conveyed the impression that no notice of breach had been sent.

249. By wrongfully purporting to terminate the 2008 Agreement effective upon 4Kids' receipt of ADK's March 25, 2011 letter without providing 4Kids with formal notice of a cure period, ADK has breached the 2008 Agreement.

250. As set forth in detail above, the large majority of purported underpayment claims raised by ADK are without merit, and a small amount of underpayments are the result of ordinary accounting oversights or other mistakes that 4Kids has addressed or agreed to address. The total amount of valid audit claims identified by ADK does not approach, let alone exceed, the $1,000,000 payment made by 4Kids to ADK on March 17, 2011.

251. Moreover, in addition to the $1,000,000 payment made by 4Kids to ADK on March 17, 2011, at the time of the purported termination of the 2008 Agreement, 4Kids enjoyed an aggregate credit under the 2008 Agreement of approximately $1.1 million of recoupable expenditures under the Agreement that are to be offset against ADK's share of Gross Income. The amount of this offset, when combined with the $1,000,000 payment made by 4Kids to ADK on March 17, 2011, far exceeds any amount owed by 4Kids to ADK with respect to any valid audit claims.

252. By purporting to terminate the 2008 Agreement based on the purported underpayments raised in ADK's audit of 4Kids that do not exceed $2.1 million (*i.e.* the sum of the $1,000,000 payment made by 4Kids to ADK on March 17, 2011 and the $1.1 million Credit Balance), ADK has breached the 2008 Agreement.

253. In the time since ADK's wrongful purported termination of the 2008 Agreement, 4Kids has made additional efforts to convince ADK to retract its purported

57

termination, including in additional correspondence to and discussions with ADK's counsel, to no avail.

254.     4Kids anticipates that the 2008 Agreement will be enormously profitable for 4Kids through the remaining term of the Agreement.  The Yu-Gi-Oh! property has generated $5 million to $6 million per year for 4Kids and is anticipated to continue to contribute revenues in excess of $5 million per year through 2018.

255.     In addition, unless ADK is enjoined from wrongfully terminating the 2008 Agreement, 4Kids will be irreparably harmed in a variety of ways.  Among other things, termination of the 2008 Agreement will severely impact 4Kids' ability to license other properties, will injure 4Kids' reputation in the children's entertainment industry and will result in enormous loss of future revenue and profits.

## ADK'S TORTIOUS INTERFERENCE WITH THE CLASSIC MEDIA MERGER

256.     Beginning in November, 2010, 4Kids and Classic Media ("Classic") were in discussions regarding the potential acquisition of 4Kids by Classic. During the months of January 2011 through March 2011, 4Kids and Classic had exchanged draft of letters of intent setting forth the material terms of the proposed transaction.

257.     At the March 18, 2011 meeting, 4Kids provided ADK and its counsel with information regarding the business of Classic Media, its results of operations, its balance sheet and the financial position of its principal stockholder, a noted private equity firm.

258.     The 2008 Agreement does not require 4Kids to obtain the approval of counterclaim-defendants with respect to the assignment of the 2008 Agreement arising from a sale of the stock or assets of 4Kids to Classic or any other party. However, since ADK is a significant client of 4Kids, 4Kids apprised ADK of the status of the proposed transaction

58

between 4Kids and Classic. 4Kids also offered to set up a meeting between representatives of ADK and representatives of Classic.

259. Prior to ADK's purported termination of the 2008 Agreement on March 25, 2011, 4Kids and Classic were poised to sign a Letter of Intent with respect to the 4Kids – Classic merger transaction.

260. A substantial reason for Classic's interest in a deal with 4Kids is 4Kids' Yu-Gi-Oh! license, which provides for roughly 40% of 4Kids' current revenue, as noted above, and also provides 4Kids with tens of millions of dollars in future revenue for 4Kids for the remainder of the term.

261. ADK's purported termination of the 2008 Agreement on March 25, 2011 ended the pending deal between 4Kids and Classic. When 4Kids advised Classic of ADK's purported termination of the 2008 Agreement, Classic confirmed to 4Kids that in light of the purported termination of the 2008 Agreement, Classic could not go forward with the contemplated merger with 4Kids.

