OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP
Kyle C. Bisceglie, Esq.
Michael S. Fox, Esq.
*Attorneys for Plaintiffs*
Park Avenue Tower
65 East 55th Street
New York, New York 10022
212-451-2300
kbisceglie@olshanlaw.com
mfox@olshanlaw.com

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 4KIDS ENTERTAINMENT, INC., *et al.*,[1] | Case No. 11-11607 (SCC) |
| Debtor. | (Jointly Administered) |
| | |
| TV TOKYO CORPORATION and NIHON AD SYSTEMS, INC., | |
| Plaintiffs, | |
| v. | |
| 4KIDS ENTERTAINMENT, INC. | Adv. Pro. No. 11-02225 (SCC) |
| Defendant and Counterclaim-Plaintiff | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION *IN LIMINE*, UNDER *DAUBERT* AND FED. R. EVID. 702, TO EXCLUDE THE TESTIMONY OF ROBERT I. FREEDMAN, ESQ. AND ARTHUR L. ERK** |
| v. | |
| ASATSU-DK INC., NIHON AD SYSTEMS, : INC., TELEVISION TOKYO CHANNEL 12, : LTD and TV TOKYO CORPORATION, | |
| Counterclaim-Defendants | |

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: 4Kids Entertainment, Inc. (1380); 4Kids Ad Sales, Inc. (6309); 4Kids Digital Games, Inc. (7645); 4Kids Entertainment Home Video, Inc. (0094); 4Kids Entertainment Licensing, Inc. (3342); 4Kids Entertainment Music, Inc. (6311); 4Kids Productions, Inc. (3593); 4Kids Technology, Inc. (8181); 4Kids Websites, Inc. (7563); 4Sight Licensing Solutions, Inc. (8897); The Summit Media Group, Inc. (2061); and World Martial Arts Productions, Inc. (8492).

# Table of Contents

Page

COUNTERSTATEMENT OF FACTS ......................................................................1

ARGUMENT .................................................................................................................4

    A.    Standard of Review.................................................................................4

    B.    The Freedman Report Is Admissible. .....................................................6

        1.    The Freedman Report Will Assist the Court to Determine
            Important Customs and Practices Issues........................................6

        2.    Mr. Freedman Does Not Offer Impermissible Legal Conclusions. ..........9

        3.    The Freedman Report Is Reliable. ..............................................14

    C.    The Erk Report Is Admissible..............................................................16

        1.    The Erk Report Will Assist the Court to Determine Important
            Customs and Practices Issues......................................................16

        2.    The Erk Report Does Not Offer Impermissible Legal Conclusions. .........20

        3.    The Erk Report Is Reliable. .......................................................21

        4.    Mr. Erk Is Extremely Well-Qualified. .......................................23

CONCLUSION............................................................................................................24

Table of Authorities

Page

CASES

*Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*,
215 F.3d 219 (2d Cir. 2000)...........................................................................12

*Berckeley Inv. Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006)...........................................................................13

*Cary Oil Co.* v. *MG Refining & Marketing, Inc.*,
No. 99 Civ. 1725, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003).............................4, 5, 13, 15

*Common Fund for Non-Profit Organizations v. KPMG Peat Marwick LLP*,
96 CIV. 0255, 2003 WL 1108493 (S.D.N.Y. Mar. 12, 2003) ................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).........................................4

*Dobco Inc. v. Facilities Dev. Corp.*,
263 A.D.2d 592, 693 N.Y.S.2d 276 (3d Dep't 1999) .............................................5

*E.R. Squibb & Sons, Inc. v Lloyd's & Companies*,
241 F.3d 154 (2d Cir. 2001).............................................................................5

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
545 F.Supp. 1314 (S.D.N.Y. 1982) ..................................................................17

*Hanley v. Orient Beach Club, Inc.*,
No. 96 CIV. 4478, 1998 WL 65990 (S.D.N.Y. Feb. 18, 1998)...............................17

*Highland Capital Mgmt., L.P. v. Schneider*,
551 F.Supp.2d 173 (S.D.N.Y. 2008)..................................................................5

*In re Initial Public Offering Securities Litigation.*,
174 F.Supp.2d 61 (S.D.N.Y. 2001) ..................................................................13

*In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liab. Litig.*,
643 F.Supp.2d. 471 (S.D.N.Y. 2009)..................................................................4

*In re MTBE*,
2008 WL 1971538 .........................................................................................5

*In re Young Broadcasting Inc.*,
403 B.R. 99 (Bankr. S.D.N.Y. 2010)..................................................................4

Table of Authorities
(continued)

*Kumho Tire Company, Ltd. v. Carmichael*,
    526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d. 238 (1999) ........................................................... 4

*Marx & Co., Inc. v Diners' Club Inc.*,
    550 F.2d 505 (2d Cir. 1977) ...................................................................................................... 13

*Pereira v. Cogan*,
    281 B.R. 194 (Bankr. S.D.N.Y. 2002) ........................................................................... 11, 12, 13

*Prof'l Consultants Ins. Co. v. Employers Reinsurance Co.*,
    1:03-CV-216, 2006 WL 751244 (D. Vt. Mar. 8, 2006) ................................................................ 11

*Snap-Drape, Inc. v. C.I.R.*,
    98 F.3d 194 (5th Cir. 1996) ........................................................................................................ 13

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC*,
    467 F.3d 107 (2d Cir. 2006) ....................................................................................................... 20

*Travelers Indem. Co. v. Scor Reinsurance Co.*,
    62 F.3d 74 (2d Cir. 1995) ............................................................................................................. 5

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION
*IN LIMINE*, UNDER *DAUBERT* AND FED. R. EVID. 702, TO EXCLUDE TESTIMONY
OF ROBERT I. FREEDMAN, ESQ. AND ARTHUR L. ERK**

1.     Plaintiffs TV Tokyo Corporation ("TV Tokyo") and Nihon Ad Systems, Inc. ("NAS") and Counterclaim-Defendants ASATSU-DK Inc. ("ADK") and Television Tokyo Channel 12, Ltd. (collectively, "Plaintiffs"), by their attorneys Olshan Grundman Frome Rosenzweig & Wolosky LLP, respectfully submit this memorandum of law in opposition to the Motion *in Limine* of 4Kids Entertainment, Inc. ("4Kids" or "the Debtors") to exclude the testimony of two of Plaintiffs' offered experts, Robert Freedman and Arthur Erk.

