<u>**FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re:                                              Chapter 11
      4KIDS ENTERTAINMENT, INC., *et al.*,[1]      Case No. 10-11607 (SCC)

                              Debtors.      (Jointly Administered)


----------------------------------------------------------------x
TV TOKYO CORPORATION and NIHON AD
SYSTEMS, INC.,

      Plaintiffs,

v.                                                  Adv. Pro. No. 11-02225 (SCC)

4KIDS ENTERTAINMENT, INC.,

      Defendant and Counterclaim-Plaintiff,

v.

ASATSU-DK INC., NIHON AD SYSTEMS, INC.,
TELEVISION TOKYO CHANNEL 12, LTD and
TV TOKYO CORPORATION,

      Counterclaim-Defendants.
----------------------------------------------------------------x


      <u>**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

---

[1]      The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: 4Kids Entertainment, Inc. (1380); 4Kids Ad Sales, Inc. (6309); 4Kids Digital Games, Inc. (7645); 4Kids Entertainment Home Video, Inc. (0094); 4Kids Entertainment Licensing, Inc. (3342); 4Kids Entertainment Music, Inc. (6311); 4Kids Productions, Inc. (3593); 4Kids Technology, Inc. (8181); 4Kids Websites, Inc. (7563); 4Sight Licensing Solutions, Inc. (8897); The Summit Media Group, Inc. (2061); and World Martial Arts Productions, Inc. (8492).

**A P P E A R A N C E S:**

OLSHAN GRUNDMAN FROME ROSENZWEIG & WOLOSKY LLP
*Attorneys for Plaintiffs and Counterclaim-Defendants*
Park Avenue Tower
65 East 55th Street
New York, NY 10022
By:    Kyle C. Bisceglie, Esq.
       Michael S. Fox, Esq.
       Ellen V. Holloman, Esq.
       Mason Barney, Esq.

KAYE SCHOLER LLP
*Attorneys for Debtor/Defendant and Counterclaim-Plaintiff*
425 Park Avenue
New York, NY 10022
By:    Michael B. Solow, Esq.
       Frederic W. Yerman, Esq.
       Paul C. Llewellyn, Esq.
       Jessica A. Malkin, Esq.

# TABLE OF CONTENTS

PARTIES AND PROCEDURAL HISTORY ............................................................................ 2

FINDINGS OF FACT ............................................................................................................ 5

   I.    Background .................................................................................................................. 5

       A.  The Licensor Parties and the Yu-Gi-Oh! Brand ................................................ 5

       B.  The Yu-Gi-Oh! License Agreements ................................................................. 6

          1.  The Short Form Agreement ......................................................................... 6

          2.  The 2001 Agreement ................................................................................... 7

          3.  The 2008 Agreement ................................................................................... 7

          4.  The Gross Income Provision ....................................................................... 8

   II.   4Kids' Activities Under the Yu-Gi-Oh! License Agreements ......................................... 10

   III.  ADK's Royalty Audit of 4Kids ............................................................................... 11

   IV.  ADK's Plan to Start its Own U.S. Home Video Business ..................................... 14

   V.   The Final Audit Findings ........................................................................................ 15

       A.  Finding No. 1: Funimation Service Fees .......................................................... 16

          1.  4Kids' Decision to Start 4Kids Home Video .............................................. 16

          2.  The Negotiation of the Home Video Rights in the 2001 Agreement ............. 17

          3.  The Parties' Understanding of Paragraph 1(b) of the 2001 Agreement ......... 19

          4.  The 4Kids-Funimation Agreements ............................................................ 20

             a.  The Funimation Distribution Agreement ................................................ 20

             b.  The Funimation Services Agreement ..................................................... 22

             c.  Execution of the Funimation Agreements ............................................... 26

             d.  Disclosure of the Funimation Services Agreement and Fees ................... 29

          5.  4Kids' Home Video Subsidiary ................................................................... 32

          6.  The Revision of Paragraph 1(b)(iii) in the 2008 Agreement ......................... 33

i

B. Finding No. 2: Majesco Service Fees ....................................................34

   1. Background of the 4Kids-Majesco Relationship .............................34

   2. The Majesco Services Agreement ..................................................36

C. Finding No. 3: International Withholding Taxes ...................................37

   1. Withholding Taxes Generally .........................................................37

   2. Treatment of Withholding Taxes under the License Agreements ...................39

   3. Mr. Elliott's Audit Finding ............................................................44

   4. Expert Testimony Regarding Japanese Tax Law............................48

   5. There Is No Credible Evidence That ADK Ever Requested Foreign Tax Withholding Certificates from 4Kids Prior to the Audit ................................53

   6. There Is No Evidence That ADK Suffered Any Tax Related Injury...............57

D. Finding No. 4: Post-June 2008 Home Video Revenue ..........................61

E. Finding No. 5: Costs of Third-Party Audits..........................................62

F. Finding No. 6: Errors & Omissions Insurance Allocation.....................69

   1. 4Kids' Methods...............................................................................70

   2. Mr. Elliott's Method ......................................................................71

G. Finding No. 7: Bank Charges................................................................72

H. Finding No. 8: Miscellaneous Costs .....................................................73

I. Finding No. 9: Material & Courier Costs ..............................................74

VI. ADK's Purported Termination of the 2008 Agreement ..................................78

A. The 2008 Agreement's Termination Provision......................................78

B. Mr. Elliott's Preliminary Audit Findings.............................................78

C. The Parties' June 2010 Correspondence................................................80

   1. ADK's June 17, 2010 Letter ..........................................................80

   2. ADK's June 25, 2010 Letter ..........................................................81

   3. 4Kids' June 29, 2010 Response .....................................................82

D.  The Parties' December 2010 Correspondence......................................................83

1.  ADK's December 20, 2010 Letters .............................................................83

2.  4Kids' December 29, 2010 Responses ........................................................87

E.  The Parties' 2011 Negotiations.............................................................................88

1.  Adaptation Agreement ................................................................................90

2.  Mr. Sugimoto's "Inadvertent" March 9, 2011 Email ..................................92

3.  4Kids' $1 Million Good-Faith Payment .....................................................94

4.  The March 18, 2011 Meeting......................................................................95

5.  4Kids' Efforts to Continue Negotiations to Resolve the Audit Claims...........96

F.  The March 25, 2011 Purported Termination .........................................................97

G.  Balance Owed to 4Kids at the Time of Termination ...........................................99

EVIDENTIARY MATTERS......................................................................................................100

I.    Admissibility of Expert Testimony...............................................................................100

A.  Plaintiffs' Motion *in Limine* to Exclude the Expert Report and Testimony of
Takaaki Tokuhiro........................................................................................101

B.  4Kids' Motion *in Limine* to Exclude the Testimony of Robert Freedman and
Arthur Erk ..................................................................................................104

II.   Evidentiary Issues Regarding the Translation of Documents.........................................105

III.  Other Evidentiary Objections .....................................................................................107

DISCUSSION ..........................................................................................................................108

I.    Applicable Law...........................................................................................................108

II.   Licensor's Purported Termination of the 2008 Agreement was
Ineffective Because Licensor Failed to Provide 4Kids with
Adequate Formal Written Notice of Breach ................................................................112

A.  ADK's June 17, 2010 Letter ........................................................................114

B.  ADK's June 25, 2010 Letter ........................................................................115

C.  ADK's December 20, 2010 Letters ...............................................................115

D.  ADK's March 4, 2011 Letter ................................................................119

E.  Mr. Sugimoto's "Inadvertent" March 9, 2011 Email ...........................119

F.  Ongoing Negotiations Continued Between the Parties
Without a Final Opportunity to Cure ...................................................120

III.  The Amount Owed by 4Kids, if Any, Was Not the $4.8 Million
Claimed in the Purported Notice of Breach, Which Renders the
Notice Materially Defective and Renders the Termination Ineffective..........122

A.  Finding No. 9: Material & Courier Costs - $247,771.88 .....................124

B.  Finding No. 8: Miscellaneous Costs - $43,554.59..............................126

C.  Finding No. 7: Bank Charges - $4,270.58 .........................................126

D.  Finding No. 6: Errors & Omissions Insurance
Allocation - $67,328.45 ....................................................................126

E.  Finding No. 5: Unauthorized Audit Fee
Deduction - $105,111.20....................................................................127

F.  Finding No. 4: Unreported Post-June 2008
Home Video Revenue - $26,894.27....................................................130

G.  Finding No. 3: Unsubstantiated International
Withholding Taxes - $2,265,767.16 ...................................................131

1.  4Kids Provided Evidence of Withholding Tax
Deductions Required by the License Agreements .........................132

2.  Licensor Has Demonstrated No Tax Injury ..................................136

3.  Even If ADK Suffered a Tax Injury, It Cannot
Recover From 4Kids Due to Its Own Inaction .............................139

H.  Findings No. 1 and No. 2: Unreported Funimation
Home Video Revenue - $1,967,000.00 and Unreported
Majesco Home Video Revenue - $91,666.50 ......................................141

1.  4Kids Exercised the Home Video Rights Itself Pursuant to
Paragraph 1(b)(iii) of the License Agreements and Earned
Service Fees from its Distributors for Separate Services Rendered ..............142

a.  Licensor's Mischaracterization of 4Kids' Duties under the
License Agreements..............................................................143

iv

　　　　b.　Licensor's Arguments that Funimation Was the Licensee
　　　　　　Because It (i) Was Manufacturing, Distributing, and Selling
　　　　　　Home Videos and (ii) Bore the "Inventory Risk" Do Not
　　　　　　Withstand Scrutiny.................................................................................144

　　　　c.　Licensor's "Secrecy Clause" Argument Has No Basis...........................146

　　2.　Paragraph 1(b)(iii) of the License Agreements and the
　　　　Misunderstanding Regarding Such Provision................................................148

IV.　Other Arguments Presented by Plaintiffs .......................................................151

CONCLUSION.........................................................................................................152

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUTPCY JUDGE**

Since 2001, defendant 4Kids Entertainment, Inc. ("4Kids" or the "Debtor") has brought the immensely popular Yu-Gi-Oh! *anime* series to children of all ages in the United States and abroad.  As licensee of the brand from plaintiffs NAS, TV Tokyo, and ADK (each as defined below), the Japanese consortium that controls the Yu-Gi-Oh! rights (the "Consortium"), 4Kids generated over $150 million in revenue between 2001 and 2009, which it shared with its licensor pursuant to the contractual arrangements between them.  But sometime in 2009, for reasons that remain unclear, the relationship soured. The Consortium decided to conduct an audit of the royalties paid by 4Kids to the Consortium.  Both 4Kids and the Consortium were troubled by the auditor's findings that there was allegedly a $4.8 million royalty underpayment.  Over the course of many months, there ensued a series of increasingly heated letters, emails, and meetings between the parties and their counsel that failed to resolve the royalty issues.  Like characters in the Yu-Gi-Oh series itself, 4Kids and the Consortium were locked in a high stakes duel over the future of the series in the Western world and, by extension, the survival of 4Kids as a going concern.

On March 24, 2011, the Consortium attempted to end the duel by issuing a letter that purports to terminate its licensing agreement with 4Kids.  Days later, 4Kids sought chapter 11 protection and asserted that the termination letter was ineffective.  Whether or not the termination letter was effective is the core issue in this adversary proceeding.  For the reasons set forth extensively below, the Court finds that the Amended and Restated Yu-Gi-Oh! Agreement dated and effective as of July 1, 2008 (the "2008 Agreement") was not effectively terminated and, accordingly, it remains an executory contract that is the property of the 4Kids estate.

1

## PARTIES AND PROCEDURAL HISTORY

Plaintiff and Counterclaim-Defendant TV Tokyo Corporation ("TV Tokyo") owns and operates a television station in Japan. Counterclaim-Defendant ASATSU-DK Inc. ("ADK") is a large Japanese advertising company. Plaintiff and Counterclaim-Defendant Nihon Ad Systems ("NAS") is ADK's wholly-owned subsidiary. Defendant and Counterclaim-Plaintiff 4Kids Entertainment Inc. is a children's entertainment company that produces children's television programming and licenses merchandise that relates to such programming, including, for example, home videos, toys, and trading cards.

On March 24, 2011, Plaintiffs TV Tokyo and NAS commenced an action against 4Kids in the United States District Court for the Southern District of New York (the "District Court"), alleging fraud and breaches of contract and of the covenant of good faith and fair dealing, and seeking monetary damages, an accounting, and fees and costs allegedly arising pursuant to the license agreements among the parties (the "Adversary Proceeding"). (*See TV Tokyo Corporation v. 4Kids Entertainment, Inc.*, Case No. 11-cv-02069 (RJH), Docket No. 1). On April 6, 2011, 4Kids commenced with this Court a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On May 23, 2011, the District Court entered an order referring the Adversary Proceeding to this Court. (*See TV Tokyo Corporation v. 4Kids Entertainment, Inc.*, Case No. 11-cv-02069 (RJH), Docket No. 6). This is a core proceeding pursuant to 28 U.S.C. section 157(b)(2).[2]

---

[2]    4Kids' Answer and Counterclaims alleges that this is a core matter pursuant to 28 U.S.C. § 157(b)(2). Plaintiffs' Answer to 4Kids' Counterclaims neither admits nor denies this allegation. In the Court's view, there is no question as to the core nature of this proceeding. Moreover, by virtue of the June 2 Order, Plaintiffs consented to this Court's adjudication of this Adversary Proceeding. Accordingly, it is the Court's view that it has authority to enter a final judgment in this Adversary Proceeding and any limitations on its authority arguably imposed by *Stern v. Marshall*, 131 S. Ct. 2594 (2011), are inapplicable.

On June 2, 2011, this Court entered its Agreed Order Setting Trial Schedule, which bifurcated the Adversary Proceeding into two phases (the "June 2 Order"). According to the June 2 Order, the initial phase of the Adversary Proceeding is:

> solely for the purposes of determining (a) whether Plaintiffs' purported termination of 4Kids' rights under the Yu-Gi-Oh! license was effective and (b) whether the amounts owing to Plaintiffs, if any, under the audit claims in paragraph 16 of the Complaint exceed the credits claimed by 4Kids for amounts paid or advanced to or on behalf of the Plaintiffs.

(Case No. 11-11607, Docket No. 130 at 2; Adv. Pro. No. 11-02225, Docket No. 2 at 2). On June 10, 2011, 4Kids filed its Answer and Counterclaims in the Adversary Proceeding. *See* Adv. Pro. No. 11-02225, Docket No. 3. On July 21, 2011, Plaintiffs filed their Answer to 4Kids' Counterclaims. *See* Adv. Pro. No. 11-02225, Docket No. 14. Commencing on August 29, 2011, the Court conducted a trial with respect to the first phase of the Adversary Proceeding. The trial concluded on September 23, 2011, after over seventy hours of testimony and argument.

Prior to the commencement of the trial, the parties filed declarations in lieu of direct testimony for each of the fact witnesses who testified during the trial. On behalf of Plaintiffs, the following witnesses submitted declarations and provided live testimony[3] at trial: (a) Yoshihiko Shinoda, Director of the Content Division of ADK, and the Managing Director of NAS;[4] (b) Shu Hosaka, Department Director of the Global Licensing Department, in the Content

---

[3] Messrs. Shinoda, Kawasaki, and Kasai testified in Japanese; live English translation of their testimony was ably provided by Ms. Elica Funatsu. Messrs. Sugimoto and Hosaka, while they testified in English, were assisted at times by Ms. Funatsu. The parties worked cooperatively in the discovery phase of these proceedings with respect to the translation of documents produced by Plaintiffs in Japanese. English translations of such documents were provided by a translation service agreed upon by the parties.

[4] Mr. Shinoda is responsible for, among other things, negotiating ADK's business contracts and overseeing their legal administration, including the agreements between the YGO Consortium and 4Kids. (Shinoda Decl. ¶ 2). He is also involved in and familiar with ADK's business operations and finances. (Shinoda Decl. ¶ 2).

3

Division of ADK;[5] (c) Haruhiko Sugimoto, Senior Vice President of ADK America, Inc., a
subsidiary of ADK;[6] (d) Yukio Kawasaki, General Manager of the animation division of TV
Tokyo since 2011;[7] and (e) Anthony Elliott, Plaintiffs' royalty auditor.  On behalf of Defendant,
the following fact witnesses submitted declarations and provided live testimony at trial: (a)
Samuel Newborn, Executive Vice President, Business Affairs and General Counsel of 4Kids;[8]
(b) Bruce Foster, Chief Financial Officer and Executive Vice President of 4Kids;[9] (c) Rosalind
Nowicki, Executive Vice President, Global Marketing and Licensing of 4Kids;[10] and (d)
Jacqueline Kozmata, Senior Royalty Manager at 4Kids.[11]  The parties also designated the
deposition transcripts of Alfred Kahn, 4Kids' former Chief Executive Officer and Chairman, and
Noriko Kubota, an ADK employee in the overseas licensing group.

At trial, live expert testimony on behalf of Plaintiffs was provided by Takashi Kasai,
Arthur Erk, and Robert Freedman, each of whom also submitted expert reports prior to trial.
Defendant presented live expert testimony of Takaaki Tokuhiro at trial and submitted an expert
report for Mr. Tokuhiro prior to trial.

---

[5]     Mr. Hosaka is responsible for the administration, management, and sale of rights related to the various
animation products that ADK handles, including Yu-Gi-Oh!.  (Hosaka Decl. ¶ 2).

[6]     Mr. Sugimoto was 4Kids' primary contact in the Consortium.  (9/19/11 Tr. 8:9-11 (Nowicki)).

[7]     From 2000 to 2009, Mr. Kawasaki worked in TV Tokyo's licensing department as Manager.  (Kawasaki
Decl. ¶ 3).  In 2009, he joined the Animation Division as Senior Manager.  (Kawasaki Decl. ¶ 3).

[8]     Mr. Newborn is responsible for, among other things, negotiating 4Kids' business contracts and overseeing
their legal administration, including the agreements with Plaintiffs.  (Newborn Decl. ¶ 2).

[9]     Mr. Foster oversees, among other things, all of the financial aspects of 4Kids, including all financial
reporting and review of all financial statements, all investing by 4Kids, and all SEC filings.  (Foster Decl. ¶ 3).

[10]    Ms. Nowicki is responsible for overseeing the day-to-day operations of the marketing and licensing of the
Yu-Gi-Oh! brand.  (Nowicki Decl. at ¶ 3).

[11]    Ms. Kozmata is responsible for, among other things, the preparation of "participation statements" that are
sent out quarterly to the licensors of various entertainment properties that are represented by 4Kids, including ADK.
(Kozmata Decl. ¶¶ 3, 5).

4

On October 12, 2011, after the conclusion of the trial, each of the parties filed with the Court (a) proposed findings of fact and conclusions of law and (b) post-trial briefs.  *See* Adv. Pro. No. 11-02225, Docket Nos. 58, 59, 61, 62.

## FINDINGS OF FACT

The following constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Having considered the voluminous evidence, testimonial and documentary, including all exhibits admitted into evidence, as well as Plaintiffs' and Defendant's post-trial proposed findings of fact and briefs, and mindful that a court should not blindly accept findings of fact and conclusions of law proffered by the parties (*see St. Clare's Hosp. and Health Ctr. v. Ins. Co. of North Am., (In re St. Clare's Hosp. and Health Ctr.)*, 934 F.2d 15 (2d Cir. 1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964)), and having conducted an independent analysis of the law and the facts, the Court makes the following Findings of Fact and Conclusions of Law:[12]

I.      **Background**

        A.      **The Licensor Parties and the Yu-Gi-Oh! Brand**

        1.      The Yu-Gi-Oh! series is an animated television series based on a Japanese comic book series, also known as a "manga."  The manga is published by Shueisha, Inc. ("Shueisha"), while the rights to the animated series are owned by NAS and TV Tokyo.  The Yu-Gi-Oh! series currently consists of Yu-Gi-Oh! Duel Monsters, Yu-Gi-Oh! GX, Yu-Gi-Oh! 5D's, and Yu-Gi-Oh! ZeXal (collectively "Yu-Gi-Oh!").

---

[12]      The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

2.      The "Yu-Gi-Oh! Consortium" or the "Consortium" refers to the group of Japanese businesses that have interests in the Yu-Gi-Oh! property.  In the narrowest sense, the Consortium includes only TV Tokyo and NAS.  However, the "Consortium" at times refers to all of the Japanese companies with an interest in Yu-Gi-Oh!, including TV Tokyo, NAS, ADK, Shueisha, and Konami.  (Hosaka Decl. ¶ 2 and n.2).

3.      Besides Yu-Gi-Oh!, ADK licenses more than twenty other programs outside of Japan.  Although NAS and TV Tokyo own and control the rights to the Yu-Gi-Oh! series, ADK has responsibility for the day-to-day management of Yu-Gi-Oh! on behalf of NAS and TV Tokyo.  (Shinoda Decl. ¶ 5).

4.      Konami Corporation ("Konami") is the worldwide licensee for Yu-Gi-Oh! trading cards.

**B.      The Yu-Gi-Oh! License Agreements**

5.      Yu-Gi-Oh! was first broadcast in Japan in or about April 2000, and, due to the success of the program in Japan, Plaintiffs decided to look into broadcasting Yu-Gi-Oh! overseas.  In or around the fall of 2000, Plaintiffs began interviewing potential licensees in the United States.  (Kawasaki Decl. ¶ 6).  Plaintiffs ultimately chose to hire 4Kids as their licensee to promote, market, and broadcast the Yu-Gi-Oh! series.

**1.      The Short Form Agreement**

6.      The licensor-licensee relationship between (i) NAS and TV Tokyo (together, "Licensor") and (ii) 4Kids was originally set forth in a deal memo titled *Yu-Gi-Oh! Duel Monsters Deal Memo* and signed on April 18, 2001 (the "Short Form Agreement"), pursuant to which NAS and TV Tokyo licensed to 4Kids certain exclusive rights to the Yu-Gi-Oh! series throughout the world outside Asia (the "4Kids Territory"). (Ex. T-1; Kawasaki Decl. ¶ 10; Newborn Decl. ¶ 6).

6

7.      The Short Form Agreement provided that the parties intended to enter into a longer agreement, but until that agreement was signed, the Short Form Agreement would "constitute the binding obligation of the parties."  (Ex. T-1).  Among the rights granted to 4Kids by the Short Form Agreement were the rights to "exploit or license" the television broadcast rights and the home video rights with respect to the Yu-Gi-Oh! series.  (Ex. T-1 ¶¶ 4, 10; Newborn Decl. ¶ 6).

### 2.      The 2001 Agreement

8.      Beginning in October 2001, the parties began negotiating a long-form agreement to replace the Short Form Agreement.  In June 2003, the parties signed a long-form Yu-Gi-Oh! Agreement (the "2001 Agreement") that superseded and replaced the Short Form Agreement. (Ex. T-6; Newborn Decl. ¶ 7; Hosaka Decl. ¶ 6; Shinoda Decl. ¶ 6).  The 2001 Agreement, though signed in June 2003, was dated and effective "as of" April 18, 2001, the date of the Short Form Agreement.   Among other things, the 2001 Agreement required 4Kids to secure a television broadcast commitment for Yu-Gi-Oh! in the U.S. for the Yu-Gi-Oh! television series, to pay to Licensor half of 4Kids's Gross Income (as defined in the 2001 Agreement) from the license of the certain rights in the 4Kids Territory, and to guarantee Licensor certain minimum royalties on merchandising rights.  (Ex. T-6; Newborn Decl. ¶ 7).

### 3.      The 2008 Agreement

9.      In 2007, the parties began discussing an extension of the 2001 Agreement, which was scheduled to expire on August 31, 2010.  These discussions culminated in the execution by 4Kids and Licensor in October 2008 of the 2008 Agreement (together with the 2001 Agreement, the "License Agreements").

10.      The rights granted to 4Kids under the License Agreements included the authority to exercise "[t]he Television Broadcast Rights, Home Video Rights, Merchandising Rights,

7

advertising and promotion rights, publishing rights and [certain] Other Rights to the Property"

(collectively, the "YGO Rights").  (License Agreements ¶¶ 1(i) at Ex. T-6 & Ex. T-11).

11.    Among other things, the 2008 Agreement confirmed 4Kids' existing television

broadcast rights, home video rights and merchandise licensing rights to the Yu-Gi-Oh! property,

added the Yu-Gi-Oh! 5D's series to the agreement, clarified that 4Kids had the option to license

any new Yu-Gi-Oh! "spinoff" series, and modified various other terms of the license.   In

addition, the 2008 Agreement extended the term of the Yu-Gi-Oh! license to 2015 and provided

for additional one-year extensions for every additional season of Yu-Gi-Oh! television episodes

licensed by 4Kids from Licensor.  (Ex. T-11; Newborn Decl. ¶ 8).  Paragraph 4(g) of the 2008

Agreement is identical to Paragraph 4(g) of the 2001 Agreement.

### 4.    The Gross Income Provision

12.    The License Agreements generally provide that the Gross Income — defined in

relevant part as "the gross receipts received from the exploitation or license of the Rights to [Yu-

Gi-Oh!] in the [4Kids] Territory" — shall be split evenly between the parties.  4Kids is generally

permitted to deduct three categories of expenses from Licensor's share of the Gross Income:

(1) expenses for maintaining Yu-Gi-Oh! trademarks and copyrights in the 4Kids Territory;

(2) errors and omissions insurance premiums, up to $15,000 per year; and (3) withholding taxes

required by law to be deducted.  (Ex. T-6 ¶¶ 4(c), 4(d); Ex. T-11 ¶¶ 4(c), 4(d)).

13.    Specifically, the Gross Income Provision is set forth in Paragraphs 4(c) and 4(d)

of the License Agreements.  (Ex. T-6 and Ex. T-11 at ¶¶ 4(c), 4(d)).

14.    The Gross Income Provision of the 2001 Agreement defined "Gross Income" as:

> the gross receipts received from the exploitation or license of the
> [YGO] Rights to the Property in the Territory (but not including
> any advertising revenues should 4Kids broadcast the Episodes in
> the United States on any network block controlled by 4Kids,

including the Fox Network during the Saturday morning kids block ("Fox Block").

(Ex. T-6 at ¶ 4(c) at T-6.)

15.    The definition of "Gross Income"[13] was amended in the 2008 Agreement, primarily to exclude advertising revenues from 4Kids' websites:

> the gross receipts received from the exploitation or license of the [YGO] Rights to the Property in the Territory (but not including any advertising revenues should 4Kids broadcast the Episodes in the United States on any network, broadcast outlet or distribution channel controlled or programmed by 4Kids in the Territory, including, without limitation, the Fox Network during the Saturday morning kids block ("Fox Block") and The CW Network (collectively, "4Kids Controlled Broadcast"). Gross Income shall also not include advertising revenues from 4Kids Websites unless otherwise agreed by the parties pursuant to Paragraph 1(a)(iii) above.

(Ex. T-11 ¶ 4(c)(iii) at T11).

16.    The Gross Income Provision provides that, in return for the right to exploit the YGO Rights, 4Kids was required to pay the YGO Consortium a portion of the Gross Income received from exploitation of those rights.    Specifically, Paragraph 4(c) of the License Agreements, provides, in relevant part, that:

> 4Kids shall pay Licensor fifty percent (50%) of the Gross Income… received by 4Kids from the exploitation or license of the [YGO] Rights less the actual third party out-of-pocket expenses

---

[13]    In the 2001 Agreement, Paragraph 1(b)(iii) provides that "[i]f 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty of twenty percent (20%) of the wholesale selling price charged for the Home Video Devices. Such royalty payment shall be part of Gross Income and shall be divided among the parties as provided below in Paragraph 4." Ex. T-6.

In the 2008 Agreement, Paragraph 1(b)(iii) was revised to provide that "[i]f 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty to be negotiated in good faith of between 15% and 20% of the wholesale selling price, net of returns, for such Home Video Devices. Such royalty payment shall not be part of Gross Income and shall not be divided among the parties as provided below in Paragraph 4 but rather shall be paid exclusively to Licensor." Ex. T-11.

incurred by 4Kids for copyright and trademark registrations for the Property in the Territory (collectively "IP Expenses"), insurance expenses pursuant to Paragraph 13 ("Insurance Expenses") (with Licensor's share of the 4Kids Errors and Omissions Insurance premiums computed on pro-rata basis with other television series and movies insured under such insurance policy but in no event shall the cost to licensor exceed $15,000 per year) and withholding taxes required by law to be deducted as provided in Paragraph 4(g) ("Taxes"), which IP Expenses, Insurance Expenses and Taxes shall be deducted by 4Kids from Licensor's share of the Gross Income.

(Ex. T-6 & Ex. T-11 at ¶¶ 4(c)).

17.    Paragraph 4(d) of the License Agreements provided that all other expenses, including "all expenses with respect to the adaption, dubbing, and rescoring of the Series, the advertising and marketing of the Series and the exploitation of the Television Broadcast Rights, Home Video Rights, Merchandising Rights, publishing rights and promotion rights to the Series" were to be paid "from 4Kids' share of the Gross Income." (*Id.* at ¶¶ 4(d)(iii).)

## II.    4Kids' Activities under the Yu-Gi-Oh! License Agreements

18.    Prior to 4Kids' licensing of Yu-Gi-Oh!, the series was virtually unknown in the 4Kids Territory. Beginning in 2001, 4Kids licensed the television broadcast rights to Yu-Gi-Oh! in the United States and Europe pursuant to the grant of rights from Licensor to 4Kids under the Short Form Agreement (later superseded by the 2001 Agreement). (Newborn Decl. ¶ 9).

19.    Since launching the Yu-Gi-Oh! series in the United States in 2001 and in Europe in 2002, 4Kids has, among other things, (a) produced the English-language adaptation of over 500 Yu-Gi-Oh! episodes for broadcast in the 4Kids Territory; (b) licensed Yu-Gi-Oh! television broadcast rights to KidsWB!, which during the early years of the 2000's was the highest rated children's television network in the United States on Saturday mornings; (c) obtained a broadcast commitment from KidsWB! in June 2001 for the Yu-Gi-Oh! series in exchange for paying KidsWB! between 10% and 20% of 4Kids' share of advances and royalties from the license of

various Rights to Yu-Gi-Oh! in the U.S. and Europe; (d) licensed master toy rights to Yu-Gi-Oh!

to Mattel in 2001; and (e) licensed promotional rights to Yu-Gi-Oh! to McDonald's for a system-

wide "Big Kids Meal" promotion in the U.S. in from December 20, 2002 through January 20,

2003. (Newborn Decl. ¶ 10).

20.     As a result of the ultimately successful launch of the Yu-Gi-Oh! property in the

United States, 4Kids has licensed various rights to the Yu-Gi-Oh! property to hundreds of

sublicensees in the 4Kids Territory. Yu-Gi-Oh! licensees have sold several billion dollars of Yu-

Gi-Oh!–related products at retail in the 4Kids Territory over the past 10 years. From 2001 to

2010, Licensor received in excess of $150 million in royalties from sales of Yu-Gi-Oh!–related

merchandise, trading cards and videogames, and from the license of Yu-Gi-Oh! television

broadcast and home video rights in the 4Kids Territory. (Newborn Decl. ¶ 14). Of that amount,

approximately $75 million came directly from 4Kids. (9/12/2011 Tr. 10:14–23 (Newborn)).

21.     The Yu-Gi-Oh! license and resulting revenue are a key part of 4Kids' business.

During 2009 and 2010, the Yu-Gi-Oh! property represented a substantial share of 4Kids' annual

revenue, in the range of 40%. Many of 4Kids' employees are primarily involved in the ongoing

adaptation and distribution of the Yu-Gi-Oh! series and related licensing and marketing efforts.

(Newborn Decl. ¶ 15).

## III.   ADK's Royalty Audit of 4Kids

22.     Both the 2001 Agreement and the 2008 Agreement contain a provision allowing

Licensor to audit the books and records of 4Kids:

> *Audit.* Licensor shall have the right to audit the books and records
> of 4Kids insofar as they relate to the exploitation of the Rights to
> the Property. Any such audit shall take place during regular
> business hours upon not less than ten (10) days written notice.
> Licensor shall pay the cost of the audit; provided, however, that if
> any audit reveals an underpayment by 4Kids of more than five
> (5%) percent of the amount due Licensor, and 4Kids shall

11

reimburse Licensor for the reasonable cost of such audit. Any underpayment reflected in the audit shall be paid to Licensor promptly.

(Ex. T-6 ¶ 4(f); Ex. T-11 ¶ 4(f)).

23.     Royalty inspections are common in the licensing and entertainment industry in the United States, but are not common in Japan.   (Elliott Decl. ¶¶ 5–6; Kawasaki Decl. ¶ 33, Sugimoto Decl. ¶ 10; Hosaka Decl. ¶ 53; 9/15/11 Tr. 58:24-59:4 (Nowicki); 9/6/11 Tr. 102:12-16 (Hosaka); Ex. T-210 (e-mail between 4Kids' consultant Enna Hozumi and EVP Nowicki, noting that "Japanese companies do not routinely conduct audits" and Plaintiffs' confirmation that Plaintiffs "rely on 4Kids," in context of licensee/sublicensee audits)).

24.     Mr. Sugimoto testified that he raised the idea of auditing 4Kids in 2003 and again around 2007–2008, and that an audit was ultimately approved by Mr. Hosaka in July 2009. (Sugimoto Decl. ¶¶ 9–11).  According to Mr. Hosaka, ADK decided to conduct the audit because of its concern at the time for 4Kids' financial position following the global financial contraction. (Hosaka Decl. ¶ 14; Shinoda Decl. ¶ 21).  This is flatly inconsistent with what Mr. Hosaka and Mr. Shinoda told 4Kids in January 2010; as reflected in both an email from Mr. Hosaka to Al Kahn dated January 13, 2010, as well as an attached letter from Mr. Shinoda to Al Kahn dated January 14, 2009 [sic], the stated reason for the audit was the implementation of "J-SOX" in Japan.  *See* Ex. T-43.  ADK thus appears to have misled 4Kids about the purpose of the audit, and apparently has made misrepresentations to the Court on this issue.

25.     In January 2010, ADK engaged Anthony Curtis Elliott to conduct a royalty audit of 4Kids.  Mr. Elliott has been a CPA since 1985, and is currently licensed as a CPA in California and New York.  (Elliott Decl. ¶¶ 4, 8).

26.     Royalty auditors such as Mr. Elliott conduct inspections to verify that the audited party conformed to the requirements of the applicable agreement when remitting payments, and

paid the licensor or other counterparty the proper amount under the terms of the agreement. (9/9/11 Tr. 8:8-11 (Erk)). Although Mr. Elliott testified that he presents himself as being "objective," he acknowledged that the use of the word "audit" is a misnomer. Indeed, Mr. Elliott's email signature block contains the slogan "Royalty Audits = Cash Recoveries." *See*, *e.g.*, Ex T-52, p. 3.

27.     On January 12, 2010, after an initial review of 4Kids' quarterly royalty statements, also referred to as "participation statements," Mr. Elliott drafted a proposal in which he recommended a three-stage audit "to determine whether the [royalties paid by 4Kids] were computed in accordance with the financial provisions of the [Licensing] Agreement[s]." (Elliott Decl. ¶ 4; Ex. T-90). The first phase would cover the parties' relationship since 2001, and examine 4Kids' royalty payments with respect to the U.S. and Canadian merchandising rights and home video rights, and 4Kids' contractual deductions. (Elliott Decl. ¶ 10; *see also* Ex. T-12; Ex. T-509.)

28.     On January 13, 2010, ADK notified 4Kids that it had engaged Mr. Elliott to conduct an audit of the books and records of 4Kids. (Ex. T-43). Mr. Elliott sent 4Kids requests for documents and information relevant to the Audit dated February 10, March 19, April 2, April 30, and July 9, 2010, with additional requests in October 2010. (Elliott Decl. ¶ 12; Ex. T-12 at TVT_NAS 0065598; Ex. T-509; Ex. T-500; Ex. T-611.)

29.     On May 21, 2010, Mr. Elliott issued a set of preliminary audit findings, along with various inquiries regarding those findings, to Mr. Sugimoto of ADK. (Ex. T-12). The report presented seven preliminary audit findings valued by Mr. Elliott at approximately $7.3 million. The preliminary report contained the following statement in bold font:

> The above audit findings are tentative. Some of these variances
> represent possible contract breaches. . . . In order to proceed with

this inspection, the Accountant requests direction and final deter-
mination from ADK regarding the contractual interpretation of
Paragraphs l(b) and 4 of the [Licensing] Agreements. . . .

(Ex. T-12 at 2).

30.    Over the next several months, Mr. Elliott continued work on the audit.  During

that time, he drafted three other interim reports dated October 11, October 18, and November 11,

2010.  (Ex. T-13; Ex. T-93; Ex. T-94).  Mr. Elliott's final audit report was sent to Mr. Sugimoto

on November 17, 2010.  (Ex. T-14).

31.    During the course of the audit, Licensor retained legal counsel in the United

States that was referred to Licensor by Mr. Elliott, and with whom Mr. Elliott had previously

worked.  Based on his preliminary audit findings, Mr. Elliott had recommended that ADK retain

legal counsel.  (Elliott Decl. ¶ 14; Sugimoto Decl. ¶ 16; Ex. T-12 at TVT_NAS 0065599).  Mr.

Elliott communicated with Licensor's counsel roughly a dozen times concerning the audit, and

drafts of his audit reports were shared with Licensor's counsel.  (8/29/2011 Tr. 229:19–231:6

(Elliott); Elliott Decl. ¶ 14).

32.    Mr. Elliott received approximately $100,000 in compensation from ADK for

conducting the 4Kids audit.  (8/29/2011 Tr. 231:15–232:4 (Elliott)).

## IV.    ADK's Plan to Start Its Own U.S. Home Video Business

33.    The evidence presented at trial and summarized below shows that, while the audit

was ongoing, ADK was planning to replace 4Kids as merchandise licensing agent and licensee

of the Yu-Gi-Oh television and home video rights.

34.    On August 5, 2010, Mr. Hosaka sent an email to various persons within ADK.

The email was tagged as "High" importance and "Internal use only," and included the notation

"(Confidential!)" in the subject line.  In the body of the email, under the heading "Current and

future policies towards 4Kids," Mr. Hosaka described the ongoing audit.  He wrote:

> At present, our company's position is to keep step with TX and
> Konami and at least "Not irritate 4kids, but have them make
> progress on the decision for broadcasts from September in the US
> and Europe by the middle of August so there is no disturbance to
> sales of cards, as well as make the release of the movie possible".
>
> Our company is currently in the process of establishing a new
> company in the US to independently and directly conduct
> operations once the decision is not made and the movie cannot be
> completed (including termination of the contract due to breach of
> contract).

Mr. Hosaka also stated that he was "in the middle of taking concrete action" on the transfer.  He stated that the information must "remain strictly confidential" and should not be shared with any other party, including Shueisha, or even other divisions within ADK.  (Ex. T-422; Ex. T-422A).[14]

36.    Also in evidence is a slide deck, dated August 25, 2010, titled "Current Status of 4kids and Countermeasures Hereafter."  The document, written in English, was created by ADK's Global Licensing Department.  One slide asks whether it is "possible to resume daily work without 4Kids," noting that ADK would "be able to receive the Konami allocation," referring to the 5% fee on Yu-Gi-Oh! trading cards and video games that Konami pays to 4Kids. (Ex. T-60; Newborn Decl. ¶ 183).