262. The 4Kids-Classic deal would have resulted in enormous financial benefit for the stockholders of 4Kids. Classic offered to purchase all of the stock of 4Kids for cash and valued 4Kids at a substantial premium to the pre-bankruptcy stock price of 4Kids. Since the proposed Classic purchase of 4Kids was in the form of a merger, the surviving Classic merger subsidiary would have succeeded to all of the liabilities of 4Kids

263. ADK's wrongful termination of the 2008 Agreement tortiously interfered with the prospective merger between 4Kids and Classic and has caused 4Kids damages that have not yet been quantified, but likely will be in excess of $10 million.

## 4KIDS' BANKRUPTCY RESULTING
## FROM ADK'S WRONGFUL CONDUCT

264.    Among other injuries, ADK's purported termination of the 2008 Agreement caused 4Kids to file bankruptcy proceedings on April 6, 2011 and to incur substantial costs in connection with that filing.

265.    4Kids' bankruptcy filing was a foreseeable and inevitable consequence of ADK's purported termination of the 2008 Agreement. Prior to the purported termination, 4Kids advised ADK several times that, if ADK sent 4Kids a notice of breach of the 2008 Agreement, 4Kids would be forced to file for bankruptcy to stay the attempted termination of the 2008 Agreement.

266.    The legal fees and administrative costs of the 4Kids bankruptcy are expected to exceed $1 million. In addition, prior to the 4Kids bankruptcy filing on April 6, 2011, 4Kids sold its portfolio of auction rate securities in order to raise cash necessary to pay the legal fees and administrative costs soon to be incurred in connection with the 4Kids bankruptcy filing. The forced sale of the relatively illiquid auction rate securities in late March 2011 and early April 2011 resulted in 4Kids incurring a loss of more than $1 million when compared to the appraised value of such auction rate securities portfolio as of December 31, 2010.

267.    ADK's wrongful termination of the 2008 Agreement also severely damaged the value of the business of 4Kids. On March 31, 2011, 4Kids filed its Annual Report on Form 10-K, which for the first time contained a "going concern" opinion from the 4Kids auditor, EisnerAmper. 4Kids' auditor noted that the purported termination by ADK of the 2008 Agreement, which had accounted for approximately 40% of the revenue earned by 4Kids, put 4Kids at substantial risk of being unable to continue operations.

### 4KIDS' LOSS OF OTHER BUSINESS OPPORTUNITIES
### RESULTING FROM ADK'S UNLAWFUL CONDUCT

268.    In addition to the Classic Media deal, ADK's wrongful conduct caused 4Kids to lose significant other business opportunities relating both to the Yu-Gi-Oh! property and other properties.  In early 2011, 4Kids was in discussions with a number of potential clients to serve as the licensee of broadcast rights and/or merchandising rights for new properties.  As a result of ADK's purported termination of the 2008 Agreement and the ensuing 4Kids bankruptcy filing, and, in at least some instances, ADK's direct interference with 4Kids' business relations, these potential clients have elected to discontinue discussions with 4Kids thereby depriving 4Kids of potential future sources of revenue.

### *ADK's Interference With 4Kids' Agreement With Konami*

269.    Prior to ADK's purported termination of 4Kids on March 25, 2011, 4Kids had entered into an oral agreement with Konami Digital Entertainment, Inc., the U.S subsidiary of Konami, providing for Konami to use the services of 4Kids to produce at least twelve television commercials for the Yu-Gi-Oh! trading card game.  As ADK also was aware, 4Kids and Konami regularly worked together on other matters, including in connection with the promotion of Yu-Gi-Oh! trading cards.  After ADK's purported termination of the 2008 Agreement on March 25, 2011, 4Kids was advised by Konami by email dated March 31, 2011 that ADK had insisted to Konami that Konami no longer work with 4Kids on any Yu-Gi-Oh! matters.  Konami cancelled its orders with 4Kids for the production of Yu-Gi-Oh! television commercials and ceased working with 4Kids on other Yu-Gi-Oh! promotions.  As a result of ADK's tortious interference with the 4Kids business relationship with Konami, 4Kids only produced 5 of the 12 Yu-Gi-Oh! television commercials. The production fee paid by Konami to

4Kids for commercial production work in the first and second quarters of 2011 was reduced by almost $240,000.