## COUNTERSTATEMENT OF FACTS

2.     In or around 2001, the Plaintiffs hired the Debtors as their licensee for an animation series known as Yu-Gi-Oh!.  The parties' relationship was governed by several documents, namely:  a deal memo dated April 18, 2001; a long-form licensing agreement signed in June 2003 and backdated as of April 18, 2001 (the "2001 Agreement"); and an amended and restated agreement dated July 1, 2008 (the "2008 Agreement") (collectively, the "License Agreements").  (*See* Docket No. 33 Exs. B, C).

3.     Plaintiffs terminated the 2008 Agreement on March 24, 2011, pursuant to Paragraph 12(a) of the 2008 Agreement.  On that date, Plaintiffs also commenced an action against the Debtors in the Southern District of New York.

4.     A precipitating factor leading up to the Debtors' decision to terminate the 2008 Agreement was an audit that Plaintiffs commenced in or around February 2010, using Anthony Elliott as their auditor.  Mr. Elliott provided his final report to Plaintiffs on or about November 17, 2010.  In that report, Mr. Elliott set forth nine audit findings, and concluded that the Debtors owed Plaintiffs approximately $4.8 million.

1

5. Three of Mr. Elliott's findings in particular are relevant to the Debtors' Motion *in Limine*.  Two of these involve the discovery that the Debtors had entered into several agreements with Funimation Productions, Ltd. ("Funimation") and Majesco Services, Inc. ("Majesco").  Specifically, in or around May 2002, the Debtors and Funimation entered into two agreements — a Home Video Distribution Agreement, and a Home Video Services Agreement — both of which were backdated to March 1, 2002.  These agreements were amended on July 1, 2003 (both the original and the amended Home Video Distribution Agreement and Home Video Services Agreement are referred to herein as the "Funimation Distribution Agreement" and the "Funimation Services Agreement," respectively) (*See* Docket No. 33 Exs. M, N).  Similarly, on or about April 1, 2004, the Debtors entered into two agreements with Majesco concerning the production and distribution of videos of the Yu-Gi-Oh! episodes on Nintendo's Gameboy Advanced ("GBA Videos") gaming system — a Gameboy Advance Video Distribution Agreement (the "Majesco Distribution Agreement") and a Gameboy Advance Services Agreement (the "Majesco Services Agreement") (*See id.* at Exs. O, P).  All of these Agreements were directly tied to sales of Yu-Gi-Oh!.

6. The Complaint alleges that the Debtors never disclosed to Plaintiffs the existence, sum, or substance of the Funimation and Majesco Services Agreements.  Plaintiffs also questioned why both the Funimation and Majesco Services Agreements (but not the Funimation and Majesco Distribution Agreements, executed on the same dates as the Services Agreements) contain secrecy clauses that prohibit the parties to disclose the terms of the Services Agreements to any third parties — including Plaintiffs — and to not even disclose such terms within their respective companies except on a "strict 'need to know'" basis (the "Secrecy Clauses").

7.        Plaintiffs also alleged that various provisions of the Funimation Distribution and Services Agreements demonstrate that the Debtors had licensed certain home video rights to Funimation — in contravention of the Debtors' representations to Plaintiffs that it was exercising those home video rights itself.   This distinction is important because, under the License Agreements, there were two different income structures depending on whether or not the Debtors exercised those rights itself or sublicensed them to a third party.   Plaintiffs further alleged that the Debtors were receiving improper kickbacks from Funimation for expenses that, under the License Agreements, 4Kids explicitly agreed to bear as part of its share of the royalty revenue pertaining to Yu-Gi-Oh!.

8.        Finally, the third relevant audit finding relates to foreign withholding taxes.   Mr. Elliott concluded that the Debtors had failed to provide the "evidence of payment of … withholding tax on behalf of Licensor" as required by the License Agreements.   Based on this finding, the Complaint alleges that the Debtors failed to provide Plaintiffs with appropriate foreign withholding tax certificates, which prevented Plaintiffs from receiving more than $2 million in tax credits.

**Plaintiffs' Expert Reports**

9.        Plaintiffs have submitted three expert reports, pursuant to Rule 26 of the Federal Rules of  Civil Procedure, including those of Robert Freedman (the "Freedman Report") and Arthur Erk (the "Erk Report").   Copies of these Reports are attached hereto as Exs. 1 and 2, respectively.   Messrs. Freedman and Erk both have provided depositions in this matter, relevant portions of which are attached hereto as Exs. 3 and 4, respectively and are referred to herein as the "Freedman Tr." and the "Erk Tr." respectively.

1392699-3

**ARGUMENT**

A.    <u>Standard of Review.</u>

10.    Under Rule 702 of the Federal Rules of Evidence, expert testimony will be admitted if "scientific, technical, or otherwise specialized knowledge will assist the trier of fact" and if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principals and methods reliably to the facts of the case.  Fed. R. Evid. 702.

11.    In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set forth a series of factors for courts to consider when evaluating the reliability of expert opinions.  Subsequently, in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 150-51, 119 S.Ct. 1167, 1175-76, 143 L.Ed.2d. 238 (1999), the Court clarified that the reliability test is flexible, and that the *Daubert* factors are often of limited relevance where, as here, experts testify based on their knowledge, skill, and experience in non-scientific fields.  In such cases, the "relevant reliability concerns may focus on personal knowledge or experience."  *Id*. at 150, 119 S.Ct. 1175.