## V.    The Final Audit Findings

36.    Mr. Elliott's final audit report contained nine audit findings (collectively, the "Findings"), which he summarized as follows:

---

[14]    Plaintiffs objected to the introduction of T-422A, a certified translation of T-422, on the basis that Mr. Hosaka, during his deposition, disagreed with portions of the translation.  As discussed herein at p. 107, the Court overruled that objection and admitted T-422A into evidence.  (9/23/2011 Tr. 18:25–24:17).

| | | | |
|---|---|---|---|
| Finding 1 | Unreported Funimation Home Video Revenue | $ | 1,967,000.00 |
| Finding 2 | Unreported Majesco Home Video Revenue | | 91,666.50 |
| Finding 3 | Unsubstantiated International Withholding Taxes | | 2,265,767.16 |
| Finding 4 | Unreported Post June 2008 Home Video Revenue | | 26,894.27 |
| Finding 5 | Unauthorized Audit Fee Deduction | | 105,111.20 |
| Finding 6 | Unauthorized E&O Insurance Cost | | 67,328.45 |
| Finding 7 | Unauthorized Bank Charges | | 4,270.58 |
| Finding 8 | Other Unauthorized Deductions | | 43,554.59 |
| Finding 9 | Other Recovery – Material and Courier Cost | | 247,771.88 |
| | Total | $ | 4,819,354.63 |

(Ex. T-14 at 3; Elliott Decl. ¶16).  Each of these Findings, and the record evidence pertinent to each, are discussed below.

### A.    Finding No. 1:  Funimation Service Fees

37.    In his first Finding, Mr. Elliott suggested that 4Kids had improperly withheld $1,967,000, representing Licensor's share of service fees paid to 4Kids by its home video distributor, Funimation Productions, Ltd. ("Funimation").  Mr. Elliott suggested that these fees should have been included as part of "Gross Income" and split 50–50 between 4Kids and Licensor.  (Ex. T-14 at 3-4; Elliott Decl. ¶¶ 17–23).  Mr. Elliott's calculation of $1,967,000 derived from the $3,934,000 in service fees received by 4Kids from Funimation, of which $1,967,000 was half.  (Elliott Decl. ¶ 23).

### 1.    4Kids' Decision to Start 4Kids Home Video

38.    As stated above, under the Short Form Agreement signed in 2001, 4Kids was given the right to "exploit or license . . . all forms of home video rights" in the Yu-Gi-Oh! series. (Ex. T-1 ¶ 10).  In early 2002, 4Kids began to discuss internally how it would use the home video rights to the Yu-Gi-Oh! television series to augment its other marketing initiatives. (Newborn Decl. ¶ 26).

39.    At the time, the U.S. home video business was changing rapidly.  The larger home video labels had begun focusing on releasing home videos of theatrical motion pictures rather than television series, which could be more easily taped off the air by means of more user-

friendly VCRs and DVD players then hitting the market.  4Kids wanted to control the marketing and sale of Yu-Gi-Oh! home videos, the number of releases, the pricing of such releases, the advertising and marketing of such releases.  (Newborn Decl. ¶ 37; Nowicki Decl. ¶ 14).  For these reasons, 4Kids decided to exploit the Yu-Gi-Oh! home video rights itself in the United States.  (Newborn Decl. ¶¶ 26, 28, and 29).

### 2.    The Negotiation of the Home Video Rights in the 2001 Agreement

40.    The Short Form Agreement, which was in force at the time, provided that "4Kids shall pay Licensor 50% of the Net Series Income from the exploitation of the . . . Home Video Rights[.]"  (Ex. T-1 ¶ 12).  The "Net Series Income" was defined in relevant part as the "Gross Receipts from the license of the Broadcast Rights, Home Video Rights, and Manufacturing Rights to the Series[.]"  (*Id.*)  The Short Form Agreement did not explicitly provide any formula for compensating Licensor in the event that 4Kids exploited the home video rights itself, as opposed to licensing them to a third party.  (*Id.*, Newborn Decl. ¶ 42).

41.    In a series of meetings that took place on June 10, 2002 in New York, Mr. Shinoda of ADK and Mr. Kawasaki of TV Tokyo met with representatives of 4Kids to discuss the long-form 2001 Agreement that would ultimately replace the Short Form Agreement.  (Newborn Decl. ¶¶ 43–44).  During one meeting, Mr. Kahn told Mr. Shinoda that 4Kids would be releasing the Yu-Gi-Oh! home videos itself for the reasons set forth above.  (9/1/2011 Tr. 33:23–34:7 (Shinoda); Newborn Decl. ¶ 43; 8/8/11 Dep Tr. 62:23–63:24 (Kahn)).  During another meeting, Mr. Newborn, along with other 4Kids employees, discussed with Mr. Shinoda and Mr. Kawasaki the compensation that would be paid to Licensor if 4Kids exploited the home video rights itself through its new home video subsidiary.  (Newborn Decl. ¶ 44).

42.    During one of the meetings in June 2002, Mr. Shinoda and Mr. Kawasaki advised Mr. Newborn that they wanted to make certain that the royalty paid by 4Kids Home Video on

Yu-Gi-Oh! home video sales in the United States was the market-rate royalty. (Newborn Decl. ¶ 45). Mr. Newborn suggested that a royalty of 20% of the wholesale price would be a market-rate royalty, and that by splitting the royalty between 4Kids and Licensor would put Licensor in the same position whether 4Kids exercised the home video rights itself or whether it licensed those rights to a third party. (Newborn Decl. ¶ 45; 8/8/11 Dep. Tr. 64:23–65:14 (Kahn)).[15] At trial, Mr. Shinoda testified that 20% was an appropriate royalty rate for a home video license in the 2002 time period. (8/30/2011 Tr. 126:2–7 (Shinoda)). Mr. Shinoda also testified that, at that time, 4Kids proposed that it would pay Plaintiffs 20% of the wholesale price as a royalty if 4Kids was going to serve as a licensee. (9/1/11 Tr. 35:22-36:8 (Shinoda)).

43.    That week, Mr. Newborn drafted a new provision, Paragraph 1(b)(iii), reflecting the discussions held on June 10, 2002 with respect to the home video royalty. (Newborn Decl. ¶ 47). Later that year, on three separate occasions — June 19, July 17, and December 9 — Mr. Newborn emailed redlined versions of the draft 2001 Agreement to representatives of ADK, each time showing the addition of Paragraph 1(b)(iii) in bold and underlined type. (Newborn Decl. ¶¶ 48–50; Ex. T-4; Ex. T-5; Ex. T-50). Licensor never provided 4Kids with any comments on the substance of Paragraph 1(b)(iii). (Newborn Decl. ¶ 50).

44.    In June 2003, the parties signed the 2001 Agreement, which contained the new provision:

> If 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty of twenty percent (20%) of the wholesale selling price charged for the Home Video Devices. Such royalty payment shall be part of Gross Income and shall be divided among the parties as provided below in Paragraph 4.

---

[15]    This testimony is corroborated by Mr. Shinoda's testimony that Mr. Kahn told him in 2002 that 4Kids would be releasing the home videos itself. (9/1/2011 Tr. 32:19–25 (Shinoda)).

(Ex. T-6 ¶ 1(b)(iii); Newborn Decl. ¶ 51, Kawasaki Decl. ¶ 24, Shinoda Decl. ¶ 13).  By the time the parties signed the 2001 Agreement, 4Kids Home Video had already released eight Yu-Gi-Oh! home video volumes in the U.S., each with the 4Kids Home Video logo featured prominently on the front and back cover and on the spine of the release.  (Newborn Decl. ¶ 51).

### 3.    The Parties' Understanding of Paragraph 1(b) of the 2001 Agreement

45.    Mr. Newborn, the drafter of the 2001 Agreement and of Paragraph 1(b)(iii) in particular, testified that he understood the provision to mean that the royalty specified therein — 20% of the wholesale price of the home videos — would be the only income from the home videos that would be included in Gross Income.  (Newborn Decl. ¶¶ 77–79).

46.    Mr. Shinoda provided inconsistent explanations for his interpretation of Paragraph 1(b) of the 2001 Agreement.   In Mr. Shinoda's Declaration, he testified that:   "It was my understanding that, if 4Kids licensed the Home Video Rights itself, it would be permitted to keep any profit that it was able to make after paying the YGO Consortium the appropriate percentage of the wholesale selling price of the home videos."  (Shinoda Decl. ¶ 15).  When examined at trial, Mr. Shinoda testified that "[his] understanding . . . was that the entire income was going to be split fifty/fifty," and that he understood that the 20% royalty paid into Gross Income was only a minimum guarantee.  At his deposition, Mr. Shinoda had testified that, with respect to the 80% of the wholesale selling price not paid as a royalty, his understanding was that Licensor would be entitled to half of any "profit that remains after subtracting, for example, manufacturing costs." (8/30/2011 Tr. 133:7–16, 134:4–13, 137:23–138:3 (Shinoda); 9/1/2011 Tr. 34:8–36:8, 93:23–94:15 (Shinoda)).[16]

---

[16]    There were several other inconsistencies in Mr. Shinoda's testimony.  For example, he testified at trial that in his opinion, a company such as 4Kids, in order to be considered the home video "licensee," must physically manufacture and duplicate the home videos itself; but he later admitted that a licensee "[does not] necessarily have
(continued...)

### 4.    The 4Kids–Funimation Agreements

#### a)    The Funimation Distribution Agreement

47.    Between February and May of 2002, 4Kids negotiated arrangements with Funimation with respect to the production, manufacture, distribution, and sale of home videos for Yu-Gi-Oh! and for three other properties represented by 4Kids:  Cabbage Patch Kids, Cubix, and Tama and Friends.  (Newborn Decl. ¶ 30).  These negotiations culminated in May 2002 with the signing of two agreements between 4Kids and Funimation (Newborn Decl. ¶ 31).

48.    First, 4Kids and Funimation entered into a distribution agreement (the "Funimation Distribution Agreement") pursuant to which Funimation would duplicate and distribute the home videos for Yu-Gi-Oh! and three other properties represented by 4Kids.  (Ex. T-35).  Funimation also handled the billing and collecting of the home video revenue from sub-distributors, wholesalers, jobbers, and retailers because Funimation had direct relationships with many of these companies in the home video supply chain.  (Newborn Decl. ¶ 33; 9/12/2011 Tr. 73:18–24, 79:24–80:21 (Newborn)).    4Kids announced that Funimation would be its "distributor" in a press release dated May 13, 2002, and in its quarterly SEC statements beginning in the second quarter of 2002.  (Newborn Decl. ¶ 72, 57; T2).

49.    The Funimation Distribution Agreement provided for a 20% royalty on the wholesale selling price to be paid to 4Kids.  (Ex. T-35 ¶ 3(b)).  Between 2002 and 2008, Funimation remitted a total of $4,863,576.21 in royalties to 4Kids on Yu-Gi-Oh! home videos.

---

to have their own factory and hire employees" or "manage their own factory per se."  8/30/2011 Tr. 140:7–11, 141:12–143:4 (Shinoda).  He also testified that he asked Mr. Kahn for foreign tax withholding certificates "every time" that he and Mr. Kahn met, only to concede later in his testimony that "[i]t might not have been every single time[.]"  (9/1/2011 Tr. 76:21–77:6, 101:9–102:19 (Shinoda)).    And, although Mr. Shinoda testified in his Declaration that "[i]t was [his] intent by including [a] ten business day cure period [in the December 20 letter] to alert 4Kids to the urgency of their need to respond to [Licensor's] demand for payment," he admitted on cross-examination that he did not write the December 20 letter and did not even know who the author was.  (Shinoda Decl. ¶ 58; 8/31/2011 Tr. 78:15–79:10 (Shinoda)).

There is no dispute that 4Kids split these royalties 50–50 with Licensor as provided for under the 2001 Agreement. (Newborn Decl. ¶ 34; Ex. T-6 ¶ 1(b)(iii), Sugimoto Decl. ¶ 20; Elliott Decl. ¶ 17).

50.     Licensors contend that the distribution agreement with Funimation effectively licensed to Funimation the home video rights to Yu-Gi-Oh!.  However, in the home video business, it is common for home video companies to use outside vendors to physically manufacture and distribute the VHS tapes and DVDs.  (Newborn Decl. ¶ 32; Ex. T-479).  Similarly, licensees in general (including many other Yu-Gi-Oh! licensees) sometimes use third parties to handle the physical manufacture and distribution of licensed products. (Newborn Decl. ¶ 33).  Mr. Shinoda testified that, in his view, in order to be the licensee, 4Kids does not necessarily need to own its own factory and physically reproduce the DVDs.  (8/30/2011 Tr. 141:21–142:1 (Shinoda)).

51.     The evidence shows that, while Funimation was responsible for the physical manufacture and distribution of Yu-Gi-Oh! home videos, 4Kids retained control over issues normally controlled by a party exercising licensed rights.  For example, 4Kids controlled what episodes to release on home video; what the final mastered versions of the episodes looked like; the number of episodes to release on each video; the timing of the home video releases; what materials the home videos contained in addition to the episodes themselves; and the appearance of the home videos' packaging, consumer advertising, and marketing materials.  (Newborn Decl. ¶ 37; Nowicki Decl. ¶ 14; 9/12/2011 Tr. 174:23–175:20 (Newborn)).

52.     By contrast, when 4Kids licensed the home video rights to third parties in territories outside of the United States, it retained little control over the exercise of those rights. Mr. Newborn testified that the contracts generally required that the licensee put out one video

21

every six months and that all packaging would be approved by 4Kids, but that otherwise 4Kids had "very little control" over foreign home video licensees.   (9/12/2011 Tr. 174:6–20 (Newborn)).

53.     Mr. Shinoda also testified that, in his view, in order to be the licensee, 4Kids should have been the entity which bore the inventory risk. (8/30/2011 Tr. 140:7–143:4 (Shinoda)).   But as between Konami, the worldwide licensee for Yu-Gi-Oh! trading cards, and its former distributor Upper Deck, Mr. Shinoda did not know which party held the inventory risk for unsold Yu-Gi-Oh! trading cards.   In response to questioning from the Court, Mr. Shinoda testified that, as between a licensee and its distributor, it is not Licensor's concern as to how the inventory risk is allocated, because royalties are paid when the products were initially shipped. (8/30/2011 Tr. 144:12–149:6 (Shinoda) ("[The] royalty is applied to the amount shipped . . . . After that, whether that product will be sold to the distributor and how much will be sold, that is beyond our concern."); *see also* 8/31/2011 Tr. 28:10–29:2 (Shinoda) ("What happens to the handling of inventory after the royalty has been paid, we're not involved in that.").[17]

b)     *The Funimation Services Agreement*

54.     In addition to the Distribution Agreement with Funimation, 4Kids and Funimation entered into a services agreement (the "Funimation Services Agreement"), under which 4Kids Home Video would provide various production, advertising, and promotion services with respect to the home videos for the four properties, apart from and in addition to 4Kids' obligations under the Funimation Distribution Agreement.  (Ex. T-36; Newborn Decl. ¶ 31; 9/12/2011 Tr. 181:10–

---

[17]     In fact, 4Kids and Funimation negotiated a provision in the amended Funimation Services Agreement that balanced 4Kids' right to approve marketing and pricing decisions against Funimation's risk of having unsold inventory.  The provision provided that if Funimation sought to reduce the price of a home video title by more than one-third, then 4Kids could either approve the reduction or buy 75% of the unsold inventory.  (Ex. T-538 ¶ 6(b)).

182:24 (Newborn)).    Specifically, the Funimation Services Agreement provided that, in exchange for certain service fees, 4Kids would provide various services related to the production, marketing, packaging, and advertisement of the home videos.  (Ex. T-36).  For example, the Funimation Services Agreement required 4Kids to:

- "create advertising, marketing and promotional materials"

- "design the packaging"

- "design the point of sale materials"

- "create, prepare and place consumer advertising"

- "produce . . . advertising teasers"

- "produce supplemental content" (*i.e.*, DVD "extras") and

- "deliver [the] DVD content as a DLT Master."

(Ex. T-36 ¶¶ 3–4).

55.    Pursuant to the Funimation Services Agreement, 4Kids Home Video (a) "authored" the VHS and DVD versions of the Yu-Gi-Oh! episodes; (b) delivered duplication-ready DVD content to Funimation; (c) produced DVD extras (additional scenes, Yu-Gi-Oh! trading card tips, Yu-Gi-Oh! music videos and other materials included in DVD versions of the Yu-Gi-Oh! home videos); (d) produced advertising and "teasers" to be viewed prior to the start of the Yu-Gi-Oh! episodes featuring Yu-Gi-Oh! merchandise, trading cards and other previously released Yu-Gi-Oh! home videos available for sale at retail; (e) designed the packaging and point of purchase materials; (f) met numerous times with retailers and wholesalers of Yu-Gi-Oh! home videos; and (g) organized various retail promotions to support sales of Yu-Gi-Oh! home videos and related merchandise.  (Newborn Decl. ¶ 35; Nowicki Dec. ¶ 18).

56.    In exchange for these services, Funimation paid 4Kids a per-unit fee according to a schedule, based in part on the average monthly unit selling price of the home videos.  (Ex. T-36

¶¶ 1(a), 8(b)). The Funimation Services Agreement was amended in 2003 to provide for an additional supplemental service fee to be "paid in consideration of the additional marketing services performed and to be performed by 4Kids," ranging from 1% to 4% of the net receipts on the Yu-Gi-Oh! home videos. (Ex. T-538 ¶ 8(d)). Between 2001 and 2009, Funimation paid a total of $3,934,458.26 in service fees to 4Kids. Mr. Elliott calculated that these fees were represented approximately 18% of the wholesale selling price of the home videos. (Ex. T-14 at 3–4; Ex. T-99; Elliott Decl. ¶ 23).

57.     Of the $3,934,458.26 in service fees paid by Funimation to 4Kids, $1,757,017.11 were paid in 2002 and 2003, and $951,597.42 in 2004. Thus, approximately $2,153,516.04 (of which Licensor claims to be owed $1,076,758.02) in service fees (the 2002 and 2003 totals plus five-twelfths of the 2004 total) were paid prior to June 1, 2004. (Ex. T-99).

58.     Mr. Shinoda and Mr. Hosaka testified that, in their view, 4Kids was obligated under the License Agreements to provide services similar to those 4Kids agreed to provide in the Funimation Services Agreement. For example, they testified that, under Paragraph 1(e) of the License Agreements, 4Kids was granted marketing rights in the Yu-Gi-Oh! brand, which they compared to the advertising in the Funimation agreements. They also compared 4Kids' obligation to develop a "style guide" to its duties under the Funimation Services Agreement to develop packaging for home videos. (Shinoda Decl. ¶ 29; Hosaka Decl. ¶ 28; Ex. T-6 ¶¶ 1(e), 7(d); Ex. T-11 ¶¶ 1(e), 7(d).

59.     On cross-examination, however, Mr. Shinoda admitted that developing a general "style guide" and developing packaging for specific home videos were different. (8/30/2011 Tr.

161:1–162:24 (Shinoda)).  Neither Mr. Shinoda nor Mr. Hosaka[18] were unable to point to any

provision of the License Agreements which required 4Kids, if it were simply licensing the home

video rights to a third party, to (1) design DVD packaging; (2) design point-of-sale materials;

(3) create, prepare and place consumer advertising; (4) produce advertising teasers; (5) produce

DVD "extras"; or (6) deliver DLT Masters.  Nor could they identify any foreign home video

licensee for which 4Kids provided those services.  (8/30/2011 Tr. 157:25–160:2, 171:19–173:21,

177:18–179:25 (Shinoda); 8/31/2011 Tr. 12:12–13:9 (Shinoda); 9/6/2011 Tr. 19:10–20:25

(Hosaka)).  Although on re-direct Mr. Shinoda identified provisions of the License Agreements

that relate to advertising, those provisions relate to 4Kids' "right" to advertise, not its obligation

to advertise — much less an obligation to advertise home videos on behalf of a home video

licensee.  (9/1/2011 Tr. 36:18–37:13 (Shinoda); Ex. T-11 ¶¶ 1(a)(ii), 1(e)).

60.     The parties introduced samples of license agreements between 4Kids and its

foreign Yu-Gi-Oh! home video licensees.  These agreements do not require 4Kids to provide the

same services as it is required to provide under the Funimation Services Agreement.  (Ex. T-136,

Ex. T-137, Ex. T-138).  This is confirmed by the testimony of Mr. Newborn and Ms. Nowicki,

each of whom testified that 4Kids does not provide these services to its foreign home video

licensees.  (9/12/2011 Tr. 63:7–65:3 (Newborn); 9/15/2011 Tr. 112:2–115:5 (Nowicki)).

---

[18]     There were many inconsistencies in Mr. Hosaka's testimony that give the Court pause with respect to his
credibility as a witness.  For example, in his trial declaration, Mr. Hosaka offered opinions on the meaning of
Paragraph 1(b)(iii) and the reasons why it was modified in 2008, despite having testified at his deposition that he
had no understanding regarding these issues.  (9/6/2011 Tr. 15:20–17:1, 17:15–19:3 (Hosaka)).  Mr. Hosaka also
testified at his deposition that, during the March 18, 2011 meeting between the parties, ADK offered to *invest* $3
million in 4Kids; but at trial he testified that ADK made a $3 million settlement *demand*.  (9/6/2011 Tr. 80:3–81:21
(Hosaka)).  And although Mr. Hosaka testified in his declaration that he personally searched for tax certificates in
"all of the logical places," he admitted during his deposition, and again on cross-examination at trial, that he only
looked in ADK's tax returns and in 4Kids' quarterly participation statements.  (Hosaka Decl. ¶ 50; 9/6/2011 Tr.
35:18–38:12, 130:15–132:23 (Hosaka)).

61.     One of ADK's experts, Robert Freedman, has written in a treatise relating to home video agreements in which he explains that, "unlike video cassettes, DVDs are often released with additional material," such as "background material, biographies or interviews of some of the participants, some making of footage or other related material; all of which can be accessed by the view at the viewer's discretion" — *i.e.*, what the parties have referred to as DVD "extras" or "supplemental DVD content." Mr. Freedman further explains that the producer of a DVD "may negotiate to be engaged for a fee to create these ancillary materials" and that "[t]he distributor will likely will be willing to engage with the producer to perform these services if the parties can agree upon appropriate compensation." Mr. Freedman testified that the distributor would engage the producer to create the ancillary materials because "the producer is the party that will have the greatest knowledge with respect to the content of the material." (Ex. T-241; 9/9/2011 Tr. 167:10–170:1 (Freedman)).

                        *c)      Execution of the Funimation Agreements*

62.     Although the Funimation Distribution Agreement and the Funimation Services Agreement were both signed in early May 2002, they were dated as of March 1, 2002. (Ex. T-35; Ex. T-36; Newborn Decl. ¶ 31). Mr. Newborn, the drafter of the Funimation agreements, testified that the reason he created two separate agreements was, in essence, to finish the Distribution Agreement (as to which there were few business issues to resolve) and to then focus on the Funimation Services Agreement while the parties were continuing to negotiate its basic business terms. Mr. Newborn testified that he was able to use an existing home video licensing agreement as a template for the Distribution Agreement, which was drafted while the businesspeople were still negotiating the details of what would become the Funimation Services Agreement, and that it was easiest to create two separate agreements rather than attempt to merge all issues in one agreement. (9/12/2011 Tr. 185:12–186:19 (Newborn)). Mr. Newborn's

explanation was credible, and there was no evidence to support Plaintiffs' theory that the use of

two separate agreements was to facilitate the inclusion of what they call the "Secrecy Clause" in

the Funimation Services Agreement. *See* p. 147, *infra*.

63.     Mr. Kahn, the former Chief Executive Officer of 4Kids, testified that he

understood that the 20% royalty paid by Funimation on the wholesale price of the videos was for

the content of the episodes, while the monies paid under the Funimation Services Agreement

were for the additional services performed by 4Kids, such as advertising and promotion, that

4Kids would not provide had it licensed the home video rights to a third party.  (8/8/11 Dep. Tr.

130:22–131:20, 132:20–136:19 (Kahn)).

64.     The Funimation Services Agreement contains a confidentiality provision which

provides, in part:

> Each party agrees to keep the terms and conditions of this
> Agreement strictly confidential and shall not disclose the terms and
> conditions of this Agreement to any third party.  Notwithstanding
> the foregoing, each party may disclose the terms and conditions of
> this Agreement or portions thereof to such persons within such
> party's company on a strict "need to know basis," and to such
> party's attorneys, accountants and professional advisors who need
> to know such information it being understood that (i) each such
> person shall be informed by the disclosing party of the confidential
> nature of the terms and conditions of this Agreement and shall be
> directed by the disclosing party to treat the terms and conditions
> this Agreement confidentially and not to use it other than for the
> purposes described above …

(Ex. T-36, ¶ 13(b)).  The Distribution Agreement does not contain a confidentiality provision.

(Newborn Decl. ¶ 75; 9/12/11 Tr. 86:1-3; T35 (Newborn)).

65.     The confidentiality provision contained in the Funimation Services Agreement

was first used by 4Kids in a January 2002 contract with Fox Broadcasting Corporation, and has

since been used in an October 2008 contract with The CW Network.  (Newborn Dec. ¶¶ 70–71;

Ex. T-341).  Mr. Newborn testified that he added the "strict 'need to know basis'" language to

the confidentiality provision that he inserted into the Funimation Services Agreement.  (9/12/11 Tr. 82:16-24 (Newborn)).

66.    The confidentiality provision allowed 4Kids to make legally-required public disclosures.  (Ex. T-36 ¶ 13(b); Newborn Decl. ¶ 69).  Because 4Kids' entry into the home video market was a material business development, 4Kids disclosed the creation of 4Kids Home Video in a press release dated May 13, 2002 — less than two weeks after signing the Funimation agreements.  (Newborn Decl. ¶ 72).  The press release also announced that Funimation would serve as 4Kids' home video distributor.  (*Id.*; Ex. T-2).  Mr. Sugimoto testified that he was aware of 4Kids' May 2002 press release and was aware that Funimation was acting as 4Kids Home Video's distributor.  (Sugimoto Decl. ¶ 20).  Mr. Newborn testified that the primary aim of the confidentiality provision was to prevent disclosure of the Services Agreement before the press release on May 13, 2002.  (9/12/11 Tr. 84:6-13) (Newborn)).

67.    The Services Agreement also included a merger clause.  (T-36 at ¶ 14; 9/12/11 Tr. 88:3-15 (Newborn)).  That provision provides:

> Entire Understanding and Modification.  This Agreement and the Distribution Agreement contain the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior oral and written understandings and agreements relating thereto.  This Agreement may not be modified discharged or terminated orally.

(T-36, ¶ 14).  The Distribution Agreement has no merger clause.  (Ex. T-35).  The Services Agreement refers to the Distribution Agreement in several places.  (Ex. T-36 at ¶ 4(c), 5(a)(v), 9(c), 12(c), 12(d), 12(e) and 14).  By contrast, the Distribution Agreement never mentions the Services Agreement.  (*See* Ex. T-35).

d)      *Disclosure of the Funimation Services Agreement and Fees*

68.      Beginning in the second quarter of 2002, 4Kids disclosed in its quarterly and annual reports to the SEC (10-Qs and 10-Ks) both its distributor relationship with Funimation and the service fees payable to 4Kids.  (Newborn Decl. ¶ 57; Ex. T-243; Ex. T-244; Ex. T-245). For example, 4Kids' Form 10-Q for the second quarter of 2002 stated that 4Kids Home Video "has entered into an agreement with its home video distributor Funimation pursuant to which [4Kids Home Video] is providing ongoing advertising, marketing and promotional services with respect to home video titles of Company represented properties distributed by Funimation. Funimation has paid the Company an advance against [4Kids Home Video's] share of the distribution proceeds to be realized by [4Kids Home Video] from such titles."  (Ex. T-243).  And in the 10-Q disclosure for the third quarter of 2003 noted that "4Kids Home Video entered into an agreement with an unaffiliated third party home video distributor (the 'Video Distributor'), pursuant to which 4Kids Home Video provides ongoing advertising, marketing and promotional services with respect to certain home video titles that are owned or controlled by the Company and which are distributed by the Video Distributor."  (Ex. T-245).

69.      Ms. Jacqueline Kozmata of 4Kids, who was responsible for assembling the participation statements, testified that because these fees were not split with ADK, it was not 4Kids' usual practice to include the service fees in the participation statements.  (Kozmata Decl. ¶ 9).

70.      However, on at least three occasions, the Funimation service fees were disclosed on quarterly participation statements sent to ADK by 4Kids.  (8/29/2011 Tr. 170:17–172:6 (Elliott); Ex. T-78; Ex. T-79; Ex. T-80; *see also* Ex. T-98; Elliott Decl. ¶ 19).  As Mr. Elliott testified, anyone reviewing those statements would be able to see that Funimation was paying service fees to 4Kids, and that Licensor was not receiving a share of those fees.  (8/29/2011 Tr.

168:7–172:6 (Elliott); 8/30/2011 Tr. 64:6–65:2 (Elliott); *see* Ex. T-78 at ACE11848; Ex. T-79 at

ACE12199–200).

71.     Mr. Shinoda testified that, from 2002 until 2006 or 2007, the person at ADK

responsible for reviewing the participation statements was Noriko Kubota.   (8/31/2011 Tr.

36:17–20 (Shinoda); *see also* 9/6/2011 Tr. 28:2–12 (Hosaka)).   Mr. Sugimoto described Ms.

Kubota as being "in charge of Yu-Gi-Oh!" during this time period.   (9/8/2011 Tr. 24:10–17,

28:10–23 (Sugimoto)).   Ms. Kubota testified that she would "quickly" review "simple areas"

[sic] of the quarterly participation statements to check "whether the money and the amount

deposited matched and whether the timelines were accurate," and whether there were "new

licensees or new television stations added."   She did not know whether anyone else at ADK had

the responsibility for undertaking a more fulsome review of the statements.   (8/22/11 Dep. Tr.

45:9–48:20 (Kubota)).

72.     Mr. Elliott testified that he learned of the service fees through examining some of

4Kids' quarterly participation statements.   (8/29/2011 Tr. 167:8–168:2 (Elliott); Ex. T-98).

73.     Before the Audit, Licensor did not know that 4Kids and Funimation had signed

any agreements related to the Yu-Gi-Oh! property other than the Funimation Distribution

Agreement, and 4Kids' executives did not mention it.   (Sugimoto Decl. ¶¶ 15, 18; Shinoda

Decl. ¶ 38; Kawasaki Decl. ¶ 42, 37; Hosaka Decl. ¶ 40).

74.     Licensor's executives testified that they first learned of the Funimation Services

Agreement in 2010 as a result of Mr. Elliott's audit.   (Hosaka Decl. ¶¶ 18–19, 21).   On June 8,

2010, Mr. Newborn delivered a copy of the Funimation agreements to Mr. Shinoda, Mr. Hosaka,

and Mr. Kawasaki, who were in Las Vegas for a trade show.   (8/31/2011 Tr. 32:20–22

(Shinoda); Hosaka Decl. ¶ 43).

75.    4Kids' witnesses testified during trial that they did not discuss the Funimation Services Agreement, or the income stream flowing from that agreement, with anyone at the Consortium.  (9/12/11 Tr. 183:11-185:11 (Newborn); 9/15/11 Tr. 42:10-17 (Nowicki); 9/19/11 Tr. 29:2-21 (Nowicki); 8/8/11 Dep. Tr. 61:17-62:22, 159:25-160:12 (Kahn)).

76.    Mr. Newborn testified that the existence of the Funimation Services Agreement was not previously disclosed to Licensor because it was not something that a licensee would typically be required to disclose.  Mr. Newborn and Mr. Kahn both explained that a licensee is required to report its sales and pay its royalty, but not to disclose the details of its relationship with its distributor, nor reveal its profit margins.  Thus, Mr. Kahn testified:

> [I]t's not the Consortium's business how any licensee distributes or sells.  The only thing the Consortium should be aware of is that the royalty that is being collected is valid and is based on the sales by that licensee.
>
> No licensee would tell you what their margins are, would tell you how they sell it.  They would — that's all stu¶that they keep inside their own particular bailiwick, and that the only thing that the licensor is responsible for is to make sure that they get an accurate accounting of the royalty based on the wholesale sales of those — of those rights — of those particular videos.

(9/12/2011 Tr. 183:11–185:11 (Newborn); 8/8/11 Dep. Tr. 88:4–89:14 (Kahn)).

77.    Consistent with 4Kids' explanation of why it did not share with Plaintiffs the details of its relationship with Funimation, Mr. Shinoda testified that ADK was not aware of the details of its licensee Konami's relationship with its former distributor Upper Deck.  For example, Mr. Shinoda did not know whether or not Upper Deck manufactured or printed trading cards on behalf of Konami.  Nor did Mr. Shinoda know who, as between Konami and Upper Deck, had the inventory risk for the trading cards.  (8/30/2011 Tr. 143:8–10, 143:18–22, 144:12–149:6 (Shinoda); 8/31/2011 Tr. 26:1–6 (Shinoda)).

78.     There is no evidence of any representation by 4Kids to Licensor that 4Kids' only revenue from the Yu-Gi-Oh! home videos came from 4Kids' share of the 20% royalty on the wholesale selling price.  Mr. Hosaka could not recall ever having received such a representation from anyone at 4Kids.  (9/6/2011 Tr. 17:7–14 (Hosaka)).

### 5.     4Kids' Home Video Subsidiary

79.     In 2002, 4Kids created a wholly-owned subsidiary, 4Kids Entertainment Home Video, Inc. ("4Kids Home Video"), to conduct its home video operations.  (Newborn Decl. ¶ 29; 9/12/2011 Tr. 171:21–172:9 (Newborn)).[19]  According to Bruce Foster, 4Kids' Chief Financial Officer, 4Kids Home Video had between seven and nine full-time employees during its peak years of operation.  In addition, a number of 4Kids employees devoted portions of their time to work on 4Kids Home Video projects, including employees from 4Kids' graphic design, editing, and art departments.  (Foster Decl. ¶ 6; 9/21/2011 Tr. 74:13–25 (Foster)).

80.     Mr. Foster compiled a summary of 4Kids Home Video expenses extracted from 4Kids' trial balance, which is created by 4Kids in the ordinary course of business and has been audited.  This expense summary shows that between 2001 and 2009, 4Kids Home Video incurred approximately $6.9 million in expenses related to, *inter alia*, cost of sales, personnel, office expenses, professional fees, and selling and production costs.  (Ex. T-242; Foster Decl. ¶¶ 7–9; 9/21/2011 Tr. 67:5–71:15 (Foster)).

81.     Approximately half of the VHS and DVD titles released by 4Kids between 2002 and 2008 related to the Yu-Gi-Oh! property.  (Ex. T-473; 9/20/2011 Tr. 98:16–99:16 (Foster); 9/21/2011 Tr. 73:12–74:6 (Foster)).  Thus, a reasonable approximation of the total 4Kids Home

---

[19]     4Kids does not generally enter into formal licensing agreements between the parent 4Kids Entertainment, Inc. and its wholly-owned subsidiaries.  (9/12/2011 Tr. 172:10–19 (Newborn)).

Video's costs associated with Yu-Gi-Oh! home videos is half of the division's approximately $6.9 million in total expenses, or roughly $3.45 million.  (Foster Decl. ¶ 9; Ex. T-242).

### 6.    The Revision of Paragraph 1(b)(iii) in the 2008 Agreement

82.    During the negotiations leading to the amendment and restatement of the 2001 Agreement, Licensor requested that Paragraph 1(b)(iii) (which governs when 4Kids is exercising home video rights itself) be revised to provide that Licensor shall receive the entire royalty paid on Yu-Gi-Oh! home video releases made by 4Kids Home Video.  (Ex. T-34).  As a result of this change, the royalty paid on Yu-Gi-Oh! home video releases made by 4Kids Home Video was no longer made part of Gross Income in the 2008 Agreement and would not be split between 4Kids and the YGO Consortium. (Hosaka Decl. ¶ 24; Ex. T-11 ¶ 1(b)(iii)).

83.    The 2008 Agreement was signed by the parties in mid-October 2008.  Paragraph 1(b)(iii) was revised as requested by Licensor to read as follows:

> If 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty to be negotiated in good faith of between 15% and 20% of the wholesale selling price, net of returns, for such Home Video Devices.[20]  Such royalty payment shall not be part of Gross Income and shall not be divided among the parties as provided below in Paragraph 4 but rather shall be paid exclusively to Licensor.

(Ex. T-11).

84.    Mr. Sugimoto testified that 4Kids had always maintained that it was exercising the home video rights itself, and that it was never ADK's belief that 4Kids had agreed to make no money off of the home videos as a result of this amendment.  (9/8/2011 Tr. 38:1–39:5 (Sugimoto); Sugimoto Decl. ¶ 20; Ex. T-8).  4Kids had been reporting and paying Licensor as if

---

[20]    "Home Video Devices" is defined in Paragraph 1(b)(ii) of the 2008 Agreement as video cassettes, dvd, cd-rom and/or such other home video formats as may hereafter be created for purposes of a consumer viewing television programs at home.

it were exercising the Home Video Rights itself, instead of under the payment structure required if 4Kids had licensed those rights to a third party.  (Sugimoto Decl. ¶ 21).

### B.      Finding No. 2:  Majesco Service Fees

85.      In his second Finding, Mr. Elliott suggested that 4Kids had improperly withheld $91,666.50, representing Licensor's 50% share of the $183,333.00 in fees paid to 4Kids by Majesco Sales Inc. ("Majesco").   (Ex. T-14 at 4–5; Elliott Decl. ¶¶ 27–29).   Mr. Elliott determined that 4Kids had not included these service fees in its calculation of the Consortium's share of Gross Income and that it had omitted any reference to such fees in its participation statements.  (Elliott Decl. ¶ 28).

86.      The Majesco service fees, like the Funimation service fees that are the subject of Finding 1, relate to Yu-Gi-Oh! home videos.  In 2004, 4Kids Home Video entered into an agreement with Majesco (the "Majesco Services Agreement") for distribution of Yu-Gi-Oh! television episodes stored on cartridges compatible with Nintendo's popular handheld videogame system, the Game Boy Advance ("GBA").  (Ex. T-39).

### 1.      Background of the 4Kids–Majesco Relationship

87.      Between 2002 and 2004, 4Kids developed and applied for patents on a video compression technology enabling television episodes to be condensed, digitized, and programmed onto cartridges compatible with GBA.  (Newborn Decl. ¶ 81).  In order for cart-ridges containing television episodes compatible with GBA to be sold, Nintendo needed to approve the quality of the video and audio compression and the functionality of the menus transforming the buttons on the GBA handheld system into controls for playing television episodes on GBA (play, rewind, stop, fast-forward).  (*Id.*).  In addition, in order to sell GBA-compatible cartridges — whether for videogames or for television episodes — the cartridges needed to be ordered from and programmed by Nintendo.  (*Id.*).