270.     ADK's wrongful termination of the 2008 Agreement and its interference with the business relationship between 4Kids and Konami will also result in additional damages from the loss of future Yu-Gi-Oh! television commercial production work that typically was performed by 4Kids for Konami. As a result of ADK's actions, 4Kids has suffered additional damages that have not yet been quantified, but likely will be in excess of $300,000 per year for the remaining future years of the term of the 2008 Agreement.

### *ADK's Wrongful Refusal to Approve and Tortious Interference With Various Pre-March 25, 2011 Deals Relating to Yu-Gi-Oh!*

271.     As of March 25, 2011, 4Kids was negotiating television broadcast license deals for the Yu-Gi-Oh! series with Nicktoons for the pay television market in the US, with cITV for the UK television market, with Digi Turk and D-Smart for the Turkish television market and with Disney Germany for the German pay television market.  ADK was advised of the pendency of at least some of these deals, including those with Nicktoons, cITV and Disney Germany.

272.     Similarly, in March 2011, 4Kids was in discussions with A&E Television Networks ("A&E") to license to A&E certain Yu-Gi-Oh! home video rights, including home video rights to the Yu-Gi-Oh! 3D movie.  ADK was advised of the pendency of the deal with A&E.

273.     In addition, ADK has unreasonably refused to approve several deals that 4Kids has negotiated with third parties relating to the Yu-Gi-Oh! property, including, among others, licenses to Panini Verlags GmbH in Germany and Credeal Manufactura De Papeis Ltda. in Brazil.

274.     ADK's wrongful purported termination of the 2008 Agreement on March 25, 2011 has resulted in the negotiation of the foregoing deals either being terminated or placed on hiatus until such time as the dispute between ADK and 4Kids is adjudicated.

275.     In addition, ADK, by holding itself out after March 25, 2011 purported termination of the 2008 Agreement as the sole authorized licensor of Yu-Gi-Oh! television broadcast rights, has damaged the business reputation of 4Kids and has created confusion in the marketplace among existing Yu-Gi-Oh! licensees and prospective Yu-Gi-Oh! licensees.

276.     The aggregate value of the license fees and minimum guarantees payable with respect to these various deals is in excess of $3 million.

### *Damage to 4Kids' Ad Sales*

277.     4Kids is a party to an agreement with The CW Network ("CW Agreement") pursuant to which 4Kids programs the five hour Saturday morning block from 7 AM to 12 noon on The CW Network ("CW Block").  Under the terms of the CW Agreement, 4Kids sells the national advertising time on said CW Block.  4Kids is obliged to pay The CW Network an annual guarantee of $11.5 million.  If 4Kids advertising sales on the CW Block do not result in the CW Network receiving $11.5 million, 4Kids is required to pay the difference between said $11.5 million guarantee and the amount of advertising proceeds from the CW Block actually received by the CW Network.  ADK is aware of the CW Agreement.

278.     Beginning in March 2011, 4Kids started making its "upfront" presentations to advertisers and media buying agencies seeking to sell advertising time for the 2011-2012 broadcast season which starts in September 2011.

279.     ADK's wrongful purported termination of the 2008 Agreement on March 25, 2011 and the resulting April 6, 2011 bankruptcy filing by 4Kids directly caused by that

wrongful termination, have adversely impacted the ability of 4Kids to sell advertising time for the remainder of the current broadcast season. Various advertisers and media buying agencies have advised 4kids that in view of the purported termination of the 2008 Agreement and the ensuing bankruptcy of 4Kids, they cannot be certain that 4Kids will be assuming the CW Agreement and, therefore, be able to broadcast their commercials on the CW Network for the 2011-2012 broadcast season. These advertisers need to purchase advertising time that reaches a large enough target audience to properly promote their products, particularly in the fourth quarter when sales of toys and games are at their highest as a result of the holiday season.

280. Because the advertisers have finite budgets and are in the process of making upfront advertising time buys from 4Kids broadcast competitors such as Nickelodeon, Disney and The Cartoon Network, it is likely that much, if not all, of the advertising budgets of prospective advertisers will be committed to 4Kids' competitors before the issues arising from the dispute between 4Kids and counterclaim defendants and the 4Kids bankruptcy are clarified.