12.    In assessing reliability of expert testimony, courts are "mindful that the Federal Rules of Evidence favor admissibility," and that exclusion of expert testimony is the exception and not the rule.  *See In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liab. Litig.*, 643 F.Supp.2d. 471, 477 (S.D.N.Y. 2009); *In re Young Broadcasting Inc.*, 403 B.R. 99, 125 (Bankr. S.D.N.Y. 2010).  *See also* Fed. R. Evid. 702 Advisory Notes.

13.    Moreover, while an expert is not permitted to offer legal conclusions, expert witnesses are allowed to testify about "issues that would help the jury understand concepts it needed to know to render a verdict despite the fact that opinions may encroach on matters of law."  *Cary Oil Co.* v. *MG Refining & Marketing, Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at

*5 (S.D.N.Y. Apr. 11, 2003).  Expert opinions based on ultimate facts are not deemed to be legal conclusions and are admissible.  *See In re MTBE*, 2008 WL 1971538, at *14 (holding that expert witness "permissibly state[d] a factual conclusion supporting a legal argument.").

14.     Moreover, it is well-settled that an expert "may testify as to the customs and practices of [an] industry."  *Highland Capital Mgmt., L.P. v. Schneider,* 551 F.Supp.2d 173, 180 (S.D.N.Y. 2008).  Thus, while an expert may not "testify as to ultimate legal conclusions," he may "opine on an issue of fact within the jury's province," and he may offer testimony that "will likely prove helpful in allowing the trier of fact to better understand the evidence and provid[e] the trier of fact with the tools necessary to make an ultimate determination."  *Id.* at 181.  For example, while an expert cannot state that he "knows" that a party had legal authority to enter into a contract, or that he "knows" that a binding agreement was formed, he may "point to factors indicating to him" that such authority existed or that such an agreement was formed.  *Id.* at 181, 183.  *See also Travelers Indem. Co. v. Scor Reinsurance Co.,* 62 F.3d 74, 78 (2d Cir. 1995) ("Parties may offer evidence of custom or practice to interpret the meaning of a term used in a contract"); *E.R. Squibb & Sons, Inc. v Lloyd's & Companies*, 241 F.3d 154, 174 (2d Cir. 2001) (in order to assist court in resolving a contractual ambiguity, expert witness testified as to whether or not the provision was consistent with industry practice); *Cary Oil*, 2003 WL 1878246, at *7 (allowing expert testimony of economist to explain nature and purpose of a specific type of contract and how it is used in a particular industry); *Dobco Inc. v. Facilities Dev. Corp.*, 263 A.D.2d 592, 593, 693 N.Y.S.2d 276, 277 (3d Dep't 1999) (crediting expert testimony that plaintiff's interpretation of the subject contract in a particular way was "reasonable and consistent with industry practice").

**B.** **The Freedman Report Is Admissible.**

    **1.** **The Freedman Report Will Assist the Court to**
        **Determine Important Customs and Practices Issues.**

15.     The Debtors argue that the Freedman Report should be excluded because it will not be helpful to the Court. However, the question of whether the Debtors licensed the home video rights to Funimation, and the legitimacy of the transactions between the Debtors and Funimation and the Debtors and Majesco, are central points of contention between the parties. Accordingly, the Freedman Report addresses some of the most significant issues in this case, and Plaintiffs respectfully submit that it will assist the Court in determining the outcome of those issues.

16.     Plaintiffs allege that, in contravention of the Debtors' representations that it was licensing the home video rights under the License Agreements itself, the Debtors in fact covertly sub-licensed those rights to Funimation. Plaintiffs further allege that the Debtors conspired with Funimation and Majesco to hide the existence and terms of the Funimation and Majesco Services Agreements from Plaintiffs through strict Secrecy Clauses. Moreover, the License Agreements also required the Debtors to "use customary forms of license agreements" when entering into licensing agreements for the home video rights, which Plaintiffs allege the Debtors did not do. The Debtors, on the other hand, have repeatedly claimed that they did not sub-license the home video rights to Funimation, that there was nothing improper about the transactions with Funimation or Majesco, and that the Funimation and Majesco Agreements, including the Secrecy Clauses, are "typical[]." (*See, e.g.,* Deposition Transcript of Samuel Newborn ("Newborn Tr."), relevant portions of which are attached hereto as Ex. 5, at pp. 243:9-18).

17.     Mr. Freedman's testimony is thus being offered to assist the Court in determining two important issues: (1) whether the terms of the Funimation Agreements are consistent with

the customary industry understanding of a distributor relationship; and (2) whether the terms of the Funimation and Majesco Agreements are customary in the television and home video business.

18.     Mr. Freedman's testimony will be particularly helpful and necessary given that several of the Debtors' witnesses intend to provide their own custom and usage testimony. In particular, the Debtors' General Counsel, Samuel Newborn, repeatedly made claims in his deposition about the customs and practices of the licensing industry as they pertain to important issues in this case.

19.     For example, Mr. Newborn testified as an "industry expert" as to "how the [licensing] business is done:"

> Q:     But don't you typically -- you're industry expert, don't you typically provide a license to allow a nonowner of the copyright to reproduce a copyrighted work?
> …
>
> A:     You enter into an agreement that sets forth what the -- what the rights are and responsibilities are of the parties doing the manufacturing and distribution.
>
> Q:     Okay. So it's your understanding that as a licensee, you can take a licensor's copyright and enter an agreement with a third party to reproduce that copyrighted work without them being a licensee?
>
> A:     Yes. And that is true, if you look at the form of license agreement that permits licensees to use third-party manufacturers. And given the fact that virtually all the U.S. based licensees use third-party manufacturers in Asia to make the T-shirts and the toys and other Yu-Gi-Oh! related merchandise, I don't even understand where you're going with this line of questioning because it's -- that's how the business is done…

(Newborn Tr. 152:24-153:22 (Ex. 5)).

20.     He also testified that service fees are "common knowledge" in the licensing industry:

> Q:      So your statement that surely they knew about the service fees that 4Kids was receiving from FUNimation is based on your view of their understanding of what it means to be a home video licensee, not something that was said, right?
>
> …
>
> A:      … [I]t is based upon common knowledge of the licensing industry…

(*Id.* at 144:20-145:8).