34

88.     During 2003, 4Kids submitted to Nintendo for review and comment many versions of compressed video of Yu-Gi-Oh! episodes using the 4Kids-developed compression technology.  (Newborn Decl. ¶ 82).  Upon receiving comments from Nintendo, 4Kids performed additional editing of the compressed episode to improve scenes or individual animation frames that did not look crisp when viewed on GBA.  (*Id.*).

89.     During the same time period, Majesco developed its own video compression technology and also submitted compressed television episodes to Nintendo for review and approval.  (Newborn Decl. ¶ 83).  Since Majesco was principally a video game company producing video games for GBA, Majesco had a longstanding relationship with the Nintendo quality control department and was more experienced in coping with the demands of this Nintendo department.  (*Id.*).

90.     In early 2004, 4Kids and Majesco agreed to work together to release cartridges compatible with GBA containing television episodes of various series, including Yu-Gi-Oh!, with respect to which 4Kids had been granted home video rights.  (Newborn Decl. ¶ 84).  4Kids and Majesco agreed that the GBA cartridges of the 4Kids-produced series would be compressed using the compression technology, which resulted in the best quality video of the specific television episode.  (*Id.*).

91.     On March 11, 2004, 4Kids issued a press release announcing that 4Kids had appointed Majesco as the distributor of GBA-compatible video cartridges of 4Kids-produced television episodes, including Yu-Gi-Oh! and that the 4Kids developed video compression technology that had been approved by Nintendo would be used in Game Boy Advance Videos. (Newborn Decl. ¶ 85; Ex. T-483).  The press release also stated that the GBA video cartridges of

the 4Kids-produced episodes would be promoted on the 4Kids-controlled four-hour Saturday morning block on the Fox Network and on 4Kids' websites.  (Newborn Decl. ¶ 85; Ex. T-483).

## 2. The Majesco Services Agreement

92.     On April 1, 2004, 4Kids entered into two agreements, a distribution agreement and a services agreement with Majesco.  (Ex. T-39).  Under the Majesco Services Agreement, 4Kids was obligated to provide certain marketing services to Majesco, including:  (i) up to four promotions per year on "FoxBox" (a four-hour block of Saturday morning television programmed by 4Kids); (ii) up to four thirty-second commercials on "FoxBox"; (iii) banner ads on the "FoxBox" website and on the 4Kids website; and (iv) coordination of cross-promotional opportunities with other licensees of Yu-Gi-Oh! merchandising rights.  (Ex. T-39 ¶ 3; Newborn Decl. ¶ 86).  In addition, 4Kids developed the video compression for the Yu-Gi-Oh! episodes sold on GBA-compatible cartridges and provided technical assistance to Majesco with regard to the user interface (converting the buttons on the GBA video game system into controls for a video player — play, rewind, fast-forward, pause).  (Newborn Decl. ¶ 86).

93.     During the first two quarters of 2004, 4Kids worked extensively with Majesco and Nintendo on the compression of the 4Kids' produced television episodes, including the Yu-Gi-Oh! episodes.  (Newborn Decl. ¶ 87; Ex. T-485).

94.     In March 2004, 4Kids received the approval of Shueisha — the publisher of the Yu-Gi-Oh! manga and a member of the Yu-Gi-Oh! Consortium — regarding the quality of the audio and video in the episodes compressed with 4Kids' compression technology.  (Newborn Decl. ¶¶ 88–89).

95.     During the next few months of 2004, 4Kids finalized the compression of the Yu-Gi-Oh! episodes that were ultimately released during the summer of 2004.  (Newborn Decl. ¶ 90).  As required by the Majesco Services Agreement, 4Kids provided Majesco with television

commercials and banner ads on 4Kids-controlled websites (which at the time were the sixth most popular kids websites in the United States), and offered GBA Videos as prizes for promotions and sweepstakes broadcast on the four-hour Saturday morning block on Fox programmed by 4Kids.  (*Id.*).  Ultimately, Game Boy Advance Video was not a successful business, due to the significant pricing disadvantage of Game Boy Advance Videos relative to DVDs.  (Newborn Decl. ¶ 92).

96.    Pursuant to the Majesco Services Agreement, 4Kids was paid $183,333.00 in services fees by Majesco.  (Ex. T-14 at 4).

97.    The Majesco Services Agreement contains a confidentiality provision identical to the provision contained in the Funimation Services Agreement.  (*Id.* at ¶ 10(a)).  The distribution agreement executed with Majesco does not contain a similar provision.  (Ex. T-246).

## C.    Finding No. 3:  International Withholding Taxes

98.    In his third Finding, Mr. Elliott suggested that 4Kids had failed to provide appropriate documentation of foreign (*i.e.*, non-U.S.) withholding taxes.  As described in detail below, according to Mr. Elliott, foreign withholding tax certificates were "unsubstantiated"[21] if (1) 4Kids did not possess the certificate or (2) if the certificate did not reference Licensor or the Yu-Gi-Oh! property.  Whether or not ADK or TV Tokyo did or could use these certificates to claim foreign withholding tax credits was irrelevant to his Finding.

### 1.    Withholding Taxes Generally

99.    As a general matter, royalty income earned in one country on behalf of a licensor in another country may be subject to a withholding tax, the amount of which will vary depending on the internal regulations of the taxing jurisdiction and on taxing treaties.  (Foster Decl. ¶ 10;

---

[21]    The term "unsubstantiated" appears nowhere in the License Agreements and, accordingly, has no legal significance or dispositive effect on the issues before the Court.

Kasai Report at 4; Tokuhiro Report at 2). For example, if a French company pays a royalty to a Japanese company, the French government can impose income taxes upon the Japanese company by requiring the French company to withhold a portion of the royalty and remit that portion to the French taxing authority. (Foster Decl. ¶ 10; Kasai Report at 4).

100. By law, the licensees and subagents are required to withhold and remit these taxes to their local tax authorities. (Elliott Decl. ¶ 30). Paragraph 4(c) of the License Agreements permits 4Kids to deduct such withholding taxes from Plaintiffs' share of Gross Income. (Ex. T-6 and Ex. T-11 at ¶ 4(c)).

101. The percentage of withholding required varies by country. (Foster Decl. ¶ 10; Tokuhiro Report at 2). In some countries where there is a tax treaty in place between Japan and the particular foreign country, the percentage that must be withheld can be reduced if the foreign licensee documents with the local tax authority that the licensor is a resident of Japan. (Foster Decl. ¶ 10).[22] With respect to 4Kids, these taxes ranged from 5% to 22.5% of gross royalties and licensing fees and represent amounts that 4Kids' international licensees and subagents deducted from their quarterly royalty and licensing payments to 4Kids. (Elliott Decl. ¶ 30).

102. After the tax is paid, the local taxing authority will issue what is known as a "withholding tax certificate." (Foster Decl. ¶ 16). The length of time between the payment of the tax and the issuance of a certificate varies depending on the country and can range from six months to a year or two; accordingly, a corporate tax payer may not have the certificate in hand for that fiscal year when its tax return is due to be filed. (Foster Decl. ¶ 17; Kozmata Decl. ¶ 13; 9/19/2011 Tr. 74:18–75:10 (Kozmata); 9/6/2011 Tr. 33:7–8, 33:18–34:12 (Hosaka)).

---

[22]     Prior to 2004, there also was a withholding tax in the United States with respect to royalties payable to Japanese licensors, but that withholding tax has since been eliminated. (Foster Decl. ¶ 10 n.2; Newborn Decl. ¶ 95). This withholding tax was eliminated on July 1, 2004.

103.    Licensees typically send withholding tax certificates either directly to the licensor or to its agent (in this case, to 4Kids in the United States or to 4Kids' United Kingdom subsidiary for all territories outside of Japan and Asia).    (Foster Decl. ¶ 18).    4Kids collects, files, and periodically transmits or distributes the certificates that it receives to its licensors.    (Foster Decl. ¶ 18; Kozmata Decl. ¶ 17; 9/19/2011 Tr. 73:4–14, 77:10–22, 80:20–81:3, 105:6–22 (Kozmata); Ex. T-250).

### 2.    Treatment of Withholding Taxes under the License Agreements

104.    Pursuant to the License Agreements, 4Kids serves as Licensor's agent with respect to certain licensing opportunities for the Yu-Gi-Oh! properties in countries outside of Japan and Asia.    (Foster Decl. ¶ 12).[23]    The License Agreements provide that foreign withholding taxes paid by 4Kids' subagents are to be deducted from Licensor's share of royalties.    (Ex. T-6 ¶¶ 4(c), (g); Ex. T-11 ¶¶ 4(c), (g)).    The License Agreements also provide that 4Kids shall provide, or cause its subagents to provide Licensor with "evidence" of taxes withheld, although the agreements do not specify the nature of such evidence:

> 4Kids shall provide Licensor or shall cause the applicable subagent or applicable licensee to provide Licensor with evidence of payment of such withholding tax on behalf of Licensor so that Licensor may claim an appropriate tax credit or tax deduction. 4Kids shall also assist Licensor in filing any and all forms with the taxation authorities of the various countries within the Territory[24]

---

[23]    In the License Agreements and in the testimony presented at trial, these foreign companies were variously referred to as "foreign licensees," "sublicensees" of 4Kids, and "subagents" of 4Kids.    For simplicity, these companies are referred to herein as "subagents" or "sublicensees."

[24]    Licensor has asserted that 4Kids was obligated to assist ADK in filing for tax credits in Japan.    (9/23/2011 Tr. 69:7–12 (Plaintiffs' Closing Argument); Ex. T-18).    In contrast, both License Agreements are clear on their face that "4Kids shall also assist Licensor in filing any and all forms with the taxation authorities of the various countries within the *Territory* so as to enable Licensor to claim any tax credits to which Licensor may be entitled."    (Ex. T-6 ¶ 4(g); Ex. T-11 ¶ 4(g)) (emphasis added) .    Both agreements define the Territory as "the world except the Asian countries [including Japan] listed on Exhibit B."    (Ex. T-6 ¶ 3; Ex. T-11 ¶ 3).    Accordingly, 4Kids was obligated to assist Licensor with the filing of forms in the Territory to enable Licensor to claim tax credits, but was not obligated to assist Licensor in filing for tax credits in Japan.

so as to enable Licensor to claim any tax credits to which Licensor
may be entitled.

(Ex. T-6 ¶ 4(g); Ex. T-11 ¶ 4(g)).

105.    Mr. Newborn explained that in drafting Paragraph 4(g) of the License
Agreements, he specifically chose to use a broad word — "evidence" — because he did not
know what documentation was required under Japanese law to claim foreign withholding tax
credits or what documentation was prepared and provided by numerous foreign countries in the
4Kids Territory.   It was his assumption that Licensor understood what documentation was
necessary, and would inform 4Kids of the requirements accordingly.  (9/12/2011 Tr. 103:8–24,
104:16–105:2 (Newborn)).

106.    4Kids cannot compel a foreign subagent to bypass, reduce, or alter the payment of
foreign withholding taxes, and 4Kids obtains no benefit from a foreign subagent's withholding of
such taxes.  (Foster Decl. ¶ 11).

107.    4Kids receives the net proceeds (*i.e.*, gross royalties less withholding taxes paid to
the local taxing authorities and other permitted deductions) from its Yu-Gi-Oh! subagents in
foreign countries.  (Foster Decl. ¶ 14).  4Kids then records the net receipts and reconciles them
with the remittances provided by the subagent.[25]  (*Id.*).  Next, the net receipts are compiled and
provided in quarterly royalty reports provided to Licensor, also known as "participation
statements."  (*Id.*).  The participation statements provide detailed information regarding gross
income, foreign withholding taxes, bank fees, and net cash receipts, all of which are organized
by date, subagent, and country.  (*Id.*).  The remittance provided by the subagent is the basis for
the information contained in participation statements provided to Licensor.  (*Id.*).

---

[25]    It is undisputed that Mr. Elliott did not request copies of foreign remittances or cash receipts from 4Kids,
which documents would have enabled Mr. Elliott to confirm that 4Kids accurately reported the amount of net
proceeds and the associated royalties. *See* ¶ 116, *infra*.

108.    It is in 4Kids' interest to ensure that foreign subagents actually pay the foreign taxing authority and are not simply reducing the proceeds payable to 4Kids by the amount of the foreign withholding taxes due.  (9/20/2011 Tr. 206:16–207:21 (Foster)).

109.    There is no dispute that 4Kids advised Licensor on a quarterly basis of the amount of foreign withholding taxes deducted from Licensor's share or royalties.  The quarterly Yu-Gi-Oh! participation statements that 4Kids provided to Licensor listed all foreign withholding taxes paid by foreign subagents and withheld from the royalty payments to the Licensor.[26]  (Foster Decl. ¶ 15; 8/31/2011 Tr. 35:18–21 (Shinoda); 8/22/11 Dep. Tr. at 48:5–20 (Kubota)).

110.    Although Licensor has claimed that no foreign withholding tax certificates were provided by 4Kids to Licensor, there is little credible evidence to support this assertion.  There is evidence that 4Kids did forward some tax certificates from foreign subagents to ADK.  (Kozmata Decl. ¶ 17; Foster Decl. ¶ 19; 9/19/2011 Tr. 72:25–73:11, 103:8–11 (Kozmata); Ex. T-250).  Mr. Hosaka testified that he personally undertook a search for such certificates after the initiation of the litigation, and looked in all of the "logical places" for the certificates — but on cross-examination he admitted that he searched for the certificates only in ADK's tax returns and in 4Kids' quarterly participation statements.  (Hosaka Decl. ¶ 50; 9/6/2011 Tr. 38:6–12, 120:10–121:1 (Hosaka)).  Although Mr. Hosaka testified in his re-direct examination that he also looked in the accounting department and in anything related to tax deductions to locate the certificates, he again admitted on re-cross examination that he looked only at the participation statements and in the tax returns for the certificates.  (9/6/2011 Tr. 123:7–19, 130:15–23, 131:7–132:3 (Hosaka)).

---

[26]    While both Licensor's and 4Kids' tax experts agree that generally the participation statements would not be sufficient proof of the payment of foreign taxes, both testified that they would advise a client to "first" request the relevant certificates after receipt of participation statements.  (8/29/2011 Tr. 127:6–9 (Kasai); Tokuhiro Report at 6).

111.    While Licensor has asserted that, "based on various agreements between the YGO Consortium," ADK is the sole entity that is responsible for and entitled to claim foreign withholding tax credits, no such agreements codifying this allocation has been produced, used at trial, or introduced into evidence. (Kawasaki Decl. ¶ 48).   Despite the assertions as to the allocation of tax credits and the existence of various agreements presented in his declaration, Mr. Kawasaki, the sole representative of TV Tokyo to appear in this adversary proceeding, testified that "it is a fact that tax credits have not been discussed in the Consortium."   (9/1/2011 Tr. 148:23–149:2 (Kawasaki)).   Mr. Kawasaki also presented contradictory testimony as to his knowledge as to which entities within the Licensor entity were entitled to claim the foreign withholding tax credits.[27]   Although Mr. Kawasaki testified at trial that, to his knowledge, ADK was the only entity entitled to claim foreign withholding tax credits, he was confronted by his contradictory deposition testimony where he stated that he did not know which of the Licensor entities were entitled to claim tax credits.  (9/1/2011 Tr. 148:1–20 (Kawasaki)).

112.    Mr. Tokuhiro, 4Kids' tax expert, testified that, under Japanese law, the beneficiary of foreign source income is entitled to claim foreign withholding tax credits, but that based on his review of the License Agreements it did not appear to him that ADK was the only entity among the Licensors that was entitled to claim the foreign withholding tax credits related to the income generated pursuant to those agreements.  (9/20/2011 Tr. 32:20–33:8 (Tokuhiro)).

---

[27]     There were a number of inconsistencies in Mr. Kawasaki's testimony.  For example, Mr. Kawasaki claimed that he received an oral recitation of Mr. Elliott's Findings in October 2010, but that he did not recall when he learned about the Funimation service fees. (9/1/2011 Tr. 144:9–146:6 (Kawasaki)).  He then testified, on redirect, that he recalled learning of the service fees after June 2010.  (9/1/2011 Tr. 186:5–14, 188:24–189:8 (Kawasaki)). Mr. Kawasaki testified that he had a general understanding of how foreign withholding taxes work, but admitted that he testified in August that he did not possess an understanding of foreign withholding taxes. (9/1/2011 Tr. 146:12–147:16 (Kawasaki)).  Mr. Kawasaki testified at his deposition that he did not often speak to ADK about 4Kids in the prior eighteen months; however, at trial, Mr. Kawasaki claimed that starting in January 2011, he and the other members of the Consortium had weekly meetings, in addition to numerous phone calls each week, concerning 4Kids between January and March 2011.  (9/1/2011 Tr. 122:11–24, 176:14–179:20 (Kawasaki)).  He then claimed that as time progressed, he was speaking to ADK on a daily basis concerning 4Kids.  (*Id.*).

42

113.    Evidence was presented that some foreign licensees directly sent foreign with-holding tax certificates to TV Tokyo.  (Ex. T-28; Ex. T-28A; Kozmata Decl. ¶ 15).  For example, Exhibit T-28 is a collection of thirteen separate tax certificates issued in the name of TV Tokyo.[28]  Although six of the certificates bear an incorrect address for TV Tokyo, the remaining seven certificates bear TV Tokyo's correct addresses in both New York and Japan.  (9/1/2011 Tr. 149:7–11, 153:4–18 (Kawasaki); Ex. T-28; Ex. T-28A).  Mr. Kawasaki admitted that he does not know whether TV Tokyo ever received these certificates, forwarded them to ADK, or ever contacted 4Kids to request that the names on the certificates be changed from TV Tokyo to ADK.  (9/1/2011 Tr. 158:21–159:3 (Kawasaki)).  Mr. Kawasaki testified that after his deposition, he checked whether TV Tokyo had received any foreign withholding tax certificates.  (9/1/11 Tr. 189:12-193:7 (Kawasaki)).  Based upon the information he received from TV Tokyo's accounting department, Mr. Kawasaki concluded that no tax certificates had been received.  (9/1/11 Tr. 189:12-193:6 (Kawasaki)).

114.    There has been no reliable evidence presented as to whether or not TV Tokyo claimed any foreign tax credits, including credits for those withholding taxes listed in Exhibit T-28.  No tax returns for TV Tokyo were produced or introduced into evidence at trial, and Mr. Kawasaki admitted that he has never reviewed or assisted in the preparation or filing of TV Tokyo's tax returns.  (9/1/2011 Tr. 157:1–5 (Kawasaki)).  Although Mr. Kawasaki admitted during his deposition that he could not say whether or not the credits represented by the certificates in Exhibit T-28 were claimed by TV Tokyo, at trial Mr. Kawasaki presented hearsay testimony that he confirmed that the credits were not received by TV Tokyo.  (9/1/2011 Tr.

---

[28]    As Mr. Foster testified in his declaration, Exhibit T-28 is a collection of certificates issued in the name of TV Tokyo that were obtained by 4Kids subsequent to Mr. Elliott's audit.  (Foster Decl. ¶ 38 n.6; 9/20/2011 Tr. 223:14–22 (Foster)).

157:6–24 (Kawasaki)).   Mr. Kawasaki did not reference his communications with the accounting

department in his declaration nor did he attach any documentation to his declaration evidencing

how he was able to confirm this information.   (9/1/2011 Tr. 153:24–155:7, 157:25–158:12

(Kawasaki)).

### 3. Mr. Elliott's Audit Finding

115.   During his royalty audit, Mr. Elliott asked that 4Kids provide him with copies of

foreign tax withholding certificates going back to 2002, ostensibly so that he could verify that the

amounts deducted in 4Kids' participation statements were accurate.   (8/29/2011 Tr. 178:3–16

(Elliott)).

116.   However, Mr. Elliott admitted that he did not review the foreign remittances or

cash receipts to confirm whether they matched the foreign withholding tax deductions listed in

the participation statements.   (8/29/2011 Tr. 176:25–177:4, 177:20–178:2 (Elliott)).   Instead, Mr.

Elliott's analysis was solely based on a review of the certificates themselves and on the

participation statements.   (8/29/2011 Tr. 176:15–19, 178:3–10 (Elliott)).

117.   There is no evidence, in Mr. Elliott's audit Findings or otherwise, that any foreign

subagent failed to pay taxes to the applicable taxing authority for any amounts that were

withheld.   The only means to assess a subagent's failure to pay taxes would be through an audit

of the subagent.   (9/19/2011 Tr. 71:11–22 (Kozmata); 9/20/2011 Tr. 206:16–208:4, 210:4–9

(Foster)).

118.   There is no evidence, in Mr. Elliott's audit Findings or otherwise, that royalties

were not reported properly with respect to foreign withholding tax deductions.   (8/30/2011 Tr.

76:21–77:2 (Elliott)).

119.     There is no evidence, in Mr. Elliott's audit Findings or otherwise, that 4Kids claimed any withholding tax credits related to the Yu-Gi-Oh! property on its own behalf.  (Foster Decl. ¶ 22; Newborn Decl. ¶ 96).

120.     Exhibit 1 to Mr. Elliott's final audit report reflects his analysis of the tax certificates.  (Ex. T-14 at 5–7).  Based on his review of the participation statements, Mr. Elliott determined that 4Kids had deducted $2,538,963.75 from Licensor's share of Gross Income.  (Ex. T-14; *see also* Elliott Decl. ¶ 30; Shinoda Decl. ¶ 41; Hosaka Decl. ¶ 49).  Mr. Elliott found that $1,386,913.86 worth of tax certificates were "unaccounted for," meaning that 4Kids did not have copies of the tax withholding certificates in its possession.  (Ex. T-14 at 6–7).  Although Mr. Elliott did not ask ADK or TV Tokyo whether they had ever received certificates from subagents directly, Mr. Elliott deemed these $1,386,913.86 worth of certificates to be "unsubstantiated" because they were not located in 4Kids' files.  (Elliott Decl. ¶ 36).

121.     Mr. Elliott noted in his analysis that tax certificates in the amount of $1,152,049.89 had been provided for his review by 4Kids.  (Ex. T-14).  Of this $1,152,049.89, Mr. Elliott determined that $273,196.59 were "substantiated" by virtue of the fact that they were located in 4Kids' files and included the Licensor's name (by referencing as the tax beneficiary either TV Tokyo, NAS, ADK, or the Yu-Gi-Oh! property).  (Ex. T-14; Elliott Decl. ¶ 35; 8/29/2011 Tr. 190:11–191:6 (Elliott)).  According to Mr. Elliott, his analysis of whether these certificates were substantiated did not turn on whether or not they had been provided to Licensor; their presence in 4Kids' files and reference to Licensor was the sole basis for his description of these certificates as substantiated.  (8/29/2011 Tr. 190:11–191:6 (Elliott))

122.     Of the tax certificates that 4Kids provided to Mr. Elliott, he noted that $873,853.30 were, in his opinion, "unsubstantiated" because they did not reference the Yu-Gi-

Oh! property or the Licensor on the face of the certificate. (Ex. T-14 at 6–7; Ex. T-97; Foster Decl. ¶ 35). However, at trial, Mr. Elliott admitted that he did not notice the Yu-Gi-Oh! notation present on substantially all of the certificates in this group.[29] (Ex. T-97; 8/29/2011 Tr. 199:5–200:7). Despite his characterization of these certificates as "unsubstantiated," Mr. Elliott testified that he did not know whether, as a matter of Japanese tax law, ADK could have relied on these certificates to claim foreign withholding tax credits. (Ex. T-97; 8/29/2011 Tr. 200:8–12) (Elliott)).

123.    Approximately $205,215.79 of these certificates which Mr. Elliott deemed to be "unsubstantiated" relate to the withholdings of the Mattel subsidiaries. Mr. Elliott admitted that during his audit he was provided with an affidavit from Mattel's Vice President of Finance/Assistant Controlled, dated March 25, 2007, which confirmed that those certificates all related to the Yu-Gi-Oh! property and reflected withholding taxes paid on behalf of NAS. (Foster Decl. ¶ 36; Ex. T-95; 8/29/2011 Tr. 200:21–201:22 (Elliott)). Mr. Elliott admitted that he does not know whether or not ADK could have used these documents to claim foreign withholding tax certificates under Japanese law. (8/29/2011 Tr. 201:23–202:3 (Elliott)).

124.    Mr. Elliott admitted that the tax deductions that he deemed as "unsubstantiated" were listed and included in the quarterly participation statements provided by 4Kids to Licensor, and thus known to Licensor. (8/29/2011 Tr. 176:11–14 (Elliott)).

125.    Based on the above, Mr. Elliott quantified Licensor's tax-related audit claim against 4Kids at $2,265,767.16 – by adding together the $1,386,913.86 of unaccounted for certificates and the $873,853.30 worth of tax certificates that were, in his opinion,

---

[29]    Substantially all of the certificates in this group reference Yu-Gi-Oh! except those from the various Mattel subsidiaries. (Foster Decl. ¶ 35).

"unsubstantiated" because he concluded, albeit erroneously, that they did not reference the Yu-Gi-Oh! property or the Licensor on the face of the certificate. *See* FF ¶ 122, *supra;* Ex. T-14 at 3, 5–6; Elliott Decl. ¶ 36. However, Mr. Elliott admitted that he could not conclude that Licensor was injured in the amount of $2,265,767.16 because that conclusion would require an understanding and knowledge of Japanese tax law, which he does not possess. (8/29/2011 Tr. 179: 4–5, 183:18–184:2 (Elliott)). Furthermore, as demonstrated below, Mr. Elliott's analysis did not and could not quantify any tax injury allegedly suffered by Licensor.

126.    Mr. Elliott did not have access to the tax returns of ADK or TV Tokyo and thus could not and did not independently assess whether either had claimed any foreign withholding tax credits related to Yu-Gi-Oh!. (8/29/2011 Tr.179:6–8, 180:9–11 (Elliott)). Although he admits that, if either ADK or TV Tokyo separately received the certificates, there would be no value to the claim that he put forth in his final report, Mr. Elliott never asked ADK or TV Tokyo whether they had received any foreign withholding tax certificates directly from subagents. (*Id.* at 183:5–9, 180:12–181:11). Mr. Elliott cannot say whether ADK or TV Tokyo had claimed any foreign withholding tax credits with respect to the approximately $2.26 million which Mr. Elliott deemed to be "unsubstantiated." (*Id.* at 181:12–182:8).

127.    According to Mr. Elliott, the crux of his Finding 3 was not whether or not Licensor could have claimed a tax credit. (*Id.* at 182:9–12). It was neither his purpose nor his intent to identify an amount that Licensor could recover from 4Kids. (*Id.* at 182:17–22). Instead, his audit focused on the identification of "unsubstantiated" tax deductions (*i.e.*, whether or not 4Kids had possession of the certificate, whether the certificate was issued in the Licensor's name, or whether the certificate, in some way, identified the Yu-Gi-Oh! property). (Ex. T-14 at 5–6).

47

128.    Exhibit 1 to Mr. Elliott's November 2010 final audit report sets forth the reasoning behind his characterization of certificates as "unsubstantiated."  Without access to Exhibit 1 to Mr. Elliott's November 2010 final audit report, there was no way for 4Kids to assess which tax events Mr. Elliott had deemed to be unsubstantiated.  (9/21/2011 Tr. 87:1–4 (Foster); Ex. T-14; Ex. T-18).  Despite a request for Mr. Elliott's audit report in June 2010, and various requests for further information about his Findings, 4Kids was not provided with any iteration of Mr. Elliott's audit report until July 2011.[30]  (Ex. T-17; Newborn ¶¶ 139, 149, 151; Foster Decl. ¶ 28).

129.    In view of the foregoing, there is no basis to find that Mr. Elliott's Finding 3 reflects an underpayment of royalties to Licensor or that it establishes that Licensor was injured in the amount of $2,265,767.16.  There is insufficient evidence to conclude that Mr. Elliott's audit Finding relates to whether or not ADK could have claimed foreign withholding tax credits.

### 4.    Expert Testimony Regarding Japanese Tax Law

130.    The Court heard testimony from two experts on Japanese tax law:  Takashi Kasai, Licensor's expert, and Takaaki Tokuhiro,[31] 4Kids' expert.

---

[30]    Licensor has asserted that it is custom and practice in the licensing field for the auditing party to not provide the audit report to the audited entity.  However, Mr. Erk, Licensor's expert on the "customs and practices [of] royalty compliance work," testified that in his practice the audited party "often" receives a copy of the audit report.  (9/9/2011 Tr. 21:20–22, 77:1–11 (Erk)).  Using a proposal sent by an external auditor (and forwarded to ADK) for an audit of foreign Yu-Gi-Oh! licensees, Licensor has attempted to demonstrate that 4Kids' own practice was to generate two reports, one internal and one external.  (Ex. T-607).  However, there is no evidence, other than this proposal which was not approved, that 4Kids ever utilized internal and external versions of audit reports; nor is there any evidence whether the proposed external report provided less or more information regarding the audit claims than the proposed internal report.  (9/15/2011 Tr. 50:21–23, 51:17–20, 52:6–10, 56:15–16 (Nowicki); 9/12/2011 Tr. 42:14–24; 51:23–25 (Newborn); 9/20/2011 Tr. 148:16–23 (Foster); Ex. T-607; Ex. T-68).  The possible reasons the final audit report was not produced to 4Kids until pre-trial discovery are obvious to the Court: it reveals Mr. Elliott's focus on whether any requests had ever been made for the withholding tax certificates, and it also reveals the auditor's unabashed motivation to "discover" aggressive claims for inclusion in the audit, notwithstanding the longstanding course of dealing between the parties.

[31]    Licensor has challenged Mr. Tokuhiro's qualifications to provide an expert opinion concerning the requirements to file for foreign withholding tax credits under Japanese tax laws and regulations.  The crux of the Licensor's challenge is that Mr. Tokuhiro's lack of a CPTA license precludes the necessary expertise required in this
(continued...)

131.    A Japanese entity receiving licensing income from overseas, some of which has been withheld by its foreign licensee for the payment of withholding taxes, may claim either a tax credit or a tax deduction with respect to those taxes withheld.  (Tokuhiro Report at 2, 5).  If the Japanese entity claims a tax credit, then it reports the gross income received by the foreign licensee.  (8/29/2011 Tr. at 135:2-6, 135:12-16 (Kasai)).  However, if the Japanese entity takes a tax deduction, then it reports the net income remitted to the licensor.  (8/29/2011 Tr. 135:17–19 (Kasai)).  There is a limit to the amount of foreign withholding tax credits that a Japanese corporation can claim in a single year.  (8/29/2011 Tr. 136:11–15, 153:20–25 (Kasai); 9/20/2011 Tr. 20:3–22 (Tokuhiro)).  It is necessary to review the full tax return and apply a formula to determine the credit limit for a given year.  (8/29/2011 Tr. 136:16–19 (Kasai)).  A corporation that has credits in excess of that limit can carry-over credits for three years.  (9/20/2011 Tr. 20:14–24 (Tokuhiro)).

132.    The parties' experts are in agreement that, during the relevant time period (2001 to 2009),[32] Japanese corporate taxpayers seeking a tax credit were required to attach proof of payment of taxes on behalf of the taxpayer, and that the best evidence of such payment is the tax withholding certificate.    (9/20/2011 Tr. 21:8–21 (Tokuhiro);  8/29/2011 Tr. 107:18–108:7 (Kasai)).  The experts' opinions diverge as to what alternatives are available to a taxpayer who

---

litigation. Mr. Tokuhiro explained that, as a CPA, he would qualify to become a CPTA solely by paying a registration fee, operating an office in Japan, and participating in ongoing education classes. (9/20/2011 Tr. 45:17–46:10 (Tokuhiro)). Although Mr. Tokuhiro has not personally prepared tax returns to be filed with the Japanese National Tax Authority, he is capable and qualified to provide advice regarding the requirements of the Japanese tax law and regulations and has advised Japanese multinational corporations on how and when to claim foreign withholding tax credits for more than 20 years. (9/20/2011 Tr. 9:10–19, 12:6–16 (Tokuhiro)). This Court finds that Mr. Tokuhiro is qualified as an expert in Japanese tax law, including the ability and means to claim foreign withholding tax credits and deductions. *See* pp. 103-104, *infra*.

[32]    Mr. Kasai testified that the Japanese tax law has recently been amended to provide that Japanese corporations seeking foreign withholding tax credits or deductions do not have to physically attach proof of payment to the tax return; such proof must now be held by the taxpayer for a period of seven years. (8/29/2011 Tr. 109:14–110:14 (Kasai)).

does not have possession of the tax certificates, although both agree that the certificate is not required under the Japanese tax law and regulations so long as the taxpayer presents alternative proof which evidences payment of taxes.  (8/29/2011 Tr. 107:18 – 108:7 (Kasai); 9/20/2011 Tr. 21:9–23:12, 52:1–52:13; 56:5—56:8 (Tokuhiro)).

133.    Mr. Kasai admitted that documentation, other than the certificate itself, would be "accept[able]" to the Japanese National Tax Authorities, so long as the documentation evidenced payment of the withholding taxes.  (8/29/2011 Tr. 108:1–108:7 (Kasai)).  In Mr. Kasai's view, proof that the taxes had been paid could not be accomplished by submission of (a) a sworn affidavit explaining that payments had been made for the benefit of ADK or (b) 4Kids' cash receipts to the Japanese National Tax Authorities.  (8/29/2011 Tr. 128:22–129:11 (Kasai)).

134.    Although Mr. Kasai has no experience filing a request for foreign tax credit without possession of the certificate, he provided his "expectation" of the result of such efforts. (8/29/2011 Tr. 110:18–22, 138:5–9, 111:4–11 (Kasai)).  Mr. Kasai was equivocal when asked, on several occasions, whether a Japanese taxpayer could seek a tax credit without having the tax certificates in hand, stating at various times that it would be "difficult."  (8/29/2011 Tr. 111:4– 11, 112:13–19, 114:17–19 (Kasai)).  Mr. Kasai then admitted that "if [the taxpayer] knew that the certificates would be coming in a month, then maybe" they could seek a tax credit, because the taxpayer "would be able to verify that the amount was correct in a very short period of time." (8/29/2011 Tr. 112:20–113:23 (Kasai)).  Mr. Kasai did not identify any law or regulation limiting this time period to one month.

135.    Mr. Kasai stated that if one of his clients was in a position where it could not take a foreign withholding tax credit because the client did not have the relevant tax certificates, he would advise his client to ask its foreign licensee for the certificates.  (8/29/2011 Tr. 113:24–

50

114:5 (Kasai)).  Mr. Kasai admitted that if one of his clients received a participation statement or royalty report from its licensing agent, the first thing he would advise his client to do would be to ask for the withholding tax certificate referenced in the participation statement.  (8/29/2011 Tr. 127:6–9 (Kasai)).

136.    Mr. Tokuhiro testified that it is "common" for Japanese corporate taxpayers to seek foreign withholding tax credits without possession of the certificate, because the certificates are often not available at the time of filing.  (9/20/2011 Tr. 21:22–22:9 (Tokuhiro)).  He explained that he often advises Japanese corporate taxpayers about what documentation to provide to the National Tax Authority to claim foreign tax credits.  (*Id*. at 22:10–23:4).  In those instances Mr. Tokuhiro advises his clients to submit the "best documentation" of proof of payment that they have and to continue to request the certificate.  (*Id*. at 23:5–23:12).

137.    Mr. Tokuhiro translated the relevant section of the Japanese tax regulations (Section 69 of the Corporate Tax Law) for the Court and explained that the regulations require only submission of documentation supporting the payment of taxes, which includes, but is not limited to, the withholding tax certificate.  (9/20/2011 Tr. 34:15–35:2, 52:1–53:2 (Tokuhiro)).

138.    Both parties' experts agree that a Japanese corporate taxpayer may, as a matter of right, amend its tax return in the year after it was filed to claim further foreign tax credits if the original return claimed some foreign tax credits.  (8/29/2011 Tr. 116:6–15, 151:9–17 (Kasai); 9/20/2011 Tr. 35:8–13 (Tokuhiro)).  In order to file the amended return, the company must have documents to substantiate its amendment.  (8/29/11 Tr. 116:13-18 (Kasai)).  To amend a tax return to receive a deduction for foreign withholding taxes, the company would need documents to show that the taxes were paid overseas.  (*Id.* at 116:19-117:4).  These documents could be

either withholding tax certificates, or tax filings showing that taxes were paid to a foreign government. (*Id.* at 117:5-11).

139.    Both parties' experts further agree that a Japanese corporate taxpayer may petition the Japanese National Tax Authority for a period of up to five years after the initial tax return is filed for permission to amend its tax return to seek further foreign tax credits if the taxpayer elected to take credits, rather than a deduction. (8/29/2011 Tr. 116:6–12, 117:22–118:19 (Kasai); 9/20/2011 Tr. 35:18–35:24 (Tokuhiro)). Both experts agree that if there is sufficient evidence to support the amendment, the taxing authority may accept the request. (8/29/2011 Tr. 125:6–10 (Kasai); 9/20/2011 Tr. 35:25–36:3, 36:19–36:22 (Tokuhiro)). If the Japanese tax authorities reject the petition, the company has no avenue to appeal the decision. (8/29/11 Tr. 118:10-15 (Kasai)).

140.    Both experts agreed that if a Japanese corporation received certificates issued in another entity's name they would advise their client to try to obtain a certificate in the correct name. (9/20/2011 Tr. 33:18–24 (Tokuhiro); 8/29/2011 Tr. 152:20–24 (Kasai)). Although Mr. Kasai has no personal experience submitting certificates issued in another entity's name as proof of payment of foreign withholding taxes, he testified that the Japanese National Tax Authority would likely reject such claims. (8/29/2011 Tr. 128:9–129:5 (Kasai)). In contrast, Mr. Tokuhiro testified that he would advise his clients to submit a certificate issued in another entity's name to claim a credit with an explanation of the incorrect issuance. (9/20/2011 Tr. 33:9–34:7 (Tokuhiro)). In Mr. Tokuhiro's experience, submission of an incorrect certificate might trigger an audit, but the audit process would afford the taxpayer an opportunity to explain the discrepancy. (9/20/2011 Tr. 37:14–24 (Tokuhiro)).

141.    One of Licensor's expert witnesses, Arthur Erk, provided an expert opinion attesting to the validity of Mr. Elliott's audit methods and Findings and as to the standards and practices in the licensing industry for substantiating deductions.  Mr. Erk testified that, with respect to the substantiation of foreign withholding taxes, he generally requires that licensees show a withholding tax certificate or a cancelled check.  (9/9/2011 Tr. 62:7–12 (Erk)).  When asked about the situation where a tax certificate did not list the licensor's name, and whether an affidavit from a sublicensee would be acceptable to substantiate the deduction, Mr. Erk testified that it would be up to his client (*i.e.*, the licensor), to determine whether such proof was acceptable.  (9/9/2011 Tr. 97:20–98:6 (Erk)).  Mr. Erk admitted that, in this case, his assessment of Mr. Elliott's third audit Finding turned on the interpretation of the word "evidence" in the License Agreements.  (9/9/2011 Tr. 83:5–16, 96:12–25 (Erk)).