281. The fourth quarter represents approximately 50% of the value of the advertising time on children's television networks in view of the premium prices that can be charged during the Christmas selling season. If there is little money remaining in the advertising budgets of the various advertisers to purchase advertising time on the CW Network in the fourth quarter because advertisers are shying away from doing business with 4Kids or advertisers have committed their advertising budgets to other networks, 4Kids' overall sales of advertising on the CW Block will be drastically affected.

282. ADK's unlawful actions in wrongfully purporting to terminate the 2008 Agreement, and causing the ensuing 4Kids bankruptcy filing, have resulted in damages to the 4Kids advertising sales of time on the CW Block both for the remainder of the 2010-2011

64

broadcast season and for the 2011-2012 broadcast season in an amount that has not yet been quantified, but likely will be in excess of $3 million.

### *Damages to 4Kids' Toonzai Brand*

283.   In 2010, 4Kids began rebranding the CW Block as "Toonzai." a five-hour block of programs featuring Japanese animation.  To date, 4Kids has spent in excess of $500,000 on advertising and promotional materials featuring "Toonzai."

284.   The prospective success of the Toonzai branding campaign is contingent upon 4Kids being able to license U.S. television broadcast rights to Japanese produced animation.

285.   ADK's unlawful actions in wrongfully purporting to terminate the 2008 Agreement, and causing the ensuing 4Kids bankruptcy filing, have resulted in severe damage to the reputation of 4Kids both in the U.S. and in the Japanese animation community.

286.   One of the primary sources of Japanese animation content for 4Kids, over the years, has been Japanese production company Toei Animation ("Toei").  In recent years, 4Kids has licensed a Japanese animated series Dragon Ball Z Kai from Toei, a series which is currently broadcast by 4Kids on the CW Block for one hour each week.  In addition, in 2009, 4Kids has licensed from Toei a Japanese themed animated series called Tai Chi Chasers.  On information and belief, ADK is aware of 4Kids' business dealings with Toei.

287.   On information and belief, ADK has tortiously interfered with the business relationship between 4Kids and Toei.  On information and belief, ADK has induced Toei to retain the services of ADK's U.S. law firm, and Toei has refused to negotiate with 4Kids with respect to the possible acquisition by 4Kids of various additional Japanese animated television series produced by Toei.

288. ADK's wrongful conduct with regard to Toei and other companies within the Japanese animation community has jeopardized the 4Kids investment in the Toonzai branding campaign and the prospects of 4Kids being able to license additional Japanese animation content. Prior to ADK's wrongful termination of the 2008 Agreement, 4Kids had been in discussions with the large Japanese advertising conglomerate, Dentsu, with regard to the potential license of a promising animation property and with another Japanese animation company, Viz Media, regarding other Japanese animation that would be suitable for the CW Block branded "Toonzai." 4Kids has been informed by Dentsu that until such time as the ADK–4Kids disputed been resolved, Dentsu would no longer continue the discussions with 4Kids. After ADK's wrongful termination of the 2008 Agreement, Viz. Media agreed to meet with 4Kids but stated that such meetings and other communications were informational in nature only and that no deals could be concluded with 4Kids. On information and belief, ADK directly or indirectly interfered with potential business relationships between 4Kids and Dentsu and 4Kids and Viz Media.

289. ADK's wrongful termination of the 2008 Agreement which caused the 4Kids bankruptcy filing, have jeopardized the value of twelve months of the Toonzai advertising campaign and resulted in damages to 4Kids in an amount that has not yet been quantified, but likely will be in excess of $500,000.

### *ADK's Failure to Make Payments Under the Cinedigm Agreement*

290. Pursuant to a Yu-Gi-Oh! Movie Deal Memo agreement between ADK and 4Kids dated December 15, 2010 (the "3D Movie Agreement"), ADK and 4Kids agreed to enter into an agreement with Vistachiara Productions d/b/a Kidtoons ("Cinedigm") relating to the distribution in the United States and Canada of the Yu-Gi-Oh! 3D Movie. Pursuant to

Paragraph 8 of the 3D Movie Agreement, 4Kids and ADK were each responsible of 50% of the distribution fees to be paid to Cinedigm, and ADK was obligated to pay its share of the each installment of the distribution fee no later than ten business days prior to the installment being due to Cinedigm.