21.      Elsewhere, he opined on how the Funimation Distribution Agreement was "more comprehensive … than in the standard license agreement" (s*ee id.* at 214:11-14) and on how distribution arrangements are "typically … done:"

> Q:      Were you aware that 4Kids made FUNimation the exclusive distributor under the 4Kids FUNimation home video distribution agreement?
>
> A:      Yes.
>
> Q:      Why did they make them the exclusive distributor?
>
> A:      Because that's typically how it's done.

(*Id.* at 201:17-25.  *See also id.*  at 198:20-199:6 (testifying that the royalty rate in the Funimation Agreements "was pretty much the royalty rate that was common to television properties at that time … and in many other home video agreement").

22.      Mr. Newborn also testifies as an industry expert in numerous places in his August 25, 2011 declaration to the Court (the "Newborn Dec.", relevant portions of which are attached hereto as Ex. 6).  For example, Mr. Newborn testifies that "many entertainment companies use confidentiality provisions in their agreements" and that "the market rate for home video royalties for animated television episodes in the U.S. was 20% of the wholesale price."  (Newborn Dec. ¶¶ 45, 74; *see also* ¶ 98).  Thus, Mr. Freedman's testimony is necessary to counter the claims of the Debtors' witnesses, and in particular Mr. Newborn, who will testify as an "expert" on these

very same issues. In the event that Mr. Freedman's testimony is precluded, the Court should also preclude any testimony from Mr. Newborn or any of the Debtors' other witnesses as to the customs and practices of the entertainment and licensing industries, whether the terms of the Funimation and Majesco Agreements comport with those standards, and whether the terms of the Funimation Agreements are consistent with the customary understanding of a distributor relationship.

23.     Finally, the Debtors also argue that the Court is "perfectly competent to interpret the terms of the agreements on its own." (Motion in Limine p. 9). We agree. However, the Court is not being asked to interpret the terms of the Funimation and Majesco Agreements, which are the agreements relevant to Mr. Freedman's testimony. (*See* Section B(2), *infra*). Rather, the Court is being asked to determine whether the Debtors should have paid royalties to Plaintiffs for sales made under the Funimation and Majesco Agreements. This determination requires the Court to understand the types of functions that licensors, licensees, and distributors typically perform. Mr. Freedman's testimony as to the customs and practices of the entertainment industry will assist the Court in making this determination.

**2.     Mr. Freedman Does Not Offer Impermissible Legal Conclusions.**

24.     The Debtors further argue that the Freedman Report should be excluded because it impermissibly offers legal opinions and contractual interpretations. However, a review of the Freedman Report makes clear that Mr. Freedman is not opining on legal obligations or impermissibly interpreting contractual terms. Rather, *all* that he is doing is providing testimony as to the customs and practices of the entertainment industry to assist the Court in determining whether, as the Debtors allege, the terms of the Funimation and Majesco Agreements are consistent with industry standards, are consistent with the type of work that would be performed

in a typical distributor relationship, and comport with the requirements of the License Agreements that "customary" forms be used.

25.     First, although the Debtors take issue with a number of specific opinions offered by Mr. Freedman, none of the opinions that the Debtors cite are legal conclusions. [2]   For example, the Debtors complain that Mr. Freedman opines on the legitimacy of the Funimation transaction, questions why certain terms were included and/or omitted in the Funimation Services Agreement, and opines on whether or not there appears to have been a legitimate business reason for the Debtors to have entered in the Funimation Agreements.  (Motion in Limine pp. 5-6).  None of these opinions are legal conclusions; these are all terms and function of a business relation.  Mr. Freedman opines on the kinds of clauses that are typically included in license agreements of the nature involved in this dispute, and on whether or not there are legitimate business reasons in his experience for structuring these types of contracts as 4Kids did, or including or omitting certain types of provisions.

26.     Moreover, the Debtors' argument that Mr. Freedman is improperly construing contractual provisions misses the mark because there is no dispute over contractual interpretation of the Funimation or Majesco Agreements.  Although Mr. Freedman recites various obligations that the Debtors and Funimation have under the Funimation Services Agreement, we are not litigating as an ultimate legal issue what those obligations actually mean.  For example, there is no dispute over the meaning of the words "manufacture," "sell," "design," etc. in the Funimation and Majesco Agreements, and Mr. Freedman does not offer an opinion as to the meaning of those words.  Rather, it is relevant to the Court's determination of what is proper under the License Agreements to hear testimony on whether the *types* of terms present in the Funimation

---

[2] Moreover, Mr. Freedman expressly testified that he was *not* giving a legal opinion concerning the Funimation Services Agreement.  (Freedman Tr. 72:13-73:20, 94:10-21 (Ex. 3)).

and Majesco Agreements comport with industry standards, and whether the act of granting these and other rights to Funimation amounts to the grant of a sub-license of the home video rights. This latter determination requires the Court to understand the types of functions that licensors, licensees, and distributors typically perform.

27.     Further, even if legal interpretation of the terms of the Funimation and Majesco Agreements were ultimate legal issues in the case, which they are not, Mr. Freedman does not opine on the legal meaning of any of the specific terms of those agreements. Rather, he offers an opinion, based on his more than 39 years of experience in the entertainment industry and with entertainment contracts, as to whether, taken as a whole, the terms of the Funimation Agreements are consistent with the terms and conditions that prevail in agreements between licensors and distributors of home video programming, and whether those contract terms comport with the custom and usage of the television and home video industries. Such "customs and usage" testimony is, by definition, factual. *See Prof'l Consultants Ins. Co. v. Employers Reinsurance Co.,* 1:03-CV-216, 2006 WL 751244, at *6 (D. Vt. Mar. 8, 2006) ("Under federal law, the existence of a custom or usage is in the first instance a question of fact"). The Court will need such factual testimony to determine what is proper under the License Agreements.