### 5.    There Is No Credible Evidence That ADK Ever Requested Foreign Tax Withholding Certificates from 4Kids Prior to the Audit

142.    According to ADK, the ADK accounting office was responsible for ensuring that foreign withholding tax credits were claimed.  (8/31/2011 Tr. at 37:13–16 (Shinoda)).  Ms. Noriko Kubota, an ADK employee in the overseas licensing group, was responsible for informing the accounting department of the amount of foreign withholding taxes to claim a tax credit on.  (*Id*. at 37:21–38:2).

143.    In addition to ADK's internal accounting office, ADK retained the services of an external accounting firm, Yasumori, to assist in the preparation and filing of its tax returns.  (8/31/2011 Tr. 36:24–37:9 (Shinoda); 9/6/2011 Tr. 31:7–11, 31:16–24 (Hosaka)).  Mr. Kasai, Licensor's tax expert, described the Yasumori firm as "small" and "not well known."  (8/29/2011 Tr. 154:9–16 (Kasai)).  ADK ceased its relationship with Yasumori in 2010.  (8/31/2011 Tr. 37:7–12 (Shinoda); 9/6/2011 Tr. 32:4–5 (Hosaka)).

144.    Ms. Kubota, the ADK employee responsible for informing ADK's accounting department about foreign withholding taxes, testified that the ADK employees who would have requested foreign withholding tax certificates from 4Kids, if any requests were made, would be Mr. Doi, Mr. Shinoda, Mr. Sato and herself.  (8/31/2011 Tr. 37:21–38:2 (Shinoda); 8/22/11 Dep. Tr. 42:20–43:25 (Kubota)).   Ms. Kubota testified that she did not recall requesting foreign withholding tax certificates from 4Kids.  (8/22/11 Dep. Tr. 44:16–24 (Kubota)); Ms. Kubota further testified that she did not recall whether Mr. Shinoda, Mr. Doi, or Mr. Sato ever personally requested 4Kids provide foreign withholding tax certificates or whether they ever asked her to make any such request.  (8/22/11 Dep. Tr. 35:22–38:13 (Kubota)).

145.    Mr. Shinoda provided inconsistent testimony concerning ADK's requests for foreign withholding tax certificates.  First, Mr. Shinoda testified in his Declaration that ADK made "numerous" requests for tax withholding certificates.  (Shinoda Decl. ¶ 41).  Mr. Shinoda then testified that he spoke to Al Kahn about foreign withholding tax certificates in 2003/2004.  (9/1/2011 Tr. 73:22–74:22 (Shinoda)).   Next, Mr. Shinoda claimed, in contradiction to his deposition testimony,[33] that he requested foreign withholding tax certificates "every time" he met with Mr. Kahn.  (9/1/2011 Tr. 76:21–77:17 (Shinoda)).  Upon further questioning, Mr. Shinoda testified that it was not "every time."  (9/1/2011 Tr. 101:12–102:18 (Shinoda)).

146.    Mr. Kahn testified that ADK "may" have "once or twice" requested tax certificates, although he could not say if those requests related to U.S. taxes paid by 4Kids itself

---

[33]    Mr. Shinoda testified in his deposition that he discussed foreign withholding tax certificates with Mr. Kahn on several occasions, but that these discussions did not occur every time that he met with Mr. Kahn.  (9/1/2011 Tr. 101:12–21 (Shinoda)).

(which are not in issue) or if they related to foreign taxes paid by 4Kids' subagents.[34]  (8/8/11

Dep. Tr. 272:5–14 (Kahn)).

147.    Despite his alleged "numerous" requests for 4Kids to provide foreign withholding

tax certificates, Mr. Shinoda admits that he never followed-up any request to Mr. Kahn in

writing, either in an email or by letter.  (9/1/11 Tr. 103:7–9 (Shinoda)).

148.    ADK's witnesses uniformly testified that no written request for foreign with-

holding tax certificates was between 2001 and 2009 had been located.[35]  (9/1/11 Tr. 103:7–9

(Shinoda); 9/6/11 Tr. 35:3–6 (Hosaka); 9/8/11 Tr. 41:10–23 (Sugimoto); Kubota Tr. 124:8–

125:4).  ADK's witnesses initially asserted that Exhibit T-65 evidenced a request for foreign

withholding tax certificates,[36] although all admitted during the trial that this email was not a

request for the withholding tax certificate, but instead related to a request from a foreign

---

[34]     Ms. Nowicki confirmed Mr. Kahn's testimony and explained that she did not recall the topic of foreign
withholding certificates being raised at any meeting with ADK.  (9/15/2011 Tr. 107:15–20 (Nowicki)).

[35]     Mr. Sugimoto testified that ADK had conducted a search for requests for foreign withholding tax
certificates between July 2010 and December 15, 2010 (five days before Licensor had sent its purported notice of
breach to 4Kids), but that no such requests or communications were located during this investigation.  (9/8/2011 Tr.
28:10–29:20, 41:10–23 (Sugimoto); 9/1/2011 Tr. 79:14–80:4 (Shinoda); Ex. T-63; Ex. T-64; Ex. T-65; Ex. T-65A).
Messrs' Shinoda and Hosaka had also asked Ms. Kubota to search for any requests from ADK to 4Kids for foreign
withholding tax certificates.  (9/8/11 Tr. 23:2-24:15; 28:10 -28:20; 29:12-29:20 (Sugimoto); T-65 & T-65A).
During his cross-examination, Mr. Sugimoto claimed, for the first time, that there had been a change in ADK's
email system and thus, it was possible that this was the reason that ADK's requests had not been located during
ADK's investigation.  (9/8/2011 Tr. 24:10–15 (Sugimoto)).  The alleged change in the email system was not
mentioned by Mr. Sugimoto during his deposition, by any other ADK witness at trial or in deposition, or by counsel
for Licensor in the course of discovery.  (9/8/2011 Tr. 41:10–23 (Sugimoto)).  As there was no other evidence of any
kind presented regarding this alleged change in the email system, the Court does not find Mr. Sugimoto's testimony
on this point to be credible.

[36]     In closing arguments, counsel for Licensor asserted that there were additional documentary requests by
ADK for 4Kids to provide foreign withholding tax certificates in exhibits T-146, T-148, and T-253.  Ms. Kubota
was the only witness to provide any testimony concerning T-146.  Ms. Kubota testified that this email exchange
evidenced 4Kids' request of ADK to fill out forms to avoid double taxation of foreign income and does not "reflect
any request by ADK for 4Kids to supply or provide foreign [i.e., non-U.S.] withholding tax certificates."  (8/22/11
Dep. Tr. 78:18–80:16 (Kubota)).  Likewise, T-148 does not reflect a request for foreign withholding tax certificates.
The email specifically states, "please arrange to send us the receipts you get from tax office (regarding withholding
Tax) as soon as possible.  We do not need to file to our tax office soon, but unless we don't have (sic) any proof of
US tax office receiving tax there, we'll be in big trouble."  (Ex. T-148).  Similarly, Ms. Kozmata explained that T-
253 was a request for U.S. withholding tax certificates (specifically the form 10-42), not foreign withholding tax
certificates.  (Ex. T-253; 9/19/2011 Tr. 84:9–25, 85:10–21 (Kozmata)).

subagent, transmitted through 4Kids, for ADK to fill out a certificate of residency to avoid double taxation on income generated by the Italian subagent.   (8/31/2011 Tr. 50:22–51:18, 53:17–54:2 (Shinoda); 9/8/2011 Tr. 29:6–11 (Sugimoto); Ex. T-65; Ex. T-65A).

149.    Mr. Foster testified that, while Licensor, specifically ADK, had requested withholding certificates related to U.S. taxes, he is aware of no request for foreign tax withholding certificates prior to 2010.   (Foster Decl. ¶ 21).   Similarly, Mr. Newborn testified that nobody at Licensor ever complained to him that certificates had not been provided.   (Newborn Decl. ¶ 99).   Likewise, Ms. Kozmata testified that, to her knowledge, no one from ADK ever requested withholding tax certificates from 4Kids.   (Kozmata Decl. ¶ 18; 9/19/2011 Tr. 83:24–84:8 105:3–5 (Kozmata)).

150.    Ms. Nowicki provided and circulated agendas for quarterly meetings between 4Kids and Licensor, and took notes at those meetings.   (Nowicki Decl. ¶¶ 29–30).   Based on these meeting notes and agendas, Ms. Nowicki testified that there was no instance where the Licensor ever discussed, complained, or raised questions at those meetings about foreign withholding tax certificates.   (Nowicki Decl. ¶ 33; Ex. T-427 to Ex. T-434).   There is no credible evidence that anyone from ADK ever complained to 4Kids about the type of evidence of withholding taxes that had been provided by 4Kids and/or 4Kids' subagents to ADK under the License Agreements.   (9/12/2011 Tr. 171:15–20 (Newborn); Newborn Decl. ¶ 99).   Likewise, there is no credible evidence that anyone from TV Tokyo ever complained to 4Kids that 4Kids was not providing adequate evidence of foreign withholding taxes pursuant to the License Agreements.   (9/1/2011 Tr. 159:4–8 (Kawasaki); Newborn Decl. ¶ 99).

151.    Despite Mr. Shinoda's assertion that he made requests of 4Kids to provide certificates in 2003/2004, he admits that neither he, nor anyone else at ADK, requested any

change to the language of Paragraph 4(g) in connection with the 2008 Agreement. (8/31/2011 Tr. 59:9–14 (Shinoda); 9/1/2011 Tr. 78:23–79:9, 83:15–17 (Shinoda)). Indeed, ADK did not suggest that the term "certificate" be added to Paragraph 4(g) of the 2008 Agreement. (8/31/2011 Tr. 59:9–11 (Shinoda)). As a result, the parties did not alter the provision governing withholding taxes between the 2001 and 2008 Agreements. (9/1/11 Tr. 83:15-84:2 (Shinoda); Ex. T-6 ¶ 4(g); Ex. T-11 ¶ 4(g)).

152.    In view of the foregoing, there is no credible evidence that anyone at Licensor ever asked anyone at 4Kids to provide them with foreign withholding tax certificates, either orally or in writing, at any time until Mr. Elliott's audit in 2010.

**6.      There Is No Evidence That ADK Suffered Any Tax Related Injury**

153.    Between 2001 and 2009, ADK did not take any tax credits for foreign withholding taxes paid by Yu-Gi-Oh! subagents of 4Kids, but did claim tax credits with respect to withholding from other foreign income. (9/20/2011 Tr. 23:19–24:6 (Tokuhiro); 9/6/2011 Tr. 32:15–22 (Hosaka); 8/31/2011 Tr. 38:21–39:17 (Shinoda)).

154.    ADK has not offered into evidence its complete tax returns for any of the years at issue. Without its entire tax returns, 4Kids' expert was unable to determine whether ADK claimed any tax deductions for the foreign withholding taxes paid by Yu-Gi-Oh! subagents. (9/20/2011 Tr. 24:21–25:19 (Tokuhiro)). Licensor's own tax expert testified that he did not review the tax returns of ADK, NAS, or TV Tokyo. (8/29/2011 Tr. 131:15–21 (Kasai)).

155.    As stated by Licensor's tax expert, without a review of the full ADK tax returns, it is impossible to determine whether or not ADK had reached its maximum foreign withholding tax credit limit for the years 2001 through 2009. (8/29/2011 Tr. 136:16–19 (Kasai)).

156.    The Court is unable to determine (a) whether ADK took tax deductions for foreign withholding taxes paid by Yu-Gi-Oh! subagents or (b) whether ADK would have been eligible for additional foreign withholding tax credits for the years 2001 through 2009.

157.    Consistent with Mr. Tokuhiro's testimony and experience, the evidence demonstrates, however, that ADK sometimes submitted documentation other than foreign withholding tax certificates in order to claim foreign withholding tax credits, as discussed below.

158.    In his review of the foreign tax credits section of the portion of ADK's tax returns admitted into evidence, Mr. Tokuhiro determined that, between 2001 and 2009, ADK had claimed foreign tax credits for foreign source income unrelated to the Yu-Gi-Oh! license. (9/20/2011 Tr. 25:24–26:3, 29:4–23 (Tokuhiro)).  Mr. Tokuhiro observed in his review that, in at least three instances (in one tax return alone), ADK claimed foreign tax credits based on letters, rather than on the certificates, as evidence of proof of payment of taxes.  (9/20/2011 Tr. 29:24–32:5 (Tokuhiro); Ex. T-260 at TVT_NAS0086960, TVT_NAS0087073, TVT_NAS0087075). One of the alternatives to the certificate submitted to the Japanese National Tax Authority to claim foreign withholding tax credits was a December 2, 2004 letter from 4Kids concerning money withheld on Yu-Gi-Oh! income earned in the U.S.  (Ex. T-260 at TVT_NAS0086960).

159.    Mr. Kasai similarly testified that, based on his review of the foreign tax section of one of ADK's tax returns for the year 2004, ADK had claimed foreign withholding tax credits based on the same letters identified by Mr. Tokuhiro.  (8/29/2011 Tr. 141:9–12, 141:23–143:18, 148:7–17, 148:24–151:8 (Kasai); Ex. T-260 at TVT_NAS0086960, TVT_NAS0087073, TVT_NAS0087075).    Another letter, from a Spanish company, stated that "the annual certificates for any given year take a long time to process [thus] the governmental official

58

certificate usually come within the first six months of the following year." (Ex. T-260 at TVT_NAS0087073).

160.    Ms. Kubota testified that proof of payment of withholding taxes includes, but is not limited to, the certificate.[37] (8/22/11 Dep. Tr. 91:2–93:2 (Kubota)).

161.    In December 2004, when the U.S. withholding tax certificates were not yet available, a member of ADK's accounting department directed Ms. Kubota to "request" from 4Kids "something in lieu of the proof of tax withholdings' (payment certificate or the like)," (Ex. T-152; Ex. T-152-A; 8/22/11 Dep. Tr. 89:20-90:2, 90:21-96:7, 96:24-97:11 (Kubota)). In an email dated December 2, 2004, Ms. Kubota requested that 4Kids provide a "substitute for the withholding certificate." (8/22/11 Dep. Tr. 97:12-100:10 (Kubota); Ex. T-153; Ex. T-153-A, Ex. T-154). Ms. Kubota confirmed that the "substitute for the withholding certificate" provided by 4Kids, as per ADK's request, was the letter from 4Kids relating to U.S. withholding taxes included in ADK's 2004 tax return. (8/22/11 Dep. Tr. 101:3–8, 102:2–103:4 (Kubota); Ex. T-152A; Ex. T-153A; Ex. T-154; Ex. T-260 at TVT_NAS0086959). Ms. Kubota further testified that she does not believe that 4Kids ever provided ADK with the Form 1042 U.S. certificate related to these credits. (8/22/11 Dep. Tr. 144:18–25 (Kubota)).

162.    Despite the knowledge of ADK's accounting department that documents other than the certificates themselves could be used by ADK to claim foreign withholding tax credits, there is no documentary evidence that ADK ever asked 4Kids to provide letters or other documentary alternative to the tax certificates as proof of payment of foreign withholding taxes by 4Kids' subagents in order to file for the credits in a timely manner.

---

[37]    Although Ms. Kubota has no formal tax training, she explained that she "trained on the job" concerning taxes because she had "a lot of interaction" with the accounting office on a "day to day" basis. (8/22/11 Dep. Tr. 15:16–16:2 (Kubota)).

11-02225-scc   Doc 72   Filed 12/29/11   Entered 12/29/11 14:28:25   Main Document
Pg 67 of 161

163.    In the course of the audit, certificates reflecting $1,152,049.89 in foreign withholding tax credits were provided to Mr. Elliott.  (Ex. T-14).

164.    Although there is a one year right under Japanese tax law to amend a corporate tax return and a five year opportunity to petition to amend a corporate tax return, ADK elected not to amend or petition to amend any tax return or file the certificates provided to Mr. Elliott. (9/6/2011 Tr. 34:13–20 (Hosaka)).

165.    Following Mr. Elliott's audit, 4Kids, through further inquiries and review of its files, was able to locate $880,680.14 worth of additional certificates.   (Foster Decl. ¶ 38; 9/12/2011 Tr. 171:5–10 (Newborn)).  These certificates have been provided to ADK.  (9/12/2011 Tr. 171:5–10 (Newborn)).  There is no evidence that ADK attempted to amend or petition to amend any tax return or file these certificates in order to claim foreign tax credits.[38]

166.    Both tax experts agree that if ADK had in its filed tax returns claimed tax credits unrelated to Yu-Gi-Oh!, ADK might be granted a petition to amend its tax returns to claim Yu-Gi-Oh! related tax credits within the five year statute of limitations.  (8/29/2011 Tr. 125:3–10 (Kasai); 9/20/2011 Tr. 36:4–37:13 (Tokuhiro)).

167.    According to Mr. Tokuhiro, had ADK elected to petition to amend its tax returns for the years 2006, 2007, 2008, or 2009, and the Japanese National Tax Authority agreed with their petition, ADK could have recovered credits of approximately $1.1 million.  (9/20/2011 Tr. 36:4–25 (Tokuhiro)).

---

[38]    Similarly, as discussed below in Section VI.D.2, *infra*, after receiving the December 20, 2010 letter, Mr. Newborn, in a letter dated December 29, 2010, proposed a "constructive solution" to work with Deloitte and Touche to determine what information would be required for ADK to file amended tax returns and claim foreign withholding tax credits.  (Ex. T-18, Ex. T-20, 9/12/2011 Tr. 170:23–171:4 (Newborn)).  ADK did not respond to 4Kids' offer of assistance on this issue.  (*Id.*; 8/31/2011 Tr. 83:22–84:17 (Shinoda)).

168.    According to Mr. Tokuhiro, had ADK timely filed a petition to amend its tax returns prior to the fifth anniversary of the original filing date for the years 2005 through 2009, and the Japanese National Tax Authority agreed with its petition, ADK could have recovered approximately $1.6 million in foreign tax credits.  (9/20/2011 Tr. 37:1–5 (Tokuhiro)).

### D.    Finding No. 4:  Post-June 2008 Home Video Revenue

169.    In his fourth audit Finding, Mr. Elliott found that 4Kids had continued to divide the 20% home video royalty between the parties during the second half of 2008.  Mr. Elliott noted that, under the 2008 Agreement, effective as of July 1, 2008, Paragraph 1(b)(iii) had been amended to provide that, if 4Kids exercised the home video rights itself, the entire home video royalty should be paid to Licensor.  (Ex. T-14 at 7–8).  Finding 4 was included in Mr. Shinoda's December 20, 2010 letter to 4Kids.  (Ex. T-18 at 1, 3).

170.    Finding 4 was premised upon the application of Paragraph 1(b)(iii) of the 2008 Agreement, which applies "[I]f 4Kids exercises the Home Video Rights . . . itself."  (Ex. T-14 at 7–8; Ex. T-11; 8/29/2011 Tr. 166:25–167:7 (Elliott)).

171.    4Kids never disputed Finding 4, and, in fact, agreed to pay the entire amount of the claim ($26,894.27).  As Mr. Newborn explained in his testimony, this Finding resulted from an error in 4Kids' accounting department following the adoption of the 2008 Agreement, which implemented the shift from the 50/50 split of home video revenue to the requirement that the entire twenty percent be remitted to Licensor.  (Newborn Decl. ¶¶ 66 & n.32, 130).

172.    Sometime between Mr. Shinoda's December 20 letter and the filing of the Complaint in this action on March 25 (concurrent with the purported termination of the 2008 Agreement), Licensor dropped Finding 4.  Mr. Shinoda testified that, "after further consider-ation, the [Yu-Gi-Oh!] Consortium has decided not to pursue this audit claim further."  (Shinoda

Decl. ¶ 44).  There is no mention of Finding 4 in the Complaint filed by Licensor on March 25, 2011.  (*See* Adv. Pro. No. 11-02225, Docket No. 1).

173.   Prior to the filing of the Complaint, Licensor never communicated to 4Kids that Licensor had decided not to pursue Finding 4.  (8/31/2011 Tr. 34:14–21 (Shinoda)).

### E.   Finding No. 5:  Costs of Third-Party Audits[39]

174.   In his fifth Finding, Mr. Elliott found that 4Kids had improperly deducted 50% of the cost of various third-party audits from Licensor's share of royalties, amounting to $105,111.20 in improper deductions.   (Ex. T-14 at 8–9; 8/29/2011 Tr. 202:9–12 (Elliott)).  According to Mr. Elliott, although 4Kids had informed him that it had obtained approval for these deductions – which were half the cost of third-party audits conducted on 4Kids' sublicensees – the fact that he did not review written authorization for these deductions led him to conclude that such costs were unauthorized by Licensor.  (Elliott Decl. ¶ 39; Ex. T-14 at 8–9).  He therefore found that any deductions by 4Kids for third-party costs were impermissible under the License Agreements.  (Elliott Decl. ¶ 40).

175.   It is customary in the licensing industry to conduct audits of licensees.  (Nowicki Decl. ¶ 22).  It is typical to conduct these audits after a significant term of the license agreement has passed but before the agreement has concluded, to ensure collection of any audit findings.  (*Id.*).

---

[39]   In support of its position, Licensor incorrectly cites Paragraph 4(f) of the License Agreements.  (Newborn Decl. ¶ 115; Ex. T-18 at 4KIDS-0041383).  Paragraph 4(f) does not relate to third-party audit costs.  Rather, this subparagraph deals exclusively with an audit conducted by Licensor of 4Kids.  This provision states that if Licensor uncovers an underpayment of more than 5% due, 4Kids is obliged to reimburse Licensor for the cost of the audit of 4Kids.  (Newborn Decl. ¶ 115; Ex. T-6 ¶ 4(f); Ex. T-11 ¶ 4(f)).  That Licensor understands the meaning of Paragraph 4(f) is evident from the penultimate paragraph of the December 20, 2010 letter, where Licensor relies upon this paragraph to seek reimbursement for the cost of Mr. Elliott's services in conducting the audit of 4Kids.  (Newborn Decl. ¶ 116; Ex. T-18).

176.    Beginning in 2005, 4Kids decided to audit some of the Yu-Gi-Oh! sublicensees. (*Id.*; Newborn Decl. ¶ 111).  All audits of the Yu-Gi-Oh! licensees were conducted by external auditors.  (Nowicki Decl. ¶ 23; 9/20/2011 Tr. 117:17–25 (Foster)).  On January 5, 2005, Ms. Nowicki sent an email to Ms. Kubota outlining 4Kids' procedures for conducting sublicensee audits.  (Ex. T-209; Nowicki Decl. ¶ 24).  The procedures expressly provided that "4Kids will recoup 50% of the audit costs from Licensor's share of the quarterly royalty revenues."  (Ex. T-209 at 4KIDS-0041378).

177.    Ms. Kubota confirmed that she received the document outlining 4Kids' procedures for conducting licensee audits and that the document sent by Ms. Nowicki specified that Licensor would share 50% of the cost of third-party audits.  (Ex. T-209; 8/22/11 Dep. Tr. 125:20–126:17 (Kubota)).  Ms. Kubota testified that, despite the clear language of the document, she was uncertain whether or not this document signified that costs of third-party audits would be split "as a matter of fact" or whether this document merely expressed 4Kids' "desire to split" these costs.  (8/22/11 Dep. Tr. 126:18–127:2 (Kubota)).  However, Ms. Kubota has no "specific recollection" of inquiring of Ms. Nowicki or anyone else at 4Kids as to the intent behind the outlined procedure and has seen no document reflecting the same.  (8/22/11 Dep. Tr. 126:18–127:9, 128:9–17 (Kubota)).  Similarly, Ms. Nowicki did not recall any follow-up discussion with Ms. Kubota.  (9/15/2011 Tr. 46:20–47:7 (Nowicki)).

178.    4Kids' practice of treating the audit costs as off-the-top costs is consistent with licensing industry practice, where the costs of third-party audits are shared in proportion to the recoveries.  (Newborn Decl. ¶ 113).

179.    Following 4Kids' provision of its third-party audit procedure to ADK in January 2005, 4Kids initiated, with Licensor's approval, various audits of Yu-Gi-Oh! licensees.

63

(Newborn Decl. ¶ 111).  4Kids sought Licensor's approval of each individual audit and "never" conducted any Yu-Gi-Oh!–related audit without Licensor's approval.  (9/15/2011 Tr. 104:15–22 (Nowicki)).

180.   For example, in 2007, 4Kids requested Licensor's approval to conduct six licensee audits.  (Ex. T-31).  In the email request for approval to conduct the most pressing of the six proposed audits, 4Kids explicitly stated that Licensor's "confirmation" was required before the audit was initiated because "the Licensor is responsible for sharing in the costs of audits." (Ex. T-31).  Licensor's response evidences that Licensor understood that costs would be shared, because in approving this audit, Mr. Doi[40] of ADK wrote, "we need TV Tokyo's confirmation because auditing involves cost."  (Ex. T-31).  Mr. Sugimoto, who was copied on this email, confirmed that Mr. Doi approved this audit and that Mr. Doi understood in approving this audit that there would be associated costs.  (9/8/2011 Tr. 44:10–25, 45:23–46:4 (Sugimoto)).

181.   The email also clearly expressed to Licensor that 4Kids would "move forward with [the one approved audit] but will hold for approval of the others."  (Ex. T-31).  Mr. Sugimoto, who was copied on this email, confirmed that 4Kids did not initiate the other suggested audits because Licensor's approval was required.   (9/8/2011 Tr. 45:23–46:4 (Sugimoto)).

182.   In a separate email in 2007, Ms. Nowicki asked for Licensor's approval to conduct another audit.  (Ex. T-101).  In responding to this email, Mr. Hosaka wrote, "please proceed licensee audit you proposed [sic].  [W]e fully understand your request."  (Ex. T-101).

---

[40]       Licensor attempted to put forth an argument that Mr. Doi did not have the authority to authorize third-party audits.  However, Mr. Sugimoto testified that Mr. Doi was in charge of ADK's licensing group and Yu-Gi-Oh! in 2007.  (9/8/2010 Tr. 118:23–119:4 (Sugimoto)).  Ms. Nowicki confirmed Mr. Doi's authority with her testimony that Mr. Doi was "in charge" of approvals.  (9/19/2011 Tr. 8:9–9:1 (Nowicki)).

Mr. Hosaka confirmed at trial that he was aware that 4Kids conducted third party audits and that he approved some of these audits.  (9/6/2011 Tr. 42:15–20 (Hosaka)).

183.    In another email in 2010 requesting Licensor's approval of two proposed audits, 4Kids explicitly conveyed, again, that the decision to conduct audits rested with Licensor.  (Ex. T-68).  In this email, 4Kids wrote, "[u]ltimately, it is your decision if you do not wish to audit these licensees, but we believe we stand to make additional revenue off of these licensees and it will be worth our while."  (Ex. T-68 at TVT_NAS0036548).  In response to questioning about this email, Ms. Nowicki testified that the proposed audits were not conducted because Licensor had not approved them.  (9/15/2011 Tr. 104:10–22 (Nowicki)).

184.    There is no dispute that Licensor understood that audits involved costs and thus Licensor had final approval over the initiation of audits.  (9/6/2011 Trial Tr. at 42:15-20 (Hosaka); 9/8/2011 Trial Tr. at 48:6-9 (Sugimoto)).  As Mr. Sugimoto explained:

> Because when usually 4Kids ask for approval it means something associated with cost.  If we say yes, then, you know, costs would be spread fifty/fifty.  So that's why we have to be very careful with when we say yes.

(9/8/2011 Tr. 48:1–5 (Sugimoto)).

185.    Ms. Nowicki, 4Kids' executive manager who was in charge of the Yu-Gi-Oh! brand on a day-to-day basis, does not recall any instance in which Licensor ever complained about, questioned, or commented on the licensee audits or the cost of those audits.  (Nowicki Decl. ¶ 29).  Nor do her meeting notes or meeting agendas reflect any such complaints, questions or comments.  (Nowicki Decl. ¶¶ 29–30).  Similarly, Mr. Hosaka testified that he was not aware of any instance where ADK complained about sharing the cost of third-party audits.  (9/6/2011 Tr. 44:17–45:6 (Hosaka)).

186.    Licensor attempted to elicit testimony from Ms. Nowicki to the effect that, because audits are not common in Japan, Licensor did not understand 4Kids' audit procedure; Licensor relied on an email concerning approval of a third-party audit settlement, not a third-party audit proposal.    (Ex. T-210).    According to Ms. Nowicki, this document does not demonstrate that Licensor was confused about third-party audits, but that they were confused about a specific issue related to a specific settlement.    (9/15/2011 Tr. 59:5–10; 60:5–12 (Nowicki)).    Licensor further attempted to elicit testimony that a suggestion had been made that 4Kids not seek Licensor's approval of audit settlements because Licensor did not understand the audit procedure.    Ms. Nowicki explained that this was not consistent with her recollection or review of the document, and correctly observed that, in the email, Ms. Hozumi was merely suggesting that 4Kids specifically explain in greater detail its recommendations for audit settlements.    (*Id*. at 105:13–106:1).

187.    There is no dispute that Licensor had final authority over the approval of audit settlements.    4Kids also informed Licensor of the audit findings and the settlement offers made by the licensees.    (Nowicki Decl. ¶ 28; Ex. T-32; Ex. T-69).    4Kids never accepted a settlement without Licensor's approval.    (9/15/2011 Tr. 106:19–24 (Nowicki)).    Licensor understood that they had approval over third party settlements.    (9/8/2011 Tr. 48:18–24 (Sugimoto)).

188.    The third party audits of 4Kids sublicensees recovered more than $750,000 in additional royalties, which were split 50–50 with Licensor.    (9/6/2011 Tr. 45:7–20 (Hosaka)).

189.    Mr. Elliott and Licensor have asserted that a written amendment was necessary to codify that Licensor and 4Kids would split the costs of third-party audits, and thus email approvals of audits were insufficient to deduct the shared cost from Licensor's share of royalties. (Shinoda Decl. ¶ 47; 8/31/2011 Tr. 67:1–16 (Shinoda); Ex. T-14 at 8–9; Elliott Decl. ¶ 40).

66

However, there is evidence that Licensor agreed, by email, to split other expenses, such as those associated with the Yu-Gi-Oh! style guide.  (8/31/2011 Tr. 67:17–25 (Shinoda); 9/21/2011 Tr. 89:22–90:17, 91:5–16 (Foster)).

190.    As Mr. Foster explained, it is impossible to understand all issues and costs that will arise when an agreement is entered into, and thus, it is common for additional costs not contemplated by the agreement to arise.  (9/21/2011 Tr. 92:5–16 (Foster)).  In those instances, depending on the nature of the cost, 4Kids will attempt to obtain verbal approval (followed-up with an email) or something in writing.  (*Id.*).

191.    The sole basis of Mr. Elliott's Finding 5 is that the License Agreements did not speak to the deduction of third party audit costs.  (Ex. T-14 at 8–9).  In the course of his audit, Mr. Elliott sent an email to Mr. Sugimoto stating, "[p]er our earlier conversation, I believe you indicated your (sic) someone in your home office may have approved [the deduction of third party audit costs].  Can you confirm this?"  (Ex. T-100).  Mr. Elliott provided inconsistent testimony as to whether or not Mr. Sugimoto had told him if these audits had been approved. During his deposition, Mr. Elliott testified that he did not recall if Licensor had told him if these audits had been approved.  (8/29/2011 Tr. 206:2–8 (Elliott)).  However, at trial, Mr. Elliott testified that Mr. Sugimoto informed him that these audit costs had not been approved by Licensor.  (8/29/2011 Tr. 204:4–9, 205:18–25 (Elliott); 8/30/2011 Tr. 85:2–13 (Elliott)).  Mr. Sugimoto testified that it was Licensor's understanding that Licensor had final approval over third-party audits, although he did not know whether or not he told Mr. Elliott about Licensor's approval authority.  (9/8/2011 Tr. 53:19–22, 57:10–19 (Sugimoto)).

192.    Mr. Elliott was shown various email communications between the parties in which Licensor agreed in writing to the initiation of third-party audits, one of which specifically

referenced that the audit would involve costs to be paid by Licensor.  (Ex. T-31; Ex. T-101).  Mr. Elliott agreed that these emails, "appear to be some support" that audits were approved by Licensor, but explained that Licensor had not provided copies of these emails nor did they tell him about these emails.  (8/30/2011 Tr. 97:11–21 (Elliott) 8/29/2011 Tr. 208:1–3, 211:8–10).  He testified that had Licensor provided him with a copy of Exhibit T-31, that email would have "impacted [his] conclusion," and he would have discussed the issue with Mr. Sugimoto.  (8/29/2011 Tr. 207:21–25 (Elliott)).  He further testified that, had Licensor provided him with copies of Exhibits T-31 and T-101, he would have spoken to Mr. Sugimoto and been "guided by his decisions as to whether or not to assert this audit claim with respect to third-party audits."  (8/30/2011 Tr. 86:24–87:10 (Elliott)).  However, Mr. Elliott evaded answering whether, in light of Exhibits T-31 and T-101, Mr. Sugimoto's statement to him that these audits were not approved was inaccurate.  (8/30/2011 Tr. 101:20–103:5 (Elliott)).

193.    Mr. Elliott testified that all of the deductions for third-party audit costs were detailed on the quarterly participation statements.  (8/29/2011 Tr. 202:13–16 (Elliott)).  Mr. Elliott admitted that, despite the inclusion of these costs on the participation statements, he was not aware of any evidence that Licensor had ever objected to these deductions, and indeed, he never asked Licensor whether they had objected to these deductions prior to 2010.  (*Id.* at 202:21–24, 203:25–204:3).

194.    Mr. Erk, Licensor's royalty inspection expert, provided testimony as to Mr. Elliott's Finding on the deduction of third-party audit costs.  Mr. Erk testified that he agreed with Mr. Elliott's Finding that the sharing of third-party audit costs had not been approved by the Licensor.  (9/9/2011 Tr. 89:7–12 (Erk)).  But he admitted that, in the course of reaching his conclusions, like Mr. Elliott, he did not look at any emails between Licensor and 4Kids.  (*Id.* at

89:24–90:23).  Mr. Erk also admitted that all deductions for the shared costs of third-party audits were listed on the quarterly participation statements.  (*Id.* at 90:24–91:2).  And, despite blessing Mr. Elliott's Finding, Mr. Erk admitted that he did not know whether or not before 2010 Licensor had ever objected to 4Kids charging them half of the third-party audit costs.  (*Id.* at 91:3–7).

195.    Based on the foregoing, the evidence establishes that there was a documented course of conduct between the parties whereby 4Kids would obtain Licensor's approval for the initiation of third-party audits, and that Licensor understood, in approving these audits, that it would share in the costs.

### F.    Finding No. 6:  Errors & Omissions Insurance Allocation

196.    In his sixth audit Finding, Mr. Elliott found that 4Kids overcharged Licensor for its share of the errors and omissions ("E&O") insurance purchased by 4Kids.  (Ex. T-14 at 9–11; Elliott Decl. ¶¶ 42–47).

197.    Paragraph 13 of each of the License Agreements requires 4Kids to obtain E&O insurance on behalf of Licensor.  (Ex. T-6 ¶ 13; Ex. T-11 ¶ 13).  The License Agreements allow 4Kids to deduct the cost of E&O insurance from Licensor's share of the Gross Income, up to a maximum of $15,000 per year.  If other television series and movies are insured under the same policy, the License Agreements provide that Licensor's share of the premium shall be "computed on a pro-rata basis."  (Ex. T-6 ¶ 4(c); Ex. T-11 ¶ 4(c)).

198.    Since 2001, 4Kids has purchased E&O insurance for the Yu-Gi-Oh! properties on behalf of both 4Kids and Licensor.  4Kids has charged Licensor the maximum amount ($15,000) each year from 2001 to 2009.  (Newborn Decl. ¶¶ 118–19; Foster Decl. ¶¶ 45–46; Elliott Decl. ¶ 44; Shinoda Decl. ¶ 48).

199.    In 2010, 4Kids' insurance policy listed 130 "additional insured" properties, seven of which were related to Yu-Gi-Oh!  (Elliott Decl. ¶ 45; Shinoda Decl. ¶ 48; Hosaka Decl. ¶ 55). However, this number included a number of inactive properties.  (Newborn Decl. ¶ 120).

200.    Mr. Elliott never asked 4Kids for a breakdown of which properties listed on the policy were active and which were inactive.  (8/29/2011 Tr. 212:8–214:10 (Elliott)).  Nor did he attempt to (i) determine whether the inclusion of inactive properties affected 4Kids' insurance premium or (ii) review the terms of 4Kids' insurance policy.  (8/29/2011 Tr. 214:11–15 (Elliott)).

201.    Mr. Newborn and Mr. Foster both testified that maintaining E&O insurance on inactive properties account for a *de minimis* marginal increase in the cost of 4Kids' insurance premiums.  When 4Kids inquired with its insurance carrier about dropping inactive properties, the carrier recommended that 4Kids "keep any discontinued names on the list."  (Newborn Decl. ¶ 120; Foster Decl. ¶ 47; Ex. T-438).

202.    The parties disagree as to how the "pro rata" share should be determined, *i.e.*, what method should be used to calculate the percentage of the premium allocated to Licensor. During trial, three methods were suggested:

### 1.    4Kids' Methods

203.    4Kids determined the allocation percentage by dividing its Yu-Gi-Oh!–derived revenue for a given year by its total company revenue.  (Elliott Decl. ¶ 44).  Using this formula, 4Kids allocated between 16% and 40% of its E&O insurance premiums to Licensor between 2001 and 2009, and for each year this amount exceeded the $15,000 maximum set out in the License Agreements.  (*Id.*).  In each case, the amount allocated to Licensor was then reduced by 4Kids to the $15,000 maximum allowed under the agreement, or approximately 11% of the total premium.  (*Id.*, Ex. T-14 at 9–11; Newborn Decl. ¶ 119; Foster Decl. ¶ 46).

70

204.    Both Mr. Newborn and Mr. Foster testified that they believed Licensor's share was justified because the Yu-Gi-Oh! property has always accounted for more than 11% of 4Kids' revenue. (Newborn Decl. ¶ 119; Foster Decl. ¶ 46).

205.    Similarly, Licensor's expert, Arthur Erk, testified that he would have calculated the allocation percentage by dividing 4Kids' Yu-Gi-Oh!–derived revenue by the revenue derived from its other insured properties. (Ex. T-200 at 6–7; 9/9/2011 Tr. 91:8–92:10 (Erk)). Mr. Erk thus disagreed with Finding No. 6.

206.    4Kids submitted a spreadsheet showing a detailed analysis of the E&O insurance costs. (Ex. T-477). The analysis shows that, for every year except one, Licensor's share of the E&O insurance exceeded $15,000 when calculated using 4Kids' revenue basis. (*Id.*). Only during a single year — from April 2001 to March 2002 — does the weighted revenue method result in an allocated premium less than the $15,000 charged by 4Kids. During that year, the weighted revenue method yields an allocated premium of $5,602.99, or $9,397.01 less than the amount charged by 4Kids. (*Id.*).