291.    As contemplated by the 3D Movie Agreement, 4Kids and ADK entered into a agreement with Cinedigm dated as of December 10, 2010 (the "Cinedigm Agreement"). Pursuant to the Cinedigm Agreement, 4Kids has paid distribution fees of over $250,000 to Cinedigm, 50% of which ADK was obligated to reimburse 4Kids under the 3D Movie Agreement.  4Kids has complied with all of its obligations to ADK under the 3D Movie Agreement and the Cinedigm Agreement.  To date, however, ADK has not paid to 4Kids $128,625 of distribution fees that are due and owing to 4Kids under the 3D Movie Agreement.

## 4KIDS' CLAIMS FOR RELIEF

292.    To the extent that any of the counts herein may be inconsistent with each other, they are to be treated as being plead in the alternative.

293.    4Kids reserves the right to (i) supplement information on the $1 million good faith payment made by 4Kids to ADK on March 17, 2011 (the "Transfer") and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT I
### (Breach of Contract – Wrongful Purported Termination)

294.    4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

295.    This claim is for ADK's wrongful purported termination of the 2008 Agreement.  4Kids claims that ADK's purported termination of the 2008 Agreement constitutes

67

a breach and is unlawful. However, 4Kids has not yet elected whether to treat this wrongful termination as a complete breach or to seek specific performance of the 2008 Agreement. Particularly in light of 4Kids' pending bankruptcy, and 4Kids' ongoing efforts to convince ADK to abide by the terms of the Agreement, 4Kids reserves all rights to elect at a later date its remedies for ADK's wrongful purported termination.

296.    By wrongfully purporting to terminate the 2008 Agreement on the ground of its baseless allegations of breach and refusal to address its claims of breach in good faith, ADK has breached the 2008 Agreement.

297.    At all times, 4Kids has remained ready, willing and able to perform under the 2008 Agreement.

298.    By wrongfully purporting to terminate the 2008 Agreement without providing to 4Kids a notice of breach commencing the ten business day cure period provided for in the 2008 Agreement, ADK has breached the 2008 Agreement.

299.    ADK's wrongful conduct threatens 4Kids ability to continue as an ongoing business and required 4Kids to file bankruptcy proceedings.

300.    ADK's conduct has severely diminished 4Kids' access to and credibility among potential licensors and licensees in the field of children's entertainment.

301.    ADK's conduct has impaired and damaged 4Kids' relationships with sublicensees, distributors and others with whom it currently deals in connection with the Yu-Gi-Oh! properties.

302.    ADK's conduct has impaired and damaged the goodwill attained by 4Kids in the area of children's entertainment.

303.     ADK's conduct has damaged and will damage 4Kids in the form of lost revenues, lost profits and other financial losses, in an amount not yet determined, but in the tens of millions of dollars or more.

304.     4Kids has performed its obligations under the 2001 Agreement and the 2008 Agreement fully and completely.

305.     4Kids will suffer irreparable harm as a result of the conduct of defendants.

306.     4Kids has no adequate remedy at law.

## <u>COUNT II</u>
### (Breach of Implied Duty of Good Faith and Fair Dealing)

307.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

308.     Under the 2001 Agreement and the 2008 Agreement, there is an implied covenant of good faith and fair dealing between ADK and 4Kids.

309.     4Kids performed all the duties required of it under the 2001 Agreement and the 2008 Agreement.

310.     By taking the above described actions in bad faith and with the intent to harm 4Kids, ADK breached the implied covenant of good faith and fair dealing.

311.     ADK's conduct has damaged and will damage 4Kids in the form of lost revenues, lost profits and other financial losses, in an amount not yet determined, but in the tens of millions of dollars or more.

312.     4Kids will suffer irreparable harm as a result of ADK's breach of the implied covenant of good faith and fair dealing.

313.     4Kids has no adequate remedy at law.

## COUNT III
### (Tortious Interference with Economic Relations)

314. 4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

315. 4Kids had a prospective business opportunity with Classic that would result in a merger of the two companies and a substantial increase in the value of 4Kids to itself and its shareholders.

316. 4Kids had prospective business opportunities with other third parties as described herein that would have resulted in substantial profits and benefits for 4Kids.