28.     Moreover, it is common to have subject matter experts testify on the customs and practices of specific industries. For example, in *Pereira v. Cogan*, 281 B.R. 194, 196 (Bankr. S.D.N.Y. 2002), the trustee in a bankruptcy proceeding under Chapter 7 sought to introduce the testimony of a corporate governance expert, who was also a lawyer and a law professor, to opine on the well-accepted corporate governance standards and duties of care that prevail in the industry. *See Id.* at 197. The company sought to exclude the report, arguing that the expert

improperly testified as to legal standards, would usurp the role of the jury, and would run afoul of *Daubert* and *Kumho*.

29.     The bankruptcy court disagreed, explaining that the expert "is merely testifying as to customs and practices in the industry and applying those customs to the facts presented here. There is no disagreement that experts may testify as to the customary practices in a profession or industry." *Id.* at 200.  The court further noted that the defendant's argument that the expert was providing a "legal opinion of what officers and directors are required to do" was "unavailing," because the expert "based this notion on his thirty years' of experience in the corporate governance field and his observations of 'good corporate practices.'" *Id.*  Finally, the court explained that, although "[t]hat custom assuredly is based in good part on what others believe the law to require, … this tenuous connection is insufficient [to exclude the testimony]." *Id.*  *See also Media Sport*, 95 CIV. 3901, 1999 WL 946354, at *1-4 (S.D.N.Y. Oct. 19, 1999) (expert testimony that "is limited to a *factual* discussion regarding the customs and practices of [an] industry [and] an analysis of whether the conduct of the parties in th[e] action conformed to those customs" is admissible); *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 225 (2d Cir. 2000) (admitting expert testimony regarding whether contract clause reflects custom and practice in petroleum industry).

30.     Here, as in *Pereira*, Mr. Freedman offers standard "customs and practices" testimony based on his more than 39 years of experience in the entertainment and licensing industry, *i.e.,* whether or not the terms of the Funimation Agreements are consistent with a distributor relationship, and whether the terms of the Funimation and Majesco Services Agreement are consistent with industry standards.  Moreover, none of the opinions that he offers even remotely rise to the level of the "opinions" that were excluded in the cases cited by the

Debtors. He does not, for example, conclude that the Debtors breached the License Agreements or committed a fraud on the Plaintiffs; he does not opine on legal standards or engage in any legal analysis or argument; and he does not construe contractual terms or purport to determine what the parties' obligations were under the License Agreements. *Cf., e.g., In re Initial Public Offering Securities Litigation.*, 174 F.Supp.2d 61 (S.D.N.Y. 2001) (excluding expert testimony submitted on a recusal motion that interpreted 28 U.S.C. § 455 and concluded that the judge was required to recuse himself pursuant to that statute); *Marx & Co., Inc. v Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (holding that, although expert testimony on the "customs" and "ordinary practices" of particular fields is admissible, expert testimony by lawyer[3] who gave his opinion "as to the legal standards which he believed to be derived from the contract and which should have governed [the defendant's] conduct, *i.e.*, "what was necessary to fulfill the covenant of the contract," was inadmissible) (formatting omitted); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (excluding expert testimony of lawyer who conducted "substantial legal analysis" of securities law exemption and concluded that it was reasonable for plaintiff to believe that it was entitled to this exemption); *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996) (expert reports from certified public accountants that analyzed tax laws excluded because they consisted of "nothing more than legal arguments"). Mr. Freedman's Report should therefore be admitted as permissible customs and usage testimony.

---

[3] Although Mr. Freedman is a lawyer, it is clear that the fact that a witness is a lawyer does not *per se* bar him or her from serving as an expert witness. *See Pereira*, 281 B.R. at 197 (admitting expert testimony by lawyer and law professor); *Cary Oil*, 2003 WL 1878246, at *5 (allowing expert testimony of law professor to explain general corporate governance principles and concept of veil-piercing to jury). Moreover, Mr. Newborn, who as noted above intends to provide testimony on the very same topics as Mr. Freedman, is also a lawyer. It should also be noted that Mr. Newborn provides substantial legal interpretations in his testimony as a "fact" witness. *See, e.g,* Newborn Dec. ¶ 18 (Ex. 6) (noting that Plaintiffs' claims contain "numerous errors and contractual misinterpretations").

### 3. The Freedman Report Is Reliable.

31.     The Debtors also argue that Mr. Freedman's Report is "unreliable" because Mr. Freedman examined only the contracts themselves and some court documents arising out of this litigation, but has "no knowledge of the discussions that occurred between the parties during the negotiations, nor any meaningful understanding of 4Kids' prior history of producing television or home videos." (Motion in Limine p. 9).  This argument, too, misses the mark.

32.     Mr. Freedman's testimony is expressly limited to an opinion based on the terms, form and functions of Funimation and Majesco Agreements at issue.  Specifically, he opines on whether certain terms of those agreements comport with industry standards, and whether the rights granted to Funimation and retained by 4Kids under the Funimation Agreements are consistent with the customary industry understanding of a licensor-licensee relationship. Clearly, the only documents necessary to reach these conclusions are the agreements themselves.

33.     Notably, the Debtors do not give any examples of how the parties' discussions during negotiations or the Debtors' prior history would have any relevance to Mr. Freedman's opinions, likely because there is none.  Indeed, given that Mr. Freedman expressly opines on industry-wide standards, it is hard to understand how the Debtors' specific prior history has any bearing on this opinion, particularly where Mr. Freedman concluded that the Debtors' practices were out of line with industry standards.  Moreover, the proper forum in which to question Mr. Freedman on any materials that he was not shown is on cross-examination, not in a motion *in limine*.

34.     The Debtors further argue that portions of the Freedman Report are contradicted by his own treatise.  Specifically, the Debtors attempt to contradict Mr. Freedman's opinion that the Funimation services fee was not typical by pointing to a portion of the treatise in which Mr. Freedman notes that, because DVD's are often released with additional material, "the producer

may negotiate to be engaged for a fee to create these ancillary materials," and "[t]he distributor will likely be willing to engage the producer to perform these services if the parties can agree upon appropriate compensation." (Ex. 7 p. 4).