207.    Another method proposed by 4Kids is to divide the number of Yu-Gi-Oh! properties by the total number of active properties maintained by 4Kids. Mr. Newborn testified that, since Yu-Gi-Oh! always accounted for more than 11% of 4Kids' active properties, that there would have been no refund due to Licensor using this methodology. (Newborn Decl. ¶ 119; Foster Decl. ¶ 46).

### 2.    Mr. Elliott's Method

208.    Mr. Elliott determined the allocation percentage by dividing the number of Yu-Gi-Oh! properties listed on 4Kids' insurance policy by the total number of insured properties. (Elliott Decl. ¶ 46). Basing his calculation on the number of insured properties listed on 4Kids' 2010 policy, Mr. Elliott calculated that the appropriate allocation percentage was approximately

71

5.4%. (*Id.*). Applying this allocation percentage, without any knowledge of how many additional insureds were listed on 4Kids' E&O policies in years prior to the 2010 policy year, Mr. Elliott concluded that 4Kids owed Licensor a refund of $67,328.45 for the nine-year period in which 4Kids had deducted a total of $135,000 from Licensor's share of Gross Income. (Ex. T-14 at 10–11; Elliott Decl. ¶ 46).

209.    In neither his audit report nor his declaration did Mr. Elliott offer an explanation as to why he determined that the pro rata share should be calculated in the manner that he suggests. (Ex. T-14 at 10–11; Elliott Decl. ¶ 46).

210.    Nor, as noted above, did Mr. Elliott conduct any investigation as to the terms of 4Kids' insurance policy or the impact, if any, of adding inactive properties to the list of additional insureds. Furthermore, Mr. Erk wrote in his expert report that this method "would have been more representative of the allocation of the insurance costs to the licensor companies covered under the insurance policies." (Ex. T-200 at 6–7; 9/9/2011 Tr. 91:8–92:10). In essence, Mr. Erk disagreed with Mr. Elliott's sixth audit Finding.

### G.    Finding No. 7:  Bank Charges

211.    In his seventh audit Finding, Mr. Elliott suggested that 4Kids had taken $4,270.58 in deductions from Licensor's share of Gross Income for bank charges that were not authorized deductions under the License Agreements. (Ex. T-14 at 12; Shinoda Decl. ¶ 49).

212.    Mr. Newborn testified that 4Kids typically deducts these bank charges to cover wire transfer fees and similar expenses, but that Finding 7 did not constitute a material dispute between the parties. (Newborn Decl. ¶ 130). 4Kids does not dispute Mr. Elliott's Finding. (Elliott Decl. ¶ 48; 9/21/11 Tr. 23:10-19, 173:5-18 (Foster)).

## H.    Finding No. 8:  Miscellaneous Costs

213.    In his eighth audit Finding, Mr. Elliott suggested that 4Kids had deducted $43,544.59 in miscellaneous costs that were not authorized under the License Agreements.  (Ex. T-14 at 12–13).  This amount was for certain style guide art and dubbing expenses and fees that 4Kids had, in Mr. Elliott's view, improperly charged to Licensor.  *Id*.; Shinoda Decl. ¶ 50).

214.    In his October 11, 2010 draft audit report, Mr. Elliott identified four items, totaling $132,151.69, that he concluded were not authorized by the License Agreements.  (Ex. T-13 at 11–12).  According to the final audit report, Ms. Kozmata "provided written support for these deductions."  Ex. T-14 at 13.  Mr. Elliott then showed these documents to Mr. Sugimoto.

215.    After Mr. Sugimoto's review of the four items, Mr. Elliott concluded that Licensor was due a total refund of $43,544.59 for costs deducted improperly pursuant to the License Agreements.  (Ex. T-14 at 12–13).  Mr. Sugimoto had approved two of the deductions and rejected another.  As for the fourth deduction, which was for Yu-Gi-Oh! style guide art costs, Mr. Sugimoto approved half of the cost.  Mr. Elliott wrote that, according to Mr. Sugimoto, the style guide art costs were "'top-off' costs" that are divided evenly between 4Kids and Licensor.  (Ex. T-14 at 12–13).

216.    There was no written amendment to the License Agreements related to the division of the style guide art costs.  (9/21/2011 Tr. 91:5–13 (Foster)).

217.    According to Mr. Newborn, Finding 8 is not a material dispute between the parties, given that 4Kids has offered to pay substantially all of the amount ($39,000).  (Newborn Decl. ¶ 130).

I.       **Finding No. 9:  Material & Courier Costs**

218.     In his ninth audit Finding, Mr. Elliott suggested that 4Kids owed Licensor

$247,771.88 in material and courier costs incurred between 2001 and 2010.  (Ex. T-14 at 13;

Elliott Decl. ¶ 50).

219.     Under the License Agreements, Licensor is obligated to send certain materials to

4Kids with respect to each television episode, including a Digital Beta NTSC master tape of each

episode, along with music effects, a script, and music cues.  4Kids, in turn, is obligated to

reimburse Licensor for the "actual cost" of such materials, including courier costs.  (Ex. T-6

¶ 5(a); Ex. T-11 ¶ 5(a)).   However, prior to October 15, 2010, Licensor had never sent any

invoice concerning material and courier costs to 4Kids, any notice concerning these costs, any

request that these costs be reimbursed, or any complaint that these costs had not been paid.

(Foster Decl. ¶ 41; 9/6/2011 Tr. 50:10–53:18 (Hosaka); 9/8/2011 Tr. 39:6–22 (Sugimoto)).

220.     Mr. Foster testified that 4Kids does not usually pay material and courier costs

under its license agreements, and that it does not have a practice of affirmatively requesting

invoices for such costs from its licensors.  Furthermore, Mr. Foster testified that it would be

"impossible" for 4Kids to track whether it was being properly invoiced for the various costs it is

obligated to pay under the hundreds of contracts to which it is a party.  (Foster Decl. ¶¶ 41–42;

9/21/2011 Tr. 100:14–101:10, 9/20/2011 Tr. 180:17–182:1 (Foster)).

221.     During the course of his audit, Mr. Elliott discovered that the material and courier

costs had never been invoiced to 4Kids.  (Elliott Decl. ¶ 50).  At Mr. Elliott's suggestion, Mr.

Hosaka directed his associate Tammy Kusama to prepare an invoice for the material and courier

costs.  (Hosaka Decl. ¶¶ 57–58).  Ms. Kusama reviewed ADK's records and "calculated" the

amount reflected on the invoice based on the average material and delivery costs.  (Hosaka Decl.

¶ 58).  The estimated costs were based on the period from the inception of the License

74

Agreements to September 2010. (Elliott Decl. at ¶ 50). The costs were then converted from Japanese yen to American dollars using the exchange rate in effect at the time the invoice was prepared, which was early October 2010, rather than the exchange rates in effect when the materials were actually delivered to 4Kids. (Hosaka Decl. ¶ 58; 9/6/2011 Tr. 47:22–48:15 (Hosaka); 9/8/2011 Tr. 40:10–13 (Sugimoto)).

222.    According to an analysis done by 4Kids' Accounting Department, the prevailing exchange rate in October 2010 was the lowest yen-to-dollar rate during the 2001 to 2010 time frame. (Ex. T-270 at 4KIDS-0060156). Licensor introduced no evidence that disputes 4Kids' analysis of the applicable exchange rates.

223.    On October 15, 2010, Mr. Hosaka sent the invoice to 4Kids, consisting of a one-page chart purporting to show material and courier costs for over 800 Yu-Gi-Oh! episodes, over a nine-year period, totaling $247,771.88. The invoice only included backup documentation regarding the then-recently-delivered episodes for the Yu-Gi-Oh! 5D series. However, it did not include any backup documentation for the costs associated with the Yu-Gi-Oh! Duel Monsters and Yu-Gi-Oh! GX series, comprising approximately 400 episodes, and, notably, it also included charges for 83 episodes "scheduled to deliver from ADK" to 4Kids in the future. (Ex. T-29; Newborn Decl. ¶ 123; 9/6/2011 Tr. 46:2–18, 47:3–21 (Hosaka)).

224.    Mr. Hosaka admitted that the costs reflected in the October 15 invoice did not reflect "actual" costs, but were based on the average costs of such materials. (9/6/2011 Tr. 46:19–47:2 (Hosaka); Hosaka Decl. ¶ 58).

225.    Mr. Elliott took ADK's representation that it was owed $247,771.88 and included that figure in his final audit report. Mr. Elliott testified that he took ADK's calculation at "face value" and did not ask for any supporting documentation. He further testified that he understood

at the time he included Finding 9 in his audit report that the numbers were based on estimated costs and not actual costs.   (8/29/2011 Tr. 217:1–219:6 (Elliott); 8/30/2011 Tr. 96:22–97:4 (Elliott); Ex. T-14).

226.   On several occasions, 4Kids requested that ADK or its counsel provide 4Kids with additional information regarding the material costs.   (Newborn Decl. ¶ 124; Ex. T-22; Ex. T-269; Ex. T-270; 9/6/2011 Tr. 48:16–52:15 (Hosaka)).   For example, in a letter dated December 29, 2010, Mr. Kahn wrote: "[T]here are no invoices or other back up information to support about ¥14 million of material costs and courier costs . . . . Please advise whether these invoices and other records exist.   If ADK has such invoices and other information, please send it to us at your earliest convenience."   (Ex. T-22).

227.   In an email dated January 14, 2011, Mr. Newborn offered that 4Kids would pay such material costs and courier costs on the more than 500 Yu-Gi-Oh! episodes delivered by ADK to 4Kids over the ten-year relationship without regard to the statute of limitations and without requiring ADK to provide documentation of the actual material costs and courier costs if such documentation could not be located.   He asked Licensor to (1) explain the 10% "management fee" included in the invoice sent regarding material costs for Yu-Gi-Oh! 5D; (2) explain why the courier costs had been charged for 123.2 episodes;[41] and (3) justify the exchange rate used in the invoice.   Mr. Newborn included a chart prepared by 4Kids' accounting department showing that the ¥80 per dollar exchange rate apparently used by Licensor was, as of January 14, 2011, the lowest (i.e., least favorable to 4Kids) in recent history, and he suggested

---

[41]   The invoice sent to 4Kids contains a line item charge for "courier costs" for 123.2 episodes.   The Court does not understand how it would be possible for ADK to send (and to charge 4Kids for) .2 of an episode.   The evidence demonstrates that this question was never answered for the Court or for Mr. Newborn.

that it would be more appropriate to use the exchange rates in effect when the episodes were delivered.  (Ex. T-270).

228.    Mr. Newborn sent a follow-up email on February 28, 2011, again offering to resolve the material costs if Licensor would provide answers to the questions posed in Mr. Newborn's January 14 email.  (Ex. T-269).

229.    In a letter dated March 4, 2011, Licensor's counsel stated with respect to the material costs that, "[a]s with all the other claims, without a larger commitment by 4Kids to resolve all outstanding issues, it is not worth the time to track down the individual invoices relating to this single claim."  (Ex. T-25 at 2).

230.    At trial, Mr. Hosaka testified that Licensor never provided any backup document-ation to 4Kids concerning the Yu-Gi-Oh! Duel Monsters and Yu-Gi-Oh! GX series.  He also testified that ADK currently has such documentation in its possession.  (9/6/2011 Tr. 52:2–53:18 (Hosaka)).

231.    Mr. Foster testified that if 4Kids had received proper backup documentation to substantiate the material and courier costs invoice, 4Kids would have paid the invoice in the normal course of business.  Mr. Foster also testified that as the CFO of a public company, and given the internal accounting controls in place, he would not have been able to pay the material costs without having the proper supporting documentation.   (9/20/2011 Tr. 177:15–178:5, 179:15–182:1 (Foster)).

232.    Licensor's expert, Mr. Erk, submitted a report in which he stated that "Mr. Elliott's inspection revealed that 4Kids had improperly shifted [the material and courier] costs to [Licensor]."  (Erk Report, Ex. T-200 at 7).  But at trial, Mr. Erk testified that, upon further reflection, 4Kids had done nothing improper with respect to the material costs.  He testified that

he would have handled the issue differently than Mr. Elliott, and would not have included the material costs as an audit claim.  Mr. Erk also testified that there was nothing improper about 4Kids' request for additional documentation regarding the material costs, and that asking for such documentation would be the logical and reasonable thing to do.  (9/9/2011 Tr. 92:19–95:1 (Erk)).

## VI.   ADK's Purported Termination of the 2008 Agreement

### A.   The 2008 Agreement's Termination Provision

233.   Paragraph 12(a) of the 2008 Agreement provides, in relevant part:

> If either party breaches any warranty or other material provision of this Yu-Gi-Oh! Agreement and does not cure such breach within ten (10) business days of the breaching party's receipt of a written notice of such breach from the non-breaching party, then at any time during the continuance of such default, the non-breaching party may, in addition to any other rights the non-breaching party may have at law or in equity, terminate this Agreement effective as of the date of the breaching party's receipt of a written notice from the non-breaching party notifying the breaching party of such termination.

(Ex. T-11).

234.   Paragraph 15(c) of the 2008 Agreement provides, in relevant part:

> All notices, requests, consents and other communications here-under shall be in writing and shall be sent by express mail, or telefax with a follow up copy by express airmail to the parties at their addresses first above written. . . . Notice shall be deemed received upon actual receipt or when such receipt has been refused.

(Ex. T-11).

### B.   Mr. Elliott's Preliminary Audit Findings

235.   Shortly after being retained in January 2010, Mr. Elliott wrote an email to Mr. Hosaka and Mr. Sugimoto in which he posed questions regarding ADK's interpretation of the

License Agreements.[42]  Mr. Elliott noted that, under the 2001 Agreement, the home video royalty had been divided evenly between the parties, and that the provision had been amended in the 2008 Agreement to provide that the entire home video royalty be paid to Licensor when 4Kids was exercising the home video rights itself.  Mr. Elliott, noting that there was no effective date provision in the 2008 Agreement, questioned whether this change was retroactive to 2001, in which case Licensor would be entitled to an additional $4.3 million in home video royalties.  (Ex. T-89).

236.    Mr. Sugimoto responded to Mr. Elliott's email, stating that "both ADK and 4Kids were assuming that the effective date was at the time of the signing of the [2008 Agreement]. Legally we may be able to claim the money, but ethically [it] may be difficult."  (Ex. T-89).

237.    Mr. Elliott provided ADK with a preliminary audit report on May 21, 2010, in which he identified seven potential claims against 4Kids valued at approximately $7.3 million. The largest preliminary audit claim was for the $4.3 million in home video royalties that Mr. Elliott had identified in his January 2010 email to Mr. Sugimoto, based on the purported retro-active applicability of the 2008 Agreement.  (Ex. T-12 at 2–6).

238.    In his May 2010 audit report, Mr. Elliott also raised three issues regarding international withholding taxes.  First, Mr. Elliott suggested that the withholding taxes should be taken equally from 4Kids' share.[43]  Second, Mr. Elliott suggested that 4Kids had not sub-stantiated foreign withholding tax deductions with withholding tax certificates.  Third, Mr. Elliott posed questions to ADK as to whether (1) anyone at ADK had ever made an inquiry with

---

[42]    There were many similar examples in the record of communications between Mr. Elliott and ADK management personnel that reflected Mr. Elliott's zealous pursuit and advocacy of interpretations of the License Agreements that would support aggressive audit claims.

[43]    This claim was never raised with 4Kids or otherwise pursued.  Contrary to Mr. Elliott's preliminary analysis, the License Agreements provide that withholding taxes "shall be deducted . . . from Licensor's share of the Gross Income."  (Ex. T-6 ¶ 4(c); Ex. T-11 ¶ 4(c)).

4Kids regarding the tax credits; (2) whether ADK actually took the tax credits on its Japanese income tax returns; and (3) whether anyone at ADK ever submitted a request to 4Kids to provide evidence that the withholding taxes were actually paid.  (Ex. T-12 at 9–11).

239.    In or about early June 2010, Mr. Elliott learned from his review of 4Kids' participation statements and subsequent conversations with 4Kids' employees that 4Kids was receiving service fees from Funimation in connection with Yu-Gi-Oh! home videos.  (Elliott Decl. ¶ 19–20).

240.    Mr. Newborn of 4Kids provided copies of the Funimation Services Agreements to ADK executives at a trade show in Las Vegas on June 8, 2010.  (Hosaka Decl. ¶ 43).  Copies were emailed to Mr. Elliott the following week.  (Ex. T-17 at 3).[44]

### C.    The Parties' June 2010 Correspondence

#### 1.    ADK's June 17, 2010 Letter

241.    On June 17, 2010, Mr. Hosaka sent a letter to Mr. Kahn at 4Kids in which he raised two substantive audit issues.  First, Mr. Hosaka stated that 4Kids had "misclassified certain income" by not paying Licensor the entire 20% home video royalty under the 2001 Agreement, and that Licensor was "entitled to 20% of the wholesale price," premised on the retroactive application of the 2008 amendment to Paragraph 1(b)(iii), which provided that the entire 15–20% home video royalty would go to ADK if 4Kids exercised the home video rights itself.  Second, Mr. Hosaka claimed that 4Kids was obligated to include the Funimation service fees in Gross Income.  (Ex. T-15).

---

[44]    Mr. Hosaka testified that Mr. Newborn's "bizarre" behavior at the June 8, 2010 Las Vegas meeting, along with the fact that 4Kids had been delisted from the New York Stock Exchange, contributed to Licensor's decision to hire U.S. litigation counsel.  (Hosaka Decl. ¶ 59).  But Mr. Sugimoto testified that Licensor had retained litigation counsel on May 28, 2010 — prior to the purported "bizarre" behavior.  (Sugimoto Decl. ¶ 16).

242.    Mr. Hosaka attached a proposed "tolling agreement," which he asked 4Kids to sign in order to "give Mr. Elliott time to complete his audit and allow [4Kids and ADK] time to informally discuss and explore issues raised by the audit."  (Ex. T-15; Newborn Decl. ¶ 137).

243.    The June 17 letter did not (1) mention tax withholding, third-party audit costs, E&O insurance allocation, or material and courier costs; (2) contain any form of the words "notice," "breach," "cure," or "terminate"; (3) make a demand for the payment of a specified sum; or (4) reference the termination provision of the 2008 Agreement.  (Ex. T-15).

244.    The June 17 letter was sent by email and facsimile.  (Ex. T-15).  There is no evidence that it was sent by express mail or express airmail as provided in Paragraph 15(c) of the 2008 Agreement.

## 2.    ADK's June 25, 2010 Letter

245.    On June 25, 2010, ADK's outside counsel sent a letter to Mr. Newborn briefly discussing Mr. Elliott's preliminary audit Findings.  The letter contained several requests or demands for payment.  The letter "demand[ed]" and "insist[ed]" that 4Kids repay and reimburse Plaintiffs for underpaid royalties and other expenses.  Specifically, the letter outlined ADK's position that it was owed:  (1) $2,431,788.10 in home video royalties which ADK asserted were wrongly split between the parties under the 2001 Agreement, or, alternatively, half of the gross amount of the service fees paid to 4Kids by Funimation (incorrectly estimated by Mr. Elliott to be $2,215,198.50); (2) third-party audit costs in the amount of $127,925.29; (3) $74,063.64 in improper deductions for bank charges and "miscellaneous undisclosed deductions"; and (4) $366,000.00 in previously uninvoiced material costs.  In addition, the letter requested documentation to support $2,424,397.76 in international withholding taxes paid by 4Kids' subagents and copies of 4Kids' E&O insurance policies and certificates.  (Ex. T-16).  All of the

81

numbers listed in the June 25 letter are inconsistent with the numbers later asserted in the December 20, 2010 letter sent by ADK to 4Kids.  (Ex. T-16; Ex. T-18; Newborn Decl. ¶ 18).

246.    The June 25 letter closed by stating, "In the interest of resolving this matter amicably, I also ask that you agree to the attached tolling agreement in order to give the parties time to discuss the issues.  I look forward to your prompt response and to working with you to resolve this matter."  (Ex. T-16).

247.    The June 25 letter did not (1) include any form of the words "notice," "breach," "cure," or "terminate"; or (2) reference the termination provision of the 2008 Agreement.  (Ex. T-16).

248.    On its face, the letter purports to have been sent by facsimile, hand delivery, and email.  (Ex. T-16).  Licensor introduced no evidence that the letter was, in fact, hand delivered, and there is no evidence that it was sent by express mail or express airmail as provided in Paragraph 15(c) of the 2008 Agreement.

### 3.    4Kids' June 29, 2010 Response

249.    On June 29, 2010, Mr. Newborn sent a letter to counsel for ADK.  Mr. Newborn requested a copy of Mr. Elliott's audit report and supporting schedules in order to assist 4Kids in understanding and resolving the audit issues:

> We believe that it would be more productive to review the audit report which Mr. Elliott is presumably compiling and which should have schedules attached to it supporting the various claims being asserted. As you're probably aware, it is customary in the licensing business for a party conducting an audit to supply the audit party with the audit report. The parties can then discuss whatever issues are raised by the audit report with the details surrounding such issues available to the parties.

(Ex. T-17 at 2).

250.     In his June 29 letter, Mr. Newborn also responded to the substantive points raised by ADK's June letters, explaining 4Kids' position that (1) the 2001 Agreement clearly states that the 20% home video royalty is to be split between the parties; (2) ADK is not entitled to any portion of the Funimation service fees, which were for "hundreds of thousands of dollars" of "services rendered" by 4Kids; (3) ADK had approved third-party audits, and was obligated to pay its share of the associated costs; and (4) ADK had been charged an appropriate amount for its share of the E&O costs.   As to withholding taxes, Mr. Newborn suggested that Mr. Elliott conduct "audit tests" in order to "verify the withholding tax information on [4Kids'] participation statements."   In addition, Mr. Newborn asked for additional information regarding the material costs.   Finally, Mr. Newborn informed ADK that the proposed tolling agreement was being reviewed by 4Kids' outside counsel.   (Ex. T-17).

251.     The parties ultimately signed the tolling agreement on June 30, 2010.   (Newborn Decl. ¶ 139).   The agreement was effective as of June 1, 2010.[45]

252.     Following the parties' June 2010 correspondence, Mr. Elliott's audit continued for several months, culminating in the issuance of his November 17, 2010 report to ADK.   (Elliott Decl. ¶¶ 14–15).   During this time, there is no record evidence of any written correspondence between the parties concerning the substance of the audit.

**D.     The Parties' December 2010 Correspondence**

**1.     ADK's December 20, 2010 Letters**

253.     On December 20, 2010, Mr. Shinoda sent a letter to 4Kids containing a brief description of Mr. Elliott's nine audit Findings.   At the conclusion of each Finding, Mr. Shinoda

---

[45]      The tolling agreement was extended twice after this date – once in October 2010 and again in January 2011.   (*See* Ex. T-536; Ex. T-610 at 15; 9/12/11 Tr. 121:20-25, 139:10-12 (Newborn); Shinoda Decl. ¶ 55).

variously wrote that ADK "expect[ed]," was "entitled to," or was "owed," or that 4Kids "should pay" certain amounts.  (Ex. T-18).

254.    The December 20 letter did not provide 4Kids with enough information to fully evaluate Licensor's audit claims.  For example, the letter provided no information regarding which withholding tax deductions were considered "substantiated" and which were not.  Mr. Foster testified that he could not determine, from looking at Mr. Shinoda's December 20 letter, which tax withholding deductions Licensor counted as "unsubstantiated."  (9/21/2011 Tr. 83:18–21, 87:1–4 (Foster)).

255.    Nor could 4Kids determine from Mr. Shinoda's letter what amounts claimed were beyond the statute of limitations period.  Similarly, Mr. Shinoda's letter provided no information regarding the basis for Licensor's calculation of the material and courier costs.  (Ex. T-18).

256.    Mr. Shinoda's letter also claimed that ADK had not received a scheduled payment for 4Kids' purchase of the Yu-Gi-Oh! 5D series, which had been due November 30, 2010.  (Ex. T-18).  In fact, 4Kids had made such a payment.  (Newborn Decl. ¶ 141; 8/31/2011 Tr. 72:15–21 (Shinoda)).  Regarding the allegedly delinquent payment, Mr. Shinoda wrote that 4Kids "must now [make the payment] *or be in breach* of the parties' agreements."  (Ex. T-18 at 1) (emphasis added).

257.    Regarding the audit claims, Mr. Shinoda wrote that he was writing to "request payment for the underpayment Mr. Elliott found" and that he "insist[ed] that within 10 business days 4Kids pay ADK $4,819.354.63 to cover the full underpayment."  Although the letter was

dated December 20, 2010, the letter called for payment of these amounts allegedly due by December 14, 2010[46] — six days *before* the date of the letter.  (Ex. T-18 at 5).

258.    Mr. Shinoda did not use the words "notice," "cure" or "terminate" in his letter, nor did he reference the termination provision of the 2008 Agreement.  The only occurrence of the word "breach" was with respect to the allegedly delinquent November 30 payment, which had been paid on November 30, 2010, as required.  (Ex. T-18).

259.    Referring to the December 20 letters, Mr. Shinoda testified that "[i]t was [his] intent by including this ten business day cure period to alert 4Kids to the urgency of their need to respond to [ADK's] demand for payment."  He also testified that he gave 4Kids ten business days to cure "because [he] was required to do so under the 2008 Agreement," and that he "included a reference to paragraph 4(f) because that paragraph states that '[a]ny underpayment reflected in the audit shall be paid to [the YGO Consortium] promptly.'"  (Shinoda Decl. ¶¶ 58–59).

260.    But on cross-examination, Mr. Shinoda admitted that he did not write the December 20 letters and, in fact, does not know who wrote those letters.  (8/31/2011 Tr. 78:20–79:5 (Shinoda)).   When asked at his deposition why he included a ten-day period in the December 20 letter, Mr. Shinoda testified that he believed ten days was an "appropriate" duration, but did not make any reference to any requirements of the 2008 Agreement. (8/31/2011 Tr. 79:11–83:9 (Shinoda)).

261.    Mr. Shinoda claims to have sent a second version of his letter later on the same day, December 20, 2010, correcting the mistake regarding the November 30 payment.  (Shinoda

---

[46]      This error suggests that the letter was originally intended to be sent immediately after the November 30, 2010 payment was due and the date was not corrected once the decision was made to send the letter on December 20, 2010 instead.  *See* footnote 81, *infra*.

Decl. ¶ 57). The second version of the letter does not explain that it replaces the first, and it omits references to the November 30 payment (and all references to a "breach" of the 2008 Agreement). (Ex. T-19). 4Kids first learned of this version of the letter during the pre-trial discovery phase of this proceeding in May 2011, and it has not been able to find this second version in its records. (Newborn Decl. ¶ 141 & n.51). Mr. Kahn testified that it is possible that it was received by 4Kids but inadvertently discarded as a duplicate. (8/8/11 Dep. Tr. 240:22—241:14 (Kahn)).

262.     The second version of Mr. Shinoda's December 20 letter contains fax lines in English at the bottom, suggesting that it was "received" by a fax machine on December 20, 2010. (Ex. T-19). However, the fax confirmation line does not indicate that the letter was sent to, or received by, 4Kids. Moreover, the letter has a document control number in the lower left that appears similar to the document control numbers on other letters sent by ADK's outside counsel (*see, e.g.*, Ex. T-16; Ex. T-25), suggesting that the letter was prepared by the Olshan firm. Mr. Hosaka also testified that the Olshan firm may have drafted the December 20 letters. (9/6/2011 Tr. 74:20–75:17 (Hosaka)).

263.     Both December 20 letters on their face state only that they were sent by facsimile. (Ex. T-18; Ex. T-19). Mr. Shinoda testified that he did not know whether the letters were sent by any method other than fax. (8/31/2011 Tr. 71:14–20 (Shinoda)). When asked at trial whether he sent the letters by courier or by mail, such as FedEx, Mr. Hosaka responded, "I think so." (9/6/2011 Tr. 114:6–115:7 (Hosaka)). However, Licensor has not introduced into evidence any shipping record or receipt showing that either letter was sent by express mail or express airmail, and neither letter refers to such a method of delivery on its face. (Ex. T-18; Ex. T-19). Thus,

there is no credible evidence that either letter was sent by express mail or express airmail as required by the notice provision in Paragraph 15(c) of the 2008 Agreement.

### 2.    4Kids' December 29, 2010 Responses

264.    On December 29, 2010, 4Kids sent three letters to Licensor addressing the Findings discussed in Licensor's December 20 letter and setting out 4Kids' position as to why the claims were largely invalid.  (Ex. T-20; Ex. T-21; Ex. T-22).  Although sent under the name of Mr. Kahn, the letters were drafted by Mr. Newborn.  (9/12/11 Tr. 187:8–187:15 (Newborn)).

265.    The first December 29 letter addressed international withholding taxes.  The letter explained that, in 4Kids' experience with other Japanese licensors, the information included on 4Kids' participation statements was sufficient for ADK to have claimed tax credits or deductions on its income tax returns.  (Ex. T-20).  It also explained 4Kids' position that Mr. Elliott could have "substantiated" the withholding taxes by examining 4Kids' cash receipts to verify that the monies received from foreign licensees reflected the payment of withholding taxes.  *Id*.  The first December 29 letter noted that it is ADK's responsibility, not 4Kids' responsibility, to ensure that ADK made appropriate tax elections on its Japanese tax returns.  Finally, 4Kids proposed that it would contact the Japanese office of an international accounting firm to assist ADK in filing amendments to its Japanese tax returns.  *Id*.  Mr. Shinoda, to whom the proposal was addressed, could not recall ever responding to 4Kids regarding that proposal.  (8/31/2011 Tr. 84:3–17 (Shinoda)).

266.    In its second December 29 letter, 4Kids addressed the home video revenue audit claims (Findings 1, 2 and 4).  (Ex. T-21).  4Kids explained that ADK was not entitled to moneys received by 4Kids Home Video, which had acted as the U.S. home video licensee and had performed various services for its distributor Funimation, including authoring DVDs, producing DVD extras, and advertising and promotions.  *Id*.  Recognizing that the parties had been "unable

87

to convince" each other about the validity of their respective arguments regarding service fees, 4Kids suggested that the parties submit these claims to arbitration to determine whether ADK is entitled to any share of the service fees. *Id.*

267.    4Kids' third December 29 letter addressed third-party audit costs, E&O insurance allocation, and material costs. (Ex. T-22). With respect to the material costs, 4Kids requested invoices or other "back up information" to support the amount claimed. In addition, 4Kids noted that it disagreed with the exchange rate used for ADK's calculation of material costs for the nine-year period at issue. *Id.*

### E.    The Parties' 2011 Negotiations

268.    Over the course of the next two months, and as described below, 4Kids and Licensor engaged in what Mr. Shinoda previously referred to as a "nearly continuous dialog" regarding the settlement of the audit claims "that continued through and beyond" Licensor's purported termination of the 2008 Agreement. (Declaration of Yoshihiko Shinoda, dated May 25, 2011, ¶ 31, Case No. 11-11607, Docket No. 112).[47]

269.    Ms. Nowicki was scheduled to travel to ADK's offices in Japan in early January 2011 to meet with Mr. Sugimoto and Mr. Hosaka regarding marketing and licensing issues. Before her trip to Japan, Ms. Nowicki sent an email to Mr. Sugimoto in order to arrange meetings. (9/15/11 Tr. 80:23-82:9 (Nowicki)). Ms. Nowicki asked Mr. Sugimoto, "Will there be any opportunity for me to review audit concerns?" (9/15/11 Tr. 80:23-82:9 (Nowicki)). Mr. Sugimoto responded by telling Ms. Nowicki that all communications regarding the audit

---

[47]    Mr. Shinoda submitted this declaration in support of Licensor's objection to 4Kids' Motion for Order Enforcing the Automatic Stay with Respect to 4Kids' Rights under the Yu-Gi-Oh! License, Case No. 11-11607, Docket No. 61 (the "Stay Motion"). The Stay Motion sought an order from this Court (i) enforcing the automatic stay to protect 4Kids' rights under the 2008 Agreement and (ii) prohibiting Licensor from exercising control over such rights until the Court had determined whether Licensor's purported termination of the 2008 was valid and enforceable.

claims should be addressed to Plaintiffs' counsel. (9/15/11 Tr. 80:23-82:9 (Nowicki)). While in Japan, Ms. Nowicki sought to meet with Mr. Shinoda to discuss the audit claims. Mr. Shinoda declined to meet with Ms. Nowicki. (Nowicki Decl. ¶ 36–37; Newborn Decl. ¶¶ 146, 148). Nonetheless, as set forth below, negotiations concerning the audit claims continued between 4Kids and ADK for the next several months.

270.    On February 2, 2011, Licensor's counsel met with Mr. Newborn, Mr. Foster, and 4Kids' outside director Wade Massad. (Newborn Decl. ¶ 150). Licensor's counsel advised 4Kids that the issues between the parties did not pertain only to the audit claims; rather, Licensor wanted information on the financial condition of 4Kids and wanted to renegotiate certain terms of the 2008 Agreement. (*Id.*). Mr. Newborn testified that he provided Licensor's counsel with information regarding 4Kids' financial condition and that Mr. Massad discussed the possible sale of 4Kids to a larger company. (Newborn Decl. ¶ 151). Mr. Newborn again requested information regarding the foreign withholding tax issue and the material costs. (*Id.*). Licensor's counsel communicated to 4Kids that Licensor wished to resolve the audit claims only on a global basis, and to reach such a resolution, 4Kids would need to pay Licensor between $2 million and $3 million. (Ex. T-25).

271.    Mr. Kahn resigned as Chief Executive Officer and Chairman of 4Kids in early 2011.[48]  (Hosaka Decl. ¶ 63). After Mr. Kahn left the company, Michael Goldstein became

---

[48]      Al Kahn, although not present during the trial, at times loomed large over the proceedings. There is no dispute that he played a significant role in the business of 4Kids and in the relationship with the Consortium. Similarly, it is undisputed that despite this role, there is no "key man" provision in the 2008 Agreement. Accordingly, his departure from 4Kids at the end of 2010 – be it abrupt, unexplained, and a "shock" to the Consortium – has no bearing on the termination issue before the Court. Nor does his alleged volatility. *See, e.g.*, Plaintiffs' Post-Trial Memorandum, Adv. Pro. No. 11-02225, Docket No. 61 ("Plaintiffs' Post-Trial Memorandum"), at pp. 14, 32. Plaintiffs' attempts to portray the man they maintain was indispensable to the 4Kids relationship as someone whom they feared are unconvincing. Equally unconvincing is the notion that Mr. Shinoda and Mr. Kahn discussed foreign tax withholding certificates "every time" they met and that the Consortium did not address the tax certificate issue in the 2008 Agreement because they were counting on 4Kids and in particular, Al
(continued...)

4Kids' new interim chairman.  (Hosaka Decl. ¶ 64).  Before this, Plaintiffs had no prior

relationship with Mr. Goldstein.  (Hosaka Decl. ¶ 64).

### 1.    Adaptation Agreement

272.    Under the 2008 Agreement, 4Kids has the exclusive and very valuable option to

license the rights to any new Yu-Gi-Oh! series.  4Kids' option for any new series must be

exercised by the April 15th immediately preceding the broadcast season during which the new

series will commence.  (Ex. T-11 ¶ 1(c)).  Plaintiffs were planning to launch a new Yu-Gi-Oh!

series, called Yu-Gi-Oh! ZeXal ("Zeal").  (9/1/11 Tr. Shinoda 7:20-23).  During early 2011,

4Kids had not yet exercised its option to license the rights to the forthcoming Zeal series.

(Newborn Decl. ¶¶ 154, 181).  4Kids had been the licensee for the other Yu-Gi-Oh! series up

until that point.  (9/1/11 Tr. 7:23-24 (Shinoda)).

273.    On February 23, 2011, Mr. Hosaka delivered to Mr. Newborn a proposed

"Adaptation Agreement," pursuant to which 4Kids would give up all the television broadcast,

home video, and merchandising rights in any new Yu-Gi-Oh! series — including the Zeal series.

(Hosaka Decl. ¶ 65).  The Adaptation Agreement would have put 4Kids in the position of a

"work for hire" production studio, responsible only for producing English language adaptations

for the Zeal series.  Such an arrangement would have cut 4Kids out of the overwhelming

majority of future Yu-Gi-Oh! revenues.  (Ex. T-111; Newborn Decl. ¶¶ 153, 155).

274.    Mr. Newborn testified that Mr. Hosaka presented the Adaptation Agreement

simply as a way to start production on promotional materials for the Zeal series in time for an

industry convention in April 2011.  Mr. Hosaka assured Mr. Newborn that once "things got back

---

Kahn, to get the certificates.  *See, e.g.*, 9/1/11 Tr. 78:5-84:1 (Shinoda).  The evidence proffered in support of these
contentions is not credible.

to normal," that 4Kids would be granted full participation in the Zeal series.  (Newborn Decl. ¶ 157).  Mr. Newborn informed Mr. Hosaka that 4Kids would not sign the proposed Adaptation Agreement.  (Newborn Decl. ¶ 156; Hosaka Decl. ¶ 65).

275.     On the evening of February 24, 2011, Licensor's counsel followed up Mr. Hosaka's hand delivery of the Adaptation Agreement with a letter demanding that 4Kids sign the "Adaptation Agreement" by no later than March 4, 2011.  According to the letter, "ADK view[ed] the Adaptation Agreement as an appropriate way to move forward with the Yu-Gi-Oh [Zeal] series adaptation process, while we continue to work to achieve a global resolution of all the outstanding issues between 4Kids and ADK."  (Ex. T-23; Newborn Decl. ¶ 158).

276.     Mr. Newborn replied on March 3, 2011, in a letter to Licensor's counsel, in which he advised the Consortium that 4Kids would not sign the Adaptation Agreement.  (Ex. T-24; 9/1/11 Tr. 8:11-8:22 (Shinoda)).  Mr. Newborn wrote that "ADK appears to be attempting to deprive 4Kdis of its contractual rights to the new Yu-Gi-Oh! series."  Mr. Newborn suggested that there was "plenty of time to resolve the various audit issues" and that 4Kids "strongly believe[s] that all outstanding issues can be resolved in several days of negotiation."  (Ex. T-24; Newborn Decl. ¶ 159).

277.     ADK's counsel replied by letter dated March 4, 2011, in which ADK declined to negotiate with 4Kids with respect to any individual audit claims.  (Ex. T-25).  In particular, the letter stated that "4Kids appears intent on approaching ADK's substantial audit claims in a piecemeal, one-claim-at-a-time manner."  *Id*.  The letter further stated that "the only way to resolve the audit claims is at a global level" and that absent a large commitment by 4Kids, "even discussing the individual audit claims is a fruitless effort."  *Id*.  In a brief response to Mr. Newborn's earlier request that Licensor submit invoices to support its material costs claim,

Licensor's counsel stated that without a global payment in the range of $2 million to $3 million, "it is not worth the time to track down the individual invoices relating to this claim." *Id*.  The letter demanded that 4Kids "either (1) sign the Adaptation Agreement; or (2) commit to negotiate within a range of $2 million to $3 million to settle all of [Licensor's] audit related claims."  The letter concluded by stating that if 4Kids did not agree to either of these two conditions, then Licensor would "proceed with the expectation that 4Kids is not genuinely interested in resolving our differences." *Id*.  No mention was made of termination of the 2008 Agreement.