317. ADK knew about the proposed deal between 4Kids and Classic and the other business opportunities described herein.

318. By taking the above described actions, ADK tortiously interfered with 4Kids' business opportunity with Classic and 4Kids' other prospective business opportunities.

319. ADK took the above described wrongful actions in bad faith and with the intent to harm 4Kids, without any legitimate economic justification and not pursuant to any legitimate contractual right.

320. As a result of ADK's tortious interference, the 4Kids-Classic merger deal under discussion in March 2011 will not take place, and the other business opportunities described herein will not take place.

321. ADK's tortious interference has caused damages in an amount to be proven at trial, but in any event, damages are in the tens of millions of dollars.

## COUNT IV
### (Declaratory Judgment of Non-Breach by 4Kids)

322.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

323.     This is a claim for a declaration judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

324.     ADK alleges that 4Kids breached the 2001 Agreement and the 2008 Agreement, and 4Kids denies that allegation.

325.     Accordingly, there is an actual, justiciable controversy between 4Kids and ADK concerning their rights, duties, and obligations under the 2001 Agreement and the 2008 Agreement.

326.     Any amounts owing to ADK under the audit claims asserted by ADK are less than the credits in favor of 4Kids for amounts paid or advanced to or on behalf of ADK.

327.     For the reasons set forth above, 4Kids is entitled to a declaratory judgment that it has not breached 2001 Agreement or the 2008 Agreement, or that any breach is not material and does not justify termination of the 2008 Agreement.

## COUNT V
### (Breach of Contract – Cinedigm Agreement)

328.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

329.     This claim is for ADK's breach of the Cinedigm Agreement.

330.     By failing to pay to 4Kids 50% of the distribution fees paid by 4Kids to Cinedigm, as required by the Cinedigm Agreement, ADK has breached the Cinedigm Agreement.

331.    4Kids has performed its obligations under the Cinedigm Agreement fully and completely.

332.    4Kids has suffered damages as a result of the conduct of ADK in an amount to be determined at trial.

## COUNT VI
### (Avoidance and Recovery of Fraudulent Conveyances Pursuant to Sections 548, 550 and 551 of the Bankruptcy Code)

333.    4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

334.    The Transfer constitutes transfer of an interest of ADK in property within the meaning of section 101(54) of the Bankruptcy Code.

335.    4Kids did not receive reasonably equivalent value in exchange for the Transfer.

336.    The Transfer was made within one (1) year of the Petition Date.

337.    4Kids was insolvent at the time of the Transfer or became insolvent by making the Transfer.

338.    4Kids was engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with 4Kids was an unreasonably small capital.

339.    By reason of the foregoing, pursuant to sections 548, 550 and 551 of the Bankruptcy Code, 4Kids may avoid, preserve and recover the full value of the Transfer from ADK.

## COUNT VII

**(Avoidance and Recovery of Fraudulent Conveyances
Pursuant to Section 544 of the Bankruptcy Code and
New York Debtor and Creditor Law Section 273)**

340.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

341.     4Kids made the Transfer without receiving fair consideration in exchange for the Transfer.

342.     The Transfer was made to or for the benefit of ADK.

343.     The Transfer was made within six years prior to the Petition Date.

344.     On the date that the Transfer was made, 4Kids was insolvent or was rendered insolvent as a result of the Transfer.

345.     By reason of the foregoing, pursuant to sections 544(b)(1) of the Bankruptcy Code and New York Debtor & Creditor Law § 273, 4Kids may avoid and recover the full value of the Transfer from ADK.

## COUNT VIII

**(Avoidance and Recovery of Fraudulent Conveyances
Pursuant to Section 544 of the Bankruptcy Code and
New York Debtor and Creditor Law Section 274)**

346.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

347.     4Kids made the Transfer without receiving fair consideration in exchange for the Transfer.

348.     On the date that the Transfer was made, 4Kids was engaged in or was about to engage in a business or transaction for which the property remaining in its possession after the Transfer was unreasonably small.

349.     By reason of the foregoing, pursuant to sections 544(b)(1) of the Bankruptcy Code and New York Debtor & Creditor Law § 274, 4Kids may avoid and recover the full value of the Transfer from the counterclaim-defendants.