35.     However, Mr. Freedman's treatise is not in any way inconsistent with his testimony.[4]     First, Mr. Freedman's treatise makes no mention of how the "fee" or "compensation" is to be structured.  However, as he explained in his deposition, "those payments are usually recoupable out of the licensor's share of royalties," which was not the case with the Funimation services fee.  (*See* Freedman Tr. 68:14-69:13 (Ex. 3)).

36.     Second, as Mr. Freedman further explained, all that his treatise says is that a distributor will "likely" be willing to engage the producer to perform certain services related to DVD additions, and that the parties could negotiate to be engaged for a fee.  (*Id.* at 100:22-102:8).  The situations in which a fee would be negotiated are not explained in Mr. Freedman's treatise.   However, had the Debtors inquired further with Mr. Freedman, he would have explained to them that, although independent producers may indeed need to receive a fee from the producer in order to cover the upfront costs of such work (which fee would then be recoupable), large companies such as 4Kids would not need such a fee because they have the capital to perform the additional services without any upfront payment.[5]  (Declaration of Robert Freedman, attached hereto as Ex. 8).

---

[4] Moreover, the purported contradiction between Mr. Freedman's testimony and one sentence in his treatise is not a valid basis on which to exclude his report.  "The fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify; rather it is for the [trier of fact], with the assistance of vigorous cross-examination, to measure the worth of the opinions."  *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,* 99 CIV. 1725, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) (citation omitted).  The Debtors are free to explore this issue on cross-examination.

[5] Indeed, rather than allow Mr. Freedman to explain, the Debtor's counsel cut him off twice in the middle of a sentence, and would not let him complete his thoughts even after Plaintiffs' counsel pointed out that Mr. Freedman was not "done with the answer."  (*See* Freedman Tr. 95:24-97:6 (Ex. 3)).

37.     Finally, a treatise on fees for work performed by a producer for DVD additions is entirely inapplicable to the present situation where the Debtors received a service fee from Funimation for a number of services, of which the DVD additions were simply one.  (*See* Freedman Tr. 96:24-100:21 (Ex. 3)).  Moreover, as Mr. Freedman explained in his Report and deposition, the "fees" referred to in his treatise do not, based on his experience, take the form of ongoing royalty payments, whereas the Funimation services fee does.  (*See* Freedman Report p. 9, Freedman Tr. 97:10-20).

**C.    The Erk Report Is Admissible.**

**1.     The Erk Report Will Assist the Court to Determine Important Customs and Practices Issues.**

38.     Mr. Erk's proposed testimony will also be helpful to the Court.  Mr. Elliott's audit report and findings were a precipitating cause of the Plaintiffs' termination of the 2008 Agreement.  The Debtors have repeatedly asserted that such termination was wrongful, and have challenged the validity of Mr. Elliott's methodology, judgment calls, and conclusions.[6]  (*See, e.g.,* Deposition Transcript of Rosalind Nowicki ("Nowicki Dep"), relevant portions of which are attached hereto as Ex. 9, at pp. 168:5-21 (characterizing Mr. Elliott as being "difficult and challenging"); Ex. 10 (email in which Ms. Nowicki writes that the Debtors' accounting team has "spent many hours providing some of the smallest details to Mr. Elliott, many of which have no relation to a standard auditing process")); Ex. 11 (email from Bruce Foster calling Mr. Elliott

---

[6]In footnote 4 of the memorandum of law, the Debtors suggest that "the validity of the audit [is] not an issue to be tried in this litigation."  However, given that the Debtors have repeatedly called into question the merits of the audit findings as well as Mr. Elliott's methodology in court submissions and proceedings, it appears that they are merely feigning this position in an attempt to contest Mr. Elliott's findings at trial with no opposition.  In fact, in his Declaration, Bruce Foster explicitly attacks Mr. Elliott's methods with respect to his review of the withholding taxes (Foster Dec. ¶ 39), and then purports to entirely re-calculate the value of the withholding tax claim, alleging that it should be valued at approximately $400,000 rather than the $2.2 million that Mr. Elliott found.  (*Id.* at ¶¶ 34-39).  If the Debtors are willing to concede that the audit was validly conducted and that the audit findings are correct, the Debtors should withdraw all of their witness' testimony challenging the validity of the audit and execute a stipulation conceding the validity of Mr. Elliott's findings.  Otherwise, the Court should not accept Debtors' representation in footnote 4.

"crazy"); Declaration of Bruce Foster dated August 25, 2011 ("Foster Dec."), relevant portions of which are attached hereto as Ex. 12, at ¶¶ 32-39 (characterizing Mr. Elliott's analysis as "fatally flawed" and re-calculating certain audit findings).

39.     To assist the Court in determining whether or not the audit claims, and thus the termination of the 2008 Agreement, are valid, Mr. Erk was asked to consider, and shall provide testimony on, whether the services performed by Mr. Elliott comport with industry standards and practices, and whether Mr. Elliott's findings had reasonable merit.  (Erk Report p. 2).  More specifically, Mr. Erk reviewed Mr. Elliott's audit report and provided his comments with respect to Mr. Elliott's methodology and conclusions.

40.     Such testimony, in which a professional opines on whether another professional within the same field complied with industry standards and regulations, is regularly permitted. *See, e.g., Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1372 (S.D.N.Y. 1982) (allowing expert testimony as to whether accountants had complied with GAAS); *Common Fund for Non-Profit Organizations v. KPMG Peat Marwick LLP*, 96 CIV. 0255, 2003 WL 1108493 (S.D.N.Y. Mar. 12, 2003) (allowing expert testimony as to whether outside auditors complied with GAAS); *Hanley v. Orient Beach Club, Inc.*, No. 96 CIV. 4478, 1998 WL 65990 (S.D.N.Y. Feb. 18, 1998) (noting the admissibility of an auditor's expert opinion).