278.    As Mr. Newborn testified, Licensor's March 4 letter was sent to 4Kids on a Friday afternoon at around 6:41 p.m.  (Newborn Decl. ¶ 160).  The letter demanded a response by the following business day (Monday, March 7) at noon.  (Ex. T-25).

279.    Between March 7 and 9, there was a series of three phone calls between the parties' counsel — including bankruptcy counsel — regarding 4Kids' response to Licensor's demand.   Mr. Newborn testified that, during these phone calls, 4Kids' counsel advised Licensor's counsel that if Licensor sent a notice of breach, that 4Kids would have no choice but to file for bankruptcy within the ten-business-day cure period set forth in Paragraph 12(a) of the 2008 Agrement, resulting in an automatic stay of the attempted termination.  (Newborn Decl. ¶¶ 161–64).  Mr. Newborn also testified that Licensor's counsel never suggested to 4Kids that any of their prior correspondence constituted a notice of breach.  (Newborn Decl. ¶ 165).

### 2.    Mr. Sugimoto's "Inadvertent" March 9, 2011 Email

280.    On March 9, Mr. Sugimoto allegedly "inadvertently" copied Mr. Newborn and Ms. Nowicki on two emails he sent to Licensor's counsel.  In one of those emails, Mr. Sugimoto wrote that 4Kids "seems . . . willing to pay [an] 'entrance fee,'" and that if 4Kids "fail[s] to commit any money (other than 7 figure[s]) by tomorrow's deadline, please send the termination letter."  (Sugimoto Decl. ¶ 29; Ex. T-311; Ex. T-492; Ex. T-493).

281.   The email contains indicia that it may not have been sent inadvertently.  First, the email's formatting and contents are unusual:  the body contains a salutation, then text, then an Olshan law firm signature block, then a horizontal line, then more text, then a signature, then another salutation, then more text, and then another signature — all within the same email body. Second, the email was apparently a reply to an email from Mr. Newborn; but instead of Mr. Newborn's name appearing in the "To" field on the reply, it appears in the "Cc" field.  (Ex. T-311; 9/8/2011 Tr. 69:19–86:6 (Sugimoto)).

282.   On cross-examination, Mr. Sugimoto testified that he hit "reply to all," but offered no explanation as to why Mr. Newborn's name appeared in the "Cc" rather than that "To" field. (9/8/2011 Tr. 69:19–70:9, 74:1–3, 83:21–84:23 (Sugimoto)).  Mr. Newborn's name could only have been manually inserted as a "Cc" to this email.  Nor could Mr. Sugimoto explain the formatting of the email, saying only that he may have "cop[ied] and paste[d]" text from another document.  (9/8/2011 Tr. 81:19–83:2, 84:24–86:6 (Sugimoto)).  Mr. Sugimoto himself referred to the formatting of the email chain as "strange."  (9/8/2011 Tr. 85:19–86:6 (Sugimoto)).

283.   As Ms. Nowicki testified, 4Kids received Mr. Sugimoto's email around the same time that its Board of Directors was meeting to decide whether to make a $1 million good-faith payment to Licensor.  Ms. Nowicki testified that she believed Mr. Sugimoto's email might have been an attempt to "nudge" 4Kids' Board into making the good-faith payment.  (9/19/2011 Tr. 13:10–22 (Nowicki)).

284.   Approximately forty minutes after Mr. Sugimoto's emails were sent, Licensor's counsel replied to Mr. Newborn and Ms. Nowicki, asking them to "[p]lease delete" the emails because they were "inadvertently copied" by Mr. Sugimoto.  (Ex. T-311).

93

285.   Ms. Nowicki testified that, following the March 9 email from Mr. Sugimoto, she discussed with both Mr. Foster and with Mr. Newborn the possibility that Plaintiffs would terminate the 2008 Agreement.  (9/15/11 Tr. 94:20-97:13 (Nowicki)).

286.   Ms. Nowicki also responded to Mr. Sugimoto via email, asking him, "is this how it has to be?"  (Sugimoto Decl. ¶ 30; Ex. T-126).  Mr. Sugimoto replied that Plaintiffs "are still waiting for your answer."  (*Id*.).

287.   Also on that same day, Mr. Newborn wrote to ADK's counsel in Japan, Tomohiro Tohyama, discussing "potential termination by ADK of the 4Kids-ADK Agreement" and asking Mr. Tohyama to intercede on behalf of 4Kids.  (Ex. T-129 at 4KIDS 0061787).

### 3.   4Kids' $1 Million Good-Faith Payment[49]

288.   On March 10, 2011, 4Kids' counsel advised Licensor's counsel that 4Kids was prepared to pay $1 million as a good faith gesture so that the parties could meet and seek to resolve the various issues.  (Newborn Decl. ¶ 168).

289.   Discussions between 4Kids and Licensor were then suspended due to the catastrophic earthquake in Japan on March 11, 2011.  On March 16, 2011, counsel for Licensor indicated that his client would view a payment of $1 million toward ultimate resolution of the audit claims as a gesture of good faith and means of rebuilding trust between the parties. (Newborn Decl. ¶ 169; Ex. T-403; Ex. T-404).

---

[49]   From the first moments of their opening statement at trial, through the pages of their post-trial submission, Plaintiffs urged that this case is about a breach of trust.  And although prior to sending the termination letter, Plaintiffs never once informed 4Kids of their position that there had been an "incurable" breach of trust, Plaintiffs now take the position that no amount of money can cure such breach.  Incredibly, however, Plaintiffs demanded and accepted $1 million from 4Kids a mere two weeks before sending the termination letter and continued to demand an additional $3 to 4 million – never once informing 4Kids that money would not be enough to cure the alleged breach.  How can this be?  Surely it would be a breach of trust by Plaintiffs to demand $4.8 million in cure payments while secretly intending to assert an incurable breach.  As Plaintiffs themselves point out in their Post-Trial Memorandum (at p. 2), one cannot tell half-truths.  As explained more fully below, if there was a breach of trust in this case, it was committed by the Consortium in demanding the payment of grossly overstated amounts resting on specious audit Findings.

290.    On March 17, 2011, 4Kids paid Licensor $1 million,[50] while reserving its position

that that it did not owe Licensor anything other than non-material amounts under the 2008

Agreement.  (Newborn Decl. ¶ 169).

### 4.    The March 18, 2011 Meeting

291.    On March 18, 2011, the parties' representatives met in New York.  Present at the

meeting on behalf of Licensor were Messrs. Shinoda, Hosaka, and Sugimoto, as well as

Licensor's counsel.  Present on behalf of 4Kids were Michael Goldstein, 4Kids' interim Chief

Executive Officer, and 4Kids' counsel.  Both 4Kids' and Licensor's witnesses testified that the

purpose of the March 18 meeting was to resolve and settle the audit claims.  At the meeting, Mr.

Goldstein made a presentation regarding a potential sale of 4Kids to a company called Classic

Media LLC.  Mr. Goldstein also made clear that 4Kids would have to declare bankruptcy if the

audit claims were not resolved.   (Newborn Decl. ¶ 170; Shinoda Decl. ¶¶ 68–74; Hosaka Decl.

¶¶ 66–69; Sugimoto Decl. ¶¶ 38–41; 9/6/2011 Tr. 82:2–5 (Hosaka)).

292.    Near the end of the meeting, which lasted for the entire day, 4Kids asked Licensor

for a settlement figure for the audit claims.  Licensor responded by offering to settle for $3

million.   (Shinoda Decl. ¶¶ 73–74; Sugimoto Decl. ¶ 40; Hosaka Decl. ¶ 68; 9/12/2011 Tr.

162:16–21 (Newborn)).

293.    Licensor's witnesses gave conflicting testimony regarding what occurred at the

end of the meeting.   Mr. Shinoda testified that Mr. Goldstein responded to the settlement

---

[50]    Plaintiffs assert (for the first time) in their Post-Trial Memorandum that this $1 million payment cannot
"count" as a cure payment because it is subject to clawback in the Debtor's chapter 11 case.  *See* Plaintiffs' Post-
Trial Memorandum at p. 108.  This is a remarkable assertion, for a number of reasons.  First, the Court is unaware of
any offer to return the payment to the Debtor.  Second, the day after receiving the payment, Plaintiffs purport to
have decided that the asserted breaches were not curable by money – a position they did not share with 4Kids until
the trial.  Third, under Plaintiffs' theory, the additional $3 million they demanded on March 18 would also have
been susceptible to clawback in a subsequent 4Kids chapter 11 case so presumably its payment could not have
"counted" as a cure.

proposal by stating that the proposal was unacceptable and that 4Kids would have to file for bankruptcy, after which he left the room. (8/31/2011 Tr. 94:2–95:2, 96:22–97:1 (Shinoda)). Mr. Sugimoto testified that Mr. Goldstein left the meeting "without allowing any further discussion." (Sugimoto Decl. ¶ 40).

294. Mr. Shinoda and Mr. Hosaka both testified that, during the March 18 meeting, nobody said or suggested that ADK would terminate the License Agreements. Mr. Shinoda testified that the issue of termination was not raised because the parties were still trying to resolve the audit claims. (8/31/2011 Tr. 97:2–12 (Shinoda); 9/6/2011 Tr. 79:23–80:2 (Hosaka)). There is no evidence that anyone suggested at the March 18 meeting that a notice of breach had already been given.

295. As of the March 18 meeting, ADK still had not provided 4Kids with a copy of Mr. Elliott's audit report. Mr. Newborn testified that he did not believe that, at the time, 4Kids possessed sufficient information to evaluate the validity of all of ADK's audit claims. (9/12/2011 Tr. 191:23–193:2 (Newborn)). For example, Mr. Newborn testified that he never received answers to questions concerning the calculation of the courier and material costs. (9/12/2011 Tr. 187:8–188:25 (Newborn)). Plaintiffs do not dispute this testimony. Furthermore, Mr. Foster testified that, throughout the negotiations over the audit claims, Licensor never provided 4Kids with sufficient information to determine which tax withholding deductions were considered "unsubstantiated" in Mr. Elliott's parlance. (9/21/2011 Tr. 87:5–21 (Foster)).

### 5.    4Kids' Efforts to Continue Negotiations to Resolve the Audit Claims

296. Mr. Newborn testified that, during the week of March 21, the parties' respective counsel continued to have conversations regarding a potential settlement of the audit claims. (Newborn Decl. ¶ 171).

297.    During this time, 4Kids' negotiations with Nicktoons regarding a potential license of television broadcast rights to Yu-Gi-Oh! continued.  On March 24, 2011, a day before the purported termination, Brian Lacey, the head of 4Kids' television distribution, forwarded to Mr. Hosaka a summary of deal points that Mr. Lacey had discussed with Nicktoons.  (Ex. T-486; Newborn Decl. ¶ 172).

298.    On March 24, 2011, Mr. Goldstein also sent an email to Mr. Shinoda, Mr. Hosaka, and Mr. Sugimoto of ADK summarizing the positive results of the negotiation with Nicktoons on the license of Yu-Gi-Oh! television broadcast rights.  Mr. Goldstein's email concluded with the following:

> Finally, despite the current difficulties, 4Kids continues to work for the benefit of the Yu-Gi-Oh Consortium and the Yu-Gi-Oh brand, whether with regard to producing the Yu-Gi-Oh Zeal sizzle tape for MIP, trying to make the Nicktoons deal or providing help to ADK on production matters and production materials during this very difficult time in Japan.

> In his e-mail of March 9 to Brian Lacey and Sam Newborn, Hosaka-san indicated that if the Nicktoons deal were to move ahead, there "must be new hope for our relationship."  4Kids has always believed that all companies involved with Yu-Gi-Oh have so much more to gain from the continuation and strengthening of the 4Kids–ADK partnership than from the very costly and destructive alternative.

(Ex. T-295; Newborn Decl. ¶ 172).

**F.    The March 25, 2011 Purported Termination**

299.    At 8:05 p.m. (EST) on March 24, 2011, Mr. Hosaka, on behalf of Mr. Shinoda, emailed to Michael Goldstein at 4Kids a letter (dated March 25, 2011)[51] purporting to "exercise

---

[51]    Japan is in a time zone that is 13 hours ahead of New York.  Accordingly, Licensor's letter is dated March 25, 2011, but was received in New York on March 24, 2011.

[Licensor's] option, under paragraph 12(a), to terminate the [2008 Agreement]."  Mr. Shinoda stated that the purported termination would be effective upon receipt of the letter.  (Ex. T-26).

300.    The March 25 letter referenced ADK's earlier letters of June 17, 2010, June 25, 2010 and December 20, 2010, but did not specify which, if any, of these letters constituted the written notice of breach required under Paragraph 12(a).  However, the March 25 letter appears to premise the purported termination on the failure to pay the approximately $4.8 million set forth in Mr. Shinoda's December 20 letter.  (Ex. T-26).

301.    The Court finds that, based on the foregoing, 4Kids never received proper and effective notice that Licensor had triggered the 10-day termination window by sending a notice of breach under Paragraphs 12(a) and 15(c), or that a cure period was running.

302.    The complaint in this action was served the following day, on March 25, 2011. (Newborn Decl. ¶ 173).  4Kids filed its bankruptcy petition on April 6, 2011, within ten business days of ADK's March 25, 2011 letter purportedly terminating the 2008 Agreement.  (Newborn Decl. ¶ 177).

303.    Mr. Shinoda, Mr. Hosaka, and Mr. Sugimoto each testified that, prior to March 25, 2011, they never told anyone at 4Kids that ADK was going to terminate the 2008 Agreement. (8/31/2011 Tr. 98:22–99:3 (Shinoda); 9/6/2011 Tr. 85:3–8 (Hosaka); 9/8/2011 Tr. 88:10–13 (Sugimoto)).  Mr. Shinoda testified that he never told 4Kids that ADK would terminate the 2008 Agreement because the parties were still engaged in discussions about the audit claims. (8/31/2011 Tr. 99:4–6 (Shinoda)).

304.    Mr. Newborn testified that, throughout the series of negotiations that took place between 4Kids and Licensor, Licensor was unwilling to unbundle the audit claims, and would only resolve them on a global basis.  (9/12/2011 Tr. 195:3–23 (Newborn)).  As noted above,

correspondence from ADK's counsel confirmed this position.  (Ex. T-25).  Mr. Newborn also

testified that, as of the date of the purported termination, 4Kids still did not have enough

information to evaluate the validity of all of Licensor's audit claims.  (9/12/2011 Tr. 195:24–

196:3 (Newborn)).

> ### G.     Balance Owed to 4Kids at the Time of Termination

305.     Under the License Agreements, 4Kids made certain advance payments to

Licensor.  (Foster Decl. ¶ 49).  The 2008 Agreement provides that 4Kids is entitled to recoup

Licensor's share of the Gross Income against any advance payments made:

> Notwithstanding anything herein to the contrary, 4Kids shall be
> entitled to all amounts earned with respect to the exploitation of
> the Rights to the Property until the cumulative share of Gross
> Income credited to Licensor calculated as provided above in
> Paragraph 4(c) exceeds the amount of advances paid by 4Kids to
> Licensor under Paragraphs 4(a) and 4(b) above.

(Ex. T-11 ¶ 4(d)(ii); *see also* Foster Decl. ¶ 49).

306.     Mr. Foster testified that, as of March 24, 2011, the balance of 4Kids' unrecouped

advances to Licensor was $841,418.77.  (Foster Decl. ¶ 52; Ex. T-475).  Upon examination at

trial, Mr. Foster agreed that this number should be reduced by $45.24, which reflected certain

bank charges not properly charged to Licensor under the 2008 Agreement.  (9/21/2011 Tr.

23:10–18, 128:7–17, 174:2–17 (Foster)).

307.     Mr. Foster testified that the unrecouped balance of the advance payments would

first be used to offset any portion of Gross Income owed to Licensor.  Mr. Foster also testified

that Gross Income from current royalties would be treated the same as, for example, Gross

Income received as a late payment from a sublicensee from five years ago.  (9/21/2011 Tr.

128:18–129:24 (Foster)).

308.    In addition, as explained above, 4Kids had made a $1 million good-faith payment toward the audit claims on March 17, 2011.  (*See* ¶ 290, *supra*).

309.    Therefore, as of the date of the purported termination, 4Kids had a balance of $1,841,373.53 in its favor against any claim by Licensor for an underpayment of Gross Income. The amounts owing to Plaintiffs under the audit claims in Paragraph 16 of the Complaint do not exceed this amount.

## EVIDENTIARY MATTERS

The Court now turns to a number of evidentiary issues raised by the parties prior to and during the trial.

## I.    Admissibility of Expert Testimony

The admissibility of expert testimony is analyzed pursuant to Rule 702 of the Federal Rules of Evidence, which, as amended in 2000, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

The proponent of the expert testimony bears the burden of establishing its admissibility at trial by a preponderance of the evidence.  *In re Young Broad., Inc.*, 430 B.R. 99, 121 (Bankr. S.D.N.Y. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc. ("Daubert")*, 509 U.S. 579, 592 n.10 (1993)).  In *Daubert*, the Supreme Court charged trial courts with the responsibility of serving as gatekeepers to exclude unreliable expert testimony.  Trial judges are to make the "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." *Daubert*, 509 U.S. 579, 592-593 (1993).  In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court clarified that this "gatekeeping" applies to all expert testimony, including "testimony based on technical and other specialized knowledge."

Rule 702 requires a court to make three determinations when assessing the admissibility of expert testimony: (1) whether the witness is qualified as an expert to testify as to a particular matter; (2) whether that opinion is based upon reliable data and methodology; and (3) whether the expert's testimony is relevant.  *Young Broad.,* 430 B.R. at 121.  As a threshold matter, a witness proffered to testify regarding specialized knowledge must first be qualified as an expert.  *Id.* at 122 (citing *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004)).

A wide variety of knowledge and experience can qualify a witness as an expert.  "The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience."  *Arista Records v. Lime Group LLC*, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011).  No particular experience or academic training is required; a court may consider the totality of a witness's qualifications in its analysis.  *Young Broad.*, 430 B.R. at 122.  As Chief Judge Gonzalez explained in *Young Broadcasting*, "an expert's qualification can be based on a broad range of knowledge, skill, experience, training, or education."  *Id.*  Given this liberal standard, the Second Circuit has cautioned that quibbles with an expert's training go to the testimony's weight, not its admissibility, and are an appropriate subject for cross-examination.  *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008).

### A.   Plaintiffs' Motion *in Limine* to Exclude the Expert Report and Testimony of Takaaki Tokuhiro

Prior to the commencement of the trial, on August 23, 2011, Plaintiffs filed a motion *in limine* seeking to exclude the expert report and testimony of Takaaki Tokuhiro ("Mr. Tokuhiro"),

a Japanese certified public accountant ("CPA"), regarding Japanese corporate tax law and regulations on foreign tax credits (the "Tokuhiro Motion").[52]  On August 26, 2011, 4Kids filed an opposition to the Tokuhiro Motion.[53]

Mr. Tokuhiro was asked by 4Kids to provide an opinion concerning the Japanese corporate tax law and regulations on foreign tax credits and the applicability of those regulations to certain issues herein.  Specifically, Mr. Tokuhiro was asked to provide an opinion concerning the requirements for claiming foreign tax credits under Japanese corporate tax law and regulations.  He was also asked to opine on the ability of a company to amend tax returns in Japan with respect to foreign tax credits, and any limitations there may be with respect to the amount of time a company has to make such amendments.  In addition, Mr. Tokuhiro was asked to provide an opinion as to whether any foreign tax credits were claimed during the duration of the agreements between 4Kids and Licensor.[54]

In the Tokuhiro Motion, Plaintiffs argue that Mr. Tokuhiro's expert report and testimony should be excluded because he is not qualified to provide an expert opinion concerning the requirements for filing for foreign withholding tax credits under Japanese tax laws and regulations.  Plaintiffs contend that Mr. Tokuhiro has no first-hand experience with respect to the requirements or practices of the Japanese tax authority.  The crux of Plaintiffs' challenge is Mr. Tokuhiro's lack of a Certified Public Tax Accountant ("CPTA") license.  They also note that Mr. Tokuhiro admitted in his deposition that he would not be permitted to render advice on these

---

[52]    Plaintiffs' Motion *In Limine* To Exclude The Expert Report And Testimony Of Takaaki Tokuhiro, Adv. Pro. No. 11-02225, Docket No. 20.

[53]    Opposition of 4Kids Entertainment to Motion *In Limine* To Exclude Expert Report And Testimony Of Takaaki Tokuhiro, Adv. Pro. No. 11-02225, Docket No. 37.

[54]    Expert Report of Takaaki Tokuhiro, Ex. T-221, at 1-2.

topics in Japan without violating the Certified Public Tax Accountants Law, a violation that is punishable in Japan by a fine and/or imprisonment.

In its opposition to the Tokuhiro Motion, 4Kids argues that Mr. Tokuhiro, as a CPA with thirty years of experience, is fully familiar with the applicable Japanese tax law and regulations. He has personally and directly advised corporate clients on how to realize the value of insufficiently documented foreign tax credits. Further, Mr. Tokuhiro explained that as a CPA, he could qualify to become a CPTA by paying a registration fee, opening an office in Japan, and participating in ongoing education classes.[55] 4Kids asserts that although Mr. Tokuhiro has not personally prepared tax returns to be filed with the Japanese National Tax Authority, he is capable and qualified to provide advice regarding the requirements of the Japanese tax law and regulations and has advised Japanese multinational corporations on how and when to claim foreign withholding tax credits for some thirty years.

Consistent with the Court's ruling previously placed on the trial record, Plaintiffs' motion is denied, for the following reasons. The fact that Mr. Tokuhiro does not hold a CPTA license is of no moment; it was abundantly clear that based on his thirty years of experience as a Japanese CPA, Mr. Tokuhiro is fully familiar with the provisions and practices of Japanese tax law at issue herein.[56] Similarly, the "admission" in his deposition that he would not be permitted to render advice on these topics "in Japan" is irrelevant.[57] The key inquiry is whether Mr. Tokuhiro has the education and experience necessary to satisfy the qualification requirements of Rule 702. The answer is clearly yes. The Court finds that Mr. Tokuhiro is qualified as an expert in Japanese tax law, including the ability and means to claim foreign withholding tax credits and

---

[55]    9/20/11 Tr. 45:17–46:10 (Tokuhiro).

[56]    8/29/11 Tr. 12:24-13:7.

[57]    *Id.*

deductions; his expert report is thus admitted and his testimony will be fully considered by the
Court

**B.     4Kids' Motion *in Limine* to Exclude the Testimony of Robert Freedman and
Arthur Erk**

The Court now turns to the admissibility of the expert report and testimony of Plaintiffs'
experts, Robert Freedman ("Mr. Freedman") and Arthur Erk ("Mr. Erk").  On August 23, 2011,
4Kids filed a motion *in limine* seeking to exclude the expert report and testimony of Messrs.
Freedman and Erk (the "Freedman/Erk Motion").   Plaintiffs filed a memorandum of law in
opposition to the Freedman/Erk Motion on August 26, 2011.[58]

Plaintiffs offered the expert report and testimony of Mr. Freedman on the issue, *inter
alia*, of whether the Funimation and Majesco Agreements "comport with custom and usage in
the television and home video industries."[59]  Plaintiffs additionally offered the expert report and
testimony of Mr. Erk on the issues, *inter alia*, of whether the services performed by Mr. Elliott
comport with industry standards and practices and whether the audit Findings had reasonable
merit.  There is no dispute as to the expert qualifications of Messrs. Freedman and Erk as each of
them has decades of experience in their respective fields.

In the Freedman/Erk Motion, 4Kids objected to the admission of the testimony of Messrs.
Freedman and Erk on the grounds that it consists "largely of legal opinions, opinions as to the
ultimate issues of this litigation and conclusory assertions with no factual basis or expert

---

[58]     On September 15, 2011, Plaintiffs filed a letter on the docket of this case addressing certain additional
objections raised by 4Kids at trial regarding the testimony of Messrs. Freedman and Erk.  *See* Adv. Pro. No. 11-
02225, Docket No. 46.  *See* footnote 63, *infra*.

[59]     Report of Robert Freedman Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)/Federal Rule of
Bankruptcy Procedure 7026(a)(2)(B), Ex. T-240 at 4.

analysis."[60]   While Plaintiffs acknowledge that an expert is not permitted to offer legal conclusions, they argue that it is permissible for an expert witness to testify about issues that would help the finder of fact understand concepts it needs to know to render a decision "despite the fact that [such] opinions may encroach on matters of law."[61]

As the Court indicated during trial, with respect to the Freedman/Erk Motion, there is merit to 4Kids' position with respect to the proffered testimony of Mr. Freedman and Mr. Erk. Accordingly, as more fully reflected in the hearing transcript from August 29, 2011,[62] the Court limited its consideration of Mr. Freedman's testimony to matters pertaining to the customs and practices of licensors and licensees, and limited its consideration of Mr. Erk's testimony to whether the services performed by Mr. Elliott comport with industry standards.   To the extent that each of these experts offered legal opinions or opinions as to ultimate issues, such opinions were not admitted or considered by the Court; conclusory assertions without a factual basis were afforded little or no weight by the Court.[63]

## II.   Evidentiary Issues Regarding the Translation of Documents

During the course of the trial, on September 6, 2011, Plaintiffs filed a motion *in limine* seeking, *inter alia*, to exclude from evidence certain un-translated non-English language documents (the "Translation Motion").[64]   4Kids filed an Opposition to the Translation Motion.[65]

---

[60]      4Kids' Motion *in Limine* Under *Daubert* and FED. R. EVID. 702 to Exclude the Testimony of Robert I. Freedman, Esq. and Arthur L. Erk, Adv. Pro. No. 11-02225, Docket No.19 at 1.

[61]      Plaintiffs' Memorandum of Law in Opposition to Debtors' Motion *in Limine*, Under *Daubert* and FED. R. EVID. 702, to Exclude the Testimony of Robert I. Freedman, Esq. and Arthur L. Erk, Adv. Pro. No. 11-02225, Docket No. 39 at 4.

[62]      8/29/11 Tr. 13:13-15:8.

[63]      The objections raised by 4Kids at trial to the Freedman and Erk testimony on the ground that details of the testimony were not explicitly set forth in the expert reports (*See* Adv. Pro. No. 11-02225, Docket No. 46) were and are hereby overruled.   *See* footnote 58, *supra*.

[64]      Plaintiffs' Motion *in Limine* to Exclude the Improper Testimony of Debtors' Witnesses and to Preclude the Use of Uncertified Translations, Adv. Pro. No. 11-02225, Docket No. 42.

Specifically, the documents at issue in the Translation Motion include: (1) the 2004 corporate tax return of ADK filed with the Japanese taxing authority, which was introduced by 4Kids for the limited purpose of rebutting Plaintiffs' contentions as to what constitutes necessary and proper supporting documentation when claiming foreign withholding tax credits under Japanese law; (2) certain tax certificates which bear, in English, the name and purported address of TV Tokyo; and (3) a set of German foreign withholding tax certificates, which was introduced by 4Kids for two limited purposes: (a) to determine whether Mr. Elliott could understand the documents, or had re-calculated his audit Finding to take the documents into account,[66] and (b) to determine whether TV Tokyo had searched its files for any such documents that might have been sent to it directly by foreign licensees.

While the law is clear that proceedings in this Court are to be conducted in English,[67] the limited use of non-English documents here qualifies for exception to the general rule. There is no serious dispute with respect to the nature of the documents at issue; no inference or conclusions are being urged based on any untranslated (*i.e.*, non-English) words in the documents. Moreover, any assertion of prejudice to Plaintiffs arising from 4Kids' reliance on Japanese language documents produced by Plaintiffs themselves is baseless, especially in light of the fact that several of Plaintiffs' key witnesses testified at trial in Japanese with the assistance of the parties' mutually agreed translator.

---

[65]     Opposition of 4Kids Entertainment to Motion *in Limine* to Exclude Testimony of the Debtors' Witnesses and to Preclude the Use of Uncertified Translations, Adv. Pro. No. 11-02225, Docket No. 43.

[66]     8/29/11 Tr. 193:7-194:22.

[67]     *United States v. Rivera-Rosario*, 300 F.3d 1, 5-6 n.4 (1st Cir. 2002) (noting the "well-settled rule that parties are required to translate foreign language documents into English").

In addition, Plaintiffs objected to the admission into evidence of the English translation of an email dated August 5, 2010, from Mr. Hosaka to a group of recipients at ADK.[68] Unlike the hundreds of pages of other Japanese language documents translated into English by the parties' agreed translation service, this particular document, say Plaintiffs, has been translated incorrectly.[69] Rejecting the Court's suggestion that the document be given to an additional neutral translator, Plaintiffs instead took the position that only the author of the document, Mr. Hosaka, is in a position to convey the document's meaning.[70] Specifically, Plaintiffs argue that, only with respect to this document, often translations between Japanese and English do not adequately convey a document's meaning because "in Japanese there is no past perfect tense and its future tense is usually the same form as the present tense."[71] The email in question is of substantial significance to 4Kids' view of Plaintiffs' motivations in pursuing the termination of the 2008 Agreement; the email, asserts 4Kids, is a highly confidential inner circle revelation of Plaintiffs' plan to replace 4Kids as its home video licensee. While telling, the email has little bearing on the issue of the effectiveness of the termination letter, except to the extent that it may evidence Plaintiffs' lack of good faith in pursuing termination. In any event, the Court finds no basis on which to exclude it from evidence in favor of what would undoubtedly be a self-serving translation of the document by Mr. Hosaka.

## III.   Other Evidentiary Objections

Plaintiffs have also objected to the admission into evidence of various portions of the Newborn Declaration and the Foster Declaration on the ground that they reflect legal conclusions

---

[68]   Ex. T-422A.

[69]   9/23/11 Tr. 19:5-9.

[70]   *Id*. at 19:1-24:20.

[71]   *Id*. at 22:13-25; *see also* Plaintiffs' Post-Trial Memorandum at p. 40.

or legal interpretations and hearsay.  As was the case with respect to the proffered testimony of

Messrs. Freedman and Erk, the Court did not consider testimony that reflects legal conclusions

nor did it afford any weight to the conclusions of any witnesses on the ultimate issues before the

Court.

## DISCUSSION

Against the foregoing extensive factual backdrop, the Court now turns to the basic

questions of contract law which are presented by this dispute.  As in any contract dispute, certain

first principles apply.

## I.      Applicable Law

Under New York law, contract termination disputes are raised as breach of contract

claims.  *Joseph Victori Wines, Inc. v. Viña Santa Carolina, S.A.*, 933 F. Supp. 347, 352-53

(S.D.N.Y. 1996).[72]  To prevail on a breach of contract claim under New York law, a party must

demonstrate, by a preponderance of the evidence, (1) the existence of a contract, (2) performance

by the party seeking recovery, (3) non-performance by the other party, and (4) damages

attributable to the breach.  *Pisani v. Westchester City Health Care Corp.*, 424 F. Supp. 2d 710,

719 (S.D.N.Y. 2006) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

A contract must be "enforced according to its terms."  *W.W.W. Associates, Inc. v.

Giancontieri*, 77 N.Y.2d 157, 162 (1990); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*,

25 N.Y.2d 535, 542 (1969).  *Accord*, *South Rd. Assocs., LLC v. Int'l Bus. Mach. Corp.*, 4 N.Y.3d

272, 277 (2005) ("In cases of contract interpretation, it is well settled that 'when parties set down

their agreement in a clear, complete document, their writing should . . . be enforced according to

---

[72]      The License Agreements provide that "[t]he law of the venue of the lawsuit shall be applicable."  Ex. T-6
¶ 15(g); Ex. T-11 ¶ 15(g).  The parties do not dispute that, here, the License Agreements are governed by New York
law.

its terms.'") (quoting *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)).   "This principle is based on the sound policy that favors predictability in the interpretation of commercial writings.  If parties are properly to structure and plan their commercial activities, they must be able to rely upon the plain language of the agreements they sign." *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 98 F. Supp. 2d 498, 503 (S.D.N.Y. 2000).

Courts resolve the question of law as to whether or not a writing is ambiguous.  *W.W.W. Associates*, 77 N.Y.2d at 162.   "[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms."  *Moore v. Kopel*, 237 A.D.2d 124, 125 (1st Dep't 1997).  *Accord*, *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."); *Atlantic Mut. Ins. Co. v. Terk Tech. Corp.*, 309 A.D.2d 22, 28 (1st Dep't 2003).   "But, if ambiguity exists, then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language."  *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

Of particular importance here is the fundamental principle that contractually-required notices of breach must provide sufficient information for the noticed party to determine what steps were necessary to cure the alleged breaches.   *See, e.g.*, *R Squared Global, Inc. v. Serendipity 3, Inc.*, 2011 U.S. Dist. LEXIS 127291 (S.D.N.Y. November 3, 2011), at *27 (granting motion for a preliminary injunction after noting that the evidence raised a sufficiently serious question as to whether the defendant had ever given the contractually-required prior written notice and opportunity to cure any of the breaches it cited as grounds for termination); *Chinatown Apartments, Inc. v. Chu Cho Lam*, 51 N.Y.2d 786, 788 (1980) (purported notice of

breach suffered from "fatal defect" because it did not state the lease provisions allegedly violated, and thus did not provide the allegedly breaching party with sufficient notice to cure the alleged defect); *City of Amsterdam Indus. Development Agency v. Safari Enterprises, Inc.*, 279 A.D.2d 865, 866–67 (3rd Dep't 2001) (a material issue of fact was raised because purported notices of breach failed to specify delinquent amount of rent due, to advise of 30-day period to cure, or of intention to terminate should the arrears remain); *Ulla-Maija, Inc. v. Kivimaki,* 2005 WL 2429490, at *4–5 (S.D.N.Y. Sept. 30, 2005) (purported notice of breach was "stated in terms so general as to be meaningless insofar as providing an opportunity to cure any alleged breaches" and failed to identify a cure period, and thus was "invalid as a notice"); *SVS, Inc. v. Rabbit Ears Producs, Inc.*, 1992 WL 91183 (S.D.N.Y. Dec. 12, 1991), at *10–11 (failure to include "decisive issue" in purported notice of breach rendered notice "invalid").

In order for a notice of breach to be effective, it must "objectively" put the allegedly breaching party on "notice that a cure period [is] being triggered" and that "drastic legal repercussions" will result from a failure to cure. *Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996); *accord, Wechsler v. Hunt Health Sys., Ltd.*, 2004 WL 2210261, *5 (S.D.N.Y. Sept. 30, 2004). In *Gil Enterprises*, the court interpreted the requirements of a contract provision which provided that, if a publisher failed to furnish a statement of account within sixty days of a written demand from the owner, the other owner had the right to terminate the agreement. *Gil Enterprises, Inc. v. Delvy*, 79 F.3d at 244. The Second Circuit held that the defendant's letter was not "sufficiently imperative" to give the allegedly breaching party "notice that a cure period was being triggered." *Id.* at 246. Similarly, the District Court has noted that "[t]he purpose of a demand requirement is to provide the target party with notice that further action in contravention to the demand will result in substantial legal consequence." *Wechsler*, 2004 WL 2210261, at *5.

Whether termed a "demand" for performance or a "notice" of breach, the purpose is to alert the recipient that a cure period is running and that the failure to cure could result in termination of the contract.

Finally, under New York law, a purported notice of breach will not be effective where it does not comply with a contractual requirement that it be sent in a specified manner. *See Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 551 (S.D.N.Y. 2001) (termination provision was not triggered by two purported notices of breach that were sent by facsimile and not by overnight mail as required under the parties' licensing agreement). "'Where the Agreement specifies conditions precedent to the right of cancellation, the conditions must be complied with.'" *Bausch & Lomb Inc. v. Bressler, et. al*, 977 F.2d 720, 727 (2d Cir. 1992) (quoting *Consumers Power Co. v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981)). The general rule is that "written notice requirements are fully enforceable." *USI Ins. Services LLC v. Miner*, 2011 WL 2848139 (S.D.N.Y. July 7, 2011), at *2 (quoting *Art of War Music Publ'g, Inc. v. Andrews*, 2000 WL 245908 (S.D.N.Y. Mar. 3, 2000), at *2). "Notice provisions, such as the one here, 'serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination.'" *Id.* Thus, "[u]nder New York law, where no notice was given as set forth under the [contract], there can be no breach of the [contract] because defendant was not afforded the opportunity to cure the defect." *Id.* In fact, terminating a contract without complying with the notice and cure provisions therein is itself a material breach. *Bausch & Lomb*, 977 F.2d at 727.

As explained more fully below, application of these first principles of New York contract law to the facts and circumstances of this case compels the conclusion that the 2008 Agreement has not been effectively terminated.

## II.    Licensor's Purported Termination of the 2008 Agreement was Ineffective Because Licensor Failed to Provide 4Kids with Adequate Formal Written Notice of Breach

The 2008 Agreement contains a termination provision which provides that, in order to terminate the agreement, the terminating party must (i) provide written notice of a breach of a warranty or other material provision of the agreement and (ii) give the breaching party ten days to cure such breach before providing written notice of termination.   Specifically, Paragraph 12(a), the termination provision of the 2008 Agreement, provides as follows:

> <u>Termination</u>. (a)    If either party breaches any warranty or other material provision of this Agreement and does not cure such breach within ten (10) business days of the breaching party's receipt of a written notice of such breach from the non-breaching party, then at any time during the continuance of such default, the non-breaching party may … terminate this Agreement effective as of the date of the breaching party's receipt of a written notice from the non-breaching party notifying the breaching party of such termination.

(Ex. T-11 at ¶ 12(a)).

Paragraph 15(c) of the 2008 Agreement provides, in relevant part:

> All notices, requests, consents and other communications here-under shall be in writing and shall be sent by express mail, or telefax with a follow up copy by express airmail to the parties at their addresses first above written. . . . Notice shall be deemed received upon actual receipt or when such receipt has been refused.

(Ex. T-11).   There is nothing ambiguous about Paragraph 12(a) or Paragraph 15(c) of the 2008 Agreement.

The Court finds that Licensor's purported termination of the 2008 Agreement is ineffective for several reasons.   First, Licensor failed to provide to 4Kids adequate formal written

notice of breach pursuant to the terms of the 2008 Agreement.  Second, Licensor's refusal to

unbundle its audit claims deprived 4Kids of an effective opportunity to determine the validity of

certain of the audit claims and to cure them.[73]  Third, even if the cure period had already run, the

fact that the parties engaged in extensive negotiations precluded Licensor from terminating

without providing 4Kids with a final opportunity to cure.  In addition (or, in the alternative), as

will be addressed in Section III below, even if Licensor had provided adequate formal notice

pursuant to Paragraphs 12(a) and 15(c), the notice was defective and thus the termination was

ineffective because the true underpayment reflected in the audit, if any, was less than the asserted

amount of $4.8 million.