## COUNT IX

**(Avoidance and Recovery of Preferential Transfers
Pursuant to Sections 547, 550 and 551 of the Bankruptcy Code)**

350.     4Kids repeats and realleges paragraphs 1 through 293 of its Counterclaims as if fully set forth herein.

351.     To the extent that 4Kids received reasonably equivalent value in exchange for all or a portion of the Transfer made to ADK, then the Transfer or such portion of the Transfer (the "Preferential Transfer"),

a.     was made for or on account of an antecedent debt or debts owed by 4Kids to ADK prior to the time the Preferential Transfer was made, and

b.     enabled ADK to receive more than they would have received (i) if 4Kids' case was a case under Chapter 7 of the Bankruptcy Code, (ii) if such Preferential Transfer to ADK had not been made, and (iii) if ADK had received payment of such debts as provided by the provisions of the Bankruptcy Code.

352.     The Preferential Transfer was made by 4Kids while it was insolvent.

353.     The Preferential Transfer was made by 4Kids within 90 days before the Petition Date.

74

354. By reason of the foregoing, pursuant to sections 547(b), 550 and 551 of the Bankruptcy Code, 4Kids may avoid, preserve and recover the full value of the Preferential Transfer from ADK.

## PRAYER FOR RELIEF

**WHEREFORE**, 4Kids prays:

a. That the Court enter judgment in favor of 4Kids on plaintiffs' claims and direct that plaintiffs take nothing by their Complaint against 4Kids;

b. That counterclaim-defendants, their officers, directors, agents, employees, servants, representatives, attorneys, subsidiaries, successors, assigns, licensees and others controlling, controlled by or affiliated with them and all those in privity or active concert or participation with any of the foregoing, be temporarily, preliminarily and permanently enjoined and restrained from terminating the 2008 Agreement, or continuing or commencing activities to effectuate termination of the 2008 Agreement.

c. That counterclaim-defendants, their officers, directors, agents, employees, servants, representatives, attorneys, subsidiaries, successors, assigns, licensees and others controlling, controlled by or affiliated with them and all those in privity or active concert or participation with any of the foregoing, be ordered to perform their obligations under the 2008 Agreement.

d. That 4Kids recovers the direct and consequential damages caused to it as a result of counterclaim-defendants' unlawful conduct, in an amount to be determined at trial but likely to exceed $30,000,000.

60121921_3.DOCX

e.  That 4Kids recover its attorneys' fees incurred in connection with ADK's breaches of the parties' agreements, pursuant to the terms of the agreements.

f.  That the Court enter judgment in favor of 4Kids:

   i.  avoiding and preserving the Transfer, and ordering the counterclaim-defendants to return to 4Kids the full value of the Transfer, including prejudgment interest and postjudgment interest thereon at the applicable legal rate from and after the date of the Transfer, as well as costs of collection, including reasonable attorneys' fees;

   ii.  declaring that the Transfer was a fraudulent conveyance under section 544(b)(1) of the Bankruptcy Code and New York Debtor & Creditor Law § 273 and is subject to avoidance;

   iii.  declaring that the Transfer was a fraudulent conveyance under section 544(b)(1) of the Bankruptcy Code and New York Debtor & Creditor Law § 274 and is subject to avoidance;

g.  That the Court enter judgment in favor of 4Kids (i) declaring that the Preferential Transfer is preferential under section 547(b) of the Bankruptcy Code and is subject to avoidance, and (ii) avoiding and preserving the Preferential Transfer and ordering the counterclaim-defendants to return to 4Kids the full value of the Preferential Transfer, including prejudgment interest and postjudgment interest thereon at the applicable legal rate from and after the date of the Preferential Transfer, as well as costs of collection, including reasonable attorneys' fees.

h.  That 4Kids recovers the costs of this civil action together with reasonable attorneys' fees.

i. That 4Kids has such other and further relief as this Court deems just and

equitable.

Dated this 10th day of June, 2011

KAYE SCHOLER LLP

By: */s/Michael B. Solow*
Michael B. Solow
Frederic W. Yerman
Paul C. Llewellyn
425 Park Avenue
New York, New York 10022
(212) 836-8000

*Attorneys for 4Kids Entertainment, Inc.*