41.     Moreover, Mr. Erk's testimony is necessary in light of the fact that the Debtors' witnesses intend to testify as to certain customs and practices within the auditing industry.  For example, at his deposition Mr. Newborn repeatedly testified as to how royalty audits are typically handled and what was "common practice in the industry:"

> Q:      Now, was it your expectation that you would be able to see
> Mr. Elliott's work papers in order to assess the foreign withholding
> tax issue?
> …

> A:      Yes. Since 4Kids conducts many audits on behalf of its clients, the typical way an audit is handled is that after the auditor completes his work or her work, the auditor submits an audit report which is shared with the party being audited….
>
> …
>
> Q:      … Are you aware of any provision in the royalty -- in the auditing standards that requires a company to provide a royalty audit report to the subject of an audit?
>
> A:      No….  I've testified to what the common practice is in the industry.  You and your client chose not to follow that practice and we're sitting here partially on account of that.  That's my testimony.

(Newborn Tr. 16:7-20, 23:10-24:19 (Ex. 5).  *See also id.* at 17:23-21:20 (discussing "standard practice" among companies that perform audits).  Mr. Newborn also devotes a significant portion of his Declaration to challenging Plaintiffs' handling of the audit and the aftermath.  For example, Mr. Newborn testifies that one of Plaintiffs' letters to the Debtors, outlining various audit claims, "contained numerous errors and contractual misinterpretations."  (Newborn Dec. ¶ 18 (Ex. 6)).  He also challenges Mr. Elliott's procedures with respect to foreign withholding taxes, testifying that "Mr. Elliott could have easily substantiated the amount of the international withholding taxes by ordinary audit procedures such as reviewing cash receipts, remittances from foreign licensees and supporting documentation for bank wire transfers from foreign licensees who withheld taxes from their remittances."  (*Id.* at ¶ 103).

42.     Mr. Foster, provides similar testimony in both his Declaration and in his deposition testimony.  For example, in his Declaration, he testifies that "[i]n my experience, it is customary for the company initiating the audit, or its auditor, to provide an audit report to the company.  It is also customary for the auditor to meet with the audited company to discuss the auditor's findings.  The audited company's management, as well as a senior member of the accounting/finance department would typically participate in any meeting with the auditor to discuss the auditor's findings."  (Foster Dec. ¶ 27.  *See also* Deposition Transcript of Bruce

Foster ("Foster Tr."), relevant portions of which are attached hereto as Ex. 13, at pp. 265:15-266:9, 269:18-270:24) (noting that, based on his "30 years of experience in audit and tax," he believes certain procedures to be utilized "industrywide" and to be the "normal course of doing business").

43.     One of the Debtors' Executive Vice Presidents, Rosalind Nowicki, also commented on her understanding that Mr. Elliott's audit did not comply with industry standards:

> Q:     … Why do you say [Mr. Elliott's requests] have "no relation to a standard auditing process"?
>
> A:     Well, what I understood from Bruce [Foster] and the accounting team is that there were various elements that Mr. Elliott was asking for that were very -- details that weren't in the normal course of doing business in terms of doing an audit, a normal and -- consistently audit -- with other audits that we've been a party to. And so I included that because as I understood it, we had provided some things that boiled down to things that were of a smaller nature when he hadn't even looked at the cash receipts yet, was something that I recall Bruce stating, as something that would be a commonality in audit.
>
> Again, I'm not in a position to comment if that's normal or not. That's just what was represented to me and other very small, minute details that seemed to be less focused on the bigger picture of doing a global audit and more on focused on things that were very specific, there were very specific things he wanted to find as opposed to doing an normal audit finding and then drilling down…. My understanding was, is that this wasn't conducted as a regular audit….

(Nowicki Tr. 189:4-190:10 (Ex. 9)).

44.     Given that the Debtors' witnesses intend to introduce extensive testimony as to the customs, practices, and standards of the audit industry — views with which Plaintiffs strongly disagree — it will certainly assist the Court to have access to expert testimony on this topic, and would be prejudicial to the Plaintiffs to deny such testimony.  In the event that Mr. Erk's testimony is precluded, the Court should also preclude any testimony from Mr. Newborn,

Mr. Foster, Ms. Nowicki, or any of the Debtors' other witnesses as to the customs and practices of the auditing industry, and whether or not Mr. Elliott complied with those standards.

**2.     The Erk Report Does Not Offer Impermissible Legal Conclusions.**

45.     As with Mr. Freedman's Report, the Debtors contend that Mr. Erk's Report improperly construes various contractual provisions.   However, once again, the Debtors' argument misses the mark for several reasons.

46.     First, the Debtors completely overlook the fact that a royalty auditor begins his or her inspection by reviewing the agreements that govern a parties' relationship and conducting the audit based on their interpretations of those agreements.   They do not audit financial statements.

47.     Second, the Debtors also misunderstand the scope of Mr. Erk's report and proposed testimony.   The purpose of the Report is not to instruct the Court as to what the various contractual provisions mean; rather, as an expert hired to assess the validity of Mr. Elliott's decisions, judgment calls, and conclusions, he reviewed the agreements from an auditor's perspective to determine if he agreed with them, *i.e.* to assist the Court in determining whether or not Mr. Elliott's interpretations were reasonable from the standpoint of the common practice of a royalty auditor.   This kind of testimony, in which an expert witness opines on whether particular interpretations comport with the customs and practices of an industry are admissible.   *See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC,* 467 F.3d 107, 132-34 (2d Cir. 2006) (upholding district court's decision to admit qualified expert testimony that it was custom and practice of insurers to interpret clauses in insurance contracts in a certain way).

48.     Indeed, Mr. Erk repeatedly made clear in his deposition that he is not a lawyer and was not providing a legal opinion, but rather was providing an "auditor's opinion as to what … those contract clauses mean."   (Erk Tr. at 64:7-10 (Ex. 4)).   Given that the Debtors

challenge may of Mr. Elliott's interpretations of the contracts during his audit, such testimony is helpful to the Court in determining whether Mr. Elliott acted reasonably.