Plaintiffs attempt to rely on the "totality of the parties' communications" in order to argue

that 4Kids was on actual notice of breach.[74]  In making this argument, they cite to decisions

rejecting "overly formalistic" interpretations of pre-termination notice provisions which have

held that a "good faith attempt to comply with the contract's . . . provisions" is sufficient.  *See

e.g., Schwartz v. Fortune Magazine*, 89 F. Supp. 2d 429, 434 (S.D.N.Y. 1999).  But it is clear

under New York law that where, as here, a party seeks what amounts to a forfeiture, a notice of

breach will be scrutinized and any inadequacy – be it trivial or material – will defeat such party's

claim.  *See Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 550-551

(S.D.N.Y. 2001) (citations omitted).  None of the communications identified by Plaintiffs (taken

together or separately) is sufficient to constitute adequate written notice of breach and an

---

[73]      Licensor elected to pursue its claims with respect to the nine audit Findings in the form of one aggregate
demand.  It could have elected to assert nine separate demands, but it did not do so.

[74]      *See* Plaintiffs' Post-Trial Memorandum at p. 9.

opportunity to cure as required by the 2008 Agreement.[75]   This conclusion is far from overly

formalistic; moreover, based on the entirety of the record, the Court finds it impossible to

conclude that the totality of Plaintiffs' communications with 4Kids between June 2010 and

March 2011 reflects a good faith attempt to comply with the provisions of the 2008 Agreement.

Plaintiffs have identified the following as communications with 4Kids in which they

purport to have given 4Kids written notice of breach:   (a) the June 17, 2010 letter from Mr.

Hosaka; (b) the June 25, 2010 letter from Mr. Bisceglie; (c) the December 20, 2010 letters from

Mr. Shinoda; (d) the March 4, 2011 letter from Mr. Bisceglie; and (e) the March 9, 2011 email

from Mr. Sugimoto.   The Court's analysis with respect to each of these communications follows.

## A.      ADK's June 17, 2010 Letter

The June 17 letter from Mr. Hosaka to 4Kids[76] did not (1) mention all of the audit issues

that comprised the total $4.8 million later sought by Plaintiffs; (2) contain any form of the words

"notice," "breach," "cure," or "terminate"; (3) make a demand for the payment of a specified

sum; or (4) reference the termination provision of the 2008 Agreement.   In addition, the June 17

letter was sent by email and facsimile and not by express mail or express airmail as provided in

Paragraph 15(c) of the 2008 Agreement.   Rather than serve as clear a notice of breach, this letter

instead requested that 4Kids sign a tolling agreement to allow time for Mr. Elliott to complete

the audit and for the parties to "informally" discuss the issues.   The presence of both imperative

and precatory language in the June 17 letter is significant.   The Court finds that this letter is

---

[75]      It would render Paragraph 12(a) of the 2008 Agreement meaningless if a termination could be effected
without complying with the notice and cure requirements provided for therein.   Under New York law, an
interpretation that renders a provision meaningless should be avoided.   *See Verzani v. Costco Wholesale Corp.*, 641
F. Supp. 2d 291, 299 (S.D.N.Y. 2009) ("[T]he [C]ourt may not read the agreement to make any of its terms
meaningless, or construe its language to render particular provisions mere surplusage." (internal quotation marks
omitted)), *aff'd*, 387 F. App'x 50 (2d Cir. 2010); *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 332–33
(S.D.N.Y. 2010).

[76]      Ex. T-15.

insufficient to objectively put 4Kids on notice that a cure period was being triggered.  *See e.g.,
Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996) (holding that, in order for a notice
of breach to be effective, it must "objectively" put the allegedly breaching party on "notice that a
cure period [is] being triggered" and that "drastic legal repercussions" will result from a failure
to cure).  In addition, because the June 17 letter did not delineate each of the audit claims, it did
not contain enough information for 4Kids to cure the alleged breach.

### B.      ADK's June 25, 2010 Letter[77]

The Court finds that the letter sent by ADK's outside counsel to Mr. Newborn on June
25, 2010[78] was also insufficiently clear and imperative to satisfy the requirements of Paragraph
12(a) of the 2008 Agreement.  Far from providing notice of breach, the June 25 letter suggested
that the parties could resolve the matter amicably, and it requested that 4Kids sign a tolling
agreement in order to allow time for discussion.  Once again, as in *Gil*, *supra*, the presence of
precatory language is significant.  Like the June 17 letter, the June 25 letter did not (1) include
any form of the words "notice," "breach," "cure," or "terminate" or (2) reference the termination
provision of the 2008 Agreement.  Finally, there is no evidence that it was sent by express mail
or express airmail as provided in Paragraph 15(c) of the 2008 Agreement.

### C.      ADK's December 20, 2010 Letters

Plaintiffs assert that either (or both) of the two versions of the letter they sent to 4Kids on
December 20, 2010,[79] satisfies the objective standard set forth in *Gil Enterprises* and otherwise
triggers a right to terminate.  However, the uncertainty regarding the transmission and receipt of

---

[77]      While the June 25 letter contained several requests or demands for payment, all of the audit amounts listed
in the June 25 letter are inconsistent with the numbers later asserted in the December 20, 2010 letter sent by ADK to
4Kids.

[78]      Ex. T-16.

[79]      Ex. T-18 and Ex. T-19.

these letters and the errors and other shortcomings in the content of the letters preclude their use (taken together or separately) as a basis on which Plaintiffs can establish that they effectively terminated.

As was the case with the prior letters, the December 20 letter did not provide 4Kids with enough information to fully evaluate Licensor's audit claims, particularly with respect to (i) which tax withholding deductions Licensor counted as "unsubstantiated" and (ii) how Licensor calculated the material and courier costs asserted.  As Mr. Foster testified, without this information, particularly with respect to material and courier costs, 4Kids, as a public company, could not pay Licensor's "estimated" amount contained in Finding 9.  Essentially, the December 20 letter left 4Kids without an effective opportunity to evaluate the validity of the amount and to cure, rendering it a defective notice of breach.  *See, e.g.*, *Chinatown Apartments, Inc. v. Chu Cho Lam*, 51 N.Y.2d 786, 788 (1980) (purported notice of breach suffered from "fatal defect" because it did not state the lease provisions allegedly violated, and thus did not provide the allegedly breaching party with sufficient notice to cure the alleged defect).  The evidence also demonstrates that 4Kids' additional requests for backup information on several of the audit claims were ignored by Licensor.

The first version of the December 20, 2010 letter claimed that ADK had not received a scheduled payment for 4Kids' purchase of the Yu-Gi-Oh! 5D series, which had been due on November 30, 2010.  Regarding the allegedly delinquent payment, Mr. Shinoda wrote that 4Kids "must now [make the payment] or be in breach of the parties' agreements."  (Ex. T-18 at 1).  Mr. Shinoda did not use the words "notice," "cure," or "terminate" in his letter, nor did he reference the termination provision of the 2008 Agreement, and the absence of any such terminology failed to give 4Kids objective notice of the alleged audit-related breach and of the drastic legal

116

repercussion of termination, as is required by courts. Significantly, the only occurrence of the word "breach" in the letter was with respect to the November 30 payment, which ADK subsequently discovered had been paid by 4Kids on November 30, 2010, as required.

ADK claims that once it discovered that this payment in fact had been made by 4Kids in a timely manner, it sent a second letter, also on December 20, correcting the mistake,[80] but there is no clear evidence that this second letter was ever received by 4Kids. The second version of the letter does not explain that it replaces the first, and it omits references to the November 30 payment (and all references to a "breach" of the 2008 Agreement which had been contained in the first version of the letter). Mr. Kahn and Mr. Newborn testified that it is possible that it was received by 4Kids but inadvertently discarded as a duplicate. Neither the first version of the letter nor the second version of the letter was sent by express mail. While the second version of the December 20 letter fails to provide adequate notice of breach for the same reasons that the first version is deficient, the Court notes that the questionable transmission and/or receipt of the second letter illustrates the purpose of provisions such as Paragraph 15(c) of the 2008 Agreement: requiring that notices be sent by express mail to ensure definitively that notices are received by the intended recipients.

In the December 20 letter, Mr. Shinoda wrote that he was writing to "request payment for the underpayment Mr. Elliott found" and that he "insist[ed] that within 10 business days 4Kids pay ADK $4,819.354.63 to cover the full underpayment." Although the letter was dated December 20, 2010, the letter called for payment by December 14, 2010 of these amounts allegedly due — six days **before** the date of the letter. Even if the letter were to be considered a notice of breach, the cure period asserted was less than clear.

---

[80]     Ex. T-19.

Both versions of the December 20, 2010 letter seek payment from 4Kids within ten business days.[81]  When asked about his selection of this time period, Mr. Shinoda gave several differing responses, which undermines the credibility of his testimony in this regard.  In his declaration, Mr. Shinoda testified that "[i]t was [his] intent by including this ten business day cure period to alert 4Kids to the urgency of their need to respond to [ADK's] demand for payment."  He also testified that he gave 4Kids ten business days to cure "because [he] was required to do so under the 2008 Agreement," and that he "included a reference to paragraph 4(f) because that paragraph states that '[a]ny underpayment reflected in the audit shall be paid to [the YGO Consortium] promptly.'"  (Shinoda Decl. ¶¶ 58–59).

On cross-examination, Mr. Shinoda admitted that he did not even write the December 20 letters and, in fact, does not know who wrote those letters.  (8/31/2011 Tr. 78:20–79:5 (Shinoda)).[82]  When asked at his deposition why he included a ten-day period in the December 20 letter, Mr. Shinoda testified that he believed ten days was an "appropriate" duration, but did not make any reference to any requirements of the 2008 Agreement.  (8/31/2011 Tr. 79:11–83:9 (Shinoda)).

Further, there is no evidence that either of the December 20 letters was sent pursuant to the notice requirement of Paragraph 15(c) of the 2008 Agreement, and Licensor's testimony on

---

[81]    Notably, neither letter accurately includes a correct calendar date for ten business days after December 20, 2010.  The first letter requests payment by December 14, 2010, and the second letter requests payment by December 30, 2010.  Ten business days after December 20, 2010, by this Court's calculation, appears to be January 3, 2011. Although there was no evidence presented as to the reason it was decided that the demand letter be sent on December 20, 2010, the Court cannot help but observe that sending such a letter during the holiday season – *i.e.*, at a time when there probably would be few senior personnel available – smacks of gamesmanship and a lack of good faith.

[82]    While Mr. Shinoda could not recall who drafted the December 20 letters, the evidence indicates that they were drafted by Licensor's outside counsel.  Mr. Hosaka also testified that the Olshan firm may have drafted the December 20 letters.  Given the significance of the December 20 letter(s), the lack of recollection and clarity on these details is striking.

this point was also inconsistent.  On their face, both letters only state that they were sent by facsimile and not by express mail or express airmail, as required.  Mr. Shinoda testified that he did not know whether the letters were sent by any method other than fax.  When asked at trial whether he sent the letters by courier or by mail, such as FedEx, Mr. Hosaka responded, "I think so."  Licensor did not introduce into evidence any shipping record or receipt showing that either letter was sent by express mail or express airmail.

For all of these reasons, the December 20 letters fail to serve as adequate and objective notice of breach pursuant to the terms of the 2008 Agreement.

### D.    ADK's March 4, 2011 Letter

The March 4, 2011 letter from ADK's outside counsel to 4Kids[83] also does not provide objective notice of the beginning of the ten business day cure period, nor does it provide details on the substance of the audit claims which would provide 4Kids an opportunity to cure.  Instead, it merely states that if 4Kids does not sign the Adaptation Agreement or commit to a $2 to $3 million payment, ADK will "proceed with the expectation that 4Kids is not genuinely interested in resolving our differences."  As with the prior letters, the terms "notice," "cure" or "terminate" are not used in the March 4 letter, and the letter was not sent in the manner required for notices under Paragraph 15(c) of the 2008 Agreement.

### E.    Mr. Sugimoto's "Inadvertent" March 9, 2011 Email

Licensor has also claimed that an email from Mr. Sugimoto, dated March 9, 2011,[84] which, according to Mr. Sugimoto, was sent in error to 4Kids, constitutes notice of breach.  The email, which was from sent from Mr. Sugimoto to Plaintiffs' counsel, requests that counsel

---

[83]     Ex. T-25.

[84]     Ex. T-311.

"send the termination letter" if 4Kids fails to commit a seven-figure amount by the following day. Licensor's counsel almost immediately asked 4Kids to delete this email because 4Kids was "inadvertently copied." The Court finds that this "inadvertent" email does not constitute adequate notice of breach, not only for the basic reason that the email fails to comply with Paragraph 15(c)'s express mail requirement, but also because it does not satisfy Licensor's termination obligations under Paragraph 12(a) of the 2008 Agreement by providing notice that a cure period is being triggered and giving 4Kids an effective opportunity to cure. Simply put, it would be absurd to conclude that an allegedly "inadvertent" email, which Licensor's counsel then requested be "deleted," could satisfy the formal contractual notice requirements of the 2008 Agreement.

### F.    Ongoing Negotiations Continued Between the Parties Without a Final Opportunity to Cure

Beginning in December 2010 and particularly between March 10, 2011 and March 24, 2011, the parties continued to have meetings and conversations regarding a potential settlement of the audit claims. Mr. Shinoda testified that no one used the word "breach" during such negotiations, nor was the issue of termination raised at the parties' final in-person meeting on March 18, 2011. Mr. Hosaka confirmed this fact as well in his testimony. FF ¶ 294; (8/31/2011 Tr. 97:2–12 (Shinoda); 9/6/2011 Tr. 79:23–80:2 (Hosaka)). There is no evidence that anyone suggested at the March 18 meeting that a notice of breach had already been given, despite Licensor's subsequent assertion that the cure period had been running or had already expired during that time.

Under New York law, when two contracting parties have engaged in extensive negotiations after a cure period has expired, an additional notice and opportunity to cure must be given prior to termination. *See Zuckerman v. 33072 Owners Corp.*, 468 N.Y.S.2d 639, 642 (1st Dep't

1983); *TSS-Seedman's, Inc. v. Elota Realty Co.*, 521 N.Y.S.2d 277, 278 (2d Dep't 1987), *aff'd*,

72 N.Y.2d 1024 (1988).[85]    Courts have also recognized that it is inequitable for one party to

induce reliance by the other party through its course of conduct, only to abruptly terminate the

contract without a final chance to cure.    For example, in *LaGuardia Assocs. v. Holiday

Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119 (E.D.N.Y. 2000), the court held that a

franchisor could not abruptly withdraw a 60-day grace period customarily extended to the

franchisee for certain payments. As a matter of equity and "sensible business practice," the

franchisor could not discontinue the practice without reasonable notice. *See id.* at 130.

The Court finds credible the testimony of 4Kids' witnesses that 4Kids believed that

Licensor would comply with the formal termination requirements of the 2008 Agreement (by

sending written notice of breach sent by express mail) before it could terminate the agreement.

The testimony reveals that, if Licensor had sent a formal notice of breach to 4Kids, 4Kids

intended to file for bankruptcy protection during the subsequent ten business day cure period in

order to invoke the automatic stay and prevent termination. *See* Ex. T-129.[86]    Moreover, by

continuing to engage in negotiations with 4Kids, Plaintiffs induced reliance by 4Kids; there is no

---

[85]    In *Zuckerman* and *TSS-Seedman's*, New York courts considered whether a lease contract had been validly terminated as a predicate to determining whether the court had the power to issue a so-called *Yellowstone* injunction. *Zuckerman* held that a purported termination was invalid because, "having participated from the outset in extensive settlement negotiations . . . , the parties have set a new period in which the defect may be cured." 468 N.Y.S.2d at 642.    And in *TSS-Seedman's*, the court reached the same result, reasoning that because "the parties engaged in extensive settlement negotiations," and because "such conduct [was] indicative of a recognition on the part of both parties that the plaintiff had a right to cure any default," the purported termination was ineffective. 521 N.Y.S.2d at 278.

[86]    Exhibit T-129 is a March 9, 2011 email from Mr. Newborn to Licensor's outside counsel, Tomohiro Tohyama, in which Mr. Newborn states that "[g]iven the threatening position of ADK's US lawyer, 4Kids has had no choice but to consult outside litigation and bankruptcy counsel . . . . 4Kids would be obligated to try to stop the termination of the [2008 Agreement] . . . . [and] would have to prepare for a bankruptcy filing in New York because of the serious harm to 4Kids' business. . . . Notwithstanding the clause in the 2008 [Agreement], permitting termination on bankruptcy of either party, as we discussed last night, under US bankruptcy law such clause would not be enforced. . . . The end result of the strategy of ADK's lawyer will be a very substantial loss of business for ADK, for 4Kids, for the rest of the Yu-Gi-Oh Consortium and for Konami."

other credible explanation for 4Kids' having refrained from filing for chapter 11 protection during this time period.

Contrary to the assertions of Licensor, the Court concludes that none of the written communications between the parties prior to March 24, 2011 was sufficient to constitute adequate notice of breach, nor are they sufficient taken as a whole. None of them was sent to 4Kids by express mail as required by Paragraph 15(c) of the 2008 Agreement.[87] Moreover, even if notice had been proper and the cure period had begun to run or had run, it would have been inequitable and improper for Licensor to continue negotiating with 4Kids throughout the cure period and abruptly terminate without providing a final opportunity to cure. Accordingly, the termination was ineffective.

### III. The Amount Owed by 4Kids, If Any, Was Not the $4.8 Million Claimed in the Purported Notice of Breach, Which Renders the Notice Materially Defective and Renders the Termination Ineffective

The Court finds that even if Plaintiffs had given 4Kids proper formal notice of breach pursuant to the terms of the 2008 Agreement, Plaintiffs' termination was ineffective nonetheless because the amount owed to Plaintiffs, if any, was not the $4.819 million amount contained in the termination letter and the purported notices of breach. The parties' positions on this issue are in stark conflict:

- 4Kids argues that if the Court determines that *any* of the audit Findings is incorrect, then Licensor's alleged notice and basis for the purported termination were defective and, therefore, ineffective. *See* 4Kids' Post-Trial Brief at p. 20.[88]

---

[87]    In *Luxottica*, numerous notices had been sent by fax but the failure to send a notice of default by overnight carrier, as required by the applicable agreement, was particularly noted by the court in its analysis. *See Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 551 (S.D.N.Y. 2001).

[88]    Adv. Pro. No. 11-02225, Docket No. 59.

- In contrast, Plaintiffs assert that as long as the amount asserted was not "arbitrary" and was "within the realm of the incoming revenues being generated by Yu-Gi-Oh!," then 4Kids "simply [has] to pay" such amount.  Plaintiffs argue that Paragraph 4(f) of the License Agreements requires 4Kids to "promptly" pay any underpayment reflected in the audit, and it does not give 4Kids the right to contest the audit procedures or to dispute the audit claim amounts.  *See* Plaintiffs' Post-Trial Memorandum at pp. 101-102.  In other words, Plaintiffs believe that, even if the Court determines that any of the audit findings is incorrect, then the termination notice premised on the demand for the $4.819 million amount is nonetheless still effective.[89]  This is notwithstanding the fact that the underpayment "reflected in the audit" is not necessarily the amount due and owing.  In other words, close enough is good enough.

The Court agrees with 4Kids: because the $4.819 million amount asserted by Plaintiffs was incorrect and inaccurate, it could not and did not form a valid basis for termination.[90]  Close enough is decidedly not good enough under the facts and circumstances present here.  *See, e.g.*, *Luxottica Group S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 545, 550-551 (S.D.N.Y. 2001) (holding that when remedy of forfeiture is invoked, notice of default is scrutinized and any defect or inadequacy will defeat the claim) (citations omitted).

---

[89]    Plaintiff's reliance on *Carvel Corporation v. Diversified Management Group, Inc.*, for this proposition (*see* Plaintiffs' Post-Trial Memorandum at p. 8) is misplaced inasmuch as *Carvel* involved payments on promissory notes, *i.e.*, amounts that were, without dispute, due and owing and were accurately cited in the notice.  *See Carvel Corporation v. Diversified Management Group, Inc.*, 930 F.2d 228 (2d Cir. 1991).

[90]    In fact, the day it sent the purported termination letter, Licensor also filed the Adversary Proceeding against 4Kids in which it alleged a $4.792 million underpayment (instead of the previously asserted $4.819 million underpayment).  Within less than one day of delivery of the termination letter, Licensor had already dropped $26K from its claim, the amount contained in Finding 4.  The Court finds that even without considering the merits of each of the other audit Findings, this "substitution" of the number being utilized as the basis for breach renders the notice ineffective.  Notwithstanding, the Court will consider the merits of each of the audit Findings in turn.

The evidence at trial revealed that, despite requests from 4Kids, Plaintiffs continuously refused to "unbundle" the total audit amount and resolve each of Mr. Elliott's nine Findings on an individual basis. However, at least seven of those Findings (Findings 1, 2, 3, 4, 5, 6, and 9), have either been withdrawn by Licensor or are meritless. This material error in the amount originally asserted by Licensor as its basis for breach renders termination ineffective, as Licensor based its purported termination on an incorrect, aggregate audit amount.

Despite the Court's conclusion that if it finds *any* of the nine substantive audit claims meritless then it need not proceed further because Licensor's alleged notice and basis for the purported termination were defective, the Court will address below each of the nine audit Findings, starting with perhaps the most egregiously incorrect so-called Finding. To do so will highlight how baseless is Licensor's demand for over $4.8 million.

A.      **Finding No. 9: Material & Courier Costs - $247,771.88**

Audit Finding 9 reflects Licensor's contention that 4Kids owes Licensor $247,771.88 in so-called material and courier costs incurred between 2001 and September 2010. This amount was based on a one-page invoice sent to 4Kids for the first time in October 2010 which reflected nine years of costs never previously mentioned, let alone invoiced, to 4Kids. The costs contained in Finding 9 were converted from Japanese yen to American dollars using the October 2010 exchange rate – the lowest exchange rate during the nine-year period – rather than the exchange rates in effect when the materials were actually delivered to 4Kids.

Mr. Elliott based Finding 9 on a provision of the License Agreements which obligates Licensor to send certain materials to 4Kids with respect to each television episode, including a Digital Beta NTSC master tape of each episode, along with music effects, a script, and music cues and which obligates 4Kids, in turn, to reimburse Licensor for the "actual cost" of such materials, including courier costs. (Ex. T-6 ¶ 5(a); Ex. T-11 ¶ 5(a)).

124

The testimony at trial revealed, however, that a large portion of the material and courier costs asserted in Finding 9 were based upon *estimates* instead of "actual costs," and another piece of the asserted costs reflected a charge for materials *not yet delivered* to 4Kids. (*See* 9/6/11 Tr. 46:19-49:21 (Hosaka); Hosaka Decl. ¶ 58).   Mr. Elliott testified that he took ADK's calculation at "face value" and did not ask for any supporting documentation; he only asked that ADK prepare a summary invoice for 4Kids because he discovered that there had been no invoice sent previously.  Mr. Elliott further testified that he understood at the time he included Finding 9 in his audit report that some of the numbers were based on estimated costs and not actual costs, but he did not mention this in his Finding.  (8/29/11 Tr. 217:1-219:6 (Elliott); 8/30/11 Tr. 96:22-97:4 (Elliott)).   Thus, the demand for payment of these charges was not a demand for unpaid royalties revealed by the audit; simply put, it was a number concocted by Plaintiffs and tacked onto their demand.

At trial, Licensor admitted that it is in possession of documentation to support the actual costs incurred, but that it never provided this backup information to 4Kids, despite multiple requests.  (9/6/2011 Tr. 52:2–53:18 (Hosaka)).[91]  The evidence reveals that 4Kids had offered in several emails to ADK to pay the material and courier costs (without regard to the statute of limitations) if Licensor would provide answers to several questions that had been posed by Mr. Newborn about the costs.   Mr. Newborn's emails went unanswered.   In short, Licensor consistently refused 4Kids' offers to address Finding 9, and this refusal of reasonable offers to

---

[91]      Licensor's expert, Mr. Erk, testified that he would have handled the material and courier costs differently than Mr. Elliott, by sending a letter to 4Kids instead of including them as an audit claim.  Mr. Erk also testified that there was nothing improper about 4Kids' request for additional documentation regarding the material costs, and that asking for such documentation would be the logical and reasonable thing to do.  (9/9/2011 Tr. 92:19–95:1 (Erk)). Mr. Foster testified that if 4Kids had received proper backup documentation to substantiate the material and courier costs invoice, 4Kids would have paid the invoice in the normal course of business.  Mr. Foster also testified that as a public company, and given the internal accounting controls in place, 4Kids would not have been able to pay the material costs without the proper supporting documentation.  (9/20/2011 Tr. 177:15–178:5, 179:15–182:1 (Foster)).

cure an alleged breach also precludes Licensor from asserting a valid claim of breach with respect to material and courier costs. *Hole v. G.M. Corp.*, 442 N.Y.S.2d 638, 640 (3rd Dep't 1981) ("It is uncontroverted that G M made several offers to repair and since plaintiff rejected those offers and never presented G M the opportunity to comply with the express warranty, he cannot now be heard to claim its breach.").[92]   Licensor cannot rely on Finding 9 as an underpayment reflected in the audit within the meaning of Paragraph 4(f) of the 2008 Agreement or as a breach which, if not cured, would justify termination of the 2008 Agreement.

### B.   Finding No. 8:  Miscellaneous Costs - $43,554.59

Finding 8 relates to certain miscellaneous costs that, in Mr. Elliott's view, were not authorized under the License Agreements and were improperly charged by 4Kids to Licensor. Based on Mr. Newborn's testimony, it is the Court's understanding that Finding 8 is not a material dispute between the parties, given that 4Kids has offered to pay substantially all of the amount ($39,000).  Accordingly, the Court will not address the merits of this claim.

### C.   Finding No. 7:  Bank Charges - $4,270.58

Finding 7 is comprised of $4,270.58 in deductions taken from Licensor's share of Gross Income for bank charges that were not authorized deductions under the License Agreements. Mr. Foster testified that 4Kids does not dispute Mr. Elliott's Finding.  Accordingly, the Court will not address the merits of this claim.

### D.   Finding No. 6:  Errors & Omissions Insurance Allocation - $67,328.45

In Finding 6, Mr. Elliott concluded that 4Kids overcharged Licensor for its "pro rata" share of E&O insurance by approximately $67,000 over the period of the License Agreements.

---

[92]    Because the Court finds that Plaintiffs have no valid claim for breach based upon (i) the merits of Finding 9 and (ii) Plaintiffs' refusal to permit 4Kids to address the claim, the Court need not reach 4Kids' argument that the statute of limitations bars a portion of the claim.  The same holds true with respect to the statute of limitations aspects of certain other of the audit claims.

Paragraph 13 of each of the License Agreements requires 4Kids to obtain E&O insurance on behalf of Licensor, and the agreements allow 4Kids to deduct the cost of the insurance from Licensor's share of Gross Income, up to a maximum of $15,000 per year. If other television series and movies are insured under the same policy, the License Agreements provide that Licensor's share of the premium shall be "computed on a pro-rata basis." The parties disagree as to the proper method for computing the pro rata allocation of the insurance premium.

Despite the fact that 4Kids' E&O policy listed a number of inactive properties, Mr. Elliott calculated Licensor's share of the premium by dividing the number of Yu-Gi-Oh! titles listed on the policy by the total number of properties on the policy. Using this method, he determined that 4Kids overcharged Licensor for its pro rata share of E&O insurance by approximately $67,000.

In contrast, 4Kids has demonstrated that if the allocation of Licensor's share of the premium were determined either (a) on a weighted revenue basis – a methodology which was supported by Licensor's own expert as more appropriate than Mr. Elliott's method – or (b) as a proportion of *active* properties insured by 4Kids (in contrast to *all* properties), then the cost allocated to Licensor was appropriate. The Court has seen no evidence demonstrating why Mr. Elliott's method was the most reasonable or correct way of calculating Licensor's share – to the contrary, even Licensor's own expert disagreed with Mr. Elliott's choice. As Plaintiffs are unable to meet their burden to demonstrate that Finding 6 evidences a breach of the License Agreements, the Court is unable to conclude that Finding 6 reflects an underpayment; accordingly, it cannot support termination of the 2008 Agreement.

### E.    Finding No. 5:  Unauthorized Audit Fee Deduction – $105,111.20

Audit Finding 5 stems from Licensor's claim that, despite the lack of an express provision in the License Agreements authorizing such deductions, 4Kids improperly deducted 50% of the costs of third-party audits conducted by 4Kids on its sublicensees from Licensor's

127

share of Gross Income.  Mr. Elliott testified that, while he was conducting his audit, Licensor did not show him or discuss with him any correspondence between the parties relating to Licensor's approval of 4Kids' third-party audits.  Mr. Elliott therefore concluded that Licensor had not authorized a modification of the License Agreements or otherwise consented to payment of 50% of the costs of such audits and that, consequently, such deductions by 4Kids were impermissible. The evidence, however, demonstrates that Licensor acted otherwise.

In January 2005, Ms. Nowicki of 4Kids informed Ms. Kubota of ADK of 4Kids' third-party audit procedure, and after that time, 4Kids initiated various audits of Yu-Gi-Oh! sublicensees.  While the parties agree that the License Agreements do not explicitly permit deductions from Licensor's share of Gross Income for these audits, the emails submitted into evidence clearly indicate Licensor's consent and approval of certain audits, and Licensor's course of conduct over the period of the License Agreements also demonstrates that Licensor never raised any objection to the deductions from Gross Income (which were prominently listed on the quarterly participation statements provided to Licensor) until the audit in 2010.  Between 2005 and 2009, 4Kids recovered over $750,000 through third-party audits, all of which was split 50-50 with Licensor, without objection.  Notably, while Licensor objects to having to pay half the cost of these audits and uses this claim as a basis for termination, it has not offered to return any portion of the $375,000 paid to Licensor as a result of these audits.

Viewing each third-party audit request and approval separately, 4Kids has demonstrated that each represented a written modification of the License Agreements.  Email communication evidencing an agreement to modify the terms of an agreement constitutes a "signed writing" as per the statute of frauds, where (1) the terms of the proposed modification are set forth in the email; (2) a reply email evidences acceptance of the proposed modification; and (3) the emails

128

include signature blocks, which signify an intent to authenticate.  *Stevens v. Publicis SA*, 854 N.Y.S. 2d 690, 691–92 (1st Dep't 2008), *appeal dismissed*, 10 N.Y.3d 930 (2008).  Each of these conditions is present in the emails submitted into evidence.  Specifically, in its requests for approval by Licensor, 4Kids made clear that the audits involved costs, and, at trial, both Mr. Hosaka and Mr. Sugimoto testified that they understood that approving the proposed audits involved a sharing of costs.  4Kids presented emails and testimony illustrating that it sought Licensor's written approval of each individual audit (which approval was given via e-mail), and 4Kids did not conduct any Yu-Gi-Oh!–related audit without Licensor's approval.  In fact, the evidence reveals that 4Kids declined to move forward with some proposed third-party audits because Licensor had not given its approval.

Moreover, even if the Court had found that the License Agreements had not been modified by the email approvals, Licensor is unable to defeat the equitable arguments of estoppel and waiver, given that (i) 4Kids relied on Licensor's written approval to conduct the audits and would not have conducted them without consent and (ii) in accepting the royalty payments recouped through the third-party audits, Licensor waived its right to object to the deductions for costs.

> An estoppel "rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury."  It is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Nassau Trust Company v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184 (1982) (citations omitted).  "While estoppel requires detriment to the party claiming to have been misled, waiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable."  *Id.*

For all of these reasons, the Court finds that Finding 5 does not reflect an underpayment nor does it constitute a breach of the License Agreements that can serve as a basis for Licensor's termination of the 2008 Agreement.

### F.    Finding No. 4: Unreported Post-June 2008 Home Video Revenue - $26,894.27

Finding 4 has been withdrawn by Licensor.  While it was included in Mr. Shinoda's December 20, 2010 letter, it was not included in the complaint filed by Plaintiffs in the Adversary Proceeding.  The Court notes, however, that Finding 4 was premised upon the application of Paragraph 1(b)(iii) of the 2008 Agreement, which applies if 4Kids "exercises the Home Video Rights . . . itself."[93]  In dropping its pursuit of this audit Finding, however, Licensor appears to have realized that it was misreading the 2008 Agreement and that it would be inconsistent to continue to pursue both Finding 4 and Finding 1, as Finding 1 relies on Licensor's allegation that 4Kids was *not* exercising home video rights itself under the License Agreements. As Finding 1 asserts a claim for nearly $2 million, Licensor clearly chose to pursue the more lucrative claim.  Moreover, the withdrawal of Finding 4 amounts to an admission by Plaintiffs that the amount demanded in the December 20 letter was erroneous.   While the amount of Finding 4 may be relatively trivial, the point is not:  if a demand is going to serve as the basis for a termination of such enormous consequence, it needs to be correct.  Once again, close enough is not good enough.

---

[93]     Finding 4 resulted from 4Kids' error in continuing to divide the 20% home video royalty between the parties during the second half of 2008 notwithstanding the change to the provision in the 2008 Agreement which provides that, if 4Kids exercises the home video rights itself, the entire home video royalty should be paid to Licensor.  4Kids acknowledged its accounting error and offered to pay the full amount of Finding 4.

G.    **Finding No. 3: Unsubstantiated International Withholding Taxes - $2,265,767.16**

Based on Mr. Elliott's audit Finding of $2,265,767.16 in "unsubstantiated" foreign withholding tax certificates, Licensor asserts that it was unable to claim foreign withholding tax credits or take foreign withholding tax deductions related to the Yu-Gi-Oh! property.  Instead of quantifying its claim by the value to Licensor of the amount of the deduction or credit which could have been taken by Licensor on Japanese tax returns, Licensor has incorrectly asserted a dollar for dollar assessment in the form of an "audit claim" based on the face amount of the tax certificates that Mr. Elliott found to be "unsubstantiated."    Licensor has failed to prove that it suffered any injury as a result of 4Kids' alleged breach, which it alleges was 4Kids' failure to provide it with such certificates as required by the License Agreements.  Licensor's position is wrong, on several levels.

Mr. Elliott's subjective and slipshod classification of certain tax certificates as "unsubstantiated" was purportedly based upon (i) whether 4Kids possessed such certificates in its files (without regard to whether they had been provided to Licensor)[94] and (ii) whether the certificates referenced Licensor or the Yu-Gi-Oh! property.[95]    Mr. Elliott did not consider whether or not Licensor did or could have used such certificates to take a deduction or credit, nor

---

[94]    Mr. Elliott testified that, in deeming $1,386,913.06 in tax certificates to be "unsubstantiated," he did not even ask ADK or TV Tokyo whether they had ever received certificates from subagents directly, and his determination did not turn on whether or not the certificates had been provided to Licensor.  Rather, the presence or absence of the certificates in 4Kids' files was the sole basis for his description of these certificates as unsubstantiated.

[95]    Of the tax certificates that 4Kids provided to Mr. Elliott, he noted that $873,853.30 were, in his opinion, "unsubstantiated" because they did not reference the Yu-Gi-Oh! property or the Licensor on the face of the certificate.  Significantly, however, Mr. Elliott admitted at trial that he did not notice the Yu-Gi-Oh! notation present on substantially all of the certificates in this group.  Also, $205,215.79 of the approximately $874,000 of these certificates relate to the withholdings of the Mattel subsidiaries.  Mr. Elliott was provided during his audit with an affidavit from Mattel's Vice President of Finance/Assistant Controlled which confirmed that those certificates all related to the Yu-Gi-Oh! property and reflected withholding taxes paid on behalf of NAS.  Mr. Elliott admitted that he does not know whether or not ADK could have used these documents to claim foreign withholding tax certificates under Japanese law, but he nevertheless categorized such certificates as "unsubstantiated."

whether Licensor suffered any tax injury in connection with his Finding.  Moreover, the evidence demonstrates that 4Kids did not breach its obligations under the License Agreements to provide "evidence of payment of such withholding tax[.]"  Ex. T-6 ¶ 4(g); Ex. T-11 ¶ 4(g).  Accordingly, Licensor has failed to prove that Finding 3 reflects an underpayment or otherwise establishes a breach of the License Agreements sufficient to justify termination.

### 1.    4Kids Provided Evidence of Withholding Tax Deductions Required by the License Agreements

Section 4(g) of the License Agreements states that "4Kids shall provide Licensor or shall cause the applicable subagent or applicable licensee to provide Licensor with evidence of payment of such withholding tax on behalf of the Licensor so that Licensor may claim an appropriate tax credit or tax deduction."  Ex. T-6 ¶ 4(g); Ex T-11 ¶ 4(g).  As explained by the drafter of the agreement, Mr. Newborn, he elected to use a purposefully broad term, "evidence," because he did not know (i) what was required to prove payment of foreign taxes under Japanese tax laws and regulations or (ii) the proof of payment executed in the various foreign countries in the 4Kids Territory, but he assumed that Licensor would inform 4Kids of what documentation was necessary.  (9/12/2011 Tr. 103:8–24, 104:16–105:2 (Newborn)).

Although Licensor has claimed that no foreign withholding tax certificates were provided to Licensor in the course of the parties' relationship, there was credible evidence to the contrary. Both Ms. Kozmata and Mr. Foster of 4Kids testified that 4Kids collected and forwarded some tax certificates from foreign subagents to ADK; evidence was also presented that some foreign subagents sent foreign withholding tax certificates directly to TV Tokyo.  Moreover, the Court finds that Plaintiffs' testimony at trial was not credible regarding searches undertaken by Plaintiffs for such certificates.  Mr. Hosaka testified (i) in his declaration that he personally undertook a search for such certificates after the initiation of the litigation, and he looked in all of

the "logical places" for the certificates and (ii) in his re-direct examination that he also looked in

the accounting department and in anything related to tax deductions to locate the certificates  —

but, on cross-examination, Mr. Hosaka admitted that he searched for the certificates only in

ADK's tax returns and in 4Kids' quarterly participation statements.

While Licensor was not obliged under the License Agreements to ask 4Kids for copies of

missing certificates, even Plaintiffs' tax expert admitted that, if one of his clients could not take a

foreign withholding tax credit because it was missing the relevant tax certificates, he would

advise his client to ask its licensee for the certificates.   There is no credible evidence that

between 2001 and 2009 ADK ever requested foreign tax withholding certificates in writing from

4Kids, and the evidence presented by Plaintiffs regarding verbal requests for such certificates is

inconsistent at best.    Ms. Kubota, the ADK employee responsible for informing ADK's

accounting department about foreign withholding taxes, testified that if any requests were made

for certificates from 4Kids, they would have been made by Mr. Doi, Mr. Shinoda, Mr. Sato, or

her.   She did not recall requesting withholding tax certificates from 4Kids, nor did she recall

being asked by one of the other ADK employees to make such a request.   Mr. Shinoda's

testimony on the topic was contradictory: he testified that he requested foreign withholding tax

certificates "every time" he met with Mr. Kahn of 4Kids, a statement directly inconsistent with

both his declaration and his deposition testimony in which he stated that it was not "every time."

He also admitted that he never followed up on any of his requests by letter or even by email; this

is not surprising as it is difficult to believe that an important high-ranking executive such as Mr.

Shinoda would discuss the topic of tax certificates with the Chief Executive Officer of 4Kids.

Plaintiffs' witnesses also uniformly testified that no *written* request for foreign

withholding taxes between 2001 and 2009 had been located.   During his cross-examination, Mr.