49. Third, the Debtors' argument also overlooks the fact that many of the contractual provisions that Mr. Erk purportedly interprets are not even at issue in this case. For example, the Debtors argue that Mr. Erk improperly "offers his interpretation of whether [bank] charges are 'allowed' under [the License Agreements]." However, the Debtors neglect to mention that they have conceded that such charges are not allowed. Thus, it is clear that Mr. Erk's opinions are being offered not speculate as to the actual legal meaning of those provisions (because the meanings are no longer in dispute), but rather to assist the Court in determining whether Mr. Elliott's interpretation of those same provisions during his audit were reasonable from the perspective of an auditor and supported the conclusions that he reached.

**3.      The Erk Report Is Reliable.**

50. The Debtors further argue that the Erk Report should be excluded as unreliable and conclusory. Specifically, they call into question Mr. Erk's "lack of independent investigatory work or analysis," and point out the fact that much of Mr. Erk's Report consists of agreeing with Mr. Elliott's audit findings.

51. However, the Debtors appear to misunderstand the scope and purpose of Mr. Erk's Report. As noted above, Mr. Erk was not asked to re-create Mr. Elliott's audit. Indeed, the Debtors concede that the Court does "not want someone to come in and recreate Mr. Elliott's audit." (Motion in *Limine* FN 4). The Erk Report thus considered only whether Mr. Elliott's audit was proper and consistent with industry standards. No additional investigatory work beyond a review of Mr. Elliott's audit report and drafts thereof, working papers, and other supporting documentation was necessary or required to render an opinion on this subject, particularly in light of Mr. Erk's own experience as a royalty auditor for dozens of clients.

Indeed, had Mr. Erk conducted an independent investigation, he would not only have been significantly expanding the scope of his mandate, but also, according to the Debtors, running afoul of the Court's instructions not to re-create Mr. Elliott's audit.

52. Specifically, the Debtors take issue with Mr. Erk's agreement with several of Mr. Elliott's audit findings. For example, they note that Mr. Erk's full analysis of audit finding number 7 consists of Mr. Erk's statement that "[t]he deduction of bank charges is not allowed under the Agreements," and that he therefore "agree[s] with claim seven." (Motion *in Limine* p. 3). Similarly, the Debtors note that Mr. Erk's opinion with respect to finding 9, which pertains to material and courier costs, consists solely of Mr. Erk's statement that he agrees with Mr. Elliott's finding, which in turn was based on the statements of an ADK employee. (Motion *in Limine* p. 10). They make similar claims with respect to Mr. Erk's opinions on audit findings 2, 3, and 5. However, they conveniently omit the fact that Mr. Erk *disagreed* with Mr. Elliott as finding number 6, concerning insurance costs. (Erk Report pp 6-7).

53. The Debtors then suggest that Mr. Erk should have conducted some additional investigation in order for his Report to be admissible. Tellingly, however, the Debtors do not specify what additional investigation they would have wanted Mr. Erk to do, or how that would have affected his ability to render an opinion on the reasonableness of Mr. Elliott's audit. Moreover, it is unclear what additional investigation Mr. Erk could have conducted with respect to many of these audit claims. To determine whether or not bank charges are properly deducted under the License Agreements, all that Mr. Erk needed to do was to look at the Agreements. Moreover, had Mr. Erk conducted such an independent investigation of the audit findings, he would have essentially been re-creating Mr. Elliott's audit, which he was not asked to do (and which according to the Debtors he could not do pursuant to the Court's instructions).

1392699-3

54.     As noted above, all that Mr. Erk was asked to do was to opine on whether Mr. Elliott's audit comported with industry standards and whether his conclusions had "reasonable merit."  If it is reasonable and customary for an auditor interpret the Agreements as not permitting bank charges, and if it is reasonable and customary for an auditor to accept an employee's statements as to what material and courier costs are owed, then Mr. Erk could — as he did — merely agree with the audit findings without somehow rendering his Report inadmissible or "conclusory."[7]

### 4.     Mr. Erk Is Extremely Well-Qualified.

55.     Finally, the Debtors suggest that Mr. Erk's Report should be excluded because "he has never before submitted a report assessing another accountant's royalty audit in another litigation," thus calling into question Mr. Erk's qualifications.  However, Mr. Erk is an auditor with more than twenty-five years conducting royalty audits.  He testified that he has conducted "hundreds" of audits, many of which have been in the entertainment field and have involved royalties and licenses.  (*See* Erk. Tr. 15:22-16:3).  He has also worked as a senior-level auditor for numerous entertainment-related companies, including RCA Records and Paramount Communications.  (Erk Report pp. 10-12).  There is absolutely no basis to even suggest that Mr. Erk is somehow not qualified to provide an opinion as to the reliability, reasonableness, and merits of Mr. Elliott's audit.

---

[7] The Debtors also suggest that the Erk Report is unreliable because the legal theory upon which another report Mr. Erk provided in another case was recently questioned.  However, the circumstances of that matter are entirely inapplicable to the present situation.  There, Mr. Erk was hired as a *fact* witness rather than an expert, and specifically was engaged to replace the original auditor in the matter.  Mr. Erk did not provide a Rule 26 report, but rather submitted an affidavit in connection with a motion.

1392699-3

**CONCLUSION**

56.     WHEREFORE Plaintiffs respectfully request that this Court deny the Debtors'

Motion In Limine to exclude the expert reports of Robert Freedman and Arthur Erk, and grant

any such other and further relief as the Court may deem just and proper.


Dated: New York, New York
            August 26, 2011

                                                    OLSHAN GRUNDMAN FROME
                                                    ROSENZWEIG & WOLOSKY LLP


                                        By:        /s/ Kyle C. Bisceglie
                                                    _____
                                                    Michael S. Fox
                                                    Kyle C. Bisceglie, Esq.
                                                    Park Avenue Tower
                                                    65 East 55th Street
                                                    New York, New York 10022
                                                    (212) 451-2300

                                                    *Counsel to TV Tokyo Corporation and*
                                                    *Nihon Ad Systems, Inc*

1392699-3