133

Sugimoto attempted to claim, for the first time, that the failure to locate any emails on the subject could be blamed on a change to ADK's email system. No other witnesses mentioned this change; it was not raised by Mr. Sugimoto at his deposition, nor was it brought to the Court's attention by Licensor's counsel. Not only does it defy common sense that something so significant to Licensor's position would not have been included in prior testimony, but it also cuts against Licensor's assertion that it had received no tax certificates, as such certificates could have been included in emails that may have been "lost" during the alleged email system change. Simply put, in the absence of any evidence that such a change in ADK's email system in fact occurred or that no email archives were created at the time of the alleged change, the Court cannot conclude that this testimony is credible.

The parties also agree that foreign withholding taxes were listed on the quarterly participation statements that were provided to Licensor. Mr. Kasai, Plaintiffs' tax expert, admitted that if one of his clients received a participation statement referencing foreign withholding taxes, the first thing he would advise his client to do would be to ask for the certificates. Instead, Licensor, a large Japanese public company with an internal accounting department and an external accounting firm, failed to ask for tax certificates and, prior to Mr. Elliott's audit in 2010, Licensor never complained to 4Kids about the type of evidence that had been provided under the License Agreements.

Moreover, it is difficult to credit Licensor's current allegations that, for numerous years, it has maintained that 4Kids failed to provide proper "evidence of payment" in accordance with Paragraph 4(g) of the agreements given that, during the 2008 re-negotiation of the 2001 Agreement, Licensor failed to request any change to the language of Paragraph 4(g). Indeed, Licensor did not suggest that the term "evidence" be replaced with the term "certificate," or even

134

that the term "certificate" be added to Paragraph 4(g).  A party's acceptance of performance in conflict with his proposed interpretation of the contract, without comment or protest, presents a strong showing that the contrary interpretation was the intent of the parties.  *Record Club of Am., Inc. v. United Artists Records, Inc.*, 1991 WL 73838, at *12 (S.D.N.Y. Apr. 29, 1991) ("UAR's course of performance in accepting without protest payments based on Record Club's interpretation of the excess-free provision warrants a finding that this reflected the intent of the parties and was a practical construction of the contract.").  This is particularly true where, as here, the party is represented by counsel and advisors.  *Jobim v. Songs of Universal, Inc.*, 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) ("Plaintiffs, represented by sophisticated counsel and accounting advisors, failed to object to this calculation.  After receiving 'net receipts' royalty payments for over thirty years, and failing to object, Plaintiffs cannot now argue for an 'at source' royalty arrangement.").  Licensor's failure to object or otherwise comment about 4Kids' provision of evidence pursuant to the agreements over a ten-year period negates Licensor's new-found position that 4Kids did not comply with Paragraph 4(g) of the License Agreements.  *See Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 459 (2004) (finding repeated performance over contracts ranging from 23 to 59 years in duration without objection or comment constituted extrinsic evidence as to which interpretation should prevail).  Whether the issue of the 4Kids' tax certificates simply "fell between the cracks" of one or more of Plaintiffs' accounting departments, or whether Plaintiffs made a deliberate decision to not seek tax credits or deductions, remains a mystery; 4Kids, however, cannot be faulted for relying on the course of conduct that had developed since the inception of the 2001 Agreement and on contractual language that was adopted verbatim in the 2008 Agreement.

135

## 2.    Licensor Has Demonstrated No Tax Injury

Licensor has conflated two distinct issues related to foreign withholding taxes: (i) whether 4Kids "substantiated" its deductions of foreign withholding taxes as determined by Mr. Elliott's audit[96] and (ii) whether Licensor suffered any actual injury, in the form of a higher tax bill, as a result of 4Kids' alleged breach of the License Agreements.   Despite Licensor's assertion of a tax injury in connection with Finding 3, Mr. Elliott admitted that he does not know whether, as a matter of Japanese tax law, ADK could have relied (or did rely) on any of the tax certificates that he found to be "unsubstantiated" in order to claim foreign withholding tax credits.   He also testified that he could not conclude that Licensor was injured in the amount of Finding 3 because that conclusion would require an understanding of Japanese tax law, which he does not possess.   Instead, Mr. Elliott summarized his audit Finding as whether he could identify "unsubstantiated" tax deductions, not as whether Licensor could have taken a tax credit or recovered a certain amount from 4Kids.   Significantly, Mr. Elliott admitted that while he valued Licensor's tax related claim against 4Kids at $2,265,767.16, he could not conclude that Licensor was "injured" in this amount.   In making his Finding, Mr. Elliott relied on an inconsistent and subjective standard which did not employ any accepted accounting principles.   The Court finds that, for all of these reasons, Finding 3 was not properly included as an audit claim, and it cannot serve as a basis for termination of the 2008 Agreement.

There is no basis on which the Court can conclude that Mr. Elliott's tax-related Finding establishes that Licensor was injured in the amount of $2,265,767.16.   A finding of an actual

---

[96]      Stated differently, since Mr. Elliott's audit mandate was to determine whether 4Kids had underpaid royalties to Licensor, he should have confirmed that when 4Kids reported a net royalty proceeds amount to Licensor (*i.e.*, gross proceeds less foreign withholding taxes), 4Kids' sublicensee had actually remitted the withholding taxes to the foreign taxing authority and had not remitted such amount to 4Kids.   Mr. Elliott did not pursue this area of inquiry.   *See* ¶¶ 115 – 119, *supra*.

injury here depends on whether Licensor was unable to claim foreign withholding tax credits, not whether or not tax certificates were located in 4Kids' files or included a reference to Licensor or the Yu-Gi-Oh! property.  However, Licensor has not presented any evidence to support any actual tax injury.

In fact, based on the evidence presented, the Court is unable to determine (i) whether tax credits were claimed by any of the Licensor entities based on the tax certificates included in Finding 3 and (ii) whether, as Plaintiffs claim, ADK was the only member of the Consortium entitled to claim such credits on its Japanese tax returns.  Mr. Elliott's conclusion that certain tax certificates were "unsubstantiated" was drawn without any investigation on his part as to whether such certificates were provided to Licensor either by 4Kids or by sublicensees, and it is possible that Licensor was in fact in possession of some or all of the allegedly "unsubstantiated" certificates and may have used them to claim tax credits on Japanese tax returns.

Similarly, with regard to those tax certificates that Mr. Elliott deemed "unsubstantiated" because they did not reference Licensor or Yu-Gi-Oh! property on their face, Mr. Elliott admitted that he does not know whether or not Licensor could have claimed foreign withholding tax credits based on any of such certificates.  Mr. Elliott could not say whether or not Licensor had claimed credits with respect to any or all of the $2.26 million which he deemed to be "unsubstantiated," although he admitted that there would be no value to the alleged injury claim he put forth in his report if Licensor received certificates directly from subagents.  Moreover, even based on his own "methodology," Mr. Elliott's Finding was erroneous because substantially all of the tax certificates deemed "unsubstantiated" by Mr. Elliott for this reason did indeed

137

contain a Yu-Gi-Oh! notation on their face, other than those relating to the withholdings of the Mattel subsidiaries. *See* footnotes 29, 94, *supra*.

Licensor claims that ADK is the only entity in the Consortium entitled to claim foreign withholding tax credits, but it has introduced no agreement into evidence which supports this assertion.[97]   Furthermore, the License Agreements themselves establish that TV Tokyo is a Licensor that is entitled to claim tax credits under Section 4(g) of the agreements, and evidence was presented at trial that TV Tokyo received certificates directly from sublicensees.[98]   In addition, the Court finds credible the testimony of Mr. Tokuhiro, 4Kids' tax expert, that, based on his review of the License Agreements, it did not appear that ADK was the only Licensor entity entitled to claim foreign withholding tax credits related to the income generated pursuant to the License Agreements.

Mr. Kawasaki, the sole representative of TV Tokyo to appear in this Adversary Proceeding, presented contradictory testimony as to which entities within the Consortium were entitled to take foreign withholding tax credits.  At trial, he testified that only ADK could take such credits, although at his deposition he stated he did not know which entities were entitled to take the credits.  Given this inconsistency and the other inconsistencies in Mr. Kawasaki's testimony (*see* footnote 27, *supra*), the Court cannot rely on Mr. Kawasaki's statement that ADK was the only entity that could take such credits.

---

[97]    Because Licensor has not produced ADK's complete tax returns for the years 2001 to 2009 or provided any other evidence of ADK's alleged tax injury, there is no way to determine whether or not ADK claimed the net income from foreign licensees and thus deducted the value of these credits and received, at least some, tax benefit. There is also no way to determine whether or not ADK was even eligible to claim additional foreign withholding tax credits, or whether it was at or near the limit for such credits.

[98]    Without access to TV Tokyo's tax returns, there is no way for the Court to confirm that TV Tokyo did not claim any foreign withholding tax credits related to Yu-Gi-Oh!.

### 3.    Even If ADK Suffered a Tax Injury, It Cannot Recover From 4Kids Due to Its Own Inaction

It would be inequitable to allow ADK to recover from 4Kids for its alleged tax injury in light of the evidence demonstrating that it took no actions to minimize such injury.  Here, Licensor had several opportunities to mitigate, none of which it exercised.  First, as discussed above, assuming Licensor did not receive the withholding tax certificates, there is no credible evidence that Licensor ever requested them from 4Kids.  Had this request been made, Mr. Foster testified that 4Kids would have timely provided the certificates.

Second, Licensor could have submitted to the Japanese National Tax Authority an alternative to a withholding tax certificate, such as a letter which evidenced proof of the payment of taxes, in order to claim foreign withholding tax credits, had the certificate not been available. In fact, both Mr. Tokuhiro and Mr. Kasai testified that, after reviewing the foreign tax credits section of a portion of ADK's 2004 tax return admitted into evidence, ADK had claimed foreign tax credit based on letters, rather than on the certificates, as evidence of proof of payment of taxes.  This undermines Plaintiffs' position at trial that, without the actual withholding tax certificates, they could take no tax credits.  In addition, despite ADK's clear knowledge that documents other than certificates could be used to claim foreign withholding tax credits, there is no evidence that ADK ever asked 4Kids to provide alternative documentation as proof of payment of foreign withholding taxes by 4Kids' sublicensees in order for ADK to file for tax credits in a timely manner.[99]    Had Licensor submitted letters or other evidence of foreign withholdings taxes and claimed tax credits in a timely manner, Licensor would have been able to amend a tax return to claim additional foreign withholding tax credits.

---

[99]    The evidence demonstrates that, on at least one occasion, Licensor requested such a letter from 4Kids to evidence the payment of U.S. withholding taxes, but no such request was made concerning the payment of foreign withholding taxes.

Third, foreign withholding tax certificates amounting to $1,152,049.89 in credits were provided to Mr. Elliott in the course of his audit, and further certificates amounting to $880,680.14 in credits were provided to Licensor following Mr. Elliott's audit.  ADK (or another Licensor entity, as appropriate) could have, as a matter of right, amended its tax return to claim foreign withholding tax credits with respect to the past one year, and petitioned the Japanese National Tax Authority to amend its tax return to claim credits related to payment between 2005 and 2009.  There is no evidence of any effort to do so.  According to Mr. Tokuhiro, had the Japanese National Tax Authority agreed with a petition filed by ADK to amend ADK's returns for the years 2006 through 2009, ADK could have recovered credits of approximately $1.1 million.  Had such petition been filed by ADK prior to the fifth anniversary of the original filing date for the years 2005 through 2009, and the Japanese National Tax Authority agreed with such petition, Mr. Tokuhiro testified that ADK could have recovered approximately $1.6 million in tax credits.  The Court finds this testimony credible, and Plaintiffs submitted no contradictory evidence which would cause the Court to question Mr. Tokuhiro's testimony in this regard.

Licensor's clear failure to attempt to minimize any of its alleged damages, either by (i) requesting missing tax certificates from 4Kids, (ii) requesting additional information or documentation needed to claim tax credits, or (iii) petitioning the Japanese National Tax Authority for permission to amend tax returns to account for the new certificates provided to Mr. Elliott strongly militates against the conclusion that 4Kids should be held liable for any tax injury allegedly suffered by Licensor.

### H.    Findings No. 1 and No. 2: Unreported Funimation Home Video Revenue - $1,967,000.00 and Unreported Majesco Home Video Revenue – $91,666.50[100]

Audit Findings 1 and 2 reflect Plaintiffs' contention that 4Kids "surreptitiously excluded" from Plaintiffs' portion of Gross Income at least (a) $1,967,000 of income that it received in the form of service fees from Funimation and (b) $91,666.50 that it received in the form of service fees from Majesco. *See* Plaintiffs' Post-Trial Memorandum at p. 43. Plaintiffs allege that 4Kids' failure to include these service fees in Plaintiffs' portion of Gross Income constitutes a breach of the Gross Income provision of the License Agreements. Licensor's claim to half of these service fees rests on, among other things, an incorrect proposition – that the service fees paid to 4Kids by Funimation and Majesco should have been included as part of Gross Income because 4Kids was obligated under the License Agreements to provide such services to its home video licensees – and reflects a misunderstanding of Paragraph 1(b)(iii) and its relationship with the Gross Income provision in Paragraph 4.

Based on the evidence presented and the Court's interpretation of the relevant paragraphs of the License Agreements, the Court finds that 4Kids, through its entity 4Kids Home Video, exercised the home video rights itself and the services fees paid to 4Kids by Funimation and Majesco were not royalties paid for the "exploitation" or "license" of the home video rights; rather, such fees were paid as compensation for actual services rendered by 4Kids to Funimation and Majesco as its distributors. Funimation and Majesco were not 4Kids' sublicensees. Accordingly, 4Kids was only obligated (i) under the 2001 Agreement, to pay to Licensor half of the 20% royalty of the wholesale selling price charged for the Home Video Devices (because such royalty was treated as Gross Income and divided 50-50) and (ii) under the 2008 Agreement,

---

[100]    The Court will address Findings 1 and 2 together, as they were handled together at trial and raise the same issues of law and of interpretation of the License Agreements. For the sake of convenience, references in this Section may be to Funimation only, but the conclusions in this Section H are applicable to both Findings 1 and 2.

to pay to Licensor 100% of the 20% royalty payment (because such royalty was no longer treated as Gross Income).[101]    The service fees received by 4Kids were not royalty payments that should have been included in such amounts.

> **1.    4Kids Exercised the Home Video Rights Itself Pursuant to Paragraph 1(b)(iii) of the License Agreements and Earned Service Fees from its Distributors for Separate Services Rendered**

The evidence shows that 4Kids created its own home video subsidiary, 4Kids Home Video, for the purpose of exercising the home video rights to Yu-Gi-Oh! and certain other properties represented by 4Kids.  In continuing to exercise its rights to the "exploitation or license of the [YGO] Rights to the Property in the Territory" pursuant to the License Agreements, 4Kids Home Video retained control over the content of each Yu-Gi-Oh! home video release in the U.S. and over the advertising and marketing of such Yu-Gi-Oh! home videos.[102]    In addition, the evidence shows that 4Kids Home Video incurred $6.9 million in expenses, at least half of which are attributable to the Yu-Gi-Oh! titles released by 4Kids. Licensor did not dispute any of these facts.

---

[101]    In the 2001 Agreement, Paragraph 1(b)(iii) provides that "[i]f 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty of twenty percent (20%) of the wholesale selling price charged for the Home Video Devices.  Such royalty payment shall be part of Gross Income and shall be divided among the parties as provided below in Paragraph 4."  Ex. T-6.

In the 2008 Agreement, Paragraph 1(b)(iii) was revised to provide that "[i]f 4Kids exercises the Home Video Rights to the Episodes and any Additional Episodes itself, 4Kids shall pay Licensor a royalty to be negotiated in good faith of between 15% and 20% of the wholesale selling price, net of returns, for such Home Video Devices. Such royalty payment shall not be part of Gross Income and shall not be divided among the parties as provided below in Paragraph 4 but rather shall be paid exclusively to Licensor."  Ex. T-11.

[102]    Specifically, as noted in the Findings of Fact above, in exercising the home video rights under the License Agreements, 4Kids Home Video controlled (a) the number of Yu-Gi-Oh! home video releases; (b) the number of Yu-Gi-Oh! television episodes to be included in each home video; (c) consumer advertising and promotion for the Yu-Gi-Oh! home video releases; (d) the contents of each Yu-Gi-Oh home! video release, including DVD "extras" such as music videos, Yu-Gi-Oh! character and trading card information and the teaser advertising on the home video release preceding the Yu-Gi-Oh! television episode; (e) pricing and "remaindering" of Yu-Gi-Oh! home video releases; and (f) packaging and point-of-sale materials.  See FF ¶ 51.

a)      *Licensor's Mischaracterization of 4Kids' Duties under the License Agreements*

Licensor spent a great deal of time at trial attempting — in vain — to draw parallels between 4Kids' practices and obligations with respect to its foreign home video licensees and its relationship with Funimation in order to argue that 4Kids was providing services that it was already obligated under the License Agreements to provide to its Yu-Gi-Oh! foreign home video licensees (and thus, the service fees paid to 4Kids were actually royalty payments that should have been treated as Gross Income).  Simply put, the evidence adduced at trial demonstrates the opposite.

The Funimation Services Agreement provides that, in exchange for certain service fees, 4Kids will provide various services related to the production, marketing, packaging, and advertisement of the home videos.  4Kids had no obligation to provide such services pursuant to the License Agreements.  At trial, Licensor attempted to (i) recharacterize the grant by Licensor to 4Kids under the License Agreements of the *right* to advertise Yu-Gi-Oh! as an *obligation* by 4Kids to advertise Yu-Gi-Oh!, in order to argue that 4Kids Home Video's advertising duties in the Funimation Services Agreement were requirements of the License Agreements and (ii) transform 4Kids' obligation pursuant to the License Agreements to provide a general Yu-Gi-Oh! "style guide" to all of its licensees into an obligation to design home video packaging and point-of-sale materials, as 4Kids Home Video did under the Funimation Services Agreement.

Neither of such attempts was successful.  On cross-examination, Mr. Shinoda admitted that the duties of 4Kids Home Video under the Funimation Services Agreement materially differed from the duties of 4Kids under the License Agreements, and neither Mr. Shinoda nor Mr. Hosaka could point to any provision of the License Agreements which required 4Kids to (1) design DVD packaging; (2) design point-of-sale materials; (3) create, prepare and place

consumer advertising; (4) produce advertising teasers; (5) produce DVD "extras"; or (6) deliver

DLT Masters, if 4Kids was licensing the home video rights to a third party.  Nor could they

identify any foreign home video licensee for which 4Kids provided those services.  FF ¶ 59.  At

trial, Mr. Newborn and Ms. Nowicki both confirmed that 4Kids does not provide these services

to its foreign home video licensees, which lends further support to 4Kids' assertion that it was

proper for 4Kids to be paid service fees for providing such services because it was not otherwise

required to do so.

> b)     *Licensor's Arguments that Funimation Was the Licensee Because
> It (i) Was Manufacturing, Distributing, and Selling the Home Videos and
> (ii) Bore the "Inventory Risk" Do Not Withstand Scrutiny*

Licensor has also attempted to argue that Funimation did not serve as a mere distributor;

rather, it contends that 4Kids licensed the home video rights to Funimation pursuant to the

Funimation Distribution Agreement by granting it the rights to "manufacture," "distribute," and

"sell" the home videos.[103]  Licensor has further asserted, as evidenced in the testimony of Mr.

Shinoda at trial, that 4Kids was not the true licensee of the Yu-Gi-Oh! home video rights because

4Kids did not carry the "inventory risk."[104]

The evidence demonstrates that home video licensees often use vendors to handle

manufacturing, distribution, and other jobs, and 4Kids need not exercise every aspect of the

home video rights itself in order to be considered the licensee.  Mr. Shinoda admitted that a

---

[103]     In Plaintiffs' Post-Trial Memorandum, they state that they do not dispute that they were aware from the very beginning that 4Kids claimed that it was exploiting the home video rights itself through its subsidiary 4Kids Home Video and that Funimation was acting as the distributor.  Their argument, however, is that, while 4Kids had represented to them that Funimation was a mere distributor, Funimation was in fact 4Kids' licensee.  *See* Plaintiffs' Post-Trial Memorandum at p. 52.

[104]     Mr. Shinoda testified that, in his view, the "inventory risk" should be with the licensee.  FF ¶ 53.

licensee need not be a manufacturer in order to be the licensee,[105] nor must a licensee distribute the product itself. The Court also finds credible Mr. Newborn's testimony that, in contrast to the activities of 4Kids Home Video, when 4Kids licenses home video rights to a third party, 4Kids retains little involvement with the home video releases and "very little control" apart from exercising rights of approval with regard to (i) the home video packaging produced by the home video licensee (as distinguished from designing the home video packaging which 4Kids Home Video did for the U.S. Yu-Gi-Oh! home video releases distributed by Funimation) and (ii) any advertising produced by the home video licensee. (9/12/2011 Tr. 174:6–20 (Newborn)); FF ¶ 52.[106]

Finally, as argued by 4Kids, Licensor's reading of the License Agreements is incorrect. The word "manufacture" as used in the License Agreements encompasses both the physical duplication of the DVDs (which was outsourced to Funimation) and the authoring and production of the home videos, *i.e.*, the steps necessary to take the bare television episodes and make them into final DLT masters ready to be duplicated (which was performed by 4Kids Home Video). In addition, the word "sell" encompasses the actual transaction to the wholesaler (which was outsourced to Funimation), but also consumer advertising and point-of-sale advertising (which was performed by 4Kids Home Video). FF ¶¶ 42, 50–51. The sharing of these tasks

---

[105]    As set forth more fully in footnote 16 *supra*, Mr. Shinoda's testimony on this point was one of several inconsistencies in his testimony at trial. He initially testified that, in his opinion, a company such as 4Kids, in order to be considered the home video "licensee," must physically manufacture and duplicate the home videos itself; but he later admitted that a licensee "[does not] necessarily have to have their own factory and hire employees" or "manage their own factory per se." (8/30/2011 Tr. 140:7–11, 141:12–143:4 (Shinoda)).

[106]    Mr. Kahn, the former Chief Executive Officer of 4Kids, also testified that he understood that the 20% royalty paid by Funimation on the wholesale price of the videos was for the content of the episodes, while the monies paid under the Funimation Services Agreement were for the additional services performed by 4Kids, such as advertising and promotion, that 4Kids would not provide had it licensed the home video rights to a third party. (8/8/11 Dep. Tr. 130:22–131:20, 132:20–136:19 (Kahn)).

demonstrates that, while 4Kids was "exercising" the home video rights, it did so by retaining rights, responsibilities, and control for itself and merely outsourcing certain tasks to its distributor Funimation.

Mr. Shinoda's argument that the party who bears the "inventory risk" should be considered the licensee also falls short. When presented with the example of Konami (the licensee for Yu-Gi-Oh! trading cards) and its former distributor, Upper Deck, on cross-examination, Mr. Shinoda admitted that he did not know whether Konami or Upper Deck had the inventory risk on the sale of Yu-Gi-Oh! trading cards. Mr. Shinoda was also asked whether he would still consider Konami the licensee of Yu-Gi-Oh! trading cards if Upper Deck had the inventory risk. After giving various inconsistent answers, Mr. Shinoda, in response to questioning from the Court, admitted that his concern was only in allocating the inventory risk between Licensor and its licensee, not between the licensee and its distributor, because Mr. Shinoda's focus was that the royalty on Yu-Gi-Oh! trading cards was paid at the time the goods are manufactured.[107] FF ¶ 53.

c)      *Licensor's "Secrecy Clause" Argument Has No Basis*

The License Agreements do not speak to the relationship between the home video licensee and its distributors or vendors, and Mr. Shinoda's reasoning in response to questioning on the Upper Deck/Konami relationship directly supports the Court's conclusion in that regard. Licensor has no legitimate concern with the service fees or any other arrangement between 4Kids and its distributor, as long as Licensor receives the appropriate amount of the 20% royalty as specified in Paragraph 1(b)(iii). As long as the 20% royalty is properly being paid (and divided

---

[107]     The facts show that 4Kids and Funimation actually shared the inventory risk. The amended version of the Funimation Services Agreement contains a provision that balanced 4Kids' right to approve marketing and pricing decisions against Funimation's risk of having unsold inventory.

50–50 between Licensor and 4Kids as per the 2001 Agreement or paid 100% to Licensor as per the 2008 Agreement), the requirements of the License Agreements are satisfied.

There is no provision in the License Agreements that requires 4Kids to disclose the business details of its distributor relationships with Licensor. Nevertheless, Plaintiffs express outrage and despair over the fact that they were allegedly never told about the Services Agreement by 4Kids. They have referred to such agreement as a "side agreement" and to its confidentiality provision as a "Secrecy Clause," implying that 4Kids intentionally hid this agreement from them. Plaintiffs have questioned the need for separate distribution and services agreements with Funimation and have accused 4Kids of using the two separate agreements to conceal the existence and details of the Services Agreement from Licensor. Notwithstanding Plaintiffs' overwrought arguments surrounding the Secrecy Clause,[108] the Court finds nothing untoward, let alone sinister, in the fact that this clause was included in the Services Agreement.

The Court cannot locate any affirmative misrepresentation in the record regarding the Funimation Services Agreement. Moreover, the Court finds credible Mr. Newborn's explanation regarding the reason for the creation of two separate agreements as well as his explanation regarding the purpose of the confidentiality provision in the Funimation Services Agreement; and no evidence was submitted by Plaintiffs to rebut this testimony.[109] Mr. Sugimoto also

---

[108] Plaintiffs' concern with secrecy is ironic, to say the least, in light of their undisclosed determination that 4Kids' alleged breaches were incurable (*see* Plaintiffs' Post-Trial Memorandum at p. 38) and their highly confidential plan to replace 4Kids as their home video licensee. (*See* FF ¶¶ 34-35, *supra*).

[109] Mr. Newborn, the drafter of the Funimation agreements, testified that the reason he created two separate agreements was, in essence, to finish the Funimation Distribution Agreement (as to which there were few business issues to resolve) and to then focus on the Funimation Services Agreement while the parties were continuing to negotiate the basic business terms. Mr. Newborn testified that he was able to use an existing home video licensing agreement as a template for the Funimation Distribution Agreement, which was drafted while the businesspeople were still negotiating the details of what would become the Funimation Services Agreement, and that it was easiest to create two separate agreements rather than attempt to merge all issues in one agreement. (9/12/2011 Tr. 185:12–186:19 (Newborn)); FF ¶ 62. In addition, because 4Kids' entry into the home video market was a material business development, 4Kids disclosed the creation of 4Kids Home Video in a press release dated May 13, 2002 — less than

(continued...)

testified that he was aware of 4Kids' May 2002 press release and was aware that Funimation was acting as 4Kids Home Video's distributor.  (Sugimoto Decl. ¶ 20).  Despite this admitted awareness, there is no evidence that Licensor ever asked 4Kids for a copy of the Funimation agreements, or inquired at all into the details of 4Kids' relationship with Funimation.  In addition, the Court notes that because the service fees received by 4Kids were listed on participation statements provided to ADK and the Services Agreement was disclosed in numerous SEC filings, Licensor also could have, through the exercise of reasonable diligence, discovered the service fees being paid to 4Kids with minimal effort and inquired further into the relationship had it decided to do so.

### 2.    Paragraph 1(b)(iii) of the License Agreements and the Misunderstanding Regarding Such Provision

Generally, under Paragraph 4(c) of the 2001 Agreement, Gross Income — defined as the "gross receipts received from the exploitation or license of the Rights" — is split evenly between the parties.  But Paragraph 1(b)(iii) of the 2001 Agreement provides that if 4Kids exercises the home video rights itself, "4Kids shall pay Licensor a royalty of twenty percent (20%) of the wholesale selling price charged for the Home Video Devices," and that the royalty shall be paid into Gross Income and split between the parties.  Applying standard rules of contract interpretation, Paragraph 1(b)(iii) controls, and Licensor's share of the home video revenues under the 2001 Agreement was limited to its share of the royalty, or 10% of the wholesale price.

It is well settled that "if there [is] an inconsistency between a specific provision and a general provision of a contract, . . . the specific provision controls." *Muzak Corp. v. Hotel Taft*

---

two weeks after signing the Funimation agreements.  (Newborn Decl. ¶ 72).  Mr. Newborn testified that the primary aim of the confidentiality provision was to prevent disclosure of the Funimation Services Agreement before the press release on May 13, 2002.  (9/12/11 Tr. 84:6-13) (Newborn)).  The evidence shows that this confidentiality provision was used by 4Kids in other agreements prior to and subsequent to the Funimation agreements.

*Corp.*, 1 N.Y.2d 42, 46 (1956); *accord Oldcastle Precast, Inc. v. U.S. Fidelity & Guar. Co.*, 458 F. Supp. 2d 131, 142–43 (S.D.N.Y. 2006); Restatement (Second) Contracts § 203(c) (1981) ("In the interpretation of a promise or agreement . . . specific terms and exact terms are given greater weight than general language[.]").  Thus, the specific provision regarding Licensor's share of the home video revenue in Paragraph 1(b)(iii) controls over the general provision for allocating Gross Income in Paragraph 4(c).

Plaintiffs argue that Paragraph 1(b)(iii) does not state that the 20% royalty shall be the *only* gross income to which Licensor is entitled, or that the 20% royalty shall override the Gross Income provision in Paragraph 4 – meaning that, under Plaintiffs' reading of the License Agreements, *all* revenue related in any way to the release by 4Kids Home Video of Yu-Gi-Oh! home videos in the U.S. (whether in the form of royalties or in the form of service fees) should be considered to be Gross Income.[110]  This interpretation, however, renders Paragraph 1(b)(iii) superfluous and is unsupported by the plain text of the provision.  Paragraph 1(b)(iii) says nothing about a minimum guarantee, nor does it say that the royalty will be "at least" twenty percent.  Furthermore, even if the provision were ambiguous, the extrinsic evidence in the record supports 4Kids' interpretation, not Licensor's.  As Mr. Newborn testified, the purpose of the provision was to put Licensor in the same position regardless of whether 4Kids exercised the rights itself or licensed them to a third party, and, in either case, Licensor would receive half of the appropriate royalty.

In addition, there is substantial evidence that, even if Licensor did not fully understand the intersection of Paragraph 1(b)(iii) with the Gross Income provision in Paragraph 4,  Licensor

---

[110]        As the Court concluded above, the service fees were not monies paid for the "exploitation" or "license" of the home video rights, and thus were properly excluded from Gross Income under Paragraph 4(c).  Under no reading of the License Agreements can such fees be considered an additional royalty on top of the existing 20% because they were not a royalty; rather they were compensation for valuable services actually rendered by 4Kids.

knew that 4Kids Home Video was receiving additional revenue from its exercise of Yu-Gi-Oh! home video rights in the U.S. and did not question this practice for almost ten years. Mr. Shinoda testified in his declaration and at trial that he knew that 4Kids was receiving additional revenue as the home video licensee.  Shinoda Decl. ¶ 15 ("It was my understanding that, if 4Kids licensed the Home Video Rights itself, it would be permitted to keep any profit that it was able to make after paying the YGO Consortium the appropriate percentage of the wholesale selling price of the home videos.").  While he later contradicted this testimony with alternative explanations for Paragraph 1(b)(iii) (*see* FF ¶ 46), a common thread throughout Mr. Shinoda's explanations was that 4Kids Home Video was receiving additional revenue as the home video licensee.

The change to Paragraph 1(b)(iii) in the 2008 Agreement also provides little reason to doubt Licensor's awareness that 4Kids was receiving additional revenue as the home video licensee over and above the royalty payment.  At the request of Licensor's outside counsel, Paragraph 1(b)(iii) of the 2001 Agreement was renegotiated in the 2008 Agreement to provide that Licensor was to receive 100% (instead of 50%) of the royalty payable by 4Kids Home Video from the exercise of Yu-Gi-Oh! home video rights in the U.S.  *See* Ex. T-34.  The ostensible reason for such renegotiation was that Licensor understood that 4Kids Home Video was receiving additional revenue as the home video licensee over and above the royalty and that, therefore, 4Kids Home Video should pay 100% of the royalty to Licensor.  Mr. Sugimoto also testified at trial that it was never ADK's belief that 4Kids had agreed to make no money off of the home videos as a result of this amendment.  FF ¶ 84.  Thus, Licensor's argument that 4Kids engaged in conduct intended to mislead Licensor is simply not credible:  Licensor, by its own

admission, knew that 4Kids Home Video was receiving additional revenue as the Yu-Gi-Oh! home video licensee.[111]

The Court concludes that, by receiving service fees from Funimation and Majesco pursuant to the respective Services Agreements, 4Kids did not breach the Gross Income provision or any other provision of the License Agreements.  4Kids was not obligated to treat such service fees as royalty payments (and thus, as Gross Income) because such service fees were not monies paid for the "exploitation" or "license" of the home video rights.  The evidence shows that such service fees were compensation for valuable services rendered by 4Kids to its home video distributors which 4Kids was under no obligation to provide pursuant to the terms of the License Agreements or otherwise.  Moreover, despite the fact that 4Kids may have outsourced certain manufacturing, distribution, and other jobs to its distributors Funimation and Majesco, 4Kids continued to "exercise" the home video rights itself, as the licensee, and it retained control over issues normally controlled by a party exercising licensed rights.  Licensor has also not demonstrated a breach of the License Agreements on account of 4Kids' failure to share the terms of the Funimation and Majesco relationships with Licensor; 4Kids was under no duty to disclose to Licensor the business details of such relationships to Licensor.

## IV.    Other Arguments Presented by Plaintiffs

Plaintiffs have raised numerous other miscellaneous arguments to justify their course of conduct prior to and during this proceeding.  Such arguments include allegations that (i) 4Kids breached the implied covenant of good faith and fair dealing, (ii) 4Kids committed a fraud by

---

[111]     As to Finding 1, 4Kids also argued that approximately $1,076,758.02 of the $1.967 million in service fees claimed by Licensor were paid more than six years prior to the effective date of the tolling agreement, *i.e.*, prior to June 1, 2004, and, as a result, Licensor is barred the statute of limitations from seeking payment of this amount. Because the Court finds that Plaintiffs have no valid claim for breach based upon the merits of Finding 1, the Court need not reach 4Kids' argument that the statute of limitations bars a portion of the claim.

(a) not disclosing the Funimation and Majesco Services Agreements to Licensor and (b) collecting withholding tax certificates while representing to Licensor that 4Kids was not doing so, and (iii) 4Kids' breaches were "incurable."

None of these arguments justifies termination of the 2008 Agreement. Plaintiffs' claim for breach of the covenant of good faith and fair dealing is duplicative of their breach of contract claim, which has already been fully addressed by the Court in this decision. The claims asserted by Plaintiffs for fraud are without support in the trial record, as the Court has found no misrepresentations made by 4Kids with respect to the Funimation and Majesco Services Agreements and no violation by 4Kids of its "evidence" obligation with respect to foreign withholding taxes under the License Agreements.

Moreover, just as the recollection and testimony of many of Plaintiffs' witnesses seems to have evolved over time, Plaintiffs' legal theories and positions also seem to have evolved to fit the facts as they developed during this proceeding. For Plaintiffs to assert now that, as of March 18, 2011, there existed an incurable breach, while still continuing to seek the $4.8 million demanded (having already accepted 4Kids' $1 million good faith payment) is troubling. Plaintiffs' credibility at every turn in these proceedings was sorely lacking, and the Court has serious concerns about Plaintiffs' good faith in this matter. Indeed, in Plaintiffs' opening statement at trial, counsel emphasized that Plaintiffs had been the victims of a breach of trust; if anyone is the victim of a breach of trust in this matter it is 4Kids.

## CONCLUSION

Licensor did not effectively terminate the 2008 Agreement. The formal requirements of Paragraphs 12(a) and 15(c) of the 2008 Agreement were not satisfied, as 4Kids never received proper and effective notice that that a cure period was running and that Licensor had triggered the 10-day termination window by sending a notice of breach. Moreover, even if notice had

been proper and the cure period had begun to run or had run, it would have been inequitable and improper for Licensor to continue negotiating with 4Kids throughout the cure period and abruptly terminate without providing a final opportunity to cure.

Even if it were the case that Licensor had properly complied with the formal notice of breach and termination requirements in the 2008 Agreement, the termination was nonetheless ineffective because the notice sent by Licensor was substantively defective. Plaintiffs' purported basis for termination – 4Kids' failure to promptly pay the royalty underpayment reflected in the audit – was improper because the amount owed to Plaintiffs, if any, was nowhere near the $4.819 million amount asserted in the termination letter and the purported notices of breach. The $4.819 million amount asserted by Plaintiffs was materially incorrect and inaccurate; therefore, it could not and did not form a valid basis for termination. Stated differently, there simply was not a $4.819 million royalty underpayment reflected in the audit. Seven of Mr. Elliott's Findings (Findings 1, 2, 3, 4, 5, 6, and 9) have either been withdrawn by Licensor or are meritless and do not reflect an underpayment or otherwise evidence a breach of the License Agreements. It bears emphasis that in the Court's view, the invalidity of any single one of these Findings is sufficient to support the ultimate conclusion that termination was ineffective. The material difference in the amount originally asserted by Licensor as its basis for breach renders termination ineffective, as Licensor based its purported termination on an incorrect aggregate audit claim amount.[112] For

---

[112]    Findings 7 and 8 are not in dispute. Together, they total $47,825.17, far less than $1,841,373.53, which is the sum of the $1 million good faith payment sent by 4Kids to Licensor plus the balance of $841,373.53 in unrecouped advances paid by 4Kids to Licensor as of March 24, 2011 (*see* FF ¶¶ 306-307, *supra*). When measured against the amount of royalties paid by 4Kids to Plaintiffs over the time period encompassed by the audit, $47,825.17 is a trivial amount. "It is in not society's interest to permit a party . . . [to use] an insignificant breach as a pretext for avoiding his contractual obligations." *SVS, Inc. v. Rabbit Ears Producs, Inc.*, 1992 WL 91183 (S.D.N.Y. Dec. 12, 1991), at *9 (citing Farnsworth on Contracts at 607).

all of these reasons, the Court concludes that the 2008 Agreement is still in effect and remains

property of the Debtor's estate.[113]


IT IS SO ORDERED.


Dated: December 29, 2011
New York, New York

                                        /s/ Shelley C. Chapman
                                        UNITED STATES BANKRUPTCY JUDGE

---

[113]    Plaintiffs characterize this result as the imposition of a specific performance remedy and charge that 4Kids is not entitled to such relief.  Plaintiffs are incorrect.  The Second Circuit has repeatedly held that a court can enjoin the attempted termination of, and order specific performance of, an agreement to supply a unique product, including an agreement to license intellectual property especially where, as here, the availability of a product is essential to the life of the business.  *See, e.g*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) (affirming preliminary injunction requiring defendant to license children's book to book publisher); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) (reversing denial of preliminary injunction where news wire service would be irreparably harmed by termination of news photograph service); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616 (S.D.N.Y. 2010) (enjoining termination of licensing and distribution agreement for medical device product).  4Kids has asserted that it is entitled to seek both specific performance *and* monetary damages for injuries caused by Licensor's breach.  The extent to which 4Kids is entitled to damages, including attorneys' fees, as a result of Plaintiffs' conduct, remains to be determined another